ACCEPTED
03-15-00436-CV
6313799
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/31/2015 3:00:46 PM
JEFFREY D. KYLE
CLERK

## NO. 03-15-00436-CV

_____

**IN THE COURT OF APPEALS**

**THIRD JUDICIAL DISTRICT COURT**

**AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/31/2015 3:00:46 PM
JEFFREY D. KYLE
Clerk

_____

CHARLES O. "CHUCK" GRIGSON,

APPELLANT

VS.

THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE,
THE TEXAS COMMISSIONER OF INSURANCE;
and FARMERS GROUP, INC. ET AL.,

APPELLEES

_____

On Appeal from the 261st Judicial District Court of Travis County, Texas
Cause No. D-1-GV-02-002501

_____

**APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF JURISDICTION AND REQUEST FOR EXPEDITED CONSIDERATION OF MOTION**

_____

Joe K. Longley
LAW OFFICES OF JOE K.
LONGLEY
State Bar No. 12542000
1609 Shoal Creek Blvd. #100
Austin, Texas 78701
512-477-4444

Philip K. Maxwell
LAW OFFICE OF PHILIP K.
MAXWELL
State Bar No. 13254000
1609 Shoal Creek Blvd #100
Austin, Texas 78701
512-947-5434

*Attorneys for Appellant Grigson*

**TO THE HONORABLE COURT OF APPEALS:**

**I. The 2015 order is a class certification order by virtue of its express terms.**

By its express terms, the July 6, 2015 Order of Preliminary Approval[1] now before the Court is a class certification order appealable under Section 51.014(a)(3) of the Texas Civil Practices and Remedies Code. Paragraph 2 of the 2015 order defines the classes as required by Rule 42(c)(1)(B).[2] Paragraph 7 of the 2015 order describes the notice to the class and paragraph 8 finds that the notice is "the best notice practicable under the circumstances" as required by Rule 42(c)(2)(B).[3] Paragraph 5 of the 2015 order finds the "fair and adequate representation" requirement of Rule 42(a)(4).[4] The Rule 42(a)(4) "fair and adequate representation" finding in paragraph 5 of the 2015 order of preliminary approval fundamentally alters the Rule 42(a)(4) finding made in paragraph 5 of the 2003

---

[1] ORDER OF PRELIMINARY APPROVAL (July 6, 2015) ("the 2015 order"). **EXHIBIT 1**. The 2015 Order was entered pursuant to Rule 42 and the Insurance Code. 2015 Order at 2 and 5, para. 8.

[2] TEX. R. CIV. P. 42(C)(1)(B): "**Determining by Order Whether to Certify a Class Action; Notice and Membership in the Class.** . . . An order certifying a class action must define the class . . . ."

[3] TEX. R. CIV. P. 42(C)(2)(B): "**Determining by Order Whether to Certify a Class Action; Notice and Membership in the Class.** . . . the court must direct to class members the best notice practicable under the circumstances . . . ."

[4] TEX. R. CIV. P. 42(a)(4): "**Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if . . . the representative parties will fairly and adequately protect the interests of the class."

order of preliminary approval,[5] a point best made by redlining the changes made in the 2015 order.

> 5.    The Court further finds that ~~there has been no~~ <u>at no time during the course of this litigation has there been any</u> collusion <u>whatsoever</u> between the State and the Farmers Parties with respect to negotiating the Settlement Agreement and ~~that~~ the State has represented, and will continue to represent, the interest of the Farmers' policyholders fairly and adequately and without a conflict of interests.

Thus, the 2015 order makes the finding that *Rule 42(a)(4) is satisfied in 2015* based on a record made 12 years *after* the 2003 order was signed.  The Rule 42(a)(4) finding in the 2003 order *had to be altered* to meet Grigson's 2015 charges of collusion, conflicts of interest, and inadequacy of the State in representing the class.[6]

These provisions in the 2015 order tracking the certification requirements of Rule 42 unmistakably brand the 2015 order as a certification order subject to this Court's interlocutory jurisdiction.

---

[5] ORDER OF PRELIMINARY APPROVAL (June 27, 2003)("the 2003 order), para. 5.  **EXHIBIT 2**.

[6]  *See* CHARLES O. "CHUCK" GRIGSON'S FOURTH AMENDED PLEA IN INTERVENTION.  **EXHIBIT 3**.    INTERVENOR GRIGSON'S RESPONSE IN OPPOSITION TO CLASS CERTIFICATION AND PRELIMINARY APPROVAL ("Grigson's Opposition to Class Certification").  **EXHIBIT 4**.

**II. The reason the 2015 order does not say "the court hereby certifies the settlement classes" is because of the State and Farmers' agreement to abrogate this Court's jurisdiction in violation of Texas law.**

The State and Farmers do not address the express terms of the 2015 Order that make it a Rule 42 certification order. Instead, they construct a "Back to the Future" alternate reality wherein a 12-year-old class certification order approving a 12-year-old terminated class settlement[7] is "fast forwarded" to the present in an effort to support the approval of a 2015 class settlement containing different terms negotiated under different circumstances, neither of which were present or addressed when the 2003 order was entered.

Why would the State and Farmers agree to go to such extremes to avoid entry of a 2015 order that contains the words "the court hereby certifies"? There is only one answer—to try to abrogate this Court's statutory jurisdiction over this appeal. The settlement history of the last two years in this case proves the point.

On August 23, 2013, the State and Farmers filed their joint motion to approve a 2013 settlement,[8] the predecessor settlement to the 2015 settlement now

---

[7] Grigson's Opposition to Class Certification at 4-7 (detailing the termination of the 2003 settlement agreement and 2003 certification order).

[8] STATE OF TEXAS AND FARMERS PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION AND CLASS NOTICE (August 23, 2013) ("the 2013 motion") **EXHIBIT 5**. The 2013 motion sought approval of the SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION. (August 29, 2013) ("the 2013 Settlement"). **EXHIBIT 6**. In the record in the trial court, the 2013 agreement is frequently referred to as "SASA."

before the Court. In their motion to approve the 2013 settlement, the State and Farmers said that:

> Approving a class action settlement as to a putative class is generally a multi-step process. *Only the first step is to occur at the upcoming hearing--**preliminary approval of the proposed settlement and conditional certification of a temporary class**.*[9]

Consistent with the 2013 Motion, the 2013 Settlement, under the heading "**CERTIFICATION OF SETTLEMENT CLASSES**", said that "[t]he Parties agree that the Court may enter an order conditionally certifying the Settlement Classes"[10] and that an order of preliminary approval be entered "substantially in the form of Exhibit A hereto."[11] The order marked Exhibit A states that "this Court hereby certifies, for purposes of effectuating the Settlement Agreement, the following Settlement Classes."[12]

On April 28, 2014—the day before the preliminary approval hearing on the 2013 settlement—Grigson filed his Plea in Intervention as a policyholder member of the putative class and as an owner of the Exchanges.[13] Grigson prayed that the

---

[9] 2013 Motion at 17-18 (citations omitted and emphasis added).

[10] 2013 Settlement at 8, para. 4.

[11] 2013 Settlement at 8, para. 3.

[12] 2013 "Proposed Order" at 2, para. 2 (attached as Exhibit A to 2013 settlement). **EXHIBIT 7 here.**

[13] Grigson's Plea in Intervention and Objection to Preliminary Approval of Second Amended Settlement. ("Grigson's Original Plea in Intervention.") **EXHIBIT 8**.

2013 settlement not be approved because there was a conflict between the policyholder-owned Exchanges (who were paying all of the settlement) and Farmers Group Inc. (who was paying nothing);[14] there was a conflict "created by one firm, Fulbright and Jaworski, representing both FGI and the Exchanges;"[15] and because the State was an inadequate class representative having agreed to surrender the State's jurisdiction to consider FGI's high management fees in making rate decisions in the future and having agreed to accept $2 million of policyholder money for case "expenses," terms that directly conflict with the interests of the class.[16] Of particular importance to the matter before this Court now, Grigson also pled that a new certification hearing and order was required because the 2003 settlement was different from, and had been expressly superseded by, the 2013 settlement: "Previous certification of the 2003 Classes did not certify anything pursuant this 2013 settlement."[17]

On April 29, 2014, the trial court rejected the 2013 settlement. Acknowledging Grigson's objections and those of the two other intervenors, the court expressed concern that the settlement would "obliterate" another Texas class

---

[14] Grigson's Original Plea in Intervention at 7-8. **EXHIBIT 8**.

[15] Grigson's Original Plea in Intervention at 7. **EXHIBIT 8**.

[16] Grigson's Original Plea in Intervention at 8-9. **EXHIBIT 8**.

[17] Grigson's Original Plea in Intervention at 5. **EXHIBIT 8**.

action against Farmers where a litigation class has already been certified;[18] that the settlement lacked class compensation for the lost time value of money;[19] and that there were questions concerning the "representational conflict" of a single law firm representing the exchanges and the corporation and "potential for unfairness to the exchanges vis-a-vis the corporation." The trial court told the State and Farmers this issue would have to be addressed before the court could grant even preliminary approval of a settlement in the case.[20]

The trial court's rejection of the 2013 settlement triggered its termination clause, which provided that:

> The Farmers Parties do not agree to certification of the Settlement Classes for any purpose other than to effectuate this Settlement Agreement. *In the event that the Court were not to approve and certify the Settlement Classes in all respects as defined in this Settlement Agreement (1) any stipulations and agreements made herein are null and void* and (2) it is understood that the Farmers Parties would challenge the certification of a litigation class . . . .[21]

On September 4, 2014, at the hearing on "Farmers Parties' Motion to Strike Grigson's Intervention," Farmers' lawyer said he didn't think the court had actually rejected the 2013 settlement. The court disagreed.

---

[18] 04/29/2014 Tr. at 56. **EXHIBIT 9**.

[19] Id. at 29-31.

[20] Id. at 49-50.

[21] 2013 Settlement at 8, para. 2. (Emphasis added.) **EXHIBIT 6**.

THE COURT: Well, I haven't approved this settlement agreement. In fact, I rejected it. So you are now in a posture where you don't agree with the class action. And in fact, you were the party who wanted the class action 12 years ago. *So it seems to me we're back at square one with no settlement agreement, no certified class . . . .*[22]

THE COURT: I thought I was pretty clear on April 29th I'm declining to approve the second amended settlement agreement. I thought that was pretty clear, and I thought that you and I had that sort of meeting of the minds at the beginning of this hearing, but I guess if I wasn't clear, I'm hopefully clear now.[23]

On March 4, 2015—nearly 11 months after rejection of the 2013 settlement on April 29, 2014, the State and Farmers filed the new 2015 settlement. To prop up an argument that the trial court had not *really* rejected the 2013 settlement, and therefore the 2013 settlement had not *really* terminated, and therefore the 2003 certification order *really* was still good, the State's and Farmers crafted the 2015 settlement as a "Supplement" to the 2013 settlement, which they attached as an exhibit along with all of its exhibits.

It is the 2015 Supplement that contains the State's and Farmers' agreement to abrogate this Court's jurisdiction. Under the heading "**CERTIFICATION OF SETTLEMENT CLASSES"**, the State and Farmers agree that:

> As to Section III of the [2013] Settlement Agreement on "Certification of Settlement Classes," the Parties acknowledge and agree that the District Court has certified the Settlement

---

[22]  09/4/2014 Tr. at 55:9-15. (Emphasis added.)  **EXHIBIT 10**.

[23]  *Id.* at 57:16-23.

Classes in its Order of Preliminary Approval (June 27, 2003), that was appealed to the Third Court of Appeals and the Supreme Court, which affirmed the Order of Preliminary Approval, and the case was ultimately remanded to the District Court on March 9, 2010. Accordingly, *the Parties have satisfied the requirement of seeking certification of the Settlement Classes for purposes of Paragraphs 1-4* of Section III of the Settlement Agreement, although the other conditions of Paragraph 2 still apply.[24]

In other words, the State and Farmers agree in 2015 to change the 2013 settlement so that it says that "The State shall ***not*** file a motion for preliminary approval that requests the Court to enter an Amended Order of Preliminary Approval substantially in the form of Exhibits A" (which, it will be recalled, contains the words "the Court hereby certifies") and to say "[t]he parties do ***not*** agree that the Court may enter an order conditionally certifying the settlement classes and appointing the State, through the Attorney General, as class representative and class counsel."

Of course, the State's and Farmers' unlawful agreement to abrogate this Court's jurisdiction was not self-executing. To complete the deal, Farmers and the State needed the trial court's cooperation. First, they needed the trial court to ignore the order that was a defined term in and part of the 2015 Settlement because that order *does* contain the words "the court hereby certifies." Next, they needed the trial court to sign a new order that is not part of the 2015 settlement agreement

---

[24] SUPPLEMENT TO THE SECOND SETTLEMENT AGREEMENT AND STIPULATION (March 4, 2015) (the "Supplement") at 2, para.III. (Emphasis added.) **EXHIBIT 11**.

the court is approving, an order that removes the words "the court hereby certifies." Finally, they needed the trial court to stick with the plan and overrule any objection that the new order did not comply with Rule 42. Farmers and the State got all they wanted from the trial court, and the trial court gave all of it to them knowingly and willingly, as the transcript of the hearing plainly shows.

> MR. LONGLEY: I want to make an objection on the record before we go off the record, Your Honor, regarding the form of the order that you're about to sign. We object to the form.
>
> THE COURT: Then tell me what the defect is in the form of the order.
>
> MR. LONGLEY: The defect is that, number one, we were just handed this order. It was not attached as part of the moving papers. The one that was attached to the moving papers in Paragraph 2 says this Court hereby certifies classes, and this is the first time we've seen an order that does not certify classes.
>
> THE COURT: That's because their position, as you know, all along in this joint motion has been that the class was previously certified -- or the Court gave preliminary approval before, it's come back to the Court and that the class has never been decertified. That's -- has that been your argument?
>
> MS. GREER [for Farmers]: Yes, Your Honor.
>
> MR. GODBEY [ for the State]: Yes, Your Honor.
>
> THE COURT: And so what you like about that other order is that it suggests that I have to go back and recertify the class, and that's what you'd like me to put in the order, right?
>
> MR. LONGLEY: Either that or that you refuse to certify a class in this particular order for the reason that you're adopting their

view that it's already been certified and you're applying that certification in 2003 to this new 2015 settlement.

THE COURT: No, I understand what they're doing in this order, and I thought about that very thing as I read it, just as you did, and I am going to sign the order as they've presented it.[25]

* * *

MR. LONGLEY: I guess what I need to know is the Court not going to entertain any alternative order to refuse with regard to what we might want to submit?

THE COURT: I'm not going to entertain any substantive differences, that's correct.

MR. LONGLEY: Such as the certification.

THE COURT: That's correct. That's exactly right.

MR. LONGLEY: We're addressing that right now.

THE COURT: Exactly, we are addressing that right now. And I understood that from the briefing you gave me in advance of this hearing that you were each trying to spin my prior comments on the record to be a "oh, we need to recertify this class" from your perspective and "no we don't" from their perspective. I understood that completely.

MR. LONGLEY: And I think I do, too, Your Honor, that this particular settlement that you're approving will not have a separate certification or refusal to certify.

THE COURT: It's going to be the order they've proposed.[26]

---

[25]  07-02-2015 Tr. pp. 116-136 at 122:5-123:12.  **EXHIBIT 12.**

[26]  07-02-2015 Tr. at 133:20 – 134:18.  **EXHIBIT 12.**  In their haste to get their deal done, Farmers and the State tendered the trial court an order that is missing its paragraphs 3 and 4.

But the jurisdiction of the courts cannot be abrogated by agreement. *Walls Regional Hosp. v. Altaras*, 903 S.W.2d 36, 40-41 (Tex. App.—Waco 1994, orig. proc.). Nor can it be abrogated by a trial court. The State's and Farmers' agreement to suppress an order that says "hereby certifies" cannot oust this Court of its jurisdiction to review an order that, despite their efforts and the complicity of the trial court, is so clearly within its jurisdiction.

Indeed, the proper invocation of this Court's interlocutory jurisdiction does not require that an order say *anything* about classes, certifications or the myriad other matters in Rule 42. *Phillips Petroleum Co. v. Yarbrough*, 405 S.W.3d 70, 80 (Tex. 2013); (holding appealable an order denying a motion to sever a new claim made after a litigation class had been certified because "the new claim raises concerns about the propriety of certification that, regardless of whether certification is ultimately ordered or upheld, were not present or considered with respect to" the class claim previously certified). The substantial changes the State and Farmers made to the 2003 settlement;[27] the gross conflict between the State

_____

These are paragraphs they excised from the order that is part of the settlement agreement where the court appoints class counsel and "hereby certifies" the classes. In the trial court's haste to give Farmers and the State everything they wanted, the court signed it, providing graphic proof of the trial court's wholesale abandonment of its duty of "heightened scrutiny" and "rigorous analysis."

[27] The changes in the 2003 settlement made by the 2013 settlement, are shown in redline comparisons submitted by the State and Farmers as Exhibit 2 to the 2013 settlement. See **EXHIBIT 13**. The changes in the 2013 settlement made by the 2015 Supplement require reading the Supplement and then comparing the affected provisions in the 2013 settlement that is

and the policyholder classes raised by the State's decision to dump the millions of dollars of undistributed settlement money into the State's unclaimed property fund in violation of last year's decision by the Supreme Court in *Highland Homes v. State*[28] that undistributed funds of a class settlement are "claimed" by the class representative and hence may not be sent to the Comptroller's "unclaimed property fund";[29] the State's and Farmers' outrageous and prohibited *ex parte* contact with the trial court on the evening before the hearing on Grigson's Motion to Disqualify Farmers' conflicted lawyers;[30] and the State's and Farmers' collusion in creating

---

attached to the 2015 Settlement and to the 2015 Joint Motion for Preliminary Approval. ("The 2015 Motion.") **EXHIBIT 14**.

[28] 448 S.W.3d 403 (Tex. 2014).

[29] In reality, there is no "fund" for unclaimed property. The State spends the money "the moment it is received." *Clark v. Strayhorn*, 184 S.W.3d 906, 908 (Tex.App.—Austin 2006), *cert. den.* 549 U.S.995 (2006) (quoting testimony of the Comptroller's office).

[30] Grigson's Opposition to Class Certification at 14-23. **EXHIBIT 4.** The claim of a conflict of interest of the lawyers for the Exchanges and FGI was not addressed in 2003, as the trial court recognized when rejecting the 2013 settlement on April 29, 2014.

> THE COURT: . . . I don't remember in that trial what discussion there was or evidence there was about the issues raised by Mr. Woods Intervenor and now amplified and somewhat clarified by Mr. Longley's intervention about the tension and even the representational conflict, they say, by a single law firm representing the exchanges and the corporation. That was -- that's really interesting to me, and I don't -- I was searching my memory bank for whether that was touched upon at all in that week-long trial, and I just couldn't remember anything. (04-29-2014 Tr. at 48:13-23).

> THE COURT: . . . Here's my question. I don't remember anybody challenging whether that was fair to the exchanges vis-a-vis the corporation. I don't remember that issue of the tension between the exchanges and the corporation being flushed out in that trial.

the artifice of "no certification" just to avoid this Court's jurisdiction—all occurred years *after* the 2003 order was entered and, in the words of the Supreme Court in *Phillips Petroleum*, "were not present or considered" then. But Grigson has no need to urge *Phillips Petroleum* to uphold the jurisdiction of this Court. The 2015 Order is not a certification order disguised as something else. The 2015 Order *is* a class certification order by virtue of its express terms, and the State and Farmers' collusive agreement to make it seem otherwise must fail.

### III. The Court must stay notice to protect its jurisdiction and avoid irreparable harm to the policyholders whose money is to be used to pay the costs of notice.

Section 51.014(b) of the Texas Civil Practice and Remedies Code automatically stays the "trial" and "all other proceedings in the trial court" pending resolution of an appeal of an interlocutory class certification order. In the class action context, a reasonable construction of "trial" includes the final fairness hearing, which the 2015 order sets for February 1, 2016.[31] Likewise, a reasonable construction of "other proceedings in the trial court" includes the sending of class notice, which the 2015 order mandates be done by September 7, 2015. To construe the statute any other way would permit the class to be notified of a hearing that cannot happen, a plainly absurd result contrary to accepted rules of statutory

---

MR. MATTAX [for the State]: I would -- I would agree with your recollection. (04-29-2014 Tr. at 49:10-16)

[31] 2015 Order at 4, para. 6. **EXHIBIT 1.**

construction. *Carreras v. Marroquin*, 339 S.W.3d 68, 73 (Tex. 2011) (stating the "absurd result" rule).

Anticipating that the State and Farmers would proceed with class notice despite the statutory automatic stay—a conclusion confirmed by the postings of the notice on several websites controlled by the State and by Farmers—Grigson has moved for an emergency stay to protect the Court's jurisdiction and prevent irreparable harm to the policyholders caused by the expenditure of policyholder money on the notice. The Court granted the same relief when this case was appealed in 2003.[32] And it should do so today. The class notice is only proper if the certification order is proper, an issue that this appeal will decide.

As the Supreme Court said in *McAllen Med. Ctr., Inc. v. Cortez*,[33] "When a trial court preliminarily certifies a settlement-only class action, the effect on the course of the proceedings is immediate, significant, and perhaps irreparable if it is later determined that the class cannot be maintained."[34] Just as in *Cortez*, the trial court here has preliminarily certified a settlement class without performing the "rigorous analysis" and "heightened scrutiny" required by Rule 42. Here, just as in *Cortez*, the settling parties want to send notice bearing the "trial court's imprimatur" in order to prime the class to participate in a settlement that too has

---

[32] **EXHIBIT 15**. (2003 Stay Order).

[33] 66 S.W.3d 227 (Tex. 2001)

[34] *Cortez* at 234.

Appellant Grigson's Response To
Appellees' Joint Motion To Dismiss Appeal                                                    15

not been subjected to the stringent requirements of Rule 42. But here, unlike *Cortez*, the Settling Parties want to use the policyholders' own money to send the notice, not only interfering with the jurisdiction of this Court but irreparably harming the policyholders should the Court overturn the order.

The reasons for staying the sending of notice in this case are compelling. The Court's authority to issue the stay is clear. No persuasive reason has been offered by the State and Farmers to support sending notice before deciding whether notice should be sent at all. Grigson prays the Court enter the order granting the stay.

WHEREFORE, PREMISES CONSIDERED, Grigson prays that the Court enter an appropriate order denying the Appellees' Motion to Dismiss Appeal for Lack of Appellate Jurisdiction and granting Grigson's Emergency Motion to Stay Sending of Class Notice. Grigson further requests that this Court grant such other relief to which he may show himself justly entitled.

Respectfully submitted,

CHARLES O. "CHUCK" GRIGSON
APPELLANT

LAW OFFICES OF JOE K. LONGLEY

_____/s/ Joe K. Longley_____
Joe K. Longley
State Bar No. 12542000
1609 Shoal Creek Blvd. #100
Austin, Texas 78701

512-477-4444 PHONE
512-477-4470 FAX

LAW OFFICE OF PHILIP K. MAXWELL
Philip K. Maxwell
State Bar No. 13254000
1609 Shoal Creek Blvd #100
Austin, Texas 78701
512-947-5434 PHONE

ATTORNEYS FOR APPELLANT,
CHARLES O. "CHUCK" GRIGSON

## CERTIFICATE OF COMPLIANCE WITH TEX. R. APP. P. 9.4(i)

I certify that the foregoing document contains 3,389 words and complies with the word limit set forth in Texas Rule of Appellate Procedure 9.4(i).

_____*/s/ Joe K. Longley*_____
Joe K. Longley

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served on the following counsel of record by eFile.TXCourts.gov electronic filing system on this the 31st day of July, 2015.

Joshua Godbey
Office of the Attorney General of Texas
P. O. Box 12548
Austin, TX 78711-2548

Sara Waitt
General Counsel
Texas Department of Insurance
P. O. Box 149104
Austin, TX 78714-9104

M. Scott Incerto
Norton Rose Fulbright
98 San Jacinto Blvd #1100
Austin, TX 78701

Marcy Greer
Alexander Dubose Jefferson & Townsend, LLP
515 Congress Ave., Suite 2350
Austin, TX 78701

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217

Joseph C. Blanks
PO Box 999
Doucette, TX 75942

_____/s/ Joe K. Longley_____
Joe K. Longley

# VERIFICATION

THE STATE OF TEXAS          §

COUNTY OF TRAVIS           §

BEFORE ME, the undersigned authority, on this day personally appeared Joe K. Longley, a person whose identity is known to me. After I administered an oath to him, upon his oath, he said the following:

"My name is Joe K. Longley, and I am capable of making this verification, and the facts in this verification are true and within my personal knowledge. I am lead counsel for Appellant Charles O "Chuck" Grigson. All documents included in the APPENDIX filed for this Response are true and correct copies of documents filed or presented to the trial court in this action. I have read the Response and the factual statements contained therein that are not otherwise established by this record are within my personal knowledge and are true and correct."

"Further, Affiant sayeth not."

_____
Joe K. Longley

SUBSCRIBED AND SWORN TO before me on this the 31st day of July, 2015.

_____
Notary Public, State of Texas
My Commission Expires: July 8, 2018

MARYANN PARRIS
Notary Public, State of Texas
My Commission Expires
July 08, 2018

**VERIFICATION OF JOE K. LONGLEY**                                    1

_____

# IN THE COURT OF APPEALS
# THIRD JUDICIAL DISTRICT COURT
# AUSTIN, TEXAS

_____

CHARLES O. "CHUCK" GRIGSON,
                                            APPELLANT
VS.

THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE,
THE TEXAS COMMISSIONER OF INSURANCE; and FARMERS GROUP,
INC. ET AL.,
                                            APPELLEES

_____

On Appeal from the 261st Judicial District Court of Travis County, Texas
Cause No. D-1-GV-02-002501

_____

**APPELLANT GRIGSON'S APPENDIX IN SUPPORT OF RESPONSE TO APPELLEES'
JOINT MOTION TO DISMISS APPEAL FOR LACK OF JURISDICTION AND REQUEST
FOR EXPEDITED CONSIDERATION OF MOTION**

_____

**EXHIBIT 1**     **7-6-2015 Order of Preliminary Approval**

**EXHIBIT 2**     **6-27-2003 Order of Preliminary Approval**

**EXHIBIT 3**     **5-15-2015 Intervenor Grigson's Fourth Amended Plea in
Intervention**

**EXHIBIT 4**     **5-15-2015 Intervenor Grigson's Response in Opposition to
Class Certification and Preliminary Approval of Class
Settlement**

**EXHIBIT 5**      **8-23-2013 State of Texas and Farmers Parties' Joint Motion for Preliminary Approval of Second Amended Settlement Agreement and Stipulation and Class Notice**

**EXHIBIT 6**      **8-29-2013 Second Amended Settlement Agreement and Stipulation**

**EXHIBIT 7**      **2013 Order of Preliminary Approval**

**EXHIBIT 8**      **4-28-2015 Charles O. "Chuck" Grigson's Plea in Intervention and Objection to Preliminary Approval of Second Amended Settlement Agreement**

**EXHIBIT 9**      **4-29-2014 Hearing Transcript**

**EXHIBIT 10**      **9-4-2014 Hearing Transcript**

**EXHIBIT 11**      **3-4-2015 Supplement to the Second Amended Settlement Agreement and Stipulation**

**EXHIBIT 12**      **7-2-2015 Hearing Transcript**

**EXHIBIT 13**      **8-29-2013 Redline Second Amended Settlement Agreement and Stipulation**

**EXHIBIT 14**      **3-6-2015 State of Texas and Farmers Parties' Joint Motion for Preliminary Approval of Second Amended Settlement Agreement and Stipulation, Supplement Thereto, and Class Notice**

**EXHIBIT 15**      **7-7-2003 03-03-00374 Third Court of Appeals Order Staying Sending of Class Notice**

# EXHIBIT 1

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

CAUSE NO. GV202501

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, and THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, and TRUCK UNDERWRITERS ASSOCIATION, | § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS

261ST JUDICIAL DISTRICT |
| Defendants. | | |

**ORDER OF PRELIMINARY APPROVAL**

This matter came on for hearing on July 1 and 2, 2015, for preliminary approval of the Second Amended Settlement Agreement and Stipulation of December 18, 2002, as amended on June 13, 2003, and as further amended on August 29, 2013, and the Supplement to the Second Amended Settlement Agreement and Stipulation of March 4, 2015 (collectively referred to as "Second Amended Settlement Agreement" or "Settlement Agreement") between the State of Texas, the Texas Department of Insurance, and the Texas Commissioner of Insurance, on behalf of Texas policyholders of the Defendants in the classes defined below (collectively, the "State") and Fire Underwriters Association, Farmers Group, Inc. d/b/a Farmers Underwriters Association,

1

Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (collectively, the "Farmers Parties"). The State and the Farmers Parties have moved jointly, pursuant to Texas Rule of Civil Procedure Rule 42(e) and Texas Insurance Code § 541.266, for an Order of Preliminary Approval ("Order") (1) preliminarily approving the settlement of all claims asserted in the above-captioned cause ("Action"), the terms of which are set forth in the Second Amended Settlement Agreement, which has been filed with the Clerk of the Court, and (2) approving the proposed notice to the Classes.

The Court having read and considered the Second Amended Settlement Agreement and attached exhibits, including the proposed Notice of Proposed Class Settlement, the proposed Claim Form, the proposed form of Final Judgment, exhibits, pleadings and record in this case, the evidence and other materials presented at the hearing, and argument of counsel and applicable authorities, finds that there exists substantial and sufficient grounds for entering this Order.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1. The Court, for purposes of this Order, adopts all defined terms as set forth in the Settlement Agreement.

2. The Court has previously certified, only for purposes of effectuating the Settlement Agreement, the following Settlement Classes ("Settlement Classes"):

    (i)    All of the Exchanges' Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed ("Rate Class");

2

(ii)    All of the Exchanges' Texas homeowners insurance policyholders who according to Farmers' records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002 ("Discount Class"); and

(iii)    All Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers who according to Farmers' records were provided or should have been provided a Credit Usage Notice from October 1, 1999, through February 28, 2003 ("Credit Usage Notice Class")

That certification decision has been affirmed in its entirety by the appellate courts of Texas. *Farmers Grp., Inc. v. Lubin*, 222 S.W.3d 417, 420, 427-28 (Tex. 2007) (holding that "the standard class action requirements must be applied generally to the claims asserted by Attorney General, not the Attorney General himself," and directing court of appeals to address intervenors' remaining points of error on remand); *Lubin v. Farmers Grp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602, at *26-32 (Tex. App.—Austin Nov. 6, 2009, no pet.) (overruling intervenors' other objections to certification).

5.    The Court further finds that at no time during the course of this litigation has there been any collusion whatsoever between the State and the Farmers Parties with respect to negotiating the Settlement Agreement and that the State has represented, and will continue to represent, the interests of the Farmers' policyholders fairly and adequately and without a conflict of interests. Accordingly, the Court preliminarily approves: (a) the Second Amended Settlement Agreement, including the terms and the releases contained in it, as being fair, just, reasonable, and adequate as to the Settlement Classes; and (b) the Settlement Funds described in the Settlement Agreement, including the Prospective Rate Reduction, Retrospective Rate Reduction, Individualized Discount Adjustment, Credit Usage Notice Fund, and the proposed additional consideration, subject to the right of any member of the Settlement Classes to exclude himself or herself from the Settlement Classes in accordance with the terms set forth in the Settlement

3

Agreement, and to show cause, if any exists, why a Final Judgment should not be entered in accordance with the terms of the Settlement Agreement.

6.     A hearing ("Settlement Hearing") shall be held before this Court on February 1, 2016, at 9:00 a.m. in the 53rd Judicial District Court Room:   (a) to determine whether the proposed Second Amended Settlement Agreement is fair, reasonable, and adequate and should be approved, and whether the Final Judgment should be entered as to claims asserted in this litigation, or which could have been asserted, against the Released Parties on the merits; (b) to determine whether the Settlement Classes members' right to adequate representation has been satisfied; and (c) to reserve jurisdiction to effect and enforce the Settlement Agreement.

7.     The Farmers Parties shall disseminate notice of the proposed Second Amended Settlement Agreement and Settlement Hearing to putative members of the Settlement Classes within sixty (60) days of the date of this Order.  The Court approves Rust Consulting, an independent third-party settlement administrator, as Farmers' agent to carry out the notice campaign and settlement administration as approved by the Court.  A copy of the Notice of Proposed Class Settlement ("Notice"), together with a copy of the Claim Form, substantially in the forms attached as Exhibits 1 and 2, shall be mailed by first-class U.S. mail, postage prepaid, to all members of the Settlement Classes at the address of each such person as set forth in the records of the Released Parties or as otherwise may be identified through reasonable effort, as more thoroughly explained in the March 28, 2014, Affidavit of Kimberly K. Ness and the May 29, 2015, Declaration of Joel K. Botzet of Rust Consulting.  In addition, commencing within seven (7) days of the date of this Order and continuing until the date of the Settlement Hearing, the Office of the Attorney General, the Texas Department of Insurance, and the Farmers Parties shall    post    on    their    respective    Internet    web-sites    (www.texasattorneygeneral.gov,

4

www.tdi.texas.gov and www.farmers.com), as well as at www.TexasFarmersSettlement.com, a Summary Notice of Settlement, substantially in the form attached as Exhibit 3 ("Summary Notice") (in both English and Spanish). The Court will permit the Parties to the Settlement Agreement to additionally post the following items on the TexasFarmersSettlement.com website: (a) a copy of the executed Second Amended Settlement Agreement (and exhibits) and (b) Commonly Asked Questions and Answers that are either approved by the Parties or ordered by the Court.

8.      The Court approves the form of the class Notice, the Summary Notice, and the Claim Form, and finds that the procedures established for mailing and distributing such notices substantially in the manner and form set forth in paragraph 7 of this Order meet the requirements of Rule 42 of the Texas Rules of Civil Procedure and §§ 541.261 and 541.267(b) of the Texas Insurance Code, and due process, and constitute the best notice practicable under the circumstances.

9.      To effectuate the provision of notice provided in paragraph 7 above, the Farmers Parties shall be responsible for the receipt of all responses from the members of the Settlement Classes and, until further order of this Court, shall preserve all entries of appearance, Claim Forms, requests for exclusion, and any and all other written communications from members of the Settlement Classes or any other person in response to the Notice. The costs of notification of the Settlement Classes as provided in this Order, including printing, mailing, and posting on the Internet of the required notices shall be borne by the Party charged with the responsibility for such actions in paragraph 7 this Order.

10.      Three (3) days before the date fixed by this Court for the Settlement Hearing, the State and the Farmers Parties shall cause to be filed with the Clerk of the Court affidavits or

declarations of the person or persons under whose general direction the mailing of the Notice and the distribution of the Summary Notice by posting on the web-sites identified in paragraph 7 shall have been made, showing that such mailing and distribution have been made in accordance with this Order.

11.     Each member of the Settlement Classes will be bound by the proposed settlement provided for in the Settlement Agreement, and by the Final Judgment or any other determination by this Court affecting the Settlement Classes, unless such member shall mail, by first-class U.S. mail, a written request for exclusion from the Settlement Classes, post-marked no later than November 13, 2015, addressed to State of Texas v. Farmers Settlement Administrator, Rust Consulting, Inc.; P.O. Box 9348; Minneapolis, MN, 55440-9348.  Such request for exclusion must state:   (a) the name, address and telephone number of the person seeking exclusion; (b) whether such person has a homeowners or automobile insurance policy from the Farmers Parties, or both; (c) the date of inception of such policy(ies) and the most recent date of renewal for such policy(ies), if available; (d) the policy number(s), if available; and (e) that the person making the request wishes to be excluded from the Settlement Classes.  Because the Settlement Agreement is intended to be a resolution of all Released Claims, any person requesting exclusion must either exclude himself or herself from the Settlement Agreement in its entirety, or submit to the Settlement Agreement in its entirety.  A request for exclusion shall not be effective unless it is made in the manner and within the time set forth in this paragraph and in the Notice.  If a member of the Settlement Classes requests to be excluded, that person will not receive any benefit from the Retrospective Rate Reduction, the Individualized Discount Adjustment, or the Credit Usage Notice Fund provided for in the Settlement Agreement, in the event the Settlement Agreement is approved by the Court.  Nor will such person be permitted to participate further in

6

the Action. Any Class Member who does not request exclusion in the manner provided for in this Order may, but need not, enter an appearance in this Action at his or her own cost through counsel of his or her own choice. If a member of the Settlement Classes does not enter an appearance, that person's interests will be represented by the State in the Action.

12. Any member of the Settlement Classes who has not requested exclusion from the Settlement Classes may appear at the Settlement Hearing, in person or through counsel, to object and be heard in opposition to any of the matters to be heard at the Settlement Hearing, including (a) the requested approval of the Settlement Agreement as fair, adequate, and reasonable, and/or (b) the requested entry of the Final Judgment. A member of the Settlement Classes cannot request exclusion from the Settlement Classes AND object to the Settlement Agreement. For any objection to be considered by the Court, the objector must mail a valid written objection, and it must be postmarked by no later than November 13, 2015. In order to be valid, the written objection must set forth: (a) a reference, at the top, to "State of Texas v. Farmers, Cause No. GV202501;" (b) a statement as to whether the objector intends to appear at the Settlement Hearing, either in person or through counsel; (c) a detailed statement of the specific basis for the objection; (d) the name that is set forth on the Notice that was sent to the objector; (e) the objector's current name, if different from the name set forth on the Notice; (f) the objector's current address; (g) the objector's current telephone number and, if available, telecopier number; (h) the objector's type of policy and policy number; and (i) the objector's signature or that of his or her authorized representative. Three copies of the written objection must be sent, the first addressed to the District Clerk of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas 78701, the second addressed to Joshua R. Godbey, Assistant Attorney General, Financial Litigation, Tax, and Charitable Trusts Division, Office of the Attorney General, P.O. Box 12548,

7

Austin, Texas 78711-2548, and the third addressed to M. Scott Incerto, Norton Rose Fulbright US LLP, 98 San Jacinto Boulevard, Suite 1100, Austin, Texas 78701. If an objection does not include all of the required information or if it is not timely mailed to the three correct addresses, then it shall be invalid, and it will not be considered by the Court. Any member of the Settlement Classes who does not object in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy, or reasonableness of the Settlement Agreement and the proposed Final Judgment. Any replies to such objections shall be filed by December 15, 2015.

13. If the Court gives final approval to the Settlement Agreement and enters a final judgment, in order to be entitled to participate in the Credit Usage Notice Fund portion of the Settlement Agreement, a member of the Credit Usage Notice Class who has not requested exclusion from the Settlement Classes must submit a Claim Form, substantially in the form attached as Exhibit 2, to the Claims Administrator at the address set forth in the Notice. Such Claim Form must be completed and postmarked on or before April 1, 2016. Any member of the Credit Usage Notice Class who does not submit a completed Claim Form and follow the process for certifying review of his or her individual credit report as provided for in section IV(4) of the Settlement Agreement shall not be entitled to share in the Credit Usage Notice Fund, but nonetheless shall be bound by the terms of the Second Amended Settlement Agreement and by the Final Judgment and any other Order of this Court approving the Second Amended Settlement Agreement, including all releases, and shall be barred and enjoined in this or any other action from asserting any Released Claims.

14. Members of the Rate and Discount Classes shall automatically receive their share of Settlement Funds within 30 days after the Effective Date of the Second Amended Settlement

8

Agreement, unless they file a written request for exclusion from the Settlement Classes as provided in paragraph 11 above.

15. The Court expressly retains the power to adjourn the Settlement Hearing, without any further notice other than an announcement at the Settlement Hearing of adjournment, and to approve, modify, or disapprove the Second Amended Settlement Agreement without further notice to members of the Settlement Classes. The Court retains jurisdiction over this Action to consider all further applications arising out of or connected with the proposed settlement.

16. The administration of the Second Amended Settlement Agreement, and the decision of all disputed questions of law and fact with respect to the validity of any claim or right of any person to participate in the distribution of the Settlement Fund, shall be under the authority of the Court. The Parties to this Second Amended Settlement Agreement, their counsel in any capacity in which they may act in implementation and fulfillment of the Settlement Agreement, and any employees or agents of such law firms or the Parties to the Second Amended Settlement Agreement (including, without limitation, those employees who may furnish services in connection with the proposed Settlement) shall not be liable for anything done or omitted in connection with the Second Amended Settlement Agreement and its administration except for their own willful misconduct.

17. The Parties to the Settlement Agreement are directed to carry out their obligations under the Second Amended Settlement Agreement.

18. In the event that the Second Amended Settlement Agreement is not approved by the Court, or the Court enters the Final Judgment and it is vacated or modified on appeal, or otherwise altered in a material way, or the Effective Date for any other reason does not occur, and if any Party to the Second Amended Settlement Agreement accordingly exercises its right to

9

terminate the Settlement Agreement pursuant to its terms, then the Second Amended Settlement Agreement and any actions to be taken in connection with it shall be vacated and terminated and shall become null and void for all purposes, and all negotiations, transactions and proceedings connected with it (a) shall be without prejudice to the rights of any Party; (b) shall not be deemed or construed as evidence or an admission by any Party of any fact, matter or thing; and (c) shall not be admissible in evidence or used for any purpose in any subsequent proceeding in the Action, or any other action or proceeding in this or any other forum, judicial, administrative, or otherwise, except proceedings to enforce the Settlement.

SIGNED _July 6, 2015_, 2015.

_____
PRESIDING JUDGE

10



# Exhibit 1

# If You Had Certain Home or Auto Insurance in Texas,

## You May Be Eligible for Benefits from a Class Action Settlement.

*A Texas court authorized this notice. This is not a solicitation from a lawyer.*

- You have been identified from Farmers' records as someone who had a homeowners or automobile insurance policy in Texas between October 1999 and February 2003.

- A Settlement has been reached with certain Insurance Exchanges and Providers ("the Defendants," *see* Question 1 for a complete list) in a class action lawsuit about the pricing and marketing of certain homeowners and automobile insurance policies. Generally, the Settlement includes Texas homeowners or automobile insurance policyholders who had certain types of insurance policies with the Defendants between October 1, 1999 and February 28, 2003 (*see* Questions 5 & 6).

- The Settlement provides payments to eligible policyholders for rate reductions or discounts on past insurance premiums and free credit reports and payments of $35 for not receiving adequate notice from the Defendants about their use of credit information (*see* Question 9).

  **Your legal rights are affected even if you do nothing. Please read this notice carefully.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM** | The only way to get a payment under the Credit Usage Fund (*see* Question 13). |
| **ASK TO BE EXCLUDED** | Get no benefits from the Settlement. This is the only option that allows you to sue the Defendants over the claims resolved by this Settlement. |
| **OBJECT** | Write to the Court if you don't like the Settlement. |
| **GO TO A HEARING** | Ask to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | Receive payment (if eligible) as a member of the Rate Class or Discount Class. Do not receive payment under the credit usage fund. Give up rights to pursue your own lawsuit about the claims this Settlement resolves. |

- These rights and options—**and the deadlines to exercise them**—are explained in this notice.

- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will only be made if the Court approves the Settlement and after any appeals are resolved. Please be patient.

QUESTIONS? CALL **1-888-222-0691** OR VISIT WWW.TEXASFARMERSSETTLEMENT.COM
PARA UNA NOTIFICACIÓN IN ESPAÑOL, LLAMAR O VISITAR NUESTRO WEBSITE.

## What This Notice Contains

**BASIC INFORMATION** ...................................................................................................... **3**

    1.    Why is there a notice?
    2.    What is this lawsuit about?
    3.    Why is this a class action?
    4.    Why is there a Settlement?

**WHO IS PART OF THE SETTLEMENT?** ............................................................................ **4**

    5.    Who is included in the Settlement?
    6.    What type of insurance policies are involved in the Settlement?
    7.    What is a Credit Usage Notice?
    8.    What if I am not sure whether I am included in the Settlement?

**THE SETTLEMENT BENEFITS** .......................................................................................... **5**

    9.    What does the Settlement provide?
    10.    What can I get from the Settlement?
    11.    When will I receive my payment?
    12.    What am I giving up to stay in the Settlement Class?

**HOW TO GET BENEFITS** .................................................................................................. **6**

    13.    How do I get benefits?

**EXCLUDING YOURSELF FROM THE SETTLEMENT** ...................................................... **7**

    14.    How do I get out of the Settlement?
    15.    If I do not exclude myself, can I sue the Defendants for the same thing later?
    16.    If I exclude myself, can I still get benefits from this Settlement?
    17.    What about other cases involving the issues in this case?

**WHO REPRESENTS ME IN THIS CASE?** ........................................................................ **8**

    18.    Who represents my interests in this case?

**OBJECTING TO THE SETTLEMENT** ................................................................................ **8**

    19.    How do I tell the Court if I do not like the Settlement?
    20.    What is the difference between objecting and asking to be excluded?

**THE SETTLEMENT HEARING** .......................................................................................... **9**

    21.    When and where will the Court decide whether to approve the Settlement?
    22.    Do I have to attend the hearing?
    23.    May I speak at the hearing?

**GETTING MORE INFORMATION** ...................................................................................... **9**

    24.    How do I get more information?

QUESTIONS? CALL 1-888-222-0691 OR VISIT WWW.TEXASFARMERSSETTLEMENT.COM

# BASIC INFORMATION

### 1. Why is there a notice?

A Court authorized this notice because you have a right to know about a proposed Settlement of this class action lawsuit and about all of your options before the Court decides whether to give final approval to the Settlement. This notice explains the lawsuit, the Settlement, and your legal rights.

Judge Scott H. Jenkins of the 261st Judicial District Court of Travis County, Texas is overseeing this case. This litigation is known as *State of Texas v. Farmers Group, Inc.,* No. GV202501. The people who sued are called the "Plaintiffs." The Defendants are: Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association.

### 2. What is this lawsuit about?

The lawsuit claims that, during 1999 to 2003, the Defendants:

- Charged rates that resulted in excessive premiums for its homeowners policies written on a form approved by the Texas Department of Insurance ("TDI") called the HO-A and used unfair or deceptive practices involving the determination of certain fees, discounts, and policy offerings, and improper use of credit scoring and certain risk assessments.

- Failed to provide adequate notices that information on certain policyholders' credit reports may have impacted their premiums or policy placement and used anticompetitive practices in the sale and marketing of homeowners and automotive insurance policies.

- Improperly stopped offering a type of homeowners policy called the HO-B.

The Defendants deny these claims and maintain they did nothing wrong.

### 3. Why is this a class action?

In a class action, one or more people or entities sue on behalf of themselves and other people with similar claims. All of these people together are the "class" or "class members." In this case, the representative entities are the State of Texas, the TDI, and the Texas Commissioner of Insurance. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class.

### 4. Why is there a Settlement?

The Court has not decided in favor of the Plaintiffs or the Defendants. Instead, both sides have agreed to a Settlement. By agreeing to the Settlement, the Parties avoid the costs and uncertainty of a trial, and Class Members receive the benefits described in this notice. The proposed Settlement does not mean that any law was broken or that the Defendants did anything wrong. The Defendants deny all legal claims in this case. The TDI, the Texas Commissioner of Insurance, and the Attorney General of Texas think the proposed Settlement is best for everyone who is affected.

# WHO IS PART OF THE SETTLEMENT?

If you received this notice addressed to you in the mail (without requesting it), then you may be a member of one or more Settlement Classes. But even if you did not receive a notice, you may be a Class Member, as described below.

## 5. Who is included in the Settlement?

The Settlement includes three Classes. You may be member of more than one Class. You are included if you are or were covered under an included Texas policy issued by one of the Defendants and you meet the following criteria:

| CLASS | TYPE OF POLICY | CLASS DEFINITION |
|---|---|---|
| Rate Class | Homeowners policy | Policy began (or was renewed) from December 28, 2001 through November 10, 2002, or you received a notice at any time after November 14, 2001, that your HO-B policy would not be renewed (*see* Question 6). |
| Discount Class | Homeowners policy | Policy where, according to Defendants' records, you are eligible under the Settlement to receive recalculated discounts on your premiums from November 16, 2000 through December 10, 2002. |
| Credit Usage Notice Class | Homeowners or automobile insurance policy | Policy where, according to Defendants' records, you were provided or should have been provided a Credit Usage Notice from October 1, 1999 through February 28, 2003. |

## 6. What types of insurance policies are involved in the Settlement?

The Settlement includes Farmers homeowners policies written on TDI-endorsed forms described as HO-A (including TDP-1), HO-B (including HO-Protector Plus, HO380 endorsement, TDP-2, TDP-3, DF-Builders Risk, and HO-A with HO-170 endorsement), HO-B-CON, and HO-B-T, and all endorsements approved by TDI for use with such forms during the time periods described above. It also includes Farmers private passenger automobile insurance policies during the same time.

## 7. What is a Credit Usage Notice?

A Credit Usage Notice is a notice of "adverse action" under the Fair Credit Reporting Act ("FCRA"), a U.S. federal law. Adverse action could mean being denied credit, receiving substandard terms from a lender, or, as in this case, receiving higher insurance rates or being placed with a different insurer because of your credit information.

As part of the claim process (*see* Question 13), Credit Usage Notice Class Members will have the opportunity to access and review a copy of their credit reports.

**8. What if I am not sure whether I am included in the Settlement?**

If you are not sure whether you are included in the Settlement, you may call 1-888-222-0691 with questions or visit www.TexasFarmersSettlement.com. You may also write with questions to Texas Farmers Settlement, P.O. Box 9348, Minneapolis, MN 55440-9348.

# THE SETTLEMENT BENEFITS

**9. What does the Settlement provide?**

If the Settlement is approved and becomes final, it will provide certain cash benefits to eligible Class Members. There are approximately 1.8 million members of the Settlement Classes, but not all Class Members are eligible to receive cash payments for rate reductions or discounts. The Defendants will pay a total of $84.38 million to those members of the Rate Class and Discount Class who are eligible to receive a payment from the Settlement. The Defendants will also provide payments of $35 to eligible Credit Usage Notice Class Members who timely file proofs of claim and follow the process outlined in the Claim Form and in section IV(4) of the Settlement Agreement (*see* Question 13).

Policyholders who renewed or received a new HO-A insurance policy from the Defendants after November 11, 2002 and before September 1, 2003, have already received an additional reduction in premiums.

More details are in a document called the Settlement Agreement, which is available at www.TexasFarmersSettlement.com.

**10. What can I get from the Settlement?**

Not every Class Member will receive a payment. The amount of your payment will depend on which Class you are in and whether you are eligible to receive a payment under the terms of the Settlement Agreement. Depending upon your eligibility, you may receive payments under one or more of the Settlement Classes. Class Members may receive the following:

| CLASS | BENEFITS | NEED TO FILE A CLAIM? |
|---|---|---|
| Rate Class | Payments for rate reductions on HO-A premiums (amounts will vary). | No, payments for rate reductions will be automatic for all eligible Rate Class Members. |
| Discount Class | Compensation for eligible Class Members based on negotiated discounts (amounts will vary). | No, payments to eligible Discount Class Members will be automatic. |
| Credit Usage Notice Class | Free access to policyholder credit report from Equifax and $35 payment if you complete the Claim Form process. | Yes (*see* Question 13). |

The Defendants also agreed to replace their Credit Usage Notice forms for Texas homeowners and automobile insurance policies with forms approved by the Texas Department of Insurance (TDI) and agreed to change certain marketing practices.

**11. When will I receive my payment?**

Class Members who are entitled to payments will receive them after the Court grants final approval to the Settlement and after any appeals are resolved (*see* "The Settlement Hearing" below). If there are appeals, resolving them can take time. Please be patient.

**12. What am I giving up to stay in the Settlement Class?**

If the Settlement becomes final, you will give up your right to sue the Defendants for the claims being resolved by this Settlement unless you exclude yourself from the case. The specific claims you are giving up against the Defendants are described in Section I of the Settlement Agreement. You will be "releasing" the Defendants and all related people as described in Section I of the Settlement Agreement. The Settlement Agreement is available at www.TexasFarmersSettlement.com.

The Settlement Agreement describes the "Released Claims" with specific descriptions, so read it carefully. If you have any questions about what this means, you can write to the Office of the Attorney General, Consumer Protection Division, P.O. Box 12548, Austin, TX 78711-2548. You can also talk to your own lawyer, if you have one.

Note: The release does not include individual claims or complaints about claims, payments, handling or processing made by individual policyholders or the TDI. The release also does not include certain claims made in two other class action lawsuits:

- *Geter v. Farmers Group, Inc.,* No. E-0167872—a class action relating to homeowners' insurance requesting a non-monetary judicial statement that Farmers acted improperly in not renewing HO-B policies for the class members, as was certified for a class action in the 172nd District Court of Jefferson County, Texas.
- *State of Texas v. Texas Farmers Insurance Company*, No. GV000271—a class action relating to automobile insurance in the 200th Judicial District Court of Travis County, Texas.

# HOW TO GET BENEFITS

**13. How do I get benefits?**

If you are a member of the Rate Class or Discount Class eligible to receive benefits under the Settlement Agreement, you will receive your payment automatically once the Settlement is finally approved. To file a claim as a member of the Credit Usage Notice Class, you must complete and submit a Claim Form. If you did not receive a Claim Form in the mail, you can request a Claim Form at www.TexasFarmersSettlement.com or by calling 1-888-222-0691. Please read the instructions carefully, fill out the Claim Form and mail it postmarked no later than **Month 00, 2015** to:

Texas Farmers Settlement
P.O. Box 9348
Minneapolis, MN 55440-9348

# EXCLUDING YOURSELF FROM THE SETTLEMENT

If you don't want benefits from this Settlement, and you want to keep the right to sue the Defendants about the issues in this case, then you must take steps to get out of the Settlement. This is called excluding yourself—or it is sometimes referred to as "opting out" of the Classes.

## 14. How do I get out of the Settlement?

To exclude yourself from the Settlement Classes, you must mail a letter that says you want to be excluded from the Settlement in *State of Texas v. Farmers Group, Inc.,* No. GV202501. Your request must include:
- Your name, address, and telephone number;
- Whether you have or had a homeowners or automobile insurance policy from the Defendants, or both;
- The date the policy(ies) began and the most recent date of renewal (if known);
- The policy number(s); and
- Your signature.

You must mail your exclusion request, postmarked no later than **Month 00, 2015**, to:

Texas Farmers Settlement Exclusions
P.O. Box 9348
Minneapolis, MN 55440-9348

You cannot ask to be excluded on the phone, by email, or at the website.

## 15. If I do not exclude myself, can I sue the Defendants for the same thing later?

No. Unless you exclude yourself, you give up the right to sue the Defendants for the claims that this Settlement resolves.

## 16. If I exclude myself, can I still get benefits from this Settlement?

No. You will not get the benefits provided if you exclude yourself from the Settlement. However, if you renewed an HO-A homeowners policy with the Defendants, the prospective Rate Reduction was reflected in your premiums between November 10, 2002 and September 1, 2003.

## 17. What about other cases involving the issues in this case?

You may have received or seen other notices about other class actions about insurance policy options, premium rates, and/or credit usage, including:
- *Fogel v. Farmers Group, Inc.,* No. BC 300142, a nationwide class in the Superior Court for the State of California for the County of Los Angeles (the "Fogel Action");
- *Geter v. Farmers Group, Inc.,* No. E-0167872 in the 172nd District Court in Jefferson County, Texas (the "Geter Action"); and
- *In re: Farmers Insurance Co., Inc. FCRA Litigation,* No. CIV-03-158-F, a nationwide class that includes all cases consolidated and coordinated in MDL No. 1564 in the U.S. District Court for the Western District of Oklahoma (often referred to as the "Mobbs Action").

If you were a Class Member in the Fogel Action, you are eligible to participate in this Settlement as well.

If you do not exclude yourself from this Settlement, you can receive benefits here and also participate in the Geter Action by seeking a judicial statement that Farmers acted improperly in not renewing HO-B homeowners policies to the class members. However, except as provided in the Settlement Agreement, you will give up all other claims, including any claims for monetary damages, related to the Geter Action.

If you filed a claim in the Mobbs Action (which was also FCRA-related), you are eligible to participate in the Rate Class and Discount Class benefits, but you are not eligible to receive a payment under the Credit Usage Fund.

## WHO REPRESENTS ME IN THIS CASE?

### 18. Who represents my interests in this case?

Your interests will be represented by the State of Texas through the Office of the Attorney General. You will not be charged for their services. By law, the Office of the Attorney General cannot represent you individually. If you want to be represented individually by your own lawyer, you are free to hire one at your own expense. You may write with any questions you may have about the information in this Notice to:

Office of the Attorney General
Consumer Protection Division
P.O. Box 12548
Austin, TX 78711-2548

## OBJECTING TO THE SETTLEMENT

### 19. How do I tell the Court if I do not like the Settlement?

If you are a member of the Settlement Classes (and do not exclude yourself), you can object to any part of the Settlement or the Settlement as a whole. To object, you must mail a letter that includes the following:

- A reference at the top to: *State of Texas v. Farmers Group, Inc.,* No. GV202501;
- Whether you intend to appear at the Settlement Hearing in person or through a lawyer (*see* Question 22);
- A detailed statement of the reasons you object to the Settlement;
- Your name (and your previous name if the name on the notice you were mailed was different), address, telephone number, and fax number (if you have one);
- Your type of policy(ies) and the policy number(s); and
- Your signature (or the signature of your authorized representative).

The requirements to object to the Settlement are described in detail in the Settlement Agreement in section VII. You must mail your objection to each of the following three addresses, and your objection must be postmarked by **Month 00, 2015**:

| COURT | ATTORNEY GENERAL | DEFENSE COUNSEL |
|---|---|---|
| District Court Clerk of Travis County, Texas 1000 Guadalupe Street Austin, TX 78701 | Joshua R. Godbey Assistant Attorney General Office of the Attorney General P.O. Box 12548 Austin, TX 78711-2548 | M. Scott Incerto Norton Rose Fulbright US LLP 98 San Jacinto Blvd., Suite 1100 Austin, TX 78701 |

## 20. What is the difference between objecting and asking to be excluded?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object only if you don't exclude yourself from the Classes. Excluding yourself is telling the Court that you don't want to be part of the Classes. If you exclude yourself, you have no basis to object because the case no longer affects you.

# THE SETTLEMENT HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak (see Questions 22 & 23), but you do not have to.

## 21. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Settlement Hearing at XX:00 x.m. on **Month 00, 2015**, at the District Court of Travis County, Texas, 1000 Guadalupe Street, Austin, TX 78701. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check www.TexasFarmersSettlement.com or call 1-888-222-0691. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them and will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

## 22. Do I have to attend the hearing?

No. The Office of the Attorney General will answer any questions the Court may have. But you or your own lawyer are welcome to attend at your expense. If you send an objection, you do not have to come to Court to talk about it. As long as you mailed your written objection on time, the Court will consider it. You may also have your own lawyer attend, but it is not necessary.

## 23. May I speak at the hearing?

You may ask the Court for permission to speak at the Settlement Hearing.

# GETTING MORE INFORMATION

## 24. How do I get more information?

This notice summarizes the proposed Settlement. More details are in the Settlement Agreement. You can get a copy of the Settlement Agreement at www.TexasFarmersSettlement.com. You also may write with questions to Texas Farmers Settlement, P.O. Box 9348, Minneapolis, MN 55440-9348 or call the toll-free

number, 1-888-222-0691. You can also request a Claim Form at the website, or by calling the toll free number.

You may also write with any questions you may have about the information in this Notice to: Office of the Attorney General, Consumer Protection Division, P.O. Box 12548, Austin, TX 78711-2548. You can also get a copy of the Settlement Agreement at that address or at www.tdi.state.tx.us. Please do not contact the Court with any questions about the Settlement Agreement.



**Exhibit 2**

Texas Farmers Settlement Administrator
P.O. Box 9348
Minneapolis, MN 55440-9348

NAME / ADDRESS CORRECTIONS

**CLAIM FORM**

**TEXAS FARMERS SETTLEMENT**

TO: *<PREPRINT NAME>*

If you are a member of the Rate Class or Discount Class, you will receive your payment automatically once the Settlement is finally approved. To file a claim as a member of the Credit Usage Notice Class, you must complete and submit this Claim Form providing the information requested below.

More information is available at the official Settlement website, www.TexasFarmersSettement.com or call 1-888-222-0691. Please print clearly in blue or black ink. This Claim Form must be mailed and postmarked by **Month 00, 2015.**

1. **CLASS MEMBER INFORMATION.**

Name of Class Member: _____

Address: _____

_____

Telephone Number: (_____) _____

2. **INSURANCE POLICY INFORMATION.**

**Homeowners' Policy Information (if applicable):**

Name(s) of Insured(s), if different from above: _____

Policy Number(s): _____     Starting Date of Policy(ies): _____

Address of Insured Premises: _____

_____

Name of Agent: _____

**Automobile Policy Information (if applicable):**

Name(s) of Insured(s), if different from above: _____

Policy Number(s): _____     Effective Date of Policy(ies): _____

Address(es) of Insured(s), if different from above: _____

_____

Name of Agent: _____

Vehicle Identification Number (VIN) of Insured Vehicle: _____

**3. SIGN AND DATE YOUR CLAIM FORM.**

I declare under penalty of perjury that:

☐ I have not opted out of the Settlement Classes in this case and will not request exclusion from the Settlement Classes;

☐ I did not submit a claim form in the settlement in *In re Farmers Insurance Co, Inc. FCRA Litigation.* (also called the "Mobbs Action"), No. CIV-03-158-F, including all cases consolidated and coordinated in MDL No. 1564, in the U.S. District Court for the Western District of Oklahoma, which was finally approved on September 29, 2011;

☐ I have read and understand the contents of this Claim Form; and

☐ I am voluntarily submitting to the jurisdiction of the 261st Judicial District Court of Travis County, Texas for the purposes of this claim.

_____

*Signature*

_____        ____ / ____ / _____

*Print Name*                                                        *Month/Day/Year*

**4. MAIL YOUR CLAIM FORM.**

This Claim Form must be postmarked by **Month 00, 2015** and mailed to: Texas Farmers Settlement Administrator, P.O. Box 9348, Minneapolis, MN 55440-9348.



# Exhibit 3

# If You Had Home or Auto Insurance in Texas,

## *You Could Benefit From A Class Action Settlement*

A Settlement has been reached with certain Insurance Exchanges and Providers ("the Defendants") in a class action lawsuit about the pricing and marketing of homeowners and automobile insurance policies. A complete list of Defendants is available at www.TexasFarmersSettlement.com. The Settlement provides payments to eligible policyholders.

### What Is This About?

The State of Texas claims that, during 1999 to 2003, the Defendants charged rates that resulted in excessive premiums for its HO-A homeowners policy and used unfair or deceptive practices involving the determination of certain fees, discounts, and policy offerings, and improper use of credit scoring and certain risk assessments.

The lawsuit also claims that, during the same time frame, the Defendants: 1) failed to provide adequate notices that information on certain policyholders' credit reports may have impacted their premiums or policy placement, 2) used anticompetitive practices in the sale and marketing of homeowners and automotive insurance policies, and 3) improperly stopped offering HO-B homeowners policies. The Defendants deny these claims and maintain they did nothing wrong.

### Who's Included?

Generally, the Settlement includes Texas homeowners or automobile insurance policyholders who had certain types of insurance policies with the Defendants between October 1, 1999 and February 28, 2003. The Settlement includes three Classes: Rate, Discount, and Credit Usage Notice. You may be member of more than one Class. More information about included policies is available at the website.

### What Can You Get?

The Defendants will pay rate reductions or discounts to the Rate Class and Discount Class Members (calculated on a case-by-case basis) and provide an additional sum to be paid to Rate Class and Discount Class Members with eligible claims proportionally. The Defendants will also provide payments of $35 to eligible Credit Usage Notice Class Members for not receiving adequate notice about the Defendants' use of their credit information. Policyholders who renewed or received a new HO-A insurance policy from the Defendants after November 11, 2002 and before September 1, 2003, have already received an additional reduction in premiums.

### How to Get Benefits.

Payments to the Rate and Discount Classes will be made automatically. You must submit a Claim Form by **Month 00, 2015** to get benefits as a Credit Usage Notice Class Member. If you did not receive one in the mail, you may request a Claim Form at the website or by calling 1-888-222-0691.

### Your Other Rights.

If you don't want a payment from this Settlement and you don't want to be legally bound by it, you need to exclude yourself in writing by **Month 00, 2015** or you won't be able to sue the Defendants about the claims in this case. If you ask to be excluded, you can't get a payment from the Settlement. If you stay in the Settlement, you may object to it by **Month 00, 2015**, but will be bound by the terms of the Settlement if it is approved by the Court.

You may have received or seen other notices about other class actions about insurance policy options, premium rates, and/or credit report usage. The website has more information about how these cases affect your eligibility to participate in this Settlement.

The Court will hold a hearing on **Month 00, 2015** to consider whether to approve the Settlement. You can appear at the hearing, but you don't have to. You can hire your own attorney, at your own expense, to appear or speak for you at the hearing.

---

## For complete information:  Visit: www.TexasFarmersSettlement.com
## Call: 1-888-222-0691

# EXHIBIT 2

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**



CAUSE NO. GV202501

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, and THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, and TRUCK UNDERWRITERS ASSOCIATION, | § § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS <br><br><br> 261ST JUDICIAL DISTRICT |
| Defendants. | | |

## ORDER OF PRELIMINARY APPROVAL

This matter came on for hearing May 19-22, 2003, for preliminary approval of the Settlement Agreement and Stipulation of December 18, 2002, as amended on June 13, 2003, ("Settlement Agreement") between the State of Texas, the Texas Department of Insurance, and the Texas Commissioner of Insurance, on behalf of Texas policyholders of the Defendants in the classes defined below (collectively, the "State") and Fire Underwriters Association, Farmers Group, Inc. d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company,

30491649.1

Truck Insurance Exchange, and Truck Underwriters Association (collectively, the "Farmers Parties"). The State and the Farmers Parties have moved jointly, pursuant to Texas Rule of Civil Procedure Rule 42(e) and Texas Insurance Code article 21.21 § 18(g), for an Order of Preliminary Approval (the "Order") (1) preliminarily approving the settlement of all claims asserted in the above-captioned cause (the "Action"), the terms of which are set forth in the Settlement Agreement which has been filed with the Clerk of the Court, and (2) approving the proposed notice to the Classes.

The Court having read and considered the Settlement Agreement and attached exhibits, including the proposed Notice of Proposed Class Settlement, the proposed Claim Form, the proposed form of Final Judgment, exhibits, pleadings and record in this case, the evidence and other materials presented at the hearing, and argument of counsel and applicable authorities, finds that there exists substantial and sufficient grounds for entering this Order.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1. The Court, for purposes of this Order, adopts all defined terms as set forth in the Settlement Agreement.

2. Pursuant to Rule 42 and Texas Insurance Code article 21.21 §§ 17 & 18, this Court hereby certifies, only for purposes of effectuating the Settlement Agreement, the following Settlement Classes (the "Settlement Classes"):

   (i) All of the Exchanges' Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed (the "Rate Class");

   (ii) All of the Exchanges' Texas homeowners insurance policyholders who according to Farmers' records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002 (the "Discount Class"); and

(iii)     All Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers who according to Farmers' records were provided or should have been provided a Credit Usage Notice from October 1, 1999, through February 28, 2003 (the "Credit Usage Notice Class").

3.     The Court hereby acknowledges and confirms the State, through the Office of the Attorney General, to fulfill the role of the Settlement Classes' Counsel. The Court finds that the Attorney General's office is authorized to bring this class action by the *parens patriae* authority granted in section 17 of article 21.21 of the Insurance Code and Rule 42 of the Texas Rules of Civil Procedure.

4.     Alternatively, if the requirements of Rule 42(a) & (b) and article 21.21 § 18(a) & (b) must be satisfied, then, with respect to the Settlement Classes, this Court finds and concludes that each of those requirements has been met, specifically: (a) each of the Settlement Classes is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Settlement Classes which predominate over any individual questions; (c) the claims or defenses brought by the State on behalf of Farmers' policyholders are typical of the claims or defenses of the Settlement Classes and the State is authorized to bring claims on behalf of the Settlement Classes; (d) in negotiating and entering into the Settlement Agreement, the State has fairly and adequately represented and protected the interests of the Settlement Classes; (e) the questions of law or fact common to the Settlement Classes predominate over any questions affecting only individual members; and (f) certifying this Action as a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

5.     The Court further finds that there has been no collusion between the State and the Farmers Parties with respect to negotiating the Settlement Agreement and that the State has represented, and will continue to represent, the interests of the Farmers' policyholders fairly and adequately and without a conflict of interests. Accordingly, the Court preliminarily approves:

30491649.1                                                -3-

(a) the Settlement Agreement, including the terms and the releases set forth therein, as being fair, just, reasonable, and adequate as to each of the parties thereto, and (b) the Settlement Funds described therein, including the Prospective Rate Reduction, Retrospective Rate Reduction, Individualized Discount Adjustment, and Credit Usage Notice Adjustment Fund, and the proposed additional consideration, subject to the right of any member of the Settlement Classes to exclude himself or herself from the Settlement Classes in accordance with the terms set forth in the Settlement Agreement, and to show cause, if any exists, why a Final Judgment should not be entered in accordance with the terms of the Settlement Agreement.

6.     A hearing (the "Settlement Hearing") shall be held before this Court on September 29, 2003, at 9:00 a.m. in the 53rd Judicial District Court Room: (a) to determine whether the proposed Settlement Agreement is fair, reasonable, and adequate and should be approved, and whether the Final Judgment should be entered as to claims asserted therein, or which could have been asserted, against the Released Parties on the merits; (b) to determine whether the Settlement Classes members' right to adequate representation has been satisfied; and (c) to reserve jurisdiction to effect and enforce the Settlement Agreement.

7.     The Farmers Parties shall disseminate notice of the proposed Settlement Agreement and Settlement Hearing to putative members of the Settlement Classes within thirty (30) days of the date of this Order. A copy of the Notice of Proposed Class Settlement (the "Notice"), together with a copy of the Claim Form, substantially in the form attached hereto as Exhibit A, shall be mailed by first-class U.S. mail, postage prepaid, to all members of the Settlement Classes at the address of each such person as set forth in the records of the Released Parties or as otherwise may be identified through reasonable effort. In addition, commencing within seven (7) days of the date of this Order and continuing until the date of the Settlement

30491649.1                                    -4-

Hearing, the Office of the Attorney General, the Texas Department of Insurance, and the Farmers Parties shall post on their respective Internet web-sites (www.oag.state.tx.us, www.tdi.state.tx.us and www.farmers.com) the Notice and a Summary Notice of Settlement, substantially in the form attached hereto as Exhibit B ("Summary Notice").

8.    The Court approves the form of Notice, the Summary Notice, and the Claim Form, and finds that the procedures established for mailing and distributing such notices substantially in the manner and form set forth in paragraph 7 of this Order meet the requirements of Rule 42 of the Texas Rules of Civil Procedure, article 21.21 § 18 of the Texas Insurance Code, and due process, and constitute the best notice practicable under the circumstances.

9.    To effectuate the provision of notice provided in paragraph 7 hereof, the Farmers Parties shall be responsible for the receipt of all responses from the members of the Settlement Classes and, until further order of this Court, shall preserve all entries of appearance, Claim Forms, requests for exclusion, and any and all other written communications from members of the Settlement Classes or any other person in response to the Notice. The costs of notification of the Settlement Classes as provided herein, including printing, mailing, and posting on the Internet of all required notices, shall be borne by the party charged with the responsibility for such actions in paragraph 7 of this Order.

10.    Three (3) days before the date fixed by this Court for the Settlement Hearing, the State and the Farmers Parties shall cause to be filed with the Clerk of the Court affidavits or declarations of the person or persons under whose general direction the mailing of the Notice and the distribution of the Summary Notice by posting on the web-sites identified in paragraph 7 shall have been made, showing that such mailing and publication have been made in accordance with this Order.

30491649.1                                                 -5-

11.     Each member of the Settlement Classes will be bound by the proposed settlement provided for in the Settlement Agreement, and by the Final Judgment or any other determination by this Court affecting the Settlement Classes, unless such member shall mail, by first-class U.S. mail, a written request for exclusion from the Settlement Classes, post-marked no later than August 29, 2003, addressed to "Exclusion Requests", c/o Rust Consulting, Inc.; P.O. Box 9348; Minneapolis, MN 55440-9348. Such request for exclusion must state (a) the name, address and telephone number of the person seeking exclusion; (b) whether such person has a homeowners or automobile insurance policy from the Farmers Parties, or both; (c) the date of inception of such policy(ies) and the most recent date of renewal for such policy(ies), if available; (d) the policy number(s), if available; and (e) that the person making the request wishes to be excluded from the Settlement Classes. Because the Settlement Agreement is intended to be a resolution of all Released Claims, any person requesting exclusion must either exclude himself or herself from the Settlement Agreement in its entirety, or submit to the Settlement Agreement in its entirety. A request for exclusion shall not be effective unless it is made in the manner and within the time set forth in this paragraph and in the Notice. If a member of the Settlement Classes requests to be excluded, that person will not receive any benefit from the Retrospective Rate Reduction, the Individualized Discount Adjustment, or the Credit Usage Notice Adjustment Fund provided for in the Settlement Agreement, in the event the Settlement Agreement is approved by the Court, nor will such person be permitted to participate further in the Action. Any Class Member who does not request exclusion in the manner provided for herein may, but need not, enter an appearance in this Action at his or her own cost through counsel of his or her own choice. If a member of the Settlement Classes does not enter an appearance, that person's interests will be represented by the State in the Action.

12. Any member of the Settlement Classes who has not requested exclusion from the Settlement Classes may appear at the Settlement Hearing, in person or through counsel, to object and be heard in opposition to any of the matters to be heard at the Settlement Hearing, including (a) the requested approval of the Settlement Agreement as fair, adequate, and reasonable, and/or (b) the requested entry of the Final Judgment. A member of the Settlement Classes cannot request exclusion from the Settlement Classes AND object to the Settlement Agreement. For any objection to be considered by the Court, the objector must mail a valid written objection, and it must be postmarked by no later than August 29, 2003. In order to be valid, the written objection must set forth (a) a reference, at the top, to "State of Texas v. Farmers, Cause No. GV202501," (b) a statement as to whether the objector intends to appear at the Settlement Hearing, either in person or through counsel, (c) a detailed statement of the specific basis for the objection, (d) the name that is set forth on the Notice that was sent to the objector, (e) the objector's current name, if different from the name set forth on the Notice, (f) the objector's current address, (g) the objector's current telephone number and, if available, telecopier number, (h) the objector's type of policy and policy number, and (i) the objector's signature or that of his or her authorized representative. Three copies of the written objection must be sent, the first addressed to the District Clerk of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas 78701, the second addressed to David C. Mattax, Chief, Financial Litigation Division, P.O. Box 12548, Austin, Texas 78711-2548, and the third addressed to Richard N. Carrell, Fulbright & Jaworski L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010-3095. If an objection does not include all of the required information or if it is not timely mailed to the three correct addresses, then it shall be invalid and it will not be considered by the Court. Any member of the Settlement Classes who does not object in the manner provided shall be deemed to have waived

30491649.1                                              -7-

such objection and shall forever be foreclosed from making any objection to the fairness, adequacy, or reasonableness of the Settlement Agreement and the proposed Final Judgment.

13.    If the Court gives final approval to the Settlement Agreement and enters a final judgment, in order to be entitled to participate in the Credit Usage Notice Adjustment Fund portion of the Settlement Agreement, a member of the Credit Usage Notice Class who has not requested exclusion from the Settlement Classes must submit a Claim Form, substantially in the form attached as Exhibit C hereto, to the Farmers Parties at the address set forth in the Notice. Such Claim Form must be completed and postmarked on or before May 15, 2004. Any member of the Credit Usage Notice Class who does not submit a completed Claim Form shall not be entitled to share in the Credit Usage Notice Adjustment Fund but nonetheless shall be bound by the terms of the Settlement Agreement and by the Final Judgment and any other Order of this Court approving the Settlement Agreement, including all releases therein, and shall be barred and enjoined in this or any other action from asserting any Released Claims.

14.    Members of the Rate and Discount Classes shall automatically receive their share of Settlement Funds upon final approval of the Settlement Agreement and entry of final judgment, unless they file a written request for exclusion from the Settlement Classes as provided in paragraph 11 herein.

15.    The Court expressly retains the power to adjourn the Settlement Hearing, without any further notice other than an announcement at the Settlement Hearing of adjournment thereof, and to approve, modify, or disapprove the Settlement Agreement without further notice to members of the Settlement Classes. The Court retains jurisdiction over this Action to consider all further applications arising out of or connected with the proposed settlement herein.

30491649.1                                    -8-

16.     The administration of the Settlement Agreement, and the decision of all disputed questions of law and fact with respect to the validity of any claim or right of any person to participate in the distribution of the Settlement Fund, shall be under the authority of the Court. The parties to this Settlement Agreement, counsel herein in any capacity in which they may act hereunder, and any employees or agents of such law firms or the parties to the Settlement Agreement (including, without limitation, those employees who may furnish services in connection with the proposed Settlement) shall not be liable for anything done or omitted in connection with the Settlement Agreement and the administration thereof except for their own willful misconduct.

17.     The parties to the Settlement Agreement are directed to carry out their obligations under the Settlement Agreement.

18.     In the event that the Settlement Agreement is not approved by the Court, or the Court enters the Final Judgment and it is vacated or modified on appeal, or otherwise altered in a material way, or the Effective Date for any other reason does not occur, and if any party to the Settlement Agreement thereafter exercises its right to terminate the Settlement Agreement as provided therein, then the Settlement Agreement and any actions to be taken in connection therewith shall be vacated and terminated and shall become null and void for all purposes, and all negotiations, transactions and proceedings connected with it (a) shall be without prejudice to the rights of any party hereto; (b) shall not be deemed or construed as evidence or an admission by any party of any fact, matter or thing; and (c) shall not be admissible in evidence or used for any purpose in any subsequent proceeding in the Action, or any other action or proceeding in this or any other forum, judicial, administrative, or otherwise, except proceedings to enforce the Settlement.

SIGNED _June 27_____, 2003.

_[signature]_
PRESIDING JUDGE

CAUSE NO. GV202501

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| | § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, AND TRUCK UNDERWRITERS ASSOCIATION, | § § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS |
| ASSOCIATION, | § | 261ST JUDICIAL DISTRICT |
| Defendants. | | |

## NOTICE OF PROPOSED CLASS SETTLEMENT

**THIS NOTICE AFFECTS YOUR RIGHTS.**
**PLEASE READ THE COMPLETE NOTICE CAREFULLY.**

TO:  ALL FARMERS INSURANCE EXCHANGE OR FIRE INSURANCE EXCHANGE TEXAS HOMEOWNERS POLICYHOLDERS (A) WHOSE HO-A POLICIES (INCLUDING TDP-1) INCEPTED OR WERE RENEWED AT ANY TIME DURING THE PERIOD OF DECEMBER 28, 2001 THROUGH AND INCLUDING DECEMBER 27, 2002, OR (B) WHO RECEIVED A NOTICE AT ANY TIME AFTER NOVEMBER 14, 2001, THAT THEIR HO-B POLICY (INCLUDING HO-PROTECTOR PLUS (PTP), HO380 ENDORSEMENT, TDP-2, TDP-3, DF-BUILDER'S RISK, AND HO-A WITH HO-170 ENDORSEMENT (COLLECTIVELY REFERRED TO HEREIN AS "HO-B")) WOULD NOT BE RENEWED.

ALL FARMERS INSURANCE EXCHANGE OR FIRE INSURANCE EXCHANGE TEXAS HOMEOWNERS POLICYHOLDERS WHO ACCORDING TO FARMERS

RECORDS WERE ELIGIBLE TO RECEIVE DISCOUNTS FOR FARMERS PROPERTY RISK ASSESSMENT ("FPRA"), AGE OF HOME, OR TERRITORY FROM NOVEMBER 16, 2000 THROUGH AND INCLUDING DECEMBER 10, 2002.

ALL TEXAS HOMEOWNERS OR AUTO INSURANCE POLICYHOLDERS OF FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, OR TRUCK INSURANCE EXCHANGE WHO ACCORDING TO FARMERS RECORDS WERE PROVIDED OR SHOULD HAVE BEEN PROVIDED A NOTICE OF ADVERSE ACTION BASED ON CREDIT HISTORY AT ANY TIME FROM OCTOBER 1, 1999 THROUGH FEBRUARY 28, 2003.

A lawsuit is pending in the 261st Judicial District Court of Travis County, Texas (Cause No. GV202501) (the "Action") in which the Attorney General of the State of Texas has brought suit in the name of the State of Texas, the Texas Department of Insurance, and the Texas Commissioner of Insurance (hereafter collectively defined as the "State"), and has filed a class action claiming that one or more of Fire Underwriters Association, Farmers Group, Inc. d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (collectively, "Farmers Parties") failed to disclose information with respect to their calculation of premiums, committed unfair and deceptive acts or practices in the business of insurance, and unfairly discriminated against Texas policyholders of the Farmers Parties in the business of insurance. The State also alleges anticompetitive practices with respect to the Farmers Parties' sale and marketing of their homeowners and automobile insurance policies.

The Farmers Parties have denied the State's allegations and alleged numerous affirmative defenses. The Farmers Parties have also counterclaimed, seeking declaratory relief that its practices do not violate Texas law.

The Court has conditionally ruled that this Action may be maintained on behalf of three classes (collectively, the "Settlement Classes") defined as:

(1) **Rate Class**: All of the Exchanges' (Farmers Insurance Exchange and Fire Insurance Exchange) Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed;

(2) **Discount Class**: All of the Exchanges' Texas homeowners insurance policyholders who according to Farmers records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002; and

(3) **Credit Usage Notice Class**: All Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers (Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, and Truck Insurance Exchange) who according to Farmers records were provided or should have been provided a notice of adverse action based on credit history ("Credit Usage Notice") from October 1, 1999, through February 28, 2003.

The purpose of this Notice of Proposed Class Settlement is to advise persons included in the Settlement Classes of the filing and status of the Action and of your rights with respect to a proposed settlement of the Action (including certain rights which you can lose if not protected). If this notice is addressed to you, you are according to Farmers' records a member of one or more of these classes. If this notice is not personally addressed to you and you believe that you may be a class member, or have any questions, then you can contact Rust Consulting, Inc. at 1-888-222-0691.

The rights of class members include the right to be excluded from the Settlement Classes. If you do not request exclusion from the settlement, you will become a "Settlement Class Member." **Please read this entire Notice of Proposed Class Settlement carefully to understand your rights and options.**

<u>TERMS OF PROPOSED SETTLEMENT</u>

1. Subject to the Court's final approval, on December 18, 2002, the State and the Farmers Parties signed a Settlement Agreement and Stipulation, and subsequently signed an Amended Settlement Agreement and Stipulation, ("Settlement Agreement") which provides that Settlement Class Members within the Rate Class ("Rate Class Members") shall be eligible to receive or participate in the following:

> <u>Retrospective Rate Reduction</u>. Rate Class Members who were insured under an HO-A policy form issued by the Exchanges at any time during the period commencing on December 28, 2001 up to and including November 10, 2002 (the "Credit Period"), shall receive a Retrospective Rate Reduction in the amount of 6.8% of the HO-A base premium earned by the Exchanges during those policies' actual term .For the above referenced Rate Class Members whose policy is no longer in effect or is not renewed at the next renewal date after the 30th day following the Effective Date (as defined in the Settlement Agreement), the Retrospective Rate Reduction shall be paid by means of a refund check based on each individual HO-A policy's base rate premium earned during the Credit Period. For the above referenced Rate Class Members whose policy is renewed at the next renewal date after the 30th day following the Effective Date (as defined in the Settlement Agreement), the Retrospective Rate Reduction shall be applied as credit. Unearned policy premiums that may be returned to the policyholder shall not include the credit. YOU DO NOT HAVE TO DO ANYTHING TO QUALIFY AND RECEIVE THE RETROSPECTIVE RATE REDUCTION.

2. In addition, the Settlement Agreement provides that Settlement Class Members within the Discount Class ("Discount Class Members") shall be eligible to receive or participate in the following:

> <u>Individualized Discount Adjustment</u>. Discount Class Members who did not receive discounts for FPRA, age of home, and territory at the level agreed to by

the State and the Farmers Parties as defined in the Settlement Agreement ("Agreed Discounts") shall receive an "Individualized Discount Adjustment" payment. The Individualized Discount Adjustment payment for each Discount Class Member shall equal the amount by which the premium actually charged for the Discount Class Member's HO-A policy exceeded the premium that would have been charged if the Farmers Parties had adopted discounts for FPRA, age of home, and territory elements at the Agreed Discounts on a revenue neutral basis ("IDA Eligibility").

The amount of the Individual Discount Adjustment, if any, will be different for each policyholder depending on insurance score, age of home and the territory in which the home is located. As a result, the Individualized Discount Adjustment will not be calculated until you renew your policy, or, if your policy is no longer in effect or you choose not to renew your policy, until your refund check is due. IF YOU ARE ELIGIBLE YOU DO NOT HAVE TO DO ANYTHING TO RECEIVE THE INDIVIDUALIZED DISCOUNT ADJUSTMENT.

3. In addition, the Settlement Agreement provides that Settlement Class Members within the Credit Usage Notice Class ("Credit Usage Notice Class Members") shall be eligible to receive or participate in the following:

a) Revised Credit Usage Notice. For new and renewed Texas homeowners and automobile policies, the Farmers Parties shall replace the existing Credit Usage Notice with a new Credit Usage Notice, the terms of which have been agreed upon jointly between the State and the Farmers Parties. The new notice must be in a minimum of 12 point type and clearly marked as "IMPORTANT INSURANCE INFORMATION." The text will be on a separate piece of paper of any other writing and the notice will not be attached to or incorporated into any other document.

b) Credit Usage Notice Adjustment Fund. Credit Usage Notice Class Members are also eligible to assert a claim against the Credit Usage Notice Adjustment Fund. The Credit Usage Notice Adjustment Fund is a fund established by the Farmers Parties for the purpose of reimbursing any overcharges that may have occurred to homeowners or automobile insurance policyholders whose policies were issued by the Farmers Parties in Texas and who paid a premium for automobile or homeowners insurance that would have been less, but for erroneous credit information on the individual's credit history maintained at the credit bureau which led the Farmers Parties to provide premium discounts lower than would have resulted from correct credit information or to assignment to a company affiliated with the Farmers Parties having a higher premium structure. If you believe that you are eligible for recovery from the Credit Usage

Notice Adjustment Fund, you must submit the Claim Form attached to this Notice of Proposed Class Settlement as Exhibit A **postmarked by May 15, 2004.**

**WITH REGARD TO THE INDIVIDUALIZED DISCOUNT ADJUSTMENT AND THE CREDIT USAGE NOTICE ADJUSTMENT FUND, RELEASED PARTIES HAVE COMMITTED TO A PAYMENT OR CREDIT OF 100% OF ANY PREMIUM DIFFERENTIAL RESULTING FROM THE ADJUSTMENT PROCESS SET FORTH IN THE IMMEDIATELY PRECEDING PARAGRAPHS 2 AND 3. IT IS NOT FEASIBLE TO CALCULATE IN ADVANCE THE AMOUNT, IF ANY, TO BE PAID TO EACH CLASS MEMBER. THESE CALCULATIONS, WHICH WILL REQUIRE INDIVIDUALIZED CALCULATIONS, WILL BE MADE BY RELEASED PARTIES AND REPORTED TO THE OFFICE OF THE ATTORNEY GENERAL AND THE TEXAS DEPARTMENT OF INSURANCE, AND WILL BE SUBJECT TO VERIFICATION BY THE TEXAS DEPARTMENT OF INSURANCE.**

4.      Prospective Rate Reduction.  In addition, the Settlement Agreement provides that the Exchanges' Texas homeowners insurance policyholders who renew or receive a new homeowners insurance policy with the Farmers Parties after November 10, 2002 and prior to September 1, 2003 shall pay premiums (or are paying premiums) calculated based on a 6.8% reduction in the statewide average base rate indications for all classes in effect as of November 10, 2002.  This reduction, however, may be reduced and may not occur if legislation or regulation subsequently requires rate reductions or rollbacks, but in no event will there be less than a 6.8% base rate reduction through either the Settlement, legislation or a combination of the two.  The Farmers Parties also have agreed to refrain from any increase in those base rates that would take effect prior to midnight on August 31, 2003, provided, however, that rates can be changed to include charges for any existing endorsement or any new endorsements approved by TDI or for coverage changes requested by policyholders.  This 6.8% reduction in the base rate will not necessarily result in a 6.8% reduction in each policyholder's premium upon renewal,

because each policy's premium depends on a number of variables, including the coverages a policyholder may choose, an increase or decrease in the value of the home insured, and other factors. However, the 6.8% reduction in the base rate will reduce the amount of the premium that otherwise would have been charged by the Exchanges. The Exchanges shall adopt discounts, applicable through August 31, 2003, based on FPRA, age of home, and territory elements in consultation with the State and consistent with sound actuarial principles. The effect of the new discount will vary from one policyholder to another. Because some policyholders who do not receive the Individualized Discount Adjustment benefited from the way the Exchanges calculated rates under the previous system, they may see a net increase in their premium under the new adopted discounts at their next policy renewal. Collectively, the relief described in this paragraph is referred to as the Prospective Rate Reduction.

5. Any policyholder whose HO-B policy was non-renewed by Farmers Insurance Exchange and who accepted an HO-A policy from Fire Insurance Exchange between December 28, 2001 and March 20, 2002, upon request, will be offered an HO-A policy from Farmers Insurance Exchange, if they qualify.

6. Pursuant to the Settlement Agreement, the Farmers Parties also agree, for the benefit of all Settlement Class Members, (a) not to require that individuals desiring to purchase homeowners insurance from the Farmers Parties also purchase automobile insurance from the Farmers Parties, or vice versa, and not to refuse to deal in good faith with any homeowners insurance customer who purchases automobile insurance from another carrier, or vice versa; (b) not to enter into any contracts, combinations, or conspiracies in restraint of trade to boycott homeowners insurance consumers or competitors, whether directly or by artificially reducing and .constricting the writing of mold and water-damage-related homeowners insurance coverages;

30491674.1 -7-

and (c) not to enter into any contracts, combinations, or conspiracies in restraint of trade to raise, standardize or otherwise fix prices by artificially reducing and constricting the writing of mold and water-damage-related homeowner's coverages. The agreements by the Farmers Parties described in this paragraph are collectively referred to as the "Injunctive Relief."

7.    In addition to these settlement terms, the Farmers Parties have agreed to pay a total of $2 million to the State for its attorneys' fees, expenses, and costs of investigation.

8.    Under the terms of the Settlement Agreement, the State of Texas, the Office of the Attorney General, the Texas Department of Insurance, the Texas Commissioner of Insurance, and the Settlement Class Members, on behalf of themselves and their heirs, assigns and successors, FULLY RELEASE AND FOREVER DISCHARGE the following entities ("Released Parties"):

> Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, and Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association, as well as their affiliates, officers, employees, agents, directors or governors, representatives, attorneys, predecessors, successors and assigns,

from any and all "Released Claims," which is defined in the Settlement Agreement as follows:

> "Released Claims" means and includes, with respect to homeowners insurance offered or sold by the Released Parties, all existing, known and unknown claims, demands and causes of action against the Released Parties, whether pending or threatened, suspected or unsuspected, contingent or non-contingent, for all existing, known and unknown damages and remedies that arise out of or relate to the acts and/or occurrences alleged in the AG Lawsuit, or in the Cease and Desist Order or the Administrative Proceedings, or in the OAG CIDs to the extent any such acts or occurrences took place prior to November 30, 2002 including but not limited to issues concerning or related to a management fee or fees, the placement of policyholders in a particular insuring entity, the age of home discount, the unfunded catastrophe load, the decision to no longer offer HO-B policies (including HO-Protector Plus (PTP), HO380 endorsement, TDP-2, TDP-3, DF-Builder's Risk, and HO-A with HO-170 endorsement (collectively referred to herein as "HO-B")), the offering of HO-A policies in place of HO-B policies,

territorial discounts, credit scoring, the use of the Farmers Property Risk Assessment, or the rates that the Released Parties have charged for homeowners policies and endorsements and all notices and statements that the Released Parties have made or issued in connection with the above, including but not limited to the notices of non-renewal of the HO-B policies and notices issued pursuant to the Fair Credit Reporting Act. The State's release of claims against Texas Farmers Insurance Company related to credit scoring is expressly based on Texas Farmers Insurance Company's representation that it does not and has not used credit scores, insurance scores, credit reports or any other method of calculating premiums based on credit history. "Released Claims" also include any claims, demands, or causes of action to the effect that the discounted rates adopted by the Exchanges from November 11, 2002 through and including August 31, 2003, are unfair, unreasonable, discriminatory, misleading or excessive. With respect to the automobile insurance offered or sold by the Released Parties, "Released Claims" includes all existing claims, demands, and causes of action related only to the disclosure or nondisclosure of consumer credit information or the disclosure or nondisclosure of the use or effect of using consumer credit information, including claims under the Fair Credit Reporting Act. "Released Claims" does not include individual claims or complaints about claims payments, handling or processing pursued by individual claimants directly or such individual claims or complaints about claims payments, handling or processing as may be pursued by TDI under Article 21.55, Texas Insurance Code, which are identified in a schedule which has been provided by TDI to the Farmers Parties. Remedies for any such scheduled claims or complaints, if pursued by the TDI, shall be limited to the payment of interest under article 21.55, section 6, of the Texas Insurance Code (which interest is not part of the total value of this settlement), as the result of non-compliance with that statute, and may not include fines or penalties or any other relief, except relief may include corrective action respecting procedures. "Released Claims" also does not include claims that have been asserted in Cause No. GV000271, *State of Texas v. Texas Farmers Insurance Company, et al.*, which is pending in the 200th Judicial District Court of Travis County, Texas, and which relates to betterment in the context of automobile insurance in the Texas market.

**The Prospective Rate Reduction, the Retrospective Rate Reduction, the Individualized Discount Adjustment, the Revised Credit Usage Notices, the Credit Usage Notice Adjustment Fund, the Injunctive Relief, and the payment of costs and fees to the State, as described above, are the only consideration, fees, costs, or expenses that the Farmers Parties or the Released Parties shall be obligated to give to any Settlement Class Member, the State, or counsel for the State or any Settlement Class Member, or other attorney in**

connection with the settlement and release of the Released Claims and/or the payment of attorneys' fees and expenses.

The Released Parties do not admit any wrongdoing or liability. The proposed settlement is a compromise of disputed claims and does not mean that the Released Parties are guilty of the charges made by the State. The terms of the settlement and the Settlement Agreement itself are matters of public record and are not confidential. Any terms used in this Notice of Proposed Class Settlement that are not defined herein shall have the meaning specified in the Settlement Agreement.

## RIGHTS AND OPTIONS OF CLASS MEMBERS

As a Class Member, you have the following rights and options:

1.     **You may become a Settlement Class Member.** If you do not request exclusion from the Settlement Classes, you will become a Settlement Class Member. Your interests will be represented by the State, through the Office of the Attorney General. You will not be charged for their services. The Office of the Attorney General cannot by law represent you individually, but you are free to seek legal advice from a private attorney at your own expense. As a Settlement Class Member, you will be bound by the Final Judgment or other disposition of this Action.

A.     **Rate and Discount Class Members.** If the settlement is approved by the Court and the Final Judgment becomes final, and if you are a Rate or Discount Class Member, you will be entitled to receive the benefits described above for which you qualify, including the Prospective Rate Reduction, the Retrospective Rate Reduction, and the Individualized Discount Adjustment, without doing anything.

B.     **Credit Usage Notice Class Members.** If the settlement is approved by the Court and the Final Judgment becomes final, you may be entitled to benefits from the Credit Usage Notice Adjustment Fund. To determine whether you are entitled to benefits, you must:

1.     Contact Trans Union Corp. by calling 1-800-736-5808, or by writing to Trans Union Corp. at P. O. Box 400, Woodlawn, PA 19094, and request a copy of your consumer report. The Farmers Parties have arranged for Trans Union Corp. (hereafter "Trans Union") not to charge you a fee if you make your request through the special procedures in this Notice, established in connection with the Settlement. **Please note that if you make your request by telephone, you will need to provide the following identifying information: the name, Social Security number, date of birth, and numeric address information for the policyholder whose credit is in issue, plus the identifying number from the mailing**

label on this Notice. The identifying number also appears on the Claim Form itself. If you make your request in writing, you must include the name, Social Security number, date of birth, and complete address for the policyholder whose credit is in issue, plus the identifying number from the mailing label on this Notice. By requesting a copy of your credit report, you are giving Trans Union permission to notify the Farmers Parties that you have made this request and to provide the Farmers Parties with a copy of your current credit report. The Farmers Parties will need this information to assist in processing any claim that you may have under the Credit Usage Notice Adjustment Fund. The Farmers Parties will keep this information confidential.

2.     Review your consumer report carefully.

3.     (a)     **If your consumer report does not contain any errors,** then you are not entitled to any benefits from the Credit Usage Notice Adjustment Fund and you do not need to do anything else.

(b)     **If you believe your consumer report contains errors that may have worked against you,** you should:

(i)     Contact Trans Union to resolve the errors, following the procedures that accompany the consumer report. By making this request, you are authorizing Trans Union and the Farmers Parties to review and reconsider your credit report. After Trans Union has processed your request for correction, Trans Union will send you a new consumer report;

(ii)     If your new consumer report from Trans Union indicates that the information in your original consumer report was correct and that no changes or corrections have been made, you need do nothing further, as you do not qualify to make a claim under the Credit Usage Notice Adjustment Fund. However, if you disagree with Trans Union's conclusion and establish thereafter that your original consumer report was incorrect, then you may proceed to the next step;

(iii)     If you receive a new consumer report from Trans Union indicating that corrections have been made to your original credit report and believe that the new consumer report corrects errors that may have worked against you, then complete the attached Claim Form, attach a copy of the new consumer report that you received from Trans Union, and mail the Claim Form and attached consumer report to Personal Lines Credit Usage Notice Administrator, Farmers Insurance, P.O. Box 149199, Austin, Texas 78714-9199,

*postmarked no later than May 15, 2004.* The Farmers Parties will recalculate your premium based upon the new credit report and send you a refund check from the Credit Usage Notice Adjustment Fund, if you qualify.

(iv)    *If you fail to complete and send in the Claim Form, postmarked by the date indicated, you will lose your right to make a claim under the Credit Usage Notice Adjustment Fund. As a Settlement Class Member, you will be bound by the Final Judgment or other disposition of this Action, even if you do not mail in a Claim Form.*

2. **You may request exclusion from the Settlement Classes.** If you request exclusion from the Settlement Classes, you will not be bound by any judgment or settlement of this Action, and you will not receive the benefits of the settlement provided, however, that if you renew your homeowners policies with either of the Exchanges, the Prospective Rate Reduction will be reflected in your premium if the Settlement Agreement is approved. If you wish to be excluded from the Settlement Classes, you must send in a request for exclusion by first-class U.S. mail stating: (1) your name, address, and telephone number; (2) whether you have or had a homeowners or automobile insurance policy from the Farmers Parties, or both; (3) the date of inception of your policy(ies), and the most recent date on which the policy(ies) was renewed, if you know; (4) that you wish to be excluded from the Settlement Classes; and (5) the policy number(s), if you know. The Settlement Agreement is intended to be a final resolution of all disputes, and thus you must either exclude yourself from the Settlement Agreement in its entirety, or submit to the Settlement Agreement in its entirety. Requests for exclusion must be sent to "Exclusion Requests", c/o Rust Consulting, Inc.; P.O. Box 9348; Minneapolis, MN 55440-9348, by first-class U.S. mail, postmarked on or before August 29, 2003. Requests will not be accepted if made verbally, by fax, e-mail, or other means. **Failure to follow these instructions for requesting exclusion will result in waiver of your right to exclude yourself from the Settlement Classes.** Even if you provide written notice of your election to opt out of the class by August 29, 2003, you have the right to revoke that request for exclusion in writing up to September 21, 2003.

3. **You may object to the Settlement.** Settlement Class Members may appear, in person or through counsel, to object and be heard in opposition to any of the matters to be heard at the Settlement Hearing, including (a) the requested approval of the Settlement Agreement as

30491674.1                                                      -14-

fair, adequate, and reasonable, and/or (b) the requested entry of the Final Judgment. **You cannot request exclusion AND object to the settlement. Only Settlement Class Members may object to the settlement.** For his or her objection to be considered by the Court, the objecting Settlement Class Member *must* mail by U.S. first-class mail a valid written objection, and it *must* be postmarked by no later than August 29, 2003. In order to be valid, the written objection *must* set forth (a) a reference, at the top, to "State of Texas v. Farmers, Cause No. GV202501," (b) a statement as to whether the objecting Settlement Class Member intends to appear at the Settlement Hearing, either in person or through counsel, (c) a detailed statement of the specific basis for the objection, (d) the name that is set forth on the notice that was sent to the objecting Settlement Class Member, (e) the objecting Settlement Class Member's current name, if different from the name set forth on the notice, (f) the objecting Settlement Class Member's current address, (g) the objecting Settlement Class Member's current telephone number and, if available, telecopier number, (h) the objector's type of policy and policy number, and (i) the objecting Settlement Class Member's signature or that of his or her authorized representative. Three copies of the written objection *must* be sent, the first addressed to the District Court Clerk of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas 78701, the second addressed to David C. Mattax, Chief, Financial Litigation Division, P.O. Box 12548, Austin, Texas 78711-2548, and the third addressed to Richard N. Carrell, Fulbright & Jaworski L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010-3095. All such objections must be postmarked on or before August 29, 2003. **IF AN OBJECTION DOES NOT INCLUDE ALL OF THE REQUIRED INFORMATION OR IF IT IS NOT TIMELY MAILED BY U.S. FIRST-CLASS MAIL TO THE THREE CORRECT ADDRESSES, THEN IT SHALL BE INVALID AND IT WILL NOT BE CONSIDERED BY THE COURT. ANY MEMBER**

30491674.1                                    -15-

OF THE SETTLEMENT CLASSES WHO DOES NOT OBJECT IN THE MANNER PROVIDED SHALL BE DEEMED TO HAVE WAIVED SUCH OBJECTION AND SHALL FOREVER BE FORECLOSED FROM MAKING ANY OBJECTION TO THE FAIRNESS, ADEQUACY, OR REASONABLENESS OF THE SETTLEMENT AGREEMENT AND THE PROPOSED FINAL JUDGMENT TO BE ENTERED APPROVING THE SETTLEMENT.

## SETTLEMENT HEARING

The Court has given its preliminary approval to the proposed settlement and has conditionally certified the Settlement Classes. The Court will hold a hearing in the District Court of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas, on the 29th day of September, 2003, at 9:00 o'clock a.m. to determine whether, as recommended by the Parties, it should give final approval to the proposed settlement.

**Any objections to the proposed settlement by Settlement Class Members will be considered by the Court, but only if such objections are filed in writing with the Clerk postmarked on or before the 29th day of August, 2003, and mailed to the individuals at the addresses stated herein.** Attendance at the hearing is not necessary; however, any Settlement Class Member wishing to be heard orally in opposition to the proposed settlement must indicate this intention in his or her objection. Settlement Class Members who support the proposed settlement do not need to appear at the hearing or take any other action to indicate their approval.

## SETTLEMENT DISTRIBUTION

If the settlement is approved by the Court, and if you are a Rate or Discount Class Member, you will receive any benefits to which you are entitled as follows: (a) you will receive the Prospective Rate Reduction at the time of renewal of any HO-A homeowners policy from

November 11, 2002 through August 31, 2003, inclusive; (b) if you choose to renew your HO-A policy at the next time that it comes up for renewal, you will receive the Retrospective Rate Reduction as a credit at the next renewal date after the 30th day following the Effective Date (described below); (c) if you choose not to renew your HO-A policy at the next time that it comes up for renewal, or if you do not currently have an HO-A policy provided by the Farmers Parties, you will receive a refund check on the later of: (1) 45 days after the end of the original annual term covered by the policy in question, which schedule will apply even if the policy is terminated prior to the end of the policy period, or (2) 30 days after the date by which all of the following have occurred: (i) an Order of Preliminary Approval has been entered by the Court in the Action; (ii) the Court has approved the settlement in all respects; (iii) an order and final judgment shall have been entered by the Court and not vacated, stayed, or modified in any material way, upon appeal or otherwise; and (iv) either the time to appeal or otherwise seek review of the order and final judgment has expired without any appeal having been taken or review sought, or if an appeal is taken or review sought, the expiration of five days after such an appeal or review shall have been finally determined by the highest court before which appeal or review is sought and is not subject to further judicial review ("Effective Date"); and (d) credits and payment of the Individualized Discount Adjustment shall be made in the same manner and at the same time as the Retrospective Rate Reduction listed above.

If the settlement is approved by the Court, and if you are a Credit Usage Notice Class Member, any payments you are entitled to from the Credit Usage Notice Adjustment Fund shall be made by means of a refund on the later of (1) thirty (30) days after the receipt of a completed Claim Form, or (2) thirty (30) days after the Effective Date.

In the event that the settlement, or the terms provided by the Settlement Agreement, is not approved by the Court, or if the Effective Date for any other reason does not occur, and if any Party to the Settlement Agreement exercises their rights to terminate the Settlement Agreement, as provided therein, then any actions to be taken in connection therewith shall be vacated and terminated and shall become null and void for all purposes, and all negotiations, transactions, and proceedings connected with it (a) shall be without prejudice to the rights of any party thereto; (b) shall not be deemed or construed as evidence or an admission by any party of any fact, matter or thing; and (c) shall not be admissible in evidence or used for any purpose in any subsequent proceeding in the Action, or any other action or proceeding in any forum, judicial, administrative, or otherwise, except proceedings to enforce the settlement.

### ADDITIONAL INFORMATION: OBTAINING A COPY OF THE SETTLEMENT AGREEMENT AND RELEASE

Any questions you have about the matters in this Notice should be directed in writing to Office of the Attorney General, Consumer Protection Division, P.O. Box 12548, Austin, Texas 78711-2548. **Questions may not be directed to the Court.** The foregoing is only a summary of the Action and the Settlement Agreement and does not purport to be comprehensive. If you wish to obtain a copy of the Settlement Agreement (including the Release and the Agreed Discounts), you may do so by requesting it in writing from the same address, or a copy may also be secured through the Texas Department of Insurance web site at "www.tdi.state.tx.us".

You may, of course, seek the advice and guidance of your own attorney if you desire. The pleadings and other records in this litigation may be examined and copied at any time during regular office hours at the office of the District Clerk, Travis County, Texas, 1000 Guadalupe Street, Austin, Texas 78701.

## TIME LIMITS

1.   IF YOU WISH TO BE EXCLUDED FROM THE SETTLEMENT CLASSES, YOU MUST SEND YOUR WRITTEN REQUEST FOR EXCLUSION BY FIRST CLASS UNITED STATES MAIL TO "EXCLUSION REQUESTS" C/O RUST CONSULTING, INC.; P.O. BOX 9348; MINNEAPOLIS, MN 55440-9348, POSTMARKED ON OR BEFORE THE 29th DAY OF AUGUST, 2003.

2.   IF YOU WISH TO OBJECT TO THE PROPOSED SETTLEMENT, YOU MUST MAIL YOUR WRITTEN OBJECTION TO THE CLERK OF THE COURT AND TO THE OTHER PERSONS IDENTIFIED ABOVE BY FIRST-CLASS UNITED STATES MAIL, POSTMARKED ON OR BEFORE THE 29th DAY OF AUGUST, 2003. YOU MUST INCLUDE A REQUEST FOR ORAL ARGUMENT IF YOU WANT TO BE HEARD ORALLY AT THE SETTLEMENT HEARING.

3.   TO BE ELIGIBLE FOR BENEFITS FROM THE CREDIT USAGE NOTICE ADJUSTMENT FUND, YOUR CLAIM FORM (ATTACHED HERETO AS EXHIBIT A) MUST BE POSTMARKED ON OR BEFORE MAY 15, 2004.

30491674.1                                          -19-

CAUSE NO. GV202501

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, AND TRUCK UNDERWRITERS ASSOCIATION, | § § § § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS

261ST JUDICIAL DISTRICT |
| Defendants. | | |

## CLAIM FORM

INSTRUCTIONS (YOU MUST READ THESE INSTRUCTIONS CAREFULLY; IF YOU FAIL TO FOLLOW THESE INSTRUCTIONS, YOU MAY LOSE CERTAIN BENEFITS TO WHICH YOU WOULD OTHERWISE BE ENTITLED):

In order to receive proceeds from the Credit Usage Notice Adjustment Fund, you must complete and mail this Claim Form to Personal Lines Credit Usage Notice Administrator, Farmers Insurance, P.O. Box 149199, Austin, Texas 78714-9199, postmarked on or before the 15th day of May, 2004. IF YOU DO NOT RETURN A CLAIM FORM POSTMARKED BY THIS DEADLINE, YOUR CLAIM WILL BE REJECTED AND YOU WILL BE DEEMED TO HAVE WAIVED ALL RIGHTS TO RECEIVE ANY CONSIDERATION UNDER THIS PORTION OF THE SETTLEMENT. If you do not request exclusion from the Settlement Class, you are

30372690.7

**bound by the terms of the Settlement Agreement and Release and Final Judgment entered pursuant to the settlement whether or not you return a Claim Form.**

Must Be Postmarked No            Deliver to:  Personal Lines Credit Usage
Later Than May 15, 2004                           Notice Administrator
                                                 Farmers Insurance
                                                 P.O. Box 149199
                                                 Austin, Texas 78714-9199

## CLAIM FORM

### A.    PERSONAL INFORMATION

---

Name (Last)                                    (First, Middle)

---

Address (Street Name and Number, Apartment Number, If Applicable)

---

City         State         Zip Code         Daytime Phone #

### B.    HOMEOWNERS' POLICY INFORMATION (If Applicable)

Names(s) of Insured(s), if         Effective Date of Policy(ies)
different from above

Address of Insured Premises         Policy Number(s)

Name of Agent

C.    AUTOMOBILE POLICY INFORMATION (If Applicable)

_____          _____
Names(s) of Insured(s), if        Effective Date of Policy(ies)
different from above

_____          _____
Address of Insured(s), if         Policy Number(s)
Different from above

_____
Name of Agent

_____
Vehicle Identification Number
(VIN) of Insured Vehicle

**D.    YOU MUST ATTACH A NEW CREDIT REPORT FROM THE CONSUMER REPORTING AGENCY (TRANS UNION) INDICATING THAT CORRECTIONS HAVE BEEN MADE TO YOUR ORIGINAL CREDIT REPORT.**

**E.    CERTIFICATION UNDER PENALTY OF PERJURY**

**I hereby affirm and declare under penalty of perjury that:**

1.    I have not opted out of the Settlement Classes in this case and will not request exclusion from the Settlement Classes;

2.    I have read and understand the contents of this Claim Form; and

3.    I am voluntarily submitting to the jurisdiction of the 261st Judicial District Court of Travis County, Texas for purposes of this claim.

_____          _____
**DATED**                         **SIGNED**

30372690.7

ATTENTION

Your rights may be affected by a class action
In the 261st Judicial District of Travis County, Texas

## SUMMARY NOTICE OF SETTLEMENT

TO:   ALL FARMERS INSURANCE EXCHANGE OR FIRE INSURANCE EXCHANGE TEXAS HOMEOWNERS POLICYHOLDERS (A) WHOSE HO-A POLICIES (INCLUDING TDP-1) INCEPTED OR WERE RENEWED AT ANY TIME DURING THE PERIOD OF DECEMBER 28, 2001 THROUGH AND INCLUDING DECEMBER 27, 2002, OR (B) WHO RECEIVED A NOTICE AT ANY TIME AFTER NOVEMBER 14, 2001, THAT THEIR HO-B POLICY (INCLUDING HO-PROTECTOR PLUS (PTP), HO380 ENDORSEMENT, TDP-2, TDP-3, DF-BUILDER'S RISK, AND HO-A WITH HO-170 ENDORSEMENT (COLLECTIVELY REFERRED TO HEREIN AS "HO-B")) WOULD NOT BE RENEWED ("RATE CLASS MEMBERS").

ALL FARMERS INSURANCE EXCHANGE OR FIRE INSURANCE EXCHANGE TEXAS HOMEOWNERS POLICYHOLDERS WHO ACCORDING TO FARMERS RECORDS WERE ELIGIBLE TO RECEIVE DISCOUNTS FOR FARMERS PROPERTY RISK ASSESSMENT ("FPRA"), AGE OF HOME, OR TERRITORY FROM NOVEMBER 16, 2000 THROUGH AND INCLUDING DECEMBER 10, 2002 ("DISCOUNT CLASS MEMBERS").

ALL TEXAS HOMEOWNERS OR AUTO INSURANCE POLICYHOLDERS OF FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY OR TRUCK INSURANCE EXCHANGE WHO ACCORDING TO FARMERS RECORDS WERE PROVIDED OR SHOULD HAVE BEEN PROVIDED A NOTICE OF ADVERSE ACTION BASED ON CREDIT HISTORY AT ANY TIME FROM OCTOBER 1, 1999 THROUGH FEBRUARY 28, 2003 ("CREDIT USAGE NOTICE CLASS").

NOTICE IS HEREBY GIVEN of the settlement of a lawsuit pending in the 261st Judicial District Court of Travis County, Texas (Civil Action No. GV202501) ("the Action"), in which the Attorney General of the State of Texas has brought suit in the name of the State of Texas, the Texas Department of Insurance, and the Texas Commissioner of Insurance (hereafter collectively defined as the "State"), and has filed a class action claiming that one or more of Fire Underwriters Association, Farmers Group, Inc. d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (collectively, the "Farmers Parties") failed to disclose information with respect to their calculation of premiums, committed unfair and deceptive acts or practices in the business of insurance, and unfairly discriminated against Texas policyholders of the Farmers Parties in the

30491657.1

business of insurance. The State also alleges anticompetitive practices with respect to the Farmers Parties' sale and marketing of their homeowners and automobile insurance policies. The Farmers Parties have denied the State's allegations and alleged numerous affirmative defenses. On December 18, 2002, the State and the Farmers Parties executed a Settlement Agreement and Stipulation and subsequently an Amended Settlement Agreement and Stipulation ("Settlement Agreement"), providing for the certification of certain settlement classes ("Settlement Classes") who would receive or be eligible to apply for certain financial and other benefits. These benefits and the Settlement Classes contemplated by the Settlement Agreement (including the Rate Class, the Discount Class, and the Credit Usage Notice Class) are more fully described in the "Notice of Proposed Class Settlement."

IF, AT ANY TIME AFTER OCTOBER 1, 1999, YOU WERE INSURED BY THE FARMERS PARTIES THEN YOU MAY BE ELIGIBLE TO SHARE IN THE BENEFITS OF THE SETTLEMENT.

The proposed settlement provides benefits that vary based on which class you are in. Rate Class Members are eligible for a 6.8% refund of earned base premiums paid on HO-A policies incepted or renewed from December 28, 2001, up to and including November 10, 2002, either in the form of a refund check or a credit upon renewal after approval of the settlement. Discount Class Members who did not receive discounts for FPRA, age of home, and territory at the level agreed to by the State and the Farmers Parties are eligible to receive an Individualized Discount Adjustment payment. Credit Usage Notice Class Members are eligible to make a claim against the Credit Usage Notice Adjustment Fund, designed to reimburse those policyholders who paid a higher premium for auto or homeowners insurance due to erroneous credit information on the individual's credit history maintained at a credit bureau, which led the Farmers Parties to charge higher premiums than they would have charged with correct credit information. In addition, any person who renews or receives a new homeowners insurance policy with the Farmers Parties from November 11, 2002, through August 31, 2003, will pay a base premium that is 6.8% less than they would otherwise have paid (the total premium paid depends on other factors in addition to base rates). The Farmers Parties have also agreed to refrain from certain conduct in the marketing of their homeowners and automobile insurance policy products and to compensate the State in the amount of $2 million for the State's fees, costs and expenses in the Action and related proceedings.

**Rate Class Members and Discount Class Members need not do anything to receive creditor payments provided for under the settlement for these classes. However, if you are a Credit Usage Notice Class Member who desires to make a claim against the Credit Usage Notice Adjustment Fund, you must fill out and return a Claim Form postmarked on or before May 15, 2004. Claim Forms and copies of the "Notice of Proposed Class Settlement," which more fully describes the Action, the Settlement Agreement, and the rights and options available to Settlement Class Members, have been mailed to persons in the Settlement Classes. If you have not received your Notice of Proposed Class Settlement, you may obtain a copy by sending a request including your name and mailing address by first-class U.S. mail to David C. Holland; Rust Consulting, Inc.; 501 Marquette Avenue, Suite 700; Minneapolis, MN 55402.**

**Any requests for exclusion from the proposed settlement must comply with all applicable**

procedures and be sent by first-class U.S. mail to "Exclusion Requests"; c/o Rust Consulting, Inc.; P.O. Box 9348; Minneapolis, MN 55440-9348, postmarked by August 29, 2003. Rights, obligations, and procedures regarding exclusion are fully explained in the "Notice of Proposed Class Settlement."

Any objections to the proposed settlement must comply with all applicable procedures and be sent by first-class U.S. mail to the District Court Clerk of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas 78701, the second addressed to David C. Mattax, Chief, Financial Litigation Division, P.O. Box 12548, Austin, Texas 78711-2548, and the third addressed to Richard N. Carrell, Fulbright & Jaworski L.L.P., 1301 McKinney, Suite 5100, Houston, Texas 77010-3095, postmarked by August 29, 2003. The procedures and requirements for making an objection are fully explained in the "Notice of Proposed Class Settlement."

The Judicial District Court of Travis County, Texas, has ordered that a hearing take place in the Courtroom of the 53rd Judicial District Court of Travis County, Texas, on the 29th day of September, 2003, at 9:00 o'clock a.m. to determine the following: (1) whether the proposed settlement of the class action litigation on terms set forth in the Settlement Agreement dated December 18, 2002, as amended, is fair, reasonable and adequate; and (2) whether the Court should enter the proposed Final Judgment.

DO NOT CONTACT THE COURT OR THE CLERK'S OFFICE FOR INFORMATION.

DATED: _____, 2003.

# EXHIBIT 3

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**

CAUSE NO. D-1-GV-02-002501

| | | |
|---|---|---|
| CHARLES O. "CHUCK" GRIGSON, | § | IN THE DISTRICT COURT |
| | § | |
| Intervenor – Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, THE TEXAS | § | |
| DEPARTMENT OF INSURANCE, AND | § | |
| THE TEXAS COMMISSIONER OF | § | |
| INSURANCE, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| FARMERS GROUP, INC., *et al.* | § | |
| | § | |
| Defendants. | § | 261ST JUDICIAL DISTRICT |

## <u>INTERVENOR GRIGSON'S</u>
## <u>FOURTH AMENDED PLEA IN INTERVENTION</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CHUCK GRIGSON ("Grigson"), a 2014 Intervenor who respectfully makes the following objections to the March 4, 2015 Settlement, and who seeks the following relief:

## I.     DISCOVERY – LEVEL 2

### A.     Discovery has been stayed since September 2003.

No discovery has been allowed in this case for over twelve (12) years.[1]  A 2013 Second Amended Settlement Agreement ("SASA") was summarily rejected by the Court

---

[1] The Court's Order staying all discovery in this cause was entered on September 10, 2003.  Exhibit A. Numerous Motions to lift the stay have been filed – and each opposed by the Farmers Defendants – with the State taking "no position."

on April 29, 2014 without lifting the stay. This rejection, by the very terms of the SASA, took the status of this case back to "square one – no settlement, no certification." 9/4/2014 Tr. at 55:9-56:25. Exhibit B. The Settling Parties delayed presenting any new settlement to this Court for over eleven (11) months when, on March 6, 2015, they filed their Joint Motion for Preliminary Approval of a new 2015 version which is set for hearing on July 1. Grigson's Response to that Motion (without exhibits) is attached as Exhibit C.

**B.**     Grigson himself has twice sought to lift the Court's stay -- with his Second Motion set to be heard on Thursday, May 28, 2015 at 2:00 P.M. Grigson's Motion seeks only new matters raised by the 2015 proposed settlement.[2] Grigson will seek Level 2 discovery under Tex. R. Civ. P. 190.3 in the event the Court's Stay is lifted.

## II.     UNDISPUTED FACTS

1.     FGI is owned by Zurich Insurance Group of Zurich, Switzerland;

2.     The Exchanges are owned by their policyholders;

3.     The assets and surplus in the Exchanges are not owned by FGI, but by the policyholders themselves who own the Exchanges;[3]

---

[2]  Exhibit D. [Grigson's Informal Requests for Discovery to Settling Parties].

[3]  The Farmers website describes the "Relationship between the Exchanges and FGI" as follows:

> The Farmers Insurance Exchange, Fire Insurance Exchange and Truck Insurance Exchange are California inter-insurance exchanges **owned by their policyholders**.
> \*     \*     \*
> The Exchanges do not hold an ownership interest in Farmers Group, Inc., or its subsidiaries, and neither **Farmers Group, Inc., nor any of its subsidiaries holds an ownership interest in any of the Exchanges.**

http://www.farmers.com/management/  [Emphasis added].

4. Grigson is a current policyholder in the Farmers Insurance Exchange and, as such, is also a putative class member in the classes for which certifications are sought;

5. As an owner of the Farmers Insurance Exchange, Grigson is likewise an owner of the Policyholder Surplus within that Exchange;

6. FGI is an Attorney-in-Fact ("AIF") pursuant to a Subscription Agreement signed (or deemed signed) by Exchange Policyholders;

7. All conduct alleged as unlawful in the State's live pleading was committed by FGI while acting as AIF for the Exchanges and their policyholder owners;

8. The State's lawyers originally filed this case as an enforcement action, rather than a class action;

9. The State's lawyers agreed to change this case to a class action at the insistence of the Farmers Defendants as a condition of settlement;

10. The Settling Parties then entered a Memorandum of Understanding ("MOU") dated November 30, 2002, which set up the framework for subsequent settlement agreements between the Settling Parties;

11. On June 27, 2003, the Court entered an Order of Preliminary Approval relating to a "settlement agreement and stipulation of December 18, 2002, as amended on June 13, 2003 ("Settlement Agreement");

12. The Court's Order certified three separate classes (the "settlement classes") – "only for purposes of effectuating the settlement agreement" as defined in number 11 above;[4]

13. The Settling Parties superseded for all purposes the Settlement Agreement referenced in the Court's June 27, 2003 Order by entering the "SASA" dated August 29, 2013;

14. The Court declined approval of the SASA on April 29, 2014;[5]

15. On December 4, 2014, the State's lawyer, Joshua Godbey, pledged to the Court that "any settlement and the agreement in fact – any settlement going forward is conditioned on the fact that the Board of Governors of the Exchanges will approve of the settlement with the advice and consultation of independent counsel;"[6]

16. On December 17, 2014, the Settling Parties entered a new MOU containing paragraph 9 on page 2:

> Defendants' acceptance of this settlement is expressly conditioned on approval of the settlement terms and conditions by the Audit Committee of the Boards of Governors of each of the Exchange Defendants, which the State understands will be advised by separate counsel;[7]

---

[4] See Exhibit E Order of Preliminary Approval; June 27, 2003.

[5] See Exhibit F 4/29/2014 Tr. at 12:11.

[6] See Exhibit G 12/4/2014 Tr. at 66:3-7.

[7] See Exhibit H December 17, 2014 MOU.

17. On March 4, 2015, the Settling Parties entered into a "Supplement" containing a paragraph 2 on page 4 as follows:

> 2. This Settlement Agreement, this Supplement, and the exhibits attached to both agreements constitute the entire agreement amount the parties. All other agreements and understandings between the Parties, including the MOU and the 2014 MOU, are superseded by the Settlement Agreement and this Supplement. To the extent there is any conflict between the Settlement agreement and this Supplement, the Supplement will control;"[8]

18. Locke Lord LLP has continuously represented FGI from 2012 until the present;

19. The proposed 2015 settlement does not change the 2003 and 2013 settlements' requirement that current policyholders make all payments, including the costs of providing class notice, from the current policyholders' surplus which they own;[9]

20. FGI pays nothing to the putative class members under the 2015 settlement;

21. The Farmers Defendants have been represented by common legal counsel throughout the pendency of this case;

22. The current policyholders' funding of the proposed 2015 settlement (including the sending of class notice) will diminish the surplus currently owned by Grigson and the other policyholders in the Exchanges;

---

[8] See Exhibit I March 4, 2015 "Supplement to the Second Amended Settlement Agreement and Stipulation."

[9] THE COURT: All right. Now, who pays it? Now respond to Mr. Longley's series of questions.
\* \* \*
THE WITNESS: *They will be made from the Exchanges* back to the individual policyholders.
THE COURT: From the nationwide Exchange?
THE WITNESS: That's correct.

Vol. 3 CR at 221 [Stephen Leaman – VP of FGI]. (Emphasis added). Exhibit J.

23. Grigson filed a Motion to Lift Stay on Discovery on March 13, 2015 relating to the new issues raised by the 2015 settlement;

24. On the same date, Grigson sought informal discovery from the Settling Parties;

25. On April 10, 2015, the December 17, 2014 MOU was produced by the OAG;

26. On May 14, 2015 (at 10:58 AM), the State produced 116 pages of documents that have been shared between the Settling Parties;

27. The Farmers Defendants have produced nothing in response to Grigson's informal discovery requests;

28. The Settling Parties have agreed that all funds claimed on behalf of putative class members by putative class counsel (OAG) on behalf of class members "shall be evidenced by a check that shall be valid for not less than 120 days after issuance. Any such checks that are uncashed, unclaimed, undeliverable, or not negotiated after 120 days from issuance shall be subject to Texas Property Code §72.002 *et seq.*"[10]

29. The Joint Motion for Preliminary Approval has been set for July 1, 2015, over the objection of Grigson's counsel; and

30. Pursuant to the Court's thirty-day briefing rule, Grigson must file his Response to Settling Parties Joint Motion prior to the May 28 hearing on his Motion to Lift Stay.

---

[10] 6. **Unclaimed Funds.** The cash components of the Settlement Fund shall be evidenced by a check that shall be valid for not less than 120 days after issuance. Any such checks that are uncashed, unclaimed, undeliverable, or not negotiated after 120 days from issuance shall be subject to Texas Property Code §72.002 *et seq.*

## III.    GRIGSON'S OBJECTION TO USE OF AFFIDAVITS BY SETTLING PARTIES

Grigson objects to the Affidavits attached to the Joint Motion, and requests a plenary hearing by live testimony and/or testimony that has been subject to cross-examination – as required by *GMC v. Bloyed*, 916 S.W.2d 949, 958 (Tex. 1996).

## IV.    GRIGSON'S SUBSTANTIVE OBJECTIONS TO THE 2015 SETTLEMENT

Grigson objects to the 2015 Settlement as being a product of collusion, conflicts of interest, and inadequacy of putative class counsel.

The Settling Parties have demonstrated actual collusion; multiple conflicts of interest; an absence of adequate legal representation for putative class members; and multiple breaches of fiduciary duties: all of which, jointly or severally, prevent the preliminary approval and class certification sought for the 2015 Settlement by the Settling Parties.  See Exhibit C.

Reprehensible greed and self-dealing by Farmers Group, Inc. ("FGI") has resulted in this blatant attempt to loot current Policyholders' Surplus of $84.38 million dollars allowing FGI to obtain a global release from 1.8 million Texas policyholders.[11]  Such scheme has been crafted by the Farmers Defendants' and implemented by their conflicted lawyers taking advantage of a compliant and inadequate putative class counsel. See Exhibit C.

---

SASA at 13.

[11]  This is precisely the kind of "disparity" that the Texas Supreme Court used to affirm the rejection of the class settlement in *GMC v. Bloyed*, 916 S.W.2d 949, 956 (Tex. 1996) ["In essence, the court of appeals overturned the settlement because it decided that the potential windfall to GMC outweighed all the reasons supporting approval"].

The primary mechanism of this scheme is the tainted agreement between the Settling Parties and their conflicted lawyers to have innocent policyholders pay a settlement which allows the rogue fiduciary, FGI, to get off scot-free[12] by using a collusive class action as a device to obtain a global release from 1.8 million policyholders that FGI has harmed.[13]

## V.     PROCEDURAL OBJECTION

The 82 page patchwork settlement – including its confusing format – is the product of collusion between the Settling Parties.

No red-line copy is provided for an amalgamation of a 2015 Supplement (with exhibits) together with portions of the rejected 2013 SASA (with exhibits) which requires the reader to cross back-and-forth between eighty-two pages of separate documents in order to glean the terms of the new settlement.   The cumbersome format of this patchwork settlement is deliberate.  From this "jumble" of terms, no one can determine if (1) they are a member of a class; (2) if so, which one; (3) are they entitled to money; and (4) if so, how much?

Two things, however, are clear: this Settlement has neither been approved – nor certified.  We are at "square one" according to the Court.  "So it seems to me we're back at square one with no settlement, no certified class, because you were the party who

---

[12]  "Scot-free" is an old English term dating from 1528 meaning "without deserved punishment."  Merrill-Webster's Dictionary.

[13]  The 1.8 million policyholder figure comes from the Settling Parties themselves.  Joint Motion Exhibit B to the March 14, 2015 Supplement at 5.

asked for it, and now you don't agree to it, according to your own signed document."
9/4-2014 Tr. at 55:13-17. Exhibit B.

Settling Parties Joint Motion should be denied.

## VI. RELIEF SOUGHT

As a current policyholder and putative class member, Grigson seeks the protection of this Court from the irreparable harm he will sustain from depletion of his share of current Policyholders' Surplus which will immediately result from court approval of the Settling Parties collusive agreement. Putative class members, including Grigson, cannot avoid this irreparable harm by opting out. That option is only afforded putative class members after notice has been sent.

Accordingly, Grigson seeks the Court to deny the Joint Motion for Preliminary Approval.

## VII. CONCLUSION

Due to the procedural and substantive objections set forth above, the proposed 2015 Settlement cannot be maintained and/or certified under either §541.249 Texas Insurance Code or Rule 42, Tex. R. Civ. P.

Accordingly, the Court should deny Settling Parties Joint Motion for Preliminary Approval by entry of an appropriate order.

WHEREFORE, PREMISES CONSIDERED, Grigson prays that the Court deny Settling Parties Motion for Preliminary Approval. Grigson further seeks such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

CHARLES O. "CHUCK" GRIGSON
INTERVENOR

LAW OFFICES OF JOE K. LONGLEY

_____*/s/ Joe K. Longley*_____
Joe K. Longley
State Bar No. 12542000
1609 Shoal Creek Blvd. #100
Austin, Texas 78701
512-477-4444 PHONE
512-477-4470 FAX

LAW OFFICE OF PHILIP K. MAXWELL
Philip K. Maxwell
State Bar No. 13254000
1609 Shoal Creek Blvd #100
Austin, Texas 78701
512-947-5434 PHONE

ATTORNEYS FOR INTERVENOR,
CHARLES O. "CHUCK" GRIGSON

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served on the following counsel of record by email transmission on this the 15th day of May, 2015.

Joshua Godbey
Office of the Attorney General of Texas
P. O. Box 12548
Austin, TX  78711-2548

Sara Waitt
General Counsel
Texas Department of Insurance
P. O. Box 149104
Austin, TX 78714-9104

Richard N. Carrell
Norton Rose Fulbright
1301 McKinney, Suite 5100
Houston, TX 77010-3095

M. Scott Incerto
Norton Rose Fulbright
98 San Jacinto Blvd #1100
Austin, TX 78701

Marcy Greer
Alexander Dubose Jefferson & Townsend, LLP
515 Congress Ave., Suite2350
Austin, TX 78701

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217

Joseph C. Blanks
PO Box 999
Doucette, TX 75942

_____/s/ Joe K. Longley_____
Joe K. Longley

# EXHIBIT 4

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

CAUSE NO. D-1-GV-02-002501

| | | |
|---|---|---|
| CHARLES O. "CHUCK" GRIGSON, | § | IN THE DISTRICT COURT |
| | § | |
| Intervenor – Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, THE TEXAS | § | |
| DEPARTMENT OF INSURANCE, AND | § | |
| THE TEXAS COMMISSIONER OF | § | OF TRAVIS COUNTY, TEXAS |
| INSURANCE, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | |
| | § | |
| | § | |
| FARMERS GROUP, INC., *et al.* | § | |
| | § | |
| Defendants. | § | 261ST JUDICIAL DISTRICT |

### INTERVENOR GRIGSON'S RESPONSE IN OPPOSITION TO CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF CLASS SETTLEMENT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, INTERVENOR CHUCK GRIGSON and, subject to his

objections to the proceedings set forth below, files his response in opposition to class

certification and preliminary approval of class settlement.[1]

---

[1] When the words "Attorney General" are used in this court document, it does not mean Ken Paxton, Greg Abbott, or John Cornyn, but rather the office of attorney general ("OAG"), a legal entity. Being barred from formal discovery restricts our ability to prove as unfounded the serious ethical issues raised by the uncontroverted evidence presented herein.

# I.

## OBJECTION TO THE DENIAL OF DISCOVERY, THE REQUIREMENT THAT OBJECTIONS BE FILED BEFORE DISCOVERY, AND THE SCHEDULING OF THE PRELIMINARY APPROVAL HEARING WITHOUT CONSENT AND WIHTOUT ADEQUATE TIME FOR DISCOVERY

Contrary to the Supreme Court's ruling in *Bloyed v. General Motors*, 916 S.W.2d 949 (Tex. 1996), guaranteeing to class settlement objectors the right to discovery, contrary to the Court's 2003 procedures and rulings upholding free and open discovery into first settlement proposal in this case, and contrary to the Court's current concern over the lost benefit of the adversary system in determining the rights of citizens who are not here to protect themselves, the Court has thus far refused to lift a discovery stay entered over 12 years ago when a now abandoned settlement agreement was on appeal. Thus Grigson—who was not a party then—is forced to proceed blindfolded in objecting to a new settlement.[2] The settling parties know the details of the settlement negotiations, but Grigson and his fellow objectors don't. Thus, the outcome of the hearing on the new settlement—which the Court has scheduled for July 1, a scant 47 days from the date of this filing—will be determined, not by what the facts reveal, but by what facts are concealed.

---

[2]  At 10:50 AM yesterday, May 14, 2015, the State delivered 116 pages of what appear to be "shared documents" that passed between the "Settling Parties." These came only after the Commissioner of Insurance and the Assistant Attorney General were subpoenaed for the May 28 Lift stay hearing. The Assistant AG actually objected to Grigson's informal discovery requests as "neither reasonable nor targeted." Ex. A. Grigson has requested other "shared documents" that he believes to exist – but have not been voluntarily produced. Ex. B.

Contrast the Court's procedures now—no formal discovery at all—with the procedure the Court ordered in 2003, described accurately by the State and Farmers in their joint motion now before the Court:

> The Court continued the hearing for four months, allowing the intervenors to conduct discovery on their objections. Thousands of pages of documents—representing all contemporaneous communications between the State and Farmers relating to this litigation—were exchanged. The intervenors were also afforded the opportunity to take depositions and other forms of discovery relating to the settlement. **As a result, they were allowed to discover, in advance of the initial hearing, precisely what transpired in the settlement negotiations**.

(Emphasis added).

Without such an open process, due process is denied and the settlement, whatever its terms, cannot be approved. Grigson objects to the Court's ban on discovery, the setting of the hearing on preliminary approval, without his consent, the time allotted to the hearing, and the requirement that Grigson file his objections without discovery.

## II.

### INCORPORATION OF OTHER DOCUMENTS

Grigson seeks judicial notice, of and incorporates herein as if fully set forth (a) all objections made to the settlement agreements submitted for Court approval in this case; (b) Grigson's motion to lift stay[3] and his reply to the settling parties' response;[4] (c)

---

[3] Intervenor Grigson's Motion to Lift Stay on Discovery filed May 22, 2014. (Judicial notice requested of the filing with exhibits).

[4] Grigson's Reply to Farmers' Opposition to Motion to Lift Stay on Discovery filed on August 4, 2014. (Judicial notice requested of the filing with exhibits).

Grigson's amended motion to lift stay[5] and his reply to the settling parties responses;[6] (c) Grigson's motion to disqualify[7] and his reply to the settling parties' responses;[8] and (d) the letter to Judge Jenkins dated May 11, 2015 and filed on that date.[9]

**III.**

**OBJECTION TO FAILING TO MAKE A DETERMINATION THAT THE SETTLEMENT CLASSES MAY BE CERTIFIED**

Grigson objects to preliminary approval of the proposed settlement without a hearing on whether the settlement classes can be certified and a Court determination on that issue. That is precisely what the State and Farmers are asking the Court to do—simply ignore the class certification issue today and just use the conditional class certification back in 2003. The 2003 certification, however, has been abandoned and vacated, as the following discussion will show.

On **June 27, 2003**, the Court issued its order[10] giving preliminary approval to the State's and Farmers' "Amended Settlement Agreement and Stipulation dated June 13, 2003."[11] The Court's order conditionally certified three settlement classes, required that

---

[5] Intervenor Grigson's Second Motion to Lift Stay on Discovery filed March 13, 2015. (Judicial notice requested of the filing with exhibits).

[6] Intervenor Grigson's Reply to Settling Parties' Response to Grigson's Motion to Lift Stay filed April 27, 2015. (Judicial notice requested of the filing with exhibits).

[7] Intervenor Grigson's Motion to Disqualify Counsel filed September 19, 2014. (Judicial notice requested of the filing with exhibits).

[8] Grigson's Reply to "Plaintiffs' Response to Intervenor Grigson's Motion to Disqualify Counsel" and to "Defendants' Opposition to Motion to Disqualify Counsel" filed November 3, 2014. Ex. C.

[9] May 11, 2015 letter to Judge Jenkins from Joe Longley. Ex. D

[10] ORDER OF PRELIMINARY APPROVAL (June 27, 2003) (the "2003 Order"). Ex. E.

[11] AMENDED SETTLEMENT AGREEMENT AND STIPULATION (June 13, 2003)(the "2003 Settlement Agreement"). (Judicial notice requested of the filing with exhibits).

notice be sent to the class within thirty days, and set September 29, 2003 for the hearing "to determine whether the proposed Settlement Agreement is fair, reasonable, and adequate and should be approved and whether the Final Judgment should be entered[.]"[12] The Court's order further provided that, if the settlement agreement was not approved or if "for any reason" the effective date of the agreement (a defined term requiring final approval and a final judgment)[13] did not occur, either party could terminate the agreement and the actions taken under it "shall be vacated and terminated and shall become null and void."[14] Similarly, the settlement agreement provided that Farmers agreed to the certification of the settlement classes only to effectuate "this Settlement Agreement"[15] and that if "this Settlement Agreement" was terminated or if "for any reason" the effective date did not occur for any reason, "the conditional certification of the Settlement Classes shall be vacated."[16] The Court never entered a final judgment approving the 2003 settlement agreement and the effective date of the 2003 settlement agreement never occurred. Accordingly, under the provisions of the 2003 settlement agreement and the Court's 2003 order, the conditional certification of the settlement classes was vacated.

---

[12] 2003 Order, paras. 2, 6-7.

[13] The 2003 Order, in paragraph 1, "adopts all defined terms as set forth in the Settlement Agreement[,]" which defines "Effective Date" as the date by which several things must have occurred, among them preliminary and final court approval of the settlement and a final judgment. 2003 Settlement Agreement at 2.

[14] 2003 Order, para. 18.

[15] 2003 Settlement Agreement at 7, para. III.2.

[16] *Id.*, para. III.5.

On **August 29, 2013**, the State and Farmers signed the "Second Amended Settlement Agreement and Stipulation" ("SASA").[17] SASA states that it "amends and supersedes" the 2003 settlement agreement[18] and that "All other agreements and understandings between the Parties, including the MOU, are superseded by this Settlement Agreement."[19] SASA thus vacated the 2003 agreement (though it had already terminated by its own terms) and thus vacated the 2003 conditional certification of the settlement classes (though the certification was already vacated). SASA recognized that there were no certified classes by providing that "[t]he Parties agree that the Court may enter an order conditionally certifying the Settlement Classes and appointing the State of Texas, through the Attorney General, as the representative and counsel for the Settlement Classes[]" and that "[t]he State shall file an amended motion for preliminary approval that requests the Court to enter an Amended Order of Preliminary Approval substantially in the form of Exhibit A hereto." The order at Exhibit A states that, "Pursuant to Rule 42 and the Texas Insurance Code §§ 541.251 - .267, this Court hereby certifies, only for the purposes of effectuating the Settlement Agreement, the following Settlement Classes[.]"[20] SASA also stated that the Farmers parties "do not agree to certification of the Settlement Classes" except to "effectuate the Settlement Agreement" and that "[i]f this Settlement Agreement is terminated pursuant to its terms, or if the Effective Date does not occur for any reason, the conditional certification of the Settlement Classes shall

---

[17] SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATIONS ("SASA") (Ex. F) (w/o exhibits)

[18] *Id.* at 1 (first para.).

[19] *Id*. at 17 (para. 2).

[20] Proposed Order of Preliminary Approval attached as Exhibit A to SASA. Ex. G.

-6-

be vacated." SASA's definition of "Effective Date", like the 2003 Settlement's, required preliminary approval, final approval and final judgment.

On **April 29, 2014**, the Court denied preliminary approval of SASA, thus vacating (again) the conditional certification of the Settlement Classes.

On **September 4, 2014**, at the hearing on Grigson's motion to lift stay, Mr. Incerto said he didn't think the Court had actually disapproved of SASA. The Court disagreed.

> THE COURT: Well, I haven't approved this settlement agreement. In fact, I rejected it. So you are now in a posture where you don't agree with the class action. And in fact, you were the party who wanted the class action 12 years ago. So it seems to me we're back at square one with no settlement agreement, no certified class . . . .[21]

> THE COURT: I thought I was pretty clear on April 29th I'm declining to approve the second amended settlement agreement. I thought that was pretty clear, and I thought that you and I had that sort of meeting of the minds at the beginning of this hearing, but I guess if I wasn't clear, I'm hopefully clear now.[22]

On **March 4, 2015**, the State and Farmers entered into a "Supplement to the Second Amended Settlement Agreement and Stipulation" (the "Supplement"). The Supplement states that the State and Farmers "reaffirm their obligations and commitments made in the Settlement Agreement (SASA) subject to the enhancements, modifications, and conditions in this Supplement."[23] But unlike SASA—which obligated the parties to seek a court order conditionally certifying the settlement classes—the Supplement rescinds that obligation.

---

[21] 09/14/2014 Tr. at 55:9-15.

[22] *Id.* at 57:9-15.

[23] SUPPLEMENT TO THE SECOND SETTLEMENT AGREEMENT AND STIPULATION (the "Supplement") (Ex. H) at 1 (second para.).

As to Section III of the Settlement Agreement [SASA] on "Certification of Settlement Classes," the Parties acknowledge and agree that the District Court has certified the Settlement Classes in its Order of Preliminary Approval (June 27, 2003), that was appealed to the Third Court of Appeals and the Supreme Court, which affirmed the Order of Preliminary Approval, and the case was ultimately remanded to the District Court on March 9, 2010. Accordingly, *the Parties have satisfied the requirement of seeking certification of the Settlement Classes for purposes of Paragraphs 1-4* of Section III of the Settlement Agreement, although the other conditions of Paragraph 2 still apply.

Thus, the Supplement effectively amends SASA to say "The State shall ***not*** file a motion for preliminary approval that requests the Court to enter an Amended Order of Preliminary Approval substantially in the form of Exhibits A" (which does conditionally certify the settlement classes), and to say "[t]he parties do ***not*** agree that the Court may enter an order conditionally certifying the settlement classes and appointing the State, through the Attorney General, as class representative and class counsel."

The Supplement further provides that:

This Settlement Agreement, this Supplement, and the exhibits attached to both agreements constitute the entire agreement among the Parties. All other agreements and understandings between the Parties, including the MOU and 2014 MOU, are superseded by the Settlement Agreement and this Supplement. To the extent there is any conflict between the Settlement Agreement and this Supplement, the Supplement will control.[24]

Thus, again, SASA and all prior agreements, including the 2003 settlement agreement, are terminated and thus, again, any conditional certification of the settlement classes based on the 2003 settlement agreement is vacated.

_____

[24] *Id*. at 4, para. 2.

On **March 6, 2015**, the State and Farmers filed their Joint Motion to approve the Supplement.[25] Consistent with the State's and Farmer's new, "no certification" strategy agreed to in the Supplement, the Joint Motion prays only for preliminary approval of the settlement, approval of the class notice, and the setting of a date for the final approval hearing.[26] The State and Farmers ignore the Court's statement that, because he rejected SASA, there is "no settlement and no certified class." They offer no analysis of the contractual language they chose in SASA that would prove the Court wrong. Instead they try to breathe life into SASA by referring to the new Supplement that "reaffirms" SASA, apparently believing that they can agree SASA back to life and that, in turn, will bring the 2003 certification back to life too.[27] Here's what they say in a paragraph called "Other Updates in the Supplement."

> The parties have also clarified and acknowledged that: the Court has approved and certified the Settlement Classes as affirmed by the Texas appellate courts and as carried forward without change in the Second Amended Settlement Agreement; the parties have satisfied the requirement of seeking certification, as set forth in Paragraph of Section III of the Second Amended Settlement Agreement; and therefore the parties agree that the stipulations and agreements made in that Agreement have not terminated and remain in effect.[28]

---

[25] STATE OF TEXAS AND FARMERS PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION, SUPPLEMENT THERETO, AND CLASS NOTICE (the "Joint Motion") (Ex. I) (w/o exhibits).

[26] Joint Motion at 12. (Ex. I).

[27] The State's and Farmers' strategy to pretend that SASA is not terminated so they can say the 2003 class certification is not terminated explains the cumbersome manner they have presented the new settlement—by a "Supplement" that makes "modifications and enhancements" to SASA, requiring the reader to constantly flip back and forth between voluminous documents—rather than as a rather than as a stand-alone "amended settlement" as was SASA itself. The State and Farmers agreed in the 2014 MOU that the settlement could be presented either way. 2014 MOU at 2, para. 8. (Ex. J).

[28] Joint Motion at 20, para. F. (Ex. I).

-9-

Using the 2003 certification, the State and Farmers tell us, is a good idea because the Court can now do a better job in reviewing the settlement.

> As noted by this Court, affirmed by the appellate courts, and acknowledged and agreed to by the parties, this Court has already certified the Settlement Classes defined in the Second amended Settlement Agreement, *so the Court need not revisit that issue, allowing it to focus on the preliminary approval.*[29]

These preposterous passages from the Joint Motion demonstrate just how desperate—and how wrong—the State and Farmers are in asking the Court to avoid a proper class certification analysis. But why are they so desperate? It's certainly not to sharpen the Court's "focus on the preliminary approval." Here are the real reasons. First, they don't want the Court to certify a settlement class because that grants the objectors the right to an interlocutory appeal. Second, they don't want to try to defend an obviously inadequate class counsel who vowed to the Court never to submit a settlement for approval without requiring that "independent" counsel advise the Exchanges and then did the exact opposite, first agreeing with Farmers that Locke Lord—who also represents FGI—would be the counsel advising the Exchanges, then papering that choice by agreeing in the MOU to just "separate" counsel rather than "independent" counsel, and then agreeing with Farmers to make no mention at all that any counsel would be advising the Exchanges in the Supplement, which expressly supersedes the MOU. The State and Farmers also don't want to try explaining away class counsel's gaping conflict of interest in requiring—in violation of the Supreme Court's holding in *Highland Homes LTD. v.*

---

[29] Joint Motion at 23, n. 13. (Ex. I). (Emphasis added).

*State*[30]--that the Exchanges transfer what will be millions of dollars of policyholder money to the black hole of the State's swollen "unclaimed property fund" where it will never be claimed and instead will be spent by the State as soon as it is deposited. Nor do the State or Farmers want to deal with defense counsel's glaring conflict of interest in aiding and abetting FGI's self-dealing misappropriation of policyholder money held in the Exchanges' accounts which it controls in order to buy its immunity for the wrongs it has done. And the State and Farmers don't want to have to torture a path around the intra-class conflict of interest (identified by Intervenor Woods) between non-current policyholders being paid with surplus funds that only current policyholders own, an intra-class conflict that afflicts all three Exchanges. Just as serious is the conflict between the current policyholders in Truck Insurance Exchange, who does not issue homeowners policies, yet are paying at least $5 million dollars of their policyholders' surplus to fund a settlement to be paid to holders of homeowner policies. These facts speak loudly against certification of the settlement classes. So loudly that it would be an abuse of discretion to refuse to determine whether the settlement classes that were certifiable in 2003 are still certifiable in 2015.

[30] 448 S.W.3d 403 (Tex. 2014).

# IV.

## OBJECTION TO THE APPOINTMENT OF THE STATE OF TEXAS AND/OR THE ATTORNEY GENERAL AS CLASS REPRESENTATIVE OR CLASS COUNSEL

First, the Attorney General and the State have a serious, disabling conflict of interest with the interests of the policyholders in the class with regard to the disposition of the tens of millions of dollars of the settlement that will never be negotiated by the class. Second, and most importantly, the Attorney General has displayed remarkably bad judgment and rank disregard for the ethical commands of the profession in the handling of this case. These two things require the Court to deny appointment of the Attorney General as class counsel.

To begin with, the proposed settlement anticipates that not all of the checks drawn on the surplus of the Exchanges and sent to the class will be negotiated. It is in the interest of the State of Texas for the undistributed Exchange surplus to go to the State's unclaimed property fund, for there it earns no interest for the owner of the money, is spent by the State as fast as it can be deposited,[31] and, because of the low claim rate for

---

[31] *See* Clark v. Strayhorn, 184 S.W.3d 906, 908 (Tex.App.—Austin 2006, rev'd den.), *cert. den.* 549 U.S.995 (2006), a class action against the Comptroller for not paying interest on money that owner's successfully reclaim. The trial court granted the Comptroller's pre-certification motion for summary judgment. In affirming, the court of appeals said:

> In response to an open records request, the Comptroller had initially reported earning millions of dollars of interest on unclaimed property. This report had been corrected in writing before the hearing, and witnesses for the Comptroller testified that no interest had been earned because unclaimed property is deposited into an account that has a negative balance. **The Comptroller asserts that the money is spent the moment it is received.**

(Emphasis added).

small amounts, the State can keep the money in perpetuity.[32]  On the other hand, it is in the interests of the current policyholders who own the surplus to retain the undrawn surplus, where it can earn a return and be available to pay claims.  The State and the Attorney General, with the consent of Farmers, has chosen the State over the policyholders, providing in the settlement agreement that any "checks that are uncashed, unclaimed, undeliverable, or not negotiated after 120 days after issuance shall be subject to Texas Property Code, § 72.001 *et seq.*"[33], the Unclaimed Property Act.

Last year in *Highland Homes LTD. v. State*,[34] the Supreme Court ruled that undistributed class settlement proceeds are not "unclaimed" property and thus are not subject to Unclaimed Property Act.  The State, represented by the Attorney General, was the losing party in the case.  The winning party, Highland Homes, was represented by Marcy Greer (both as a Fulbright lawyer and an Alexander Dubose lawyer).  The Attorney General knows that class proceeds are not "unclaimed property" and yet continues to sponsor a settlement agreement that unlawfully deems them to be so, all to detriment of the policyholders.  Grigson objects to the undistributed settlement proceeds going to the State's unclaimed property fund.

Second, the OAG is inadequate and unqualified to serve as class counsel as illustrated by misrepresentations to the Court concerning the independence of the lawyer Farmers has selected to give legal advice to the Exchanges on whether they should agree

---

[32]  There is $3.9 Billion in unclaimed property. http://comptroller.texas.gov/up/about.php.

[33]  See SASA at 18, para. 4 of Section IV.  Ex. F.

[34]  448 S.W.3d 403 (Tex. 2014).

to the proposed settlement now before the Court and other issues much graver. The following narrative timeline sets forth chronology of the last 24 months and describes the conduct we believe bars appointment of the OAG as class counsel.

The misrepresentation occurred on **December 4, 2014**, when the Court heard Grigson's motion to disqualify the Farmers' lawyers grounded upon the serious conflict of interest between the policyholder-owned Exchanges, who in all versions of the settlement from 2002 to the present are required to pay all of the settlement, while FGI, who committed all of the acts claimed unlawful by the State pays nothing. Grigson's motion told the Court that a conflict of interest between FGI and the Exchanges had existed from the beginning of the case because the Attorney General had expressly pled a conflict of interest in his original suit—that FGI had conflicts of interest and engaged in self-dealing by charging excessive management fees that, in turn, caused the Exchanges to charge excessive premiums. In other words, the Attorney General pled that it was FGI who caused the Exchanges to violate state law. Farmers' lawyers responded that they had no conflict of interest because they had never advised the Exchanges on the "allocation" of the settlement. This meant, Grigson replied, that the Exchanges had *no* lawyers to advise them on whether to settle or what to pay, the most important issues facing the Exchanges.

Grigson's motion to disqualify brought to a head the concern the Court expressed on **April 29, 2014**, when it rejected SASA—what the Court termed the "representational conflict" and the "potential for unfairness to the exchanges vis a vis the corporation."

The Court told the State and Farmers this issue would have to be addressed before the Court could grant even preliminary approval of a settlement in the case.[35]

The State and Farmers did nothing to "address" this issue, or any other raised by the Court, until Grigson filed his Motion to Disqualify the Farmers' lawyers. The motion was filed **September 19, 2014** and the notice of hearing was filed **October 3, 2014**, informing the State and Farmers that the motion would be heard on **December 4, 2014** at 2 p.m.

On **December 1, 2014**—three days before the hearing on the motion to disqualify—the State and Farmers met with Patrick Keel, a lawyer mediator. Grigson and his lawyer declined to attend.[36] Intervenor Woods (unrepresented) and Joe Blanks

---

[35] The Court said it could not remember whether this issue had been dealt with in 2003, and asked assistant attorney general Mattax whether it had. Mattax said he didn't remember and wanted to defer to Farmers' lawyers.

> MR. MATTAX: I don't recollect. And let me, if I could, defer to Norton Rose and see if they have a recollection, if that's okay, or should we do that later?
>
> THE COURT: No, let's finish yours.
>
> MR. MATTAX: Okay.
>
> THE COURT: But they'll make a note, and they'll know they're going to have to explain that if it was in that trial, because I don't have enough of a recollection to be confident going forward that I can approve the settlement given this issue that I'm now discerning about the potential for unfairness to the exchanges vis-a-vis the corporation. That's something I don't remember anybody briefing for me ten plus years ago.
>
> MR. MATTAX: Let me --
>
> THE COURT: And I'm going to need that to be satisfied that I can ever approve this settlement or give preliminary approval, so somebody's going to have to address that.
>
> MR. MATTAX: Very good, Your Honor.

04/29/2014 Tr. at 50:3-22 (Ex K).

[36] Longley emailed Keel that he would not attend the Mediation eight days before the Mediation because of the pending motion to disqualify. See *infra* fn. 42

(lawyer for Intervenor Hooks) did attend. There was no plenary session at the mediation. Keel met briefly with Woods and Blanks at the beginning and briefly with them at the end. Between the beginning of the mediation in the morning and the end of the mediation between 3:30 and 4 PM, Keel met only with lawyers for the State (Godbey) and Farmers (Incerto and Carrell) while Woods and Blanks waited. Keel did not tell Woods or Blanks anything about the negotiations between Farmers and the State or whether there was anything that the State and Farmers agreed on. At the end of the mediation in the afternoon, Keel told Woods and Blanks that he needed to confirm their authorization that he could make a report to the Court and that he would send an email for that confirmation. Keel did not call or email Longley to say that he was going to call the Court or to ask Longley for his authorization.

On **December 3, 2014**, **at 6:30 or 7:00 p.m**. on the evening before the hearing on Grigson's motion to disqualify, Keel called the Court at 6:30 or 7:00 p.m. Grigson does not know if Keel afterwards called Incerto or Godbey to report that the call to the Court had been made or what was said. But at **7:30 p.m. that same evening**, Incerto emailed Godbey the new MOU.[37]

> David & Josh,
>
> Attached is a term sheet/MOU setting out the terms of settlement. Please note that paragraph no. 5 is to rectify a mistake carried over into the 2nd Amended SA. Please let me know if you have any questions or concerns about this provision. *The rest of the deal terms are self-explanatory and are intended to reflect our discussions and agreements from*

---

[37] Incerto email to Godbey, December 3, 2014, 7:30 p.m. (Ex. L). (Emphasis added).

*mediation*. Should you have any changes to the MOU please let me know; otherwise, please execute the MOU on behalf of The Plaintiffs and return a copy to me, as I will do on behalf of the Defendants.

Best, regards,
Scott

On **December 4, 2014**, at the hearing on the motion to disqualify and after the opening statements of Longley and Bob Newman (who represented the Farmers at the hearing), Godbey rose to speak.

> MR. GODBEY: Your Honor, Joshua Godbey from the Texas Attorney General's Office representing the State of Texas, the Texas Department of Insurance and the commissioner of insurance. I will be the only one speaking as it stands right now. Mr. Mattax has been delayed with some transition meetings, so I hope to fill in. But I know he did want me to briefly let the Court know that in part because of Your Honor's urging and in part because we thought it would be fruitful, the State, the Farmers defendants, Mr. Blanks and Mr. Woods *engaged in a mediation earlier this week on Monday* that we believe has been very fruitful. And *there are two issues from there that I think bear for the Court and are important to note in terms of agreements in principle that have been reached.*[38]

The Court did not take this opportunity to announce on the record that Keel had called him the night before to report on the mediation. Instead, the Court said:

> THE COURT: Well, then I think that *you'll have to communicate that to the Court as part of the motion. If that's important for the purposes of the motion today, then I will let them decide, that is the Farmers lawyers to decide, whether to share time in order to incorporate that information for my purposes today.* Otherwise, I would ask that you make a report to the Court as necessary for any future proceedings or scheduling. All right?[39]

---

[38] 12/04/2014 Tr. at 11:10-12:15 (Ex. M). (Emphasis added).

[39] *Id*. at 12:2-11. (Emphasis added).

During his argument, lawyer Newman made several references to a settlement that had been reached between the State and Farmers that he said would solve the problem raised by the motion to disqualify. This was one.

> MR.NEWMAN: The reality is a settlement in this case, which Mr. Godbey can inform the Court of in just a moment, where we are on that issue, will unquestionably entail an evaluation by -- for a very colloquial inexact term, a guardian ad litem. It will involve an evaluation by an independent counsel. And additionally a settlement in this case will absolutely not include, as the State has said in its briefing and as we've said, an interparty release between FGI and the exchanges. So there is no conflict at this time.[40]

When Mr. Newman was through, he passed the argument to Mr. Godbey to tell the Court about the two issues that the State and Farmers has settled "in principle:"

> MR. GODBEY: Then, Your Honor, I'll be as brief as I can to not take any extra time from Mr. Newman. The question before that Mr. Newman did a good job of not opining on, I think the State would believe that -- in the affirmative, that there would be nothing in the current settlement or in the agreements in principal to be reached that would preclude the type of action after this settlement that Your Honor had asked about. And that is in part because -- and as we have briefed, and we did leave something open in our briefing, which we have reached agreement in principal [*sic*] on after our mediation on Monday, is that there will be no interparty release in any further amendments to the settlement that are made. It will remain a cross-party release where the State and TDI and the commissioner are releasing the Farmers parties. There is no release between the exchanges and FGI. And there will be none inserted in any amendment down the road.
>
> THE COURT: And you mediated with Patrick Keel, former Judge Patrick Keel.
>
> MR. GODBEY: We did.

---

[40] *Id.* at 54:5-14.

THE COURT: And all of the people who decided to participate in mediation suggested that he let me know that you reached an agreement in principal [*sic*] without giving me any details about it.

MR. GODBEY: That's correct.

THE COURT: *And he did, just for the sake of transparency, let me know. I spoke with him briefly last night at 6:30 or so, 6:30 or 7:00. It's not common for me to do that, but for the sake of everybody knowing, I did.* All the people who participated in the mediation I understood authorized him to do that, and so I did briefly. I didn't get the details, but I understand that you're dealing with some of these issues and hope to present -- potentially present a proposed settlement for preliminary approval assuming we get farther down the road after this hearing.

MR. GODBEY: That is correct, Your Honor. And we do believe it was very fruitful and productive. The other point that was agreed to in principal at the mediation and I believe is bearing on this, as Mr. Newman has alluded to, is the notion sort of like the guardian ad litem example that has been raised. Any settlement and the agreement in fact – any settlement going forward is conditioned on the fact that the board of governors of the exchanges will approve of the settlement with the advice and consultation of independent counsel.

THE COURT: Apart from Fulbright.

MR. GODBEY: That's correct, Your Honor.

THE COURT: I understand.

MR. GODBEY: So there will be -- they will have to sign off on it and it will not happen -- it will not be -- it will not reach the point of being brought to this Court if it has not been signed off on and they have had the chance to consult and have been advised by independent counsel other than Fulbright before that happened.

THE COURT: And even with that, what I'm inferring so far from what you're saying and *what I understand, is that you've been dealing with the very issues Mr. Longley's raised about how much should be paid in this settlement by the exchanges vis-a-vis the corporation?*

-19-

MR. GODBEY: *Those are points that came up* in the mediation at well, and we still working on things, but by and large, *we do have an agreement, and we are working towards agreements on those as well* that we would put down in writing to bring forward to the Court.

THE COURT: Anything else I need to know?

MR. GODBEY: Nothing else from the State, Your Honor. Hopefully I used no more than two or three minutes of Mr. Newman's time.[41]

A fair reading of this exchange leads to three disturbing conclusions: First, the night before the Court was to decide whether to disqualify Farmers' lawyers the Court received an ex parte communication from the State and Farmers (courtesy of Keel[42] who they requested make the communication) that Farmers and the State had reached an agreement on an alternate way to deal with the conflict raised in the motion. The Court knew Longley had not authorized Keel to call because the Court knew Longley was not at the mediation and that it was "the people who participated in the mediation authorized [Keel] to do that.

Second, Godbey, who represented the State at the mediation, colluded with Farmers' lawyers to make the ex parte communication to the Court through Keel.

---

[41] *Id.* at 65:3 – 67-8. (Emphasis added). Ex. M.

[42] At the time Keel made the call to the Judge, presumably at home, he (Keel) had knowledge of Grigson's Motion to Disqualify and that it was to be heard on the next day, December 4. Ex. N.

Third, the purpose of the ex parte communication was to predispose the Court to deny the motion, which is exactly what the Court did. What other purpose could there have been? If the purpose of having Keel update the Court on the status of settlement talks, why have Keel call before the hearing? Why have Keel call at all? Why not just wait until the next day and have Godbey make the report, which is exactly what Godbey did?

Fourth, the purpose of the mediation itself was not to resolve the four concerns the Court had expressed in rejecting the settlement on April 29. It was to get a deal on juse one of the concerns—the "representational conflict" of the lawyers. Godbey rose at the beginning of the hearing not to make a general report to the Court about the progress at the mediation on the Court's four concerns. He rose to tell the Court that the State and Farmers had agreed to wire around the conflict so the motion did not need to be granted. Godbey reported nothing on whether FGI would be contributing to the settlement, the prejudgment issue, or excluding the *Geter* class. They were just "points that came up in the mediation as well that they were still working on." The State's and Farmers' negotiating priority and orchestrating the call by Keel the night before the hearing, were conceived and executed to kill the motion and to save the conflicted lawyers. Nothing would have blown the conspiracy of the settling parties more decisively than the hiring of new, skilled and aggressive litigators to pursue FGI on behalf of the policyholder-owned Exchanges. The State and Farmers couldn't stand that. And they didn't.

These facts support the conclusion that the colluding lawyers for the Settling Parties violated the Rules of Professional Conduct. Rule 3.05 states that:

A lawyer shall not:

(a) seek to influence a tribunal concerning a pending matter by means prohibited by law or applicable rules of practice or procedure;

(b) except as otherwise permitted by law and not prohibited by applicable rules of practice or procedure, communicate *or cause another to communicate* ex parte with a tribunal for the purpose of influencing that entity or person concerning a pending matter[.]"[43]

Comment 3 to the Rule states:

**Ex Parte Contacts**

3. Historically, ex parte contacts between a lawyer and a tribunal have been subjected to stringent control because of the potential for abuse such contacts present. For example, Canon 3A(4) of the Texas Code of Judicial Conduct prohibits many ex parte contacts with judicial officials. *A lawyer in turn violates Rule 8.04(a)(6) by communicating with such an official in a manner that causes that official to violate Canon 3A(4).* This rule maintains that traditional posture towards ex parte communications and extends it to the new

---

[43] TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT, RULE 3.05(emphasis added).

settings discussed in paragraph 2 of this Comment [dealing with communications with arbitrators][44].

Canon 3 of the Texas Code of Judicial Conduct has been revised so that the ex parte communications rule now appears in Canon 3(B)(8), which provides:

> A judge shall not initiate, permit, or consider *ex parte* communications or other communications made to the judge outside the presence of the parties between the judge and a party, an attorney, a guardian or attorney ad litem, an alternative dispute resolution neutral, or any other court appointee concerning the merits of a pending or impending judicial proceeding. A judge shall require compliance with this subsection by court personnel subject to the judge's direction and control.[45]

Matching the plain meaning of these rules with the known conduct in this case, it is clear that the Rules have been violated. Whether further action regarding these violations should be taken is worthy of serious consideration. But one thing is clear, the OAG has forfeited any claim or right to be class counsel.

---

[44] *Id.*, COMM. 3 (emphasis added).

[45] TEXAS CODE OF JUDICIAL CONDUCT, CANON 3B(8). The rule imposes on court staff the obligation to prevent ex parte communications to the court. That may explain why Keel made his call to the Court after the close of business at the courthouse. The Court has an experienced, well-trained, highly capable and loyal staff. They are well-known for strictly screening calls to the Court and handling virtually all calls themselves. If the Court talks to anyone calling his office, it will only be after the staff has determined that the Court needs to talk to the caller and has cleared that decision with the Court.

Moreover, everything Godbey told the Court about the lawyer Farmers would hire for the Exchanges--that the lawyer would be "independent" and would act like an "attorney *ad litem*" to advise the Exchanges whether they should settle—was not true. Not one word of it. FGI picked Locke Lord, and the OAG agreed. Locke Lord currently represents FGI and has for years.[46] Except for FGI's lawyers in *Fogel*, there is no set of lawyers on the planet less "independent" of FGI and its influence than Locke Lord. Professor Charles Silver testified, without contradiction, that Locke Lord could not represent the Exchanges in this case because a lawyer cannot advise one of his clients whether to sue another of his clients. Even Mr. Newman, Farmers lawyer at the hearing, said the same thing.[47]

> THE COURT: That gets to the question I asked him. Are they precluded from subsequent litigation assuming somebody has standing to bring the litigation and wishes to bring it between the two defendants to determine who should reimburse the other for whatever payments flow in this case?
>
> MR. NEWMAN: *Judge, the short answer is I'm not in a position without creating a conflict to opine as to whether or not one of my clients can sue another one of my clients*.
>
> THE COURT: There you go.
>
> MR. NEWMAN: Thank you, Your Honor.
>
> THE COURT: Very careful answer.
>
> MR. NEWMAN: Thank you.

---

[46] Locke Lord cases representing FGI: 2012 to present. Exhibit O.

[47] 12/4/2014 at 53:11-24. (Ex. M). (Emphasis added).

To reach a sound decision whether you should accept a settlement that requires you pay all of a settlement and for your co-defendant to pay nothing requires, at the least, legal advice whether you have a claim against your co-defendant that might lessen or extinguish the settlement demand of the plaintiff. In the Exchanges case, reaching such a sound decision requires, at the least, legal advice whether FGI charged excessive management fees that caused the Exchanges to charge excessive premiums that the State demands be refunded, and whether that conduct breached FGI's fiduciary duty to the Exchanges entitling the Exchanges to damages or fee forfeiture.[48] A competent "independent" lawyer called to give that opinion today would have to say yes, and cite *Fogel v. FGI* which netted a settlement for $445 million for 12.5 million policyholders. Locke Lord can't do that because it *represents* FGI. FGI, by any stretch of the imagination, is not an "independent" lawyer that can "act like an attorney ad litem."

At the time Godbey made his "independent" lawyer representation to the Court, he had already received Incerto's email and attached MOU that stated:

> 9.     Defendants' acceptance of this settlement is expressly conditioned on approval of the settlement terms and conditions by the Audit Committee of the Boards of Governors of each of the Exchange Defendants, which the State understands will be advised by *separate* counsel.[49]

---

[48] Attorney General Wenzel argued in opening for the State at the 2003 hearing that their discussions prior to the settlement "raised a question whether there was a conflict between Farmers Group and the Exchanges and their subscribers because the more premium that is charged in the policy, the more money the management fee company, Farmers Group, makes whether there was any conflict of interest or self-dealing involved in that." 5/19/03 CR Vol. 1 82:14-20.

[49] 2014 MOU at 2, para. 9. (Ex. J). (Emphasis added)

Having only gotten the Exchanges a "separate" lawyer in the MOU, Godbey then signed the "Supplement" settlement now before the Court, which expressly supersedes the MOU.[50] So Godbey not only failed to get the Exchanges an "independent" lawyer, he invalidated the only contract that got them any lawyer at all. This is textbook inadequate representation.[51]

In conclusion, the OAG is neither a competent, nor an adequate class counsel. And as shown by the ex parte contact with the Court, the OAG has been, in a "best base" scenario, wholly oblivious to the ethical obligations required of a competent and adequate class counsel.

Moreover, the OAG labors under a conflict that forces it to demand that the undistributed funds of the settlement, which will be in the tens of millions of dollars, be "subject to" the Unclaimed Property Act when the Texas Supreme Court has held that undistributed class funds are "claimed" funds *not* "subject to" the Act. The OAG cannot serve as class counsel.

---

[50] Supplement at 4, para. 2. (Ex. H).

[51] The concern over the true independence of the lawyer selected to advise on the current settlement is important, but at the same time misses the bigger picture --the independent lawyer may be 12 years late coming to the aid of his client. As Farmers and the State say in their Joint Motion urging approval of the new settlement, the new settlement "does not re-trade the deal; it maintains much of the substance of the Second Amended Settlement Agreement and thus the 2003 Settlement Agreement." Joint Motion at 16. Farmers and the State are absolutely right. The two main parts of the settlement—who pays and how much—were decided in the negotiations in the closing days of 2002 and memorialized in the 2003 settlement approved by the Court that year. The Exchanges had no lawyer representing their interest at that time—when it really would have made a difference. From the beginning this case has been all about settling and settlements, and never about developing the State's—and hence the Exchanges' claim— against FGI, action that would have improved the outcome for the Exchanges. The Attorney General pled a startlingly strong claim against FGI in 2003, but had no stomach to pursue it, and there was no lawyer for the Exchanges to pick up the sword and keep charging. The Farmers' lawyers' conflict of interest today is real and should be addressed, but the most serious damage their conflict has inflicted on the Exchanges occurred when the original settlement was signed.

## CONCLUSION

Every problem in this case stems from one simple fact – the Exchanges are paying the settlement and FGI, excepting its vaguely worded obligation to reimburse the Exchanges in the future, is paying nothing. This core fact guarantees the conflict of interest suffered by the lawyers because FGI controls the Exchanges subject only to the common law fiduciary duty imposed on attorneys-in-fact to not engage in self dealing.

The State and Farmers have suggested that the answer to this problem is not to disqualify the lawyers and hire the Exchanges new ones that will prepare the clearly available case against FGI and start real, arms-length bargaining with FGI, but to let the Exchanges pay now and sue FGI later if they want to. That answer, of course, does not respond to the question, "Do the lawyers have a clear conflict of interest? (of course they do) and "Is the conflict such that the lawyers should be disqualified?" (of course it is). The "let them sue later if they want to" answer is not an answer at all to the lawyers clear conflict, but a way to wire around it. And it isn't really that either, because FGI and its powerful parent Zurich Insurance Group control the Exchanges, and they're never going to allow the Exchanges to sue them.

So, since the State and Farmers continue to seek the Court's blessing of a wire around solution, let us suggest one that at least has a hope of working. Require *FGI* to pay the whole settlement and let *FGI* sue the Exchanges later "if *it* wants to." Do for *FGI* what the OAG says to do for the Exchanges—make sure the settlement doesn't contain a release that would prevent FGI from suing the Exchanges "later if it wants to." And consider this. FGI doesn't even have to sue the Exchanges to get their money back.

They can get their money back by bumping their management fee, selling the Exchanges more reinsurance, or in some other way it will figure out at the next company meeting in Zurich. Judge Highberger mused during the approval hearing in *Fogel* that:

> The other money that's coming off the books of Zurich and going into the Exchanges, can't be reversed out as readily as just putting it back there in January 2nd or April 2nd. It's going to be slower and harder for Farmers to get its greedy little fingers on it over time by repricing the attorney in fact fee.

FGI's actions to get back their money may be breaches of fiduciary duty, but they won't have to be dealt with until *later*.

The Court can make this far superior wire around solution a reality. Just say no to the current settlement and strongly suggest that it happen.

WHEREFORE, PREMISES CONSIDERED, Grigson prays that the Court deny Settling Parties Joint Motion for Preliminary Approval. Grigson further prays for such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

CHARLES O. "CHUCK" GRIGSON
INTERVENOR

LAW OFFICES OF JOE K. LONGLEY

_____/s/ Joe K. Longley_____
Joe K. Longley
State Bar No. 12542000
1609 Shoal Creek Blvd. #100
Austin, Texas 78701
512-477-4444 PHONE
512-477-4470 FAX

LAW OFFICE OF PHILIP K. MAXWELL

_____/s/ Philip K. Maxwell_____
Philip K. Maxwell
State Bar No. 13254000
1609 Shoal Creek Blvd #100
Austin, Texas 78701
512-947-5434 PHONE

ATTORNEYS FOR INTERVENOR,
CHARLES O. "CHUCK" GRIGSON

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served on the following counsel of record by email transmission on this the 15th day of May, 2015.

Joshua Godbey
Office of the Attorney General of Texas
P. O. Box 12548
Austin, TX 78711-2548

Sara Waitt
General Counsel
Texas Department of Insurance
P. O. Box 149104
Austin, TX 78714-9104

Richard N. Carrell
Norton Rose Fulbright
1301 McKinney, Suite 5100
Houston, TX 77010-3095

M. Scott Incerto
Norton Rose Fulbright
98 San Jacinto Blvd #1100
Austin, TX 78701

Marcy Greer
Alexander Dubose Jefferson & Townsend, LLP
515 Congress Ave., Suite2350
Austin, TX 78701

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217

Joseph C. Blanks
PO Box 999
Doucette, TX 75942

_____/s/ Joe K. Longley_____
Joe K. Longley

# EXHIBIT 5

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, and FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, | § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS |
| Defendants. | § § § § | 261ST JUDICIAL DISTRICT |

## STATE OF TEXAS AND FARMERS PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION AND CLASS NOTICE

DAVID C. MATTAX
Director of Defense Litigation
JOSHUA GODBEY
Assistant Attorney General
JAMES R. WENZEL
Assistant Attorney General, Consumer
Protection Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
209 West 14th Street
Austin, Texas 78711-2548

RICHARD N. CARRELL
State Bar No. 03871000
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713-651-5151
Telecopier: 713-651-5246

M. SCOTT INCERTO
State Bar No. 10388950
MARCY HOGAN GREER
State Bar No. 08417650
FULBRIGHT & JAWORSKI L.L.P.
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

OVERVIEW ........................................................................................................................... 1

BACKGROUND FACTS......................................................................................................... 2

    A.   History of the State's Claims    4

    B.   Recovery for the Class Members    7

    C.   The Court Conducts a Thorough Preliminary Hearing    8

    D.   The Seven-Year Appeals Process Ultimately Vindicates the Attorney General's Authority    10

    E.   The Nationwide Class Action Settlements in *Fogel* and *Mobbs*    10

        1.   The Fogel Action—Management Fee Claims    11

        2.   The Mobbs Action—FCRA Claims    12

EXPLANATION OF CHANGES TO SETTLEMENT AGREEMENT AND NOTICE .............. 13

    I.   The Second Amended Settlement Agreement is Ripe for Preliminary Approval    13

    A.   FCRA Claims Process Update and Carve-Outs    14

    B.   Updating of Terms    15

    C.   FCRA Adverse Action Notices    15

    D.   Injunctive Relief    16

    E.   Class Notice    16

ARGUMENT AND AUTHORITIES........................................................................................ 17

    I.   Preliminary Approval is the First of a Two-Step Approval Process    17

    II.   The Proposed Settlement is Well Within the "Range of Possible Approval"    18

    A.   The Terms of the Second Amended Settlement Agreement Track the Favorable Terms of the 2003 Settlement Agreement    20

    B.   The *Bloyed* Factors That Will Be Considered at the Ultimate Fairness Hearing Counsel in Favor of Preliminary Approval    21

        1.   There is no evidence of collusion    22

        2.   The complex issues presented would undoubtedly result in protracted litigation if not settled    22

        3.   The facts and legal theories were sufficiently developed to permit a proper analysis of the settlement terms    22

        4.   There is a significant chance that the State will be unable to establish liability or damages    23

        5.   The Settlement Agreement actually exceeds the anticipated recovery, considering the highly uncertain nature of liability and the damages sought    24

6. The opinions of experienced counsel confirm the fairness of the settlement to the class members 24

III. The Court Should Approve the Class Notice 25

CONCLUSION AND PRAYER ...................................................................................27

**CERTIFICATE OF SERVICE** ...................................................................................29

## OVERVIEW

In 2003, after an extensive hearing lasting four days, this Court issued preliminary approval of a $117,500,000 settlement—one of the largest property and casualty insurance settlements in Texas history. The settlement resolved a bitterly fought dispute between the State of Texas and the Farmers Parties that had threatened Farmers' ability to continue business in the Texas market. A series of appeals lasting almost a decade delayed further implementation of this landmark agreement, but those appeals have now been resolved in favor of this Court's original ruling. In the interim, nationwide class actions in California and Oklahoma have raised and settled claims that overlap some of the issues addressed in the 2003 Settlement Agreement in this case, and in so doing have entirely disposed of a number of Intervenors' objections to the 2003 Settlement Agreement.

The State and Farmers have amended the 2003 Settlement Agreement to bring it current to 2013. The parties now seek preliminary approval of the Second Amended Stipulation and Settlement Agreement ("Second Amended Settlement Agreement").[1] The Second Amended Settlement Agreement is an update—not a renegotiation—of the 2003 Settlement. This update in large part simply reflects the fact that the parties have already voluntarily implemented all the prospective relief terms agreed in 2003. With respect to the still-outstanding retrospective monetary relief agreed in 2003, the Second Amended Settlement Agreement provides the same recovery to the class as the 2003 Settlement Agreement. Only where the passage of time has made the proposed claims process for the Credit Usage Class unworkable (as explained below)

---

[1] The executed Second Amended Settlement Agreement is attached as Exhibit 1. A redlined copy of the Second Amended Settlement Agreement is provided as Exhibit 2, showing the changes from the Amended Settlement Agreement executed in 2003 and preliminarily approved by the Court. The exhibits to the settlement agreement that were changed to conform to the amendments are also attached to Exhibit 2.

have the parties adopted a substantively similar recovery mechanism that has previously been approved by the federal court in the Oklahoma class action addressing similar claims. Additionally, in recognition of the overlap between the Oklahoma and California actions and this case, the Second Amended Settlement Agreement permits the Texas policyholders included in the other class actions to maintain their recovery here despite overlapping claims.

Because the Second Amended Settlement Agreement is as fair and beneficial to Texas insureds as the 2003 Settlement Agreement, which this Court has already preliminarily approved, the State and Farmers respectfully request that this Court grant preliminary approval of the Second Amended Settlement Agreement and approval of class notice.

## BACKGROUND FACTS

The genesis of this lawsuit was the State of Texas' commencement of an investigation of Farmers' homeowners insurance practices in the fall of 2001. That investigation led to a number of complex, interrelated civil lawsuits and administrative proceedings. The Attorney General brought this action under his *parens patriae* authority provided by the Insurance Code to represent the Farmers policyholders in Texas. His authority was vigorously contested in seven years of appeals, but has been definitively settled by the appellate courts, *see Farmers Grp., Inc. v. Lubin*, 222 S.W.3d 417 (Tex. 2007) (Exhibit 3), and the settlement classes have been upheld against a variety of challenges by objectors. *See Lubin v. Farmers Grp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602 (Tex. App.—Austin Nov. 6, 2009, no pet.) (Exhibit 4).

After weeks of vigorous and intensive litigation on multiple fronts—on the eve of the effective date of an onerous *ex parte* cease and desist order issued by TDI—the Farmers parties and the State reached an agreement over the Thanksgiving holiday in 2002. A $117 million settlement agreement was executed in January of 2003. The settlement was designed to be

comprehensive and to conclude completely the litigation surrounding the challenged insurance practices. To insure this global peace, the State converted this action from a pure *parens patriae* to a class action under a provision of the Insurance Code. This change did not alter the nature of the claims or the State's representation of all Farmers' policyholders statewide—only the procedural vehicle through which the global peace would be implemented.

Some of the claims the State had been pursuing on behalf of the Farmers policyholders overlapped with private class and individual actions. Before the preliminary approval hearing, eleven law firms representing five policyholders intervened and submitted objections to the settlement agreement—Gilberto Villanueva, Michael Paladino, Jan Lubin, and Gerald and Lesly Hooks (collectively, "Intervenors").

The Court continued the hearing for four months to permit the Intervenors discovery and an opportunity to brief the issues. After an unprecedented four-day evidentiary hearing, the Court certified the settlement classes and preliminarily approved the settlement, overruling each of the myriad objections raised by the Intervenors.

The certification order was appealed by the Intervenors, commencing an appellate process that lasted seven years. After the court of appeals' final decision in 2009, the case was remanded to this Court, and the parties jointly requested that it be informally stayed so that overlapping class actions in California and Oklahoma involving some of the particular claims could be resolved on a nationwide basis. As explained below, those nationwide settlements are now final, and the State and Farmers have amended their settlement agreement to explain both the interplay of those settlements on the one presented and some other matters that needed revision due to the passage of time.

## A.    History of the State's Claims

A bit of context is necessary to fully understand the circumstances that gave rise to the controversy. As a result of a vast increase in claims for mold and water damage in the late 1990s, rates for homeowners insurance across the State of Texas began to rise. Farmers and other Texas insurers were offering homeowners policies under the HO-B policy form that, at the time, was asserted by policyholders to provide coverage for mold and water damage claims.[2] As the number of these claims under HO-B policies rose sharply, so did HO-B rates.

Because no insurer in Texas may offer a homeowners policy that has not been approved by TDI, in November 2001, the homeowners insurance industry asked for TDI's approval to offer a new HO-A homeowners policy. Responding to the growing crisis, TDI approved the new HO-A policy form that excluded coverage for most mold and water damage claims. Farmers, like virtually all Texas insurers, ceased offering HO-B policies and instead began offering its policyholders HO-A policies as the HO-B policies came up for renewal.

In October 2001, the Office of Attorney General initiated a series of Civil Investigative Demands ("CIDs") directed to various Farmers entities on a variety of insurance practices and alleged conduct in Texas. In addition to the numerous CIDs, TDI also conducted a Market Conduct Examination beginning in January 2002, inquiring into many of the practices that later formed the basis of the State's suit against Farmers. In connection with these information requests, the Farmers entities collectively produced to the State approximately 10,000 pages of documents—many of which were proprietary and confidential—in cooperation with the State's investigation and engaged in a dialogue with TDI about its concerns. In addition, TDI

---

[2] The primary distinction between the HO-A and HO-B policies was the perception that the HO-B policy covered mold damage and the HO-A policy did not provide that coverage. In late 2006, the Texas Supreme Court concluded that the HO-B policy did not provide mold coverage. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006).

representatives were allowed to go to the Farmers' regional office to review documents and conduct computer searches.

On August 5, 2002, the State of Texas and the Commissioner filed suit against Farmers Insurance Exchange and Fire Insurance Exchange ("Exchanges"), as well as related entities, complaining of Farmers' homeowners' insurance practices in Texas, seeking permanent injunctive relief and monetary "restoration" of alleged overpayments made by insureds, as well as civil penalties and attorneys' fees.

Within a week of filing the lawsuit, TDI's staff prepared and presented to the Commissioner an application for emergency cease and desist order, requesting the Commissioner to order the Exchanges to change their rate practices under TDI's authority to regulate "unfair methods of competition" or "unfair practice[s]." Emergency Cease and Desist Order (Exhibit 5). The Exchanges were given no prior notice and were not provided an opportunity to participate in the *ex parte* process leading to the issuance of the cease and desist order on the same day. The cease and desist order restricted the Exchanges' rate practices—specifically requiring them to cease and desist from increasing their rates and seeking to regulate the components of their new rates—and threatened the Exchanges with civil penalties of $25,000 "for each act of violation" of the order. The order compelled the Exchanges to alter their policy practices by imposing significant conditions on all new or renewal policies that were to take effect in 90 days. Farmers sought review of the order both through the administrative process and in the courts.

The principal challenge to Farmers homeowners' practices was based on policyholder complaints that the new HO-A forms provided less coverage—excluding mold and limiting coverage for water damage—and charged excessive rates. Although the policy forms were regulated and approved by TDI, as noted above, the rates that the Exchanges charged were

statutorily exempt from TDI regulation at the time. *See* TEX. INS. CODE ANN. art. 19.12(a) (repealed).

While Farmers vigorously defended its actions and was confident of its legal position, it risked losing its franchise in the struggle. Farmers was left with three difficult choices: (i) withdraw from the Texas market; (ii) comply with, but continue to challenge, the cease and desist order; or (iii) settle its differences with the State.

The Exchanges had already lost $1.3 billion in the Texas homeowners lines in the approximate two-year period prior to this time. As the litigation and other tensions mounted, Farmers made the reluctant decision on September 25, 2002, to announce its withdrawal from the Texas homeowners' insurance market. Although settlement communications continued throughout this time period, no resolution was apparent.

By early October, the situation had become critical for Farmers. Several onerous requirements under the Cease and Desist Order were about to go into effect on November 6, 2002, that would have significantly compromised Farmers' ability to write homeowners' insurance without also jeopardizing its ability to meet obligations to other insureds. Acting at the request of their constituents, two state senators attempted to bring the parties back to the negotiating table. These discussions sparked renewed settlement efforts between the parties, and Farmers and the State continued to engage in numerous, lengthy face-to-face settlement discussions in an effort to reach a compromise. The parties continued their negotiations almost daily over the course of the next few weeks and, through that process, exchanged more documents and information. On November 30, 2002, they executed a Memorandum of Understanding ("MOU").

Based upon that MOU, the parties began to prepare a formal settlement agreement, meeting on an almost daily basis to iron out the remaining details of the settlement. Several weeks later, the original Settlement Agreement and Stipulation was executed. It provided that the settlement would be effectuated through a class action so that (i) court approval would be obtained to confirm the fairness of the agreement, (ii) the insureds would have both notice and an opportunity either to object or to "vote" by opting out of the class, and (iii) Farmers would have greater certainty and a "global resolution" of the pending matters. The agreement also contained a bilateral "blow-up" provision allowing either the State or Farmers to terminate the settlement if more than 2% of the insureds decided to opt out, meaning that if the settlement were rejected by a sufficient number of policyholders, the State also had the option to terminate.

## B. Recovery for the Class Members

The Settlement Agreement provided for three settlement classes, each of which would receive a different form of compensation, although Farmers insureds could be members of more than one class. The first class of Farmers' insureds received a 6.8% premium abatement both prospectively and retrospectively. Exhibit 2 § IV(1) & (2). The Attorney General believed that Farmers' rates were approximately 12% too high and explained to the Court that Farmers would not have paid more, and "given the vagaries of litigation," he believed the settlement was fair and adequate. Ltr. of Ltr. of David C. Mattax to Joe K. Longley dtd. March 12, 2003 ("Mattax Letter") (Exhibit 6).

The members of the second class received full restitution for any discrepancies in their premiums as a result of certain challenged discounts. Exhibit 2 § IV(3). This recovery was designed to resolve TDI's challenge to the manner in which Farmers had instituted a series of discounts off premiums for such things as age of home and location of home.

The third class of insureds, the Credit Usage Class, alleged that they failed to receive adequate notice that their credit reports might have adversely affected their insurance premiums in violation of the Fair Credit Reporting Act ("FCRA"). Under the settlement, a Credit Usage Fund was established, and these class members could receive full restitution on a claims-made basis, but had to prove that their credit reports contained erroneous information. *Id.* § IV(4). A prerequisite to any recovery from the fund was the policyholder's ability to retrieve a copy of his or her contemporaneous credit report, and with the passage of so much time while the settlement has been stayed, this provision had to be changed. The third-party credit agencies have indicated it is no longer possible to provide individual credit reports going back so far in time, and so this provision has been amended in the Second Amended Settlement Agreement to match the recovery provided in the *Mobbs* case, discussed below.

The estimated total value of the Settlement Agreement was $117,500,000. *Id.* § IV(9). The State of Texas recovered $2,000,000 in attorneys' fees, costs of investigation, and expenses. *Id.* § IV(8). The claims released included issues as to homeowners rating and renewal practices that had been raised in the various lawsuits between the State and Farmers.

## C. The Court Conducts a Thorough Preliminary Hearing

The State and Farmers then requested the Court to certify settlement classes and preliminarily approve the Settlement Agreement. At that point, Lubin, Paladino, Villanueva, and the Hooks intervened to challenge the proceedings.

The Court allowed the Intervenors to conduct discovery, and thousands of pages of documents—representing all communications between the State and Farmers relating to this litigation—were exchanged. They were also afforded the opportunity to take depositions and other forms of discovery relating to the settlement. As a result, the Intervenors were allowed to

discover, in advance of the initial hearing, precisely what transpired in the settlement negotiations.

The principal objections to the Settlement Agreement involved: (i) suggestions of collusion; (ii) the authority of the Attorney General to bring and settle the claims; (iii) the management fee component of the homeowners rates; (iv) the policyholders claims under the FCRA; and (v) Farmers' withdrawal from the HO-B line of policies in favor of offering the newly approved HO-A form of homeowners coverage. The Court found that there was "not . . . a scintilla of evidence of collusion," 5 RR 48 (Exhibit 7), and, as noted, the appellate courts have upheld the Attorney General's authority to bring and settle the claims on behalf of the Texas policyholders.

On May 19-22, 2003, the Court conducted a preliminary approval and class certification hearing with three full days of testimony. Prior to the hearing, hundreds of pages of briefing were provided to the court regarding the propriety of preliminarily approving the settlement and certifying the settlement classes. At the hearing, numerous witnesses and thousands of pages of exhibits were proffered by the parties. Professor Samuel Issacharoff, a leading national class action expert, testified that the hearing was "the most elaborate preliminary approval hearing I've ever been a part of." The Court actively participated in the hearing by questioning witnesses, and the Intervenors were allowed full participation as parties to the proceeding. At the conclusion of the hearing, the Court certified the settlement classes (with some changes to class definitions based upon testimony at the hearing) and preliminarily approved the Settlement Agreement. In several pages of transcript, the Court provided its reasons for determining that the Attorney General of Texas was not only an appropriate and adequate, but a vigorous and able, advocate for the interests of the Farmers' policyholders. 5 RR 45-58 (Exhibit 7). The

Intervenors appealed the decision and obtained a stay of class notice and further proceedings in connection with the settlement.

### D. The Seven-Year Appeals Process Ultimately Vindicates the Attorney General's Authority

On appeal, the Austin Court of Appeals overturned the certification order. The State and Farmers successfully sought review by the Texas Supreme Court, which unanimously upheld the Attorney General's authority to represent the Texas policyholders in this class action under the Insurance Code. *Lubin*, 222 S.W.3d at 424-28 (Exhibit 3).[3]

The case was remanded to the court of appeals to address the remaining challenges to the certification order. The court of appeals upheld the settlement classes against every other challenge to certification and eventually remanded to this Court. *See generally Lubin*, 2009 WL 3682602 (Exhibit 4).

### E. The Nationwide Class Action Settlements in *Fogel* and *Mobbs*

While the *Lubin* case was on appeal through the Texas appellate system, nationwide class actions progressed in California and Oklahoma. In particular, these class actions included the same management fee and FCRA related objections raised by the Intervenors with regard to the 2003 Settlement Agreement, and the Intervenors who raised them in this case have dismissed their claims and objections with prejudice.

---

[3] Justice Hecht concurred in part and dissented in part from the majority's analysis, but agreed that the Attorney General was statutorily authorized to bring and settle the claims.

## 1.    The Fogel Action—Management Fee Claims

A nationwide class action challenging the management fee charged by Farmers Group Inc. ("FGI")[4] to the Exchanges was filed in the Superior Court for the State of California for the County of Los Angeles, styled *Benjamin Fogel v. Farmers Group, Inc., et al.*, Case No. BC 300142 ("Fogel Action")..

The Exchanges are reciprocals, sometimes referred to as inter-insurance exchanges, created under California law.  They are not corporations, but rather, a different type of business entity through which individuals, partnerships, and corporations pool premiums to indemnify each other from loss.  They are managed by FGI in exchange for a percentage of premiums, referred to as the management fee.

The *Fogel* action, filed in August 2003, after preliminary approval of the *Lubin* settlement agreement, asserted that the management fee was excessive and made claims for breach of fiduciary duty, violation of California's Unfair Competition Law, fraud, and deceit against FGI.  The same claims asserted in the *Fogel* Action were also pursued by Intervenor Jan Lubin in intervening and objecting to the 2003 Settlement Agreement in this case.  The Villanueva and Paladino Intervenors likewise adopted those claims here.

After a vigorous contest in both the trial and appellate courts and following multiple mediations over the course of a year, a substantial settlement was reached in the *Fogel* Action. A final judgment approving the settlement agreement on behalf of a nationwide class was signed by the *Fogel* court on December 21, 2011.

Recognizing the overlap between the nationwide *Fogel* class claims and the claims of the Texas settlement class here, Farmers has agreed that it will not assert the defenses of release,

---

[4] Farmers Group Inc. does business as Farmers Underwriters Association, and Fire Underwriters Association is its subsidiary.  These entities will be referred to collectively as "FGI."

accord and satisfaction, estoppel, collateral estoppel (issue preclusion), res judicata (claim preclusion), or any similar defense that is based on the *Fogel* settlement agreement or the final judgment in the Fogel Action to preclude any recovery under the Settlement Agreement in this case. As a result, the *Fogel* class members in Texas may participate in, and do not need to opt out of, the benefits provided by this Settlement Agreement even if they were members of the class certified in *Fogel*.

### 2. The Mobbs Action—FCRA Claims

Another nationwide class was certified in *In re: Farmers Insurance Co., Inc. FCRA Litigation*, Case No. CIV-03-158-F, including all cases consolidated and coordinated in MDL No. 1564, before the United States District Court for the Western District of Oklahoma ("Mobbs Action"). The claims in that case revolved around allegations that the Farmers defendants violated the FCRA by taking adverse action against their insureds without providing sufficient notice as required under the federal statute, and the class sought statutory damages as a result. A final judgment approving the settlement agreement in *Mobbs* was entered by that court on September 29, 2011. The claims settled and released on a nationwide basis in *Mobbs* paralleled the FCRA claims and objections raised by some of the Intervenors as to the proposed 2003 Settlement Agreement in this case.

Except as to the class members who timely filed a completed claim form in *Mobbs*, the Farmers Parties have agreed that they will not assert the defenses of release, accord and satisfaction, estoppel, collateral estoppel (issue preclusion), *res judicata* (claim preclusion), or any similar defense that is based on the *Mobbs* settlement agreement or the final judgment in the *Mobbs* Action to preclude any recovery under the Settlement Agreement in *Lubin*. Those class

members who filed a proof of claim may still receive the other benefits provided under the *Lubin* Settlement Agreement if they are otherwise eligible to receive them.

The only intervention and objection that has not been dismissed at this point is the one filed by Intervenors Gerald and Lesly Hooks, who are also members of a class certified by another Texas court, styled *Sandra Geter v. Farmers Group, Inc., et al.*, No. No. E-0167872, in the 172d Judicial District Court of Jefferson County, Texas ("Geter Action"). The Geter class was not certified until *after* the Settlement Classes were certified in this case. The Hooks' counsel was present and given the opportunity to argue and question witnesses at the preliminary approval hearing in this case. *See* 2 RR 126-27; 3 RR 114-120 (Exhibit 8). None of the other Intervenors joined this objection. The Court has previously overruled their objections to this settlement in preliminarily approving the 2003 Settlement Agreement.

## EXPLANATION OF CHANGES TO SETTLEMENT AGREEMENT AND NOTICE

### I.     The Second Amended Settlement Agreement is Ripe for Preliminary Approval

Now that the appellate process has resolved all challenges to the certification of the proposed settlement classes, and the *Mobbs* and *Fogel* Actions have put to rest the key objections that were raised (and overruled) in the context of preliminary approval of the 2003 Settlement Agreement, the time has come to implement the agreement the parties negotiated so long ago. The Second Amended Settlement Agreement does not re-trade the deal or change the fine print. In fact, the parties have been operating since 2003 in compliance with many of the terms of the original 2003 Settlement Agreement, including the prospective relief to the Rate Class, the revised FCRA notices, and injunctive relief. *See, e.g.*, Proposed Class Notice (Exhibit 1-B).[5]

---

[5] A redlined version of the class notice reflecting the changes from the approved notice in 2003 is attached as Exhibit 2-B.

The Second Amended Settlement Agreement simply brings the settlement current in only a few ways.

## A. FCRA Claims Process Update and Carve-Outs

As noted, in the 2003 Settlement Agreement, a Credit Usage Fund was established to compensate the insureds who allegedly failed to receive adequate notice that their credit reports might have adversely affected their insurance premiums for any overpayments they might have made based upon erroneous credit information, provided that they could show that their credit reports contained erroneous information. Exhibit 1 § IV(4). A necessary prerequisite to this recovery was the policyholder's ability to retrieve a copy of his or her contemporaneous credit report, and with the passage of so much time while the settlement has been stayed, this provision had to be changed. Because the third-party credit agencies have indicated it is no longer possible to provide individual credit reports going back so far in time, this provision has been amended in the Second Amended Settlement Agreement to match the recovery provided in the *Mobbs* Action, which resolves the same FCRA issues for a nationwide class.

Notably, none of the *Mobbs* class members is precluded from participating in this settlement unless they previously filed a proof of claim in *Mobbs*. Exhibit 1 § IV(4)(a). Those class members who filed a proof of claim in *Mobbs* may still receive the other benefits provided under the Second Amended Settlement Agreement if they are otherwise eligible to receive them. Additionally, for those class members who did not file a proof of claim in *Mobbs*, but whose claims overlap the *Mobbs* class claims, the Farmers Parties have agreed that they will not assert the defenses of release, accord and satisfaction, estoppel, collateral estoppel (issue preclusion), *res judicata* (claim preclusion), or any similar defense that is based on the *Mobbs* settlement

agreement or the final judgment in the *Mobbs* Action to preclude any recovery under the Second Amended Settlement Agreement.

The Second Amended Settlement Agreement provides a similar carve-out for members of the *Fogel* class—who will likewise be permitted to participate in this settlement notwithstanding any recovery in *Fogel*. *See* Exhibit 1-B, "Other Class Actions That May Impact Your Rights."

## B.     Updating of Terms

No other settlement provisions required updating as extensive as the FCRA claims process, but, as noted, the prospective relief has already been provided, Exhibit 1 § IV(1)(a), (c)(3), and the retrospective rate relief warranted some updating due to the passage of time. For example, the refund checks can be issued thirty days after the effective date of the Second Amended Settlement Agreement, as the alternative date noted in the original agreement for policies that had not yet expired is no longer necessary. Exhibit 1 § IV(2)(a). Second, to reflect the fact that some of the policyholders covered by the Settlement Class are no longer Farmers insureds, language was added allowing Farmers to issue the rate reduction as a refund instead of a credit, where appropriate. *Id.* at § IV(2)(b).

Some terms were brought current because the events have already passed or circumstances have changed. *See id.* at §§ VII(1) (August 31, 2003, date has already passed); VII(5) (time for renewal of 2001-02 HO-A policies has long passed); IX(6) (TDI no longer uses a "benchmark" rate process).

## C.     FCRA Adverse Action Notices

Farmers has used the forms previously negotiated with the State in the 2003 Settlement Agreement for adverse action notices issued under the FCRA since the time of the initial settlement. *See* Exhibit 1 § IV(4)(i). Those notices required Farmers to disclose to its insureds

the discounts they would have received if they had excellent credit scores. Since the time these forms were initially agreed, two major developments have occurred in this area of the law. First, the Texas Legislature has statutorily decreed what is required in such notices, *see* TEX. INS. CODE ANN. § 559.051 *et seq.*, and the requirement is that the insured be advised that their credit was considered and how it was used in underwriting or rating the policy. *Id.* at § 559.053. The Texas statute does not require the notice to include any differentials showing what the rate would have been without consideration of the credit score.

Second, the U.S. Supreme Court has made clear that the "highest available discount" is not the standard for notices under the FCRA. *See Safeco v. Burr Ins. Co.*, 551 U.S. 47, 65, 127 S. Ct. 2201, 2213 (2007). Instead, the standard is whether the credit information "adversely affected" the policyholder. As a result, the parties have agreed that Farmers can cease using the exemplar forms once they have submitted replacement forms to TDI and provided a 30-day window for TDI to object. Exhibit 1 § IV(4)(i).

### D.    Injunctive Relief

Finally, the agreed proposed Final Judgment provided for injunctive relief relating to the State's antitrust claims (that were not brought by any of the Intervenors). Farmers has abided by this injunction since at least 2003, and the parties agree that ten years has been sufficient. Consequently, the State and Farmers Parties haves agreed that Farmers should not have to operate under a consent order in Texas any longer, but will continue to comply with the antitrust laws of the United States and the State of Texas.

### E.    Class Notice

The proposed class notice that the Court approved in 2003 needed more substantial revisions to help communicate the reasons for the decade-long delay and what has happened as a

55935052.6                                    - 16 -

result to the class members. Further, the notice needs to inform the class members about the multiple other class actions affecting their rights and advise them of their options so that they can make informed decisions. The parties have endeavored to make the class notice as clear and understandable as possible for the class members, taking into account the complexities of an already complicated settlement whose implementation has been delayed by the passage of so much time and impacted by other competing class actions.

Because the Second Amended Settlement Agreement maintains the full substantive recovery to Texas policyholders that was negotiated in 2003, the State and Farmers respectfully request that the Court grant preliminary approval to the Second Amended Settlement Agreement so that notice can be provided to the class members.

## ARGUMENT AND AUTHORITIES

### I. Preliminary Approval is the First of a Two-Step Approval Process

Court approval is required before any action brought as a class action may be settled. TEX. INS. CODE ANN. art. 21.21, § 18(g); TEX. R. CIV. P. 42(e). Courts generally look with favor on the voluntary resolution of litigation through settlement, particularly so in the context of a class action: "[C]lass action damage suits should be settled whenever possible, as soon as possible." *In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1157 (S.D. Tex. 1982); *see also In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982) (noting that public policy strongly favors pretrial settlement of class actions).

Approving a class action settlement as to a putative class is generally a multi-step process. MOORE'S FEDERAL PRACTICE: MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 (2004) ("MANUAL FOR COMPLEX LITIGATION").[6] Only the first step is to occur at the upcoming

hearing—preliminary approval of the proposed settlement and conditional certification of a temporary class. *McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 234 (Tex. 2001); *O'Reilly v. Brodie*, 975 S.W.2d 57, 59 & n.1 (Tex. App.—San Antonio 1998, pet. denied).

Upon preliminary approval, the court directs that notice be given to class members before proceeding with the second step of the process—a formal "fairness hearing" at which class members can be heard regarding the settlement and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented. *See* MANUAL FOR COMPLEX LITIGATION § 21.632.[7] This notice will provide the class members an opportunity to be heard at the final "fairness hearing" or to opt out of the classes.

The fairness hearing is the final step in the approval process where the Court will determine whether the settlement should be approved as fair, adequate, and reasonable, and whether it should be certified for the class. *E.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997); *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 954-55 (Tex. 1996).

## II. The Proposed Settlement is Well Within the "Range of Possible Approval"

The issue currently before the Court is limited to the first step in the approval process. The preliminary approval stage constitutes an "initial evaluation" of the fairness of the proposed

---

[6] Although commercially published as part of the MOORE'S FEDERAL PRACTICE papers, the MANUAL FOR COMPLEX LITIGATION is actually a manual prepared by the Federal Judicial Center, which compiled the experiences and counsel of federal judges having expertise in complex case management issues.

[7] Professors Newburg and Conte suggest that the Court's preliminary approval at this stage is not required in order to send the notice, but certainly desirable to avoid a costly notification. *See* 4 ALBA CONTE AND HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS ("NEWBERG ON CLASS ACTIONS") § 11.25 (4th ed. 2002) ("Because notice to the class, with its attendant expenses, and a hearing will be futile gestures if the court feels that some of the settlement terms are unacceptable at the outset, the parties are well advised to seek informally a preliminary court response in a pretrial conference that the proposed settlement is within the range of possible judicial approval.").

settlement, which can be made by the Court on the basis of written submissions and informal

presentation from the settling parties. MANUAL FOR COMPLEX LITIGATION § 21.632, 321 and n.

976 (citing *In re Amino Acit Lysine Antitrust Litig.*, MDL No. 1083, 1996 U.S. Dist. LEXIS

5308, *11 (N.D. Ill. Apr. 22, 1996)) (the first step of the process is the preliminary ascertainment

of whether the settlement appears to fall within the "range of possible approval").

The nature of the decision at the preliminary step of the settlement approval process is

limited:

> At this preliminary stage, the Court need only determine whether the settlement is "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). Preliminary approval does not require the district court to answer the ultimate question of whether a proposed settlement is "fair, reasonable, and adequate." *Armstrong v. Bd. of Sch. Dirs. Of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980). Rather, that determination is made only at the final approval stage, after notice of the settlement has been provided to the class members and they have had an opportunity to voice their views of the settlement or to exclude themselves from the settlement.

*City of Greenville v. Syngenta Crop Prot., Inc.*, No. 3:10-cv-188-JPG-PMF, 2012 U.S. Dist.

LEXIS 74305, *11-12 (S.D. Ill. May 30, 2012) (citing MANUAL FOR COMPLEX LITIGATION §

21.632).; *see also Bloyed*, 916 S.W.2d at 954 (quoting 2 NEWBERG ON CLASS ACTIONS § 11.27 at

11-50 (3d ed. 1992), for the proposition that "'[t]he actual class ruling is deferred in [settlement

class actions] until after the hearing on the settlement approval, following notice to the

class . . . .'"). The standard for approval—"[w]ithin the range of possible approval"—"is simply

a determination that there is, in effect, 'probable cause' to submit the proposal to members of the

class and to hold a full-scale hearing on its fairness, at which all interested parties will have an

opportunity to be heard and after which a formal finding on the fairness of the proposal will be

made." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983); *see

also Peters v. Blockbuster, Inc.*, 65 S.W.3d 295, 305 (Tex. App.—Beaumont 2001, no pet.)

(upholding trial court's preliminary finding that certification requirements had been met and finding that approval of the settlement agreement was not reviewable until after the fairness hearing). The Court held that this standard was met in 2003, and the changes made in the Second Amended Settlement Agreement provide no reason for coming to a different conclusion now.

A.    The Terms of the Second Amended Settlement Agreement Track the Favorable Terms of the 2003 Settlement Agreement

The Second Amended Settlement Agreement easily falls within "the range of possible approval." The updated agreement maintains the same significant concessions negotiated in 2003, including: (1) a significant rate reduction for homeowners insured by the Exchanges in Texas going forward—a rate reduction the Exchanges actually implemented in 2003; (2) a similarly significant, retrospective rate reduction for homeowners' policyholders; (3) a fund for individualized discount adjustments; (4) a fund to compensate any insureds whose credit reports contained adverse, but erroneous, credit information, without which the insureds would have paid lower premiums; and (5) attorneys' fees and investigative costs. *See generally* Exhibit 1 § IV.

The core terms of this settlement have already been vetted and approved in a detailed evidentiary hearing and the Court's thorough, well-reasoned ruling that has stood the test of the appellate process. Both this Court and the Austin Court of Appeals found persuasive the fact that the Attorney General believed the settlement was fair and adequate after a thorough and vigorously contested fight. *See Lubin*, 2009 WL 3682602, at *7 at n.9 (Exhibit 4); *see also* Mattax Letter (Exhibit 6). By executing the Second Amended Settlement Agreement, the Attorney General and TDI continue to stand behind this settlement as being in the best interests of the policyholders.

**B.     The *Bloyed* Factors That Will Be Considered at the Ultimate Fairness Hearing Counsel in Favor of Preliminary Approval**

In *General Motors Corp. v. Bloyed*, the Texas Supreme Court outlined six considerations, known as the *Ball* factors, that are considered by a court in evaluating the fairness of a proposed settlement:  (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and amount of discovery; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members.  916 S.W.2d at 955 (citing *Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 423-24 (Tex. App.—Fort Worth 1988, writ denied)).  The *Ball/Bloyed* factors remain the gold standard for settlement fairness review in Texas today.  *See, e.g., Hall v. Pedernales Elec. Coop., Inc.*, 278 S.W.3d 536, 548-549 (Tex. App.—Austin 2009, no pet.) (citing *Bloyed*, 916 S.W.2d at 955) ("The Texas Supreme Court has provided six factors that a trial court must take into account when determining whether a proposed class settlement is fair, adequate, and reasonable."); *Johnson v. Scott*, 113 S.W.3d 366, 371 (Tex. App.—Beaumont 2003, pet. dism'd) (same); *see also Rocker v. Centex Corp.*, 377 S.W.3d 907, 913 (Tex. App.—Dallas 2012, judgm't vacated pursuant to settlement by *Rocker v. Centex Corp.*, No. 12-0797, 2012 Tex. LEXIS 1015 (Tex. Nov. 30, 2012)) (same).

As discussed above, the standard for this hearing's determination is whether the Settlement Agreement is "within the range of possible approval."  MANUAL FOR COMPLEX LITIGATION § 21.632, 321 and n. 976; *City of Greenville*, 2012 U.S. Dist. LEXIS 74305 at *11—12..  Accordingly, the *Ball/Bloyed* factors are not applicable at this time.  *Bloyed*, 916 S.W.2d at 954.  However, whether viewed through the lens of preliminary approval or the ultimate fairness inquiry, this Settlement Agreement is fair and adequate.

### 1. There is no evidence of collusion

The settlement was the product of serious, arm's-length negotiations between the State and Farmers over an extended period of time after a great deal of discovery and conducted by competent counsel. The Court has previously found that there was "not . . . a scintilla of evidence of collusion." 5 RR 48 (Exhibit 7).

### 2. The complex issues presented would undoubtedly result in protracted litigation if not settled

The decade-long appellate process to determine issues relating to this settlement agreement—itself the product of years of investigation and legal battles on multiple fronts—is the best evidence of the complexity and uncertainty of litigating this complex of related cases to conclusion. The vast and hotly contested discovery disputes related to the settlement agreement are only a taste of what would follow if the merits were to be litigated. Not only is this litigation unavoidably complex and inevitably protracted, but the practical stakes are enormous, with over one million policyholders affected by the litigation.

By settling the litigation, the parties will conserve substantial time and expense if the cases were to go forward, and the class members will receive relief much sooner than would be possible with further drawn-out litigation. In fact, if this Settlement were not approved and litigation were to continue, the policyholders may—and in Farmers' view would—recover nothing.

### 3. The facts and legal theories were sufficiently developed to permit a proper analysis of the settlement terms

As the Court heard and considered in preliminarily approving the 2003 Settlement Agreement, Farmers has produced thousands of pages of documents both formally and informally to the State in connection with the CIDs, the Market Conduct Examination, and other

discovery requests. These documents included a number of highly confidential materials from which the State could evaluate the strength of its case against Farmers. Further, the State interviewed Farmers' representatives both for further information in connection with the Market Conduct Examination and in connection with the Settlement Agreement. The State had ample information from which to make informed decisions about the strength of its claims.[8] The Intervenors were afforded substantial opportunity for discovery during the 2003 preliminary approval process. Even now, with the unusual benefit of over ten years of time to reflect on it, the State and the Attorney General have reaffirmed the deal they made in 2003, believing it to be fully informed and in the best interests of the policyholders.

4.    **There is a significant chance that the State will be unable to establish liability or damages**

As explained above, the settlement terms are generous; they should be considered even more so when the Court weighs into the fairness equation the fact that it is highly questionable whether either liability or damages could be established. First, there are serious questions as to a number of critical issues, including: (i) whether the State has the authority to examine, regulate, and/or enjoin the rate practices enumerated in the cease and desist Order and in the administrative proceedings; (ii) whether Farmers made any misrepresentations to its insureds; (iii) whether any policyholders relied to their detriment upon any alleged misrepresentations; (iv) whether any action of Farmers was a producing cause of damages to any policyholder; (v) whether any policyholders could prove damages (or at least damages in any significant

---

[8] The Court should consider the entire context of the parties' controversy, especially when considering that the State began its investigation—with the attendant powers to compel discovery—in late 2001. *Compare Bloyed*, 916 S.W.2d 949 (case had been pending for nine months and trial court agreed that sufficient discovery and case development had occurred to evaluate settlement).

amount) as a result of an unlawful practice as opposed to universal changes in the marketplace; and (vi) whether any cause of action for unfair discrimination lies under the facts alleged.

### 5. The Settlement Agreement actually exceeds the anticipated recovery, considering the highly uncertain nature of liability and the damages sought

In its review of the fairness of the proposed settlement, the Court has already considered (i) the risks of establishing liability and damages, and (ii) the range of reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation. *In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 317 (3d Cir. 1998). The purpose of this inquiry is to balance the likelihood of success on the merits and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. *Id.* at 319.

Here, Farmers believes that the issues of liability would likely have been disposed of as a matter of law because the practices underlying the claims were not unlawful and that the magnitude of the Settlement Agreement is attributable not to the legal or factual merit of the claims, but rather to a confluence of myriad political, media, and litigation pressures that threatened Farmers' ability to remain in the Texas homeowners' marketplace. The State agreed that the benefits to the class members of the settlement reached exceeded the risks of continued litigation.

### 6. The opinions of experienced counsel confirm the fairness of the settlement to the class members

Both representatives and counsel for the State and Farmers support this Settlement Agreement as a fair and appropriate way to resolve what will otherwise become protracted litigation. There does not appear to be any dispute that counsel for both sides are well experienced with complex litigation and in a position to evaluate the objective fairness of the

proposal. Further, counsel for the State has prepared a detailed and comprehensive evaluation of the strengths and weaknesses of the claims and issues, explaining why the State supports the Settlement Agreement. *See generally* Exhibit 6.

In sum, the Second Amended Settlement Agreement that this Court is asked to preliminarily approve has already been determined to be the result of these serious and arms' length discussions, and it continues to represent a number of hard-fought compromises that are designed to benefit the Farmers' insureds in Texas. As the Court can see from the terms of the parties' agreement, the settlement falls easily within the range of possible approval as is necessary for notice to be provided to Farmers' insureds and for this litigation to proceed—at last—to a fairness hearing to grant final approval and implement the settlement.

## III. The Court Should Approve the Class Notice

The proposed form requires class notice to be disseminated via direct mail to the class members' most recent addresses in the Farmers' records. In addition, the State and Farmers will disseminate a Summary Notice of Settlement in the form attached as Exhibit 1-E by posting it on their respective websites—www.farmers.com, www.oag.state.tx.us, and www.tdi.state.tx.us, and www.TexasFarmersSettlement.com—beginning as soon as practicable after the Court's entry of the Order of Preliminary Approval and continuing through the date of the fairness hearing. The full Notice of Proposed Class Settlement will also be made available on the respective websites, and the Settlement Agreement itself will be posted on TDI's website. *See, e.g., Peters*, 65 S.W.3d at 308 (finding notice to be sufficient where it directed class members to website with full copy of the settlement agreement and informed them of their right to opt out and the consequences of not doing so).

The Manual for Complex Litigation recommends that, under circumstances like the ones presented—where preliminary approval and temporary certification decisions are made in one proceeding—the certification and settlement notices should be combined, reducing both the likelihood of confusion and the expense of notice. MANUAL FOR COMPLEX LITIGATION § 21.633 at 321-22.

The form of notice is reasonably calculated to apprise members of the Settlement Classes of the terms and conditions of the Settlement Agreement, the background of the litigation and the nature of these proceedings, the nature of the claims asserted and the proposed release, the identity of class counsel, and the rights and responsibilities of class members. The notice need only be the best notice practicable under the circumstances. *Peters*, 65 S.W.3d at 308 ("[T]he notice must 'contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.'" (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 355 n.22 (1978) (speaks favorably of the use of second-class mail to provide notice to class members). It also affords sufficient time for the class members to prepare to appear at the final approval hearing and present any objections to the Settlement Agreement they may have. Finally, the notice fulfills the requirement of neutrality in class notices. *See* 3 NEWBERG ON CLASS ACTIONS § 8.39. It summarizes the pertinent information in an informative and coherent manner and makes clear that the settlement does not constitute an admission of liability by Farmers. It further provides instruction about how to opt out of the class or raise objections at the fairness hearing. Accordingly, the notice complies with the standards of fairness,

55935052.6

completeness, and neutrality required of a combined settlement-certification class notice disseminated under the authority of the Court. *Id.* §§ 8.21 & 8.39.

## CONCLUSION AND PRAYER

For these reasons, the State of Texas and the Farmers Parties jointly request that the Court:

(1)     grant preliminary approval of the Settlement Agreement for the purpose of providing notice to the Settlement Classes of the terms of the Settlement Agreement and the date of the fairness hearing before the Court when a final determination of the adequacy and fairness of the Settlement Agreement will be made;

(2)     approve the notice to be sent to the class members; and

(3)     grant such other and further relief to which the State and Farmers are entitled.

Respectfully submitted,

**OFFICE OF THE ATTORNEY GENERAL OF TEXAS**

*Joshua Godbey / by permission MHG*

DAVID C. MATTAX
Director of Defense Litigation
State Bar No. 13201600
JOSHUA GODBEY
Assistant Attorney General
State Bar No. 24049996
JAMES R. WENZEL
Assistant Attorney General, Consumer Protection
Division
State Bar No. 21179370
P.O. Box 12548
209 West 14th Street
Austin, Texas 78711-2548


**FULBRIGHT & JAWORSKI L.L.P.**

*Marcy Hogan Greer*

RICHARD N. CARRELL
State Bar No. 03871000
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713-651-5151
Telecopier: 713-651-5246

MARCY HOGAN GREER
State Bar No. 08417650
M. SCOTT INCERTO
State Bar No. 10388950
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served on the following counsel of record on this the 23d day of August, 2013, via certified mail, return receipt requested and email:

Joseph C. Blanks
blanxlex@gmail.com

_____
Marcy Hogan Greer

# EXHIBIT 6

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

## SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION

This Second Amended Settlement Agreement and Stipulation ( "Settlement Agreement"), entered into on the 29th of August, 2013, amends and supersedes the Settlement Agreement and Stipulation entered into on the 18th day of December, 2002, as amended on 13th of June, 2003 ("2003 Amended Settlement Agreement"), by and among the State of Texas ("Texas"), the Office of the Attorney General ("OAG"), the Texas Department of Insurance ("TDI"), including the Texas Commissioner of Insurance ("Commissioner") (hereafter sometimes referred to collectively as the "State"), and defendants Fire Underwriters Association, Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (hereafter sometimes referred to collectively as the "Farmers Parties"). The State and the Farmers Parties (hereafter collectively the "Parties") agree as follows:

## I. DEFINITIONS

For purposes of this Settlement Agreement, the following terms have the meanings specified below:

"Administrative Proceeding" means the Notice of Public Hearing, Docket No. 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.D, To Consider Whether Commissioner's Emergency Cease and Desist Order No. 02-0844 Should Be Affirmed and Whether Disciplinary Action Should Be Taken Against Farmers Insurance Exchange and Fire Insurance Exchange, which TDI issued on or about September 18, 2002.

"AG Lawsuit" means Cause No. GV202501, *The State of Texas and The Texas Commissioner of Insurance v. Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, and Fire Insurance Exchange*, in the 261st Judicial District Court of Travis County, Texas, filed on or about August 5, 2002, and including all amendments thereto.

"Agreed Discounts" means the discounts described in Section IV, Paragraph 3(b), below.

"Associations" means defendants Fire Underwriters Association and Farmers Group, Inc. d/b/a Farmers Underwriters Association, acting as the Exchanges' attorneys in fact.

"Amended Order of Preliminary Approval" means an order substantially in the form attached as Exhibit A.

"Automobile insurance" means private passenger automobile insurance.

"Automobile Insurance Providers" means defendants Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, and Truck Insurance Exchange.

"Cease and Desist Order" means the Cease and Desist Order, No. 02-0844, which the Commissioner signed and entered against the Exchanges, on or about August 13, 2002.

"Claim Form" means the form to be used by applicants for the Credit Usage Notice Fund, attached as Exhibit E hereto and addressed in Section IV, Paragraph 4(b) below.

"Commissioner" means the Texas Commissioner of Insurance.

"Court" means the 261st Judicial District Court of Travis County, Texas, in which the AG Lawsuit was filed.

"Credit Period" shall have the meaning given it in Section IV, Paragraph 2, below.

"Credit Usage Notice Fund" shall have the meaning given it in Section IV, Paragraph 4, below.

"Credit Usage Notice" means a notice of adverse action under the Fair Credit Reporting Act.

"Effective Date" means the date by which all of the following have occurred: (i) an Order of Preliminary Approval has been entered by the Court in the AG Lawsuit giving notice of a hearing on the Settlement of the Settlement Classes' claims; (ii) the Court has approved the Settlement in all respects; (iii) a Final Judgment as described below shall have been entered by the Court and not vacated, stayed, or modified in any material way, upon appeal or otherwise; and (iv) either the time to appeal or otherwise seek review of the Final Judgment has expired without any appeal having been taken or review sought, or if an appeal is taken or review sought, the expiration of five days after such an appeal or review shall have been finally determined by the highest court before which appeal or review is sought and is not subject to further judicial review.

"Exchanges" means Farmers Insurance Exchange and Fire Insurance Exchange.

"Exchanges Lawsuit" means Cause No. GN-203156, *Farmers Insurance Exchange and Fire Insurance Exchange v. Jose Montemayor, individually and in his capacity as Texas Commissioner of Insurance, and Texas Department of Insurance*, in the 353rd Judicial District Court of Travis County, Texas.

"FARA" means Farmers Auto Risk Assessment.

"FCRA" means the Fair Credit Reporting Act.

"*Fogel* Action" means *Benjamin Fogel v. Farmers Group, Inc., et al.*, Case No. BC 300142, in the Superior Court for the State of California for the County of Los Angeles, in which a final judgment was signed on December 21, 2011.

"FPRA" means Farmers Property Risk Assessment.

"Homeowners insurance" means and includes policies written on TDI-promulgated forms described as HO-A (including TDP-1), HO-B (as defined in "Released Claims"), HO-B-CON, and HO-B-T, and all endorsements, promulgated or approved, for use with such forms.

"IDA Eligibility" shall have the meaning given it in Section IV, Paragraph 3(a), below.

"Individualized Discount Adjustment" shall have the meaning given it in Section IV, Paragraph 3, below.

"Final Judgment" means a final judgment to be rendered by the 261st Judicial District Court of Travis County, Texas, substantially in the form attached as Exhibit K hereto.

"*Mobbs* Action" means *In re Farmers Insurance Co, Inc. FCRA Litig.*, No. CIV-03-158-F, including all cases consolidated or coordinated in MDL No. 1564, before the U.S. District Court for the Western District of Oklahoma, in which a final judgment was entered on September 29, 2011.

"MOU" means the Memorandum of Understanding between and among the Parties, which was signed by authorized representatives of the Parties on November 30, 2002.

"Notice of Proposed Class Settlement" means the notice of this Settlement Agreement and of the Settlement Hearing substantially in the form of Exhibit B hereto that is to be made available to all persons in the Settlement Classes pursuant to Section III, Paragraph 7 below.

"OAG CIDs" means all Civil Investigative Demands that OAG has served on the Released Parties that are listed in the attached Exhibit N.

"Opt-Out Claimant" means a member of the Settlement Classes who submits a timely and valid request for exclusion in accordance with the Amended Order of Preliminary Approval and the Notice of Proposed Class Settlement, and who does not revoke that request for exclusion in writing at least seven (7) days prior to the Settlement Hearing. Such requests for exclusion shall apply to all of the Released Claims which a given Opt-Out Claimant has against the Released Parties.

"Opt-Out Claims" means Released Claims that belong to Opt-Out Claimants. Opt-Out Claims are not settled by this Settlement Agreement.

"Order of Preliminary Approval" means the Order signed by the District Court on June 27, 2003, certifying the Settlement Classes and preliminarily approving the 2003 Settlement Agreement.

"Prospective Rate Reduction" shall have the meaning given it in Section IV, Paragraph 1, below.

"Released Claims" means and includes, with respect to homeowners insurance offered or sold by the Released Parties, all existing, known claims and Unknown Claims, demands and causes of action against the Released Parties, whether pending or threatened, suspected or unsuspected, contingent or non-contingent, for all existing, known and unknown damages and

remedies that arise out of or relate to the acts and/or occurrences alleged in the AG Lawsuit, or in the Cease and Desist Order or the Administrative Proceedings, or in the OAG CIDs to the extent any such acts or occurrences took place prior to November 30, 2002, including but not limited to issues concerning or related to a management fee or fees, the placement of policyholders in a particular insuring entity, the age of home discount, the unfunded catastrophe load, the decision to no longer offer HO-B policies (including HO-Protector Plus (PTP), HO380 endorsement, TDP-2, TDP-3, DF-Builder's Risk, and HO-A with HO-170 endorsement (collectively referred to herein as "HO-B")), the offering of HO-A policies in place of HO-B policies, territorial discounts, credit scoring, the use of the Farmers Property Risk Assessment, or the rates that the Released Parties have charged for homeowners policies and endorsements and all notices and statements that the Released Parties have made or issued in connection with the above, including but not limited to the notices of non-renewal of the HO-B policies and notices issued pursuant to the Fair Credit Reporting Act. The State's release of claims against Texas Farmers Insurance Company related to credit scoring is expressly based on Texas Farmers Insurance Company's representation that it did not and has not used credit scores, insurance scores, credit reports or any other method of calculating premiums based on credit history until 2011, at which time it began using the credit model that is on file with TDI. "Released Claims" also include any claims, demands, or causes of action to the effect that the discounted rates adopted by the Exchanges from November 11, 2002, through and including August 31, 2003, are unfair, unreasonable, discriminatory, misleading or excessive. With respect to the automobile insurance offered or sold by the Released Parties, "Released Claims" includes all existing claims, demands, and causes of action related only to the disclosure or nondisclosure of consumer credit information or the disclosure or nondisclosure of the use or effect of using consumer credit information, including claims under the Fair Credit Reporting Act. "Released Claims" does not include individual claims or complaints about claims payments, handling or processing pursued by individual claimants directly or such individual claims or complaints about claims payments, handling or processing as may be pursued by TDI under Article 21.55, Texas Insurance Code, which are identified in a schedule which has been provided by TDI to the Farmers Parties. Remedies for any such scheduled claims or complaints, if pursued by the TDI, shall be limited to the payment of interest under article 21.55, section 6 (now § 542.060), of the Texas Insurance Code (which interest is not part of the total value of this settlement), as the result of non-compliance with that statute, and may not include fines or penalties or any other relief, except relief may include corrective action respecting procedures. "Released Claims" also does not include claims that have been asserted in Cause No. GV000271, *State of Texas v. Texas Farmers Insurance Company, et al.*, which was pending in the 200th Judicial District Court of Travis County, Texas, relates to betterment in the context of automobile insurance in the Texas market, and was dismissed in 2003.

"Released Parties" means and includes Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association, as well as their affiliates, officers, employees, agents, directors or governors, representatives, attorneys, predecessors, successors and assigns.

"Releasing Parties" means and includes Texas, the OAG (both on behalf of Texas and, subject to Court approval, the members of the Settlement Classes defined below), the TDI, and the Commissioner.

"Retrospective Rate Reduction" shall have the meaning given it in Section IV, Paragraph 2, below.

"Settlement" shall have the meaning given it in Section II, below.

"Settlement Classes" means and includes (1) all of the Exchanges' Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed (the "Rate Class"); (2) all of the Exchanges' Texas homeowners insurance policyholders who according to Farmers records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002 (the "Discount Class"); and (3) all Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers who according to Farmers records were provided or should have been provided a Credit Usage Notice from October 1, 1999, through February 28, 2003 (the "Credit Usage Notice Class").

"Settlement Class Members" means all members of the Settlement Classes except for Opt-Out Claimants.

"Settlement Fund" shall have the meaning given it in Section IV, below.

"Settlement Hearing" means the hearing to be held before the District Court of Travis County, Texas, to determine (a) whether this Settlement Agreement, including the Settlement Fund and the attached exhibits, should be approved as fair, adequate and reasonable; and (b) whether the Final Judgment should be entered.

"Summary Notice of Settlement" shall have the meaning given it in Section III, Paragraph 7, below.

"Unknown Claims" means any and all provisions, rights, and benefits conferred either (a) by section 1542 of the California Civil Code, or (b) by any federal law or law of any state or territory of the United States, or by any principle of common law that is similar, comparable, or equivalent to section 1542 of the California Civil Code, with respect to the Claims released pursuant to part II.B. Section 1542 of the California Civil Code reads:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

## II. RECITALS

WHEREAS, on or about October 1, 1999, the FARA discount program was introduced in Texas for the Farmers Parties' automobile policyholders;

WHEREAS, on or about November 16, 2000, the FPRA discount program was introduced in Texas for the Farmers Parties' homeowners policyholders;

WHEREAS, on or about November 9, 2001, the Exchanges announced they would no longer renew Texas HO-B homeowners policies;

WHEREAS, on or about November 14, 2001, the Exchanges began issuing notices of non-renewal of HO-B policies to Texas HO-B homeowners insureds;

WHEREAS, on or about January, 2002, the TDI initiated a market conduct examination of the Farmers Parties pursuant to article 1.15 of the Texas Insurance Code;

WHEREAS, on or about December 28, 2001, Fire Insurance Exchange began offering Texas HO-A homeowners policies for former HO-B insureds;

WHEREAS, on or about March 20, 2002, Farmers Insurance Exchange began offering Texas HO-A homeowners policies for former HO-B insureds;

WHEREAS, on or about August 5, 2002, the OAG, on behalf of Texas and the TDI, brought the AG Lawsuit against the Farmers Parties;

WHEREAS, on or about August 13, 2002, the TDI brought an Application for Emergency Cease and Desist Order against the Exchanges;

WHEREAS, on or about August 13, 2002, the Commissioner entered the Cease and Desist Order against the Exchanges;

WHEREAS, on or about August 14, 2002, the TDI filed a Report to the Commissioner of Insurance concerning the Exchanges;

WHEREAS, the OAG has served the "OAG CIDs" on the Released Parties;

WHEREAS, on or about August 30, 2002, the Exchanges brought the Exchanges Lawsuit against the Commissioner and TDI, appealing from the Cease and Desist Order and also seeking a declaratory judgment that, *inter alia*, the Commissioner and TDI lack the authority to issue the Cease and Desist Order and to institute disciplinary action as outlined in the Report to the Commissioner of Insurance filed by TDI on or about August 14, 2002;

WHEREAS, on or about September 18, 2002, the TDI commenced the Administrative Proceedings against the Exchanges;

WHEREAS, on or about September 24, 2002, the Exchanges gave notice to their Texas homeowners insureds that the Exchanges would not be offering coverage or renewing

homeowners insurance policies, with effective dates of such non-renewal action falling between November 11, 2002 and November 10, 2003, and also notified their agents they would accept no new business after November 11, 2002;

WHEREAS, on November 13, 2002, TDI agreed to extend the effective date of the Cease and Desist Order for thirty days through December 10, 2002, to allow the Parties an opportunity to negotiate a settlement of these matters and the Exchanges, in turn, agreed to continue offering coverage and renewing homeowners insurance policies until December 10, 2002, with a base rate reduction of 6.8% from the rate structure used in the period immediately prior to November 2002;

WHEREAS, after considering the benefits to be gained under the Settlement Agreement, the risks associated with continuing to prosecute this complex and time-consuming litigation, the likelihood of success on the merits of the litigation, the public interest in an efficient market for homeowners and automobile insurance, the welfare of Texas' consumers, and to avoid further expense and inconvenience, the State believes this Settlement Agreement is fair, adequate, reasonable, and in the best interests of the Settlement Classes;

WHEREAS, the Farmers Parties, while denying each of the claims alleged herein and further denying wrongdoing of any kind whatsoever, and without admitting liability, have agreed to enter into the Settlement Agreement to avoid further expense, inconvenience, and the distraction of a burdensome and lengthy litigation, and in order to be completely free of any further controversy with respect to the Released Claims;

WHEREAS, the Parties have agreed that there should be a global settlement of all of the Released Claims, as herein defined, and this document sets forth the terms of the Parties' settlement agreement, which was reached after arms' length negotiations between the State and the Farmers Parties (the "Settlement");

WHEREAS, the Court has certified the Settlement Classes and preliminarily approved the 2003 Amended Settlement Agreement by order of June 27, 2003 ("Order"), which was appealed to the Third Court of Appeals and the Texas Supreme Court, which affirmed the Order, and the case was ultimately remanded to this Court on March 9, 2010;

WHEREAS, upon its remand to the Court, this case was stayed pending the resolution of certain nationwide class actions involving some of the claims made in the AG Lawsuit, including the *Fogel* and *Mobbs* Actions, in which final judgments approving settlement agreements were issued on September 29, 2011, and December 21, 2011, respectively;

WHEREAS the passage of time caused by the lengthy appeal and the settlement agreements in the *Fogel* and *Mobbs* Actions have necessitated certain limited changes to the 2003 Amended Settlement Agreement;

NOW THEREFORE IT IS AGREED by the Parties that subject to approval of the Judicial District Court of Travis County, Texas, the AG Lawsuit, the Administrative Proceeding, the Exchanges Lawsuit, and the other matters in Section IX below are conditionally settled, on the following terms and conditions:

## III. CERTIFICATION OF SETTLEMENT CLASSES

1. The Parties shall promptly and jointly submit this Settlement Agreement, including the exhibits hereto, to the Court for preliminary approval.

2. The State has sought, and the Farmers Parties have agreed to, conditional certification of the Settlement Classes pursuant to this Settlement Agreement, which the Court granted in its June 27, 2003 Order. The Farmers Parties do not agree to certification of the Settlement Classes for any purpose other than to effectuate this Settlement Agreement. In the event that the Court were not to approve and certify the Settlement Classes in all respects as defined in this Settlement Agreement, (1) any stipulations and agreements made herein are null and void and (2) it is understood that the Farmers Parties would challenge the certification of a litigation class and nothing relating to this Settlement Agreement will be introduced into evidence or used in any way to impede the exercise of that right.

3. The State shall file an amended motion for preliminary approval that requests the Court to enter an Amended Order of Preliminary Approval substantially in the form of Exhibit A hereto.

4. The Parties agree that the Court may enter an order conditionally certifying the Settlement Classes and appointing the State of Texas, through the Attorney General, as representative and counsel for the Settlement Classes.

5. If this Settlement Agreement is terminated pursuant to its terms, or if the Effective Date does not occur for any reason, the conditional certification of the Settlement Classes shall be vacated.

6. In additional proceedings before the Court (and before any appellate courts, if necessary), the State shall continue to affirmatively present their support for certification of the Settlement Classes and for final judicial approval of the Settlement Agreement.

7. Subject to the Court's prior preliminary approval of the Settlement Agreement (including the exhibits hereto), the Farmers Parties shall assume responsibility for identifying, locating, and providing a copy of the Notice of Proposed Class Settlement, substantially in the form attached as Exhibit B hereto, to as many members of the Settlement Classes as is reasonably practicable by means of a direct mailing to such Settlement Classes members' most recent address in the Farmers Parties' records. In addition, the OAG, TDI and the Farmers Parties shall disseminate a Summary Notice of Settlement, in the form attached hereto as Exhibit C, by posting the Summary Notice of Settlement through their respective web-sites (www.farmers.com, www.oag.state.tx.us, and www.tdi.state.tx.us), as well as at www.TexasFarmersSettlement.com, beginning as soon as practicable after the Court's entry of the Order of Preliminary Approval and continuing until the date of the Settlement Hearing. The full Notice of Proposed Class Settlement also shall be made available through these websites over the same period of time. In order to avoid any confusion, no other documents interpreting the Settlement Agreement or the Notice of Proposed Class Settlement, or the provisions or effect of such documents, will be posted on the Parties' websites without prior Court approval.

## IV. SETTLEMENT FUND

In conjunction with the settlement of the Released Claims, the Released Parties agree to create a settlement fund ("Settlement Fund") with the following components:

1. **Prospective Rate Reduction.** Subject in all respects to Paragraph 1(b) below, the Exchanges agreed (1) to reduce their HO-A primary contract homeowners insurance (excluding endorsements) base rates in effect as of November 10, 2002 in the overall average amount of 6.8%, based on a statewide average rate indication for all classes, effective as of November 11, 2002 (the "Prospective Rate Reduction"), (2) to refrain from any increase in those base rates that would take effect prior to midnight on August 31, 2003, provided, however, that rates can be changed to include charges for any existing endorsement or any new endorsements approved by TDI or for coverage changes requested by policyholders, and (3) for the period December 11, 2002 through August 31, 2003, to adopt the Agreed Discounts described in Section IV, Paragraph 3(b) hereof.

a. The reduction in premiums contemplated by the Prospective Rate Reduction was undertaken for all Texas policyholders who renewed an existing HO-A homeowners' insurance policy through the Exchanges or obtained a new policy.

b. It is understood and agreed to by the Parties that adopting the Agreed Discounts as contemplated under this settlement will change each customer's rate even though the 6.8% reduction is made to the base rate;

c. If legislation or regulation is hereafter enacted that has the effect of requiring or compelling the Exchanges to implement a rate reduction or rollback, then:

(1) The Exchanges' obligation to issue or grant credits or refunds under the Prospective Rate Reduction and, if the legislation or regulation is retroactive, under the Retrospective Rate Reduction, will be reduced by the amount of the rate reduction or rollback to customers mandated by such legislation or regulation;

(2) In the event any such rate reduction or rollback is enacted or adopted, the Exchanges' rates and rate structures on the day before the effective date of any such rate reduction or rollback shall be deemed to revert back to the rates and rate structures in effect as of November 10, 2002. Under no circumstances would such rate reduction or rollback be applied to the Exchanges' rates in effect as the result of the Prospective Rate Reduction, the Retrospective Rate Reduction, or any other term of this Settlement Agreement.

(3) This consideration was previously provided to the Class Members pursuant to the Parties' agreement.

2. **Retrospective Rate Reduction.** In addition to the Prospective Rate Reduction, for all Texas policyholders who were insured under an HO-A policy form issued by the Exchanges at any time during the period commencing on December 28, 2001 up to and including November 10, 2002 (the "Credit Period"), the Exchanges agree to fund a Retrospective Rate

Reduction in the amount of 6.8% of the base premium for the HO-A policy form earned by the Exchanges during those policies' actual term ("Retrospective Rate Reduction").

a.     For those Texas policyholders who were insured under an HO-A policy form issued by the Exchanges during the Credit Period but such policy is no longer in effect or is not renewed at the next renewal date after the 30th day following the Effective Date, the Retrospective Rate Reduction shall be paid by means of a refund check based on each individual HO-A policy's base rate premium earned with appropriate release language in favor of the Released Parties as an endorsement. Refund checks in payment of the Retrospective Rate Reduction will be processed and paid on: thirty (30) days after the Effective Date.

b.     For those Texas policyholders who were insured under an HO-A policy form issued by the Exchanges during the Credit Period with coverage going forward beyond the next renewal date after the 30th day following the Effective Date, the Retrospective Rate Reduction shall be applied as either a credit or a refund check, at Farmers' election. Unearned policy premiums that may be returned to the policyholder shall not include the credit or refund. If a credit is used, the credit shall be applied to the first premium notice for such HO-A policies renewed after the 30th day following the Effective Date.

3.     **Individualized Discount Adjustment.** In addition to the Prospective Rate Reduction and Retrospective Rate Reduction described above, and with respect to Texas homeowners insurance policyholders who did not receive the Agreed Discounts for FPRA, age of home, and territory at any time during the period commencing November 16, 2000, continuing through and including December 10, 2002, the day immediately preceding the adoption of the Agreed Discounts described in Paragraph 3(b) below, the Exchanges agree to fund an "Individualized Discount Adjustment" payment.

a.     Payments to individual Texas homeowners insurance policyholders for the Individualized Discount Adjustment shall be determined in the following fashion: The Individualized Discount Adjustment payment for each Texas policyholder equals the amount by which the premium actually charged for the Texas policyholder's policy exceeded the premium which would have been charged if the Exchanges had adopted discounts for FPRA, age of home, and territory elements at the Agreed Discounts on a revenue neutral basis, rather than the lesser discounts which were actually adopted on a revenue neutral basis (the "IDA Eligibility") as provided in Paragraph 3(b) below. In calculating each policyholder's IDA Eligibility, if the aggregate of the three discount factors (FPRA, age of home, or territory) results in a negative value for that individual, then the Individual Discount Adjustment shall be considered a zero.

b.     The Parties' actuaries have met and agreed on discounts for FPRA and age of home, as well as territorial rate revisions, to be applied for purposes of the Individualized Discount Adjustment and also to be applied to the same factors for the period identified in Section IV. Paragraph 1 hereof (the "Agreed Discounts"). For informational purposes, schedules setting forth the Agreed Discounts for the FPRA and age of home discounts and the territorial rate revisions to be applied for purposes of the

Individualized Discount Adjustment are attached as Exhibits D-1 and D-3, and schedules setting forth the Agreed Discounts for the FPRA and age of home discounts and the territorial rate revisions to be applied commencing December 11, 2002, and continuing through and including August 31, 2003, are attached as Exhibits D-2 and D-3.

      c.     No Individualized Discount Adjustment benefits shall be paid or credited prior to the Effective Date.

      d.     Credits and payment of the Individualized Discount Adjustment shall be made in the same manner and at the same time as the Retrospective Rate Reduction listed above.

      e.     Thirty (30) days after the final payment is made or credit provided under this section dealing with the Individualized Discount Adjustment, the Released Parties shall report to the OAG and TDI the amounts so paid and credited.

      4.     **Credit Usage Notice Fund.** In addition to the Prospective Rate Reduction, the Retrospective Rate Reduction, and the Individualized Discount Adjustment, the Released Parties further agree initially to provide funds in the total amount of $3.0 million, but will provide additional funds if necessary ("Credit Usage Notice Fund"), as well as certain non-cash benefits, to compensate eligible Settlement Class Members who allege that adverse actions were taken by the Farmers Parties without providing sufficient notice as required by the Fair Credit Reporting Act, 15 U.S.C. § 1681m, resulting in credit report inaccuracies going undetected and potentially resulting in FPRA or FARA discounts lower than would have resulted from correct credit information or to assignment to a company affiliated with the Farmers Parties having a higher premium structure.

      a.     Eligibility for the Credit Usage Notice Fund is limited to Credit Usage Notice Class Members who were issued an automobile or homeowners insurance policy by one or more Released Parties during the time period October 1, 1999, through February 28, 2003; provided however, that any eligible Settlement Class Member who mailed a timely claim form (or on whose behalf such a claim form was submitted) pursuant to the settlement agreement in the *Mobbs* Action is not eligible for any additional benefits, including cash payments, described in this component (part IV.4) of the Settlement Agreement.

      b.     Submission of a completed Claim Form in the form attached hereto as Exhibit E ("Claim Form") is a prerequisite to any individual receiving a credit report code to obtain a free copy of his or her credit report from Equifax and any payment from the Credit Usage Notice Fund. Eligible Settlement Class Members will have until 60 days after the Settlement Hearing to mail-in the Claim Form. A timely submitted and completed Claim Form entitles the eligible Settlement Class Member to access and review at no cost his or her individual credit report as maintained by Equifax, Inc. A Claim Form will be considered complete if it provides all of the requested information except a policy number, so long as the information provided is sufficient to identify the claimant from the records of the Released Parties after a good faith effort. Each eligible Settlement Class Member will receive only one Claim Form with the Class Notice and is

eligible to receive only one credit report code and one payment as provided in paragraph (d) below.

c. Within 15 business days after the deadline to mail-in the Claim Form, each eligible Settlement Class Member who timely completes and submits a Claim Form will be mailed a credit report code and accompanying letter on how class members may use the credit report code to review their individual credit report for accuracy. The credit report code will expire 30 days from the date of mailing.

d. Settlement Class Members who use the credit report code and review their credit reports will be given the opportunity to certify online that they reviewed their individual credit reports for accuracy within 45 days from the date of mailing of the letter described in paragraph IV.4(c) above. The certification will read as follows: "I certify that I have reviewed my Equifax consumer credit report for errors and inaccuracies." Each eligible Settlement Class Member who so certifies will be mailed a check in the amount of thirty-five dollars ($35.00 US) within 60 days following receipt of the Settlement Class Member's certification, assuming the Effective Date has passed.

e. Each eligible Settlement Class Member who timely submits a Claim Form shall also receive an educational credit brochure, explaining the importance of accurate credit reports and the Settlement Class Member's right to review his or her credit report and dispute any inaccuracies or errors contained in it.

f. The Credit Usage Notice Fund shall terminate 180 days after the Effective Date. To the extent that there is a remaining balance in the Credit Usage Notice Fund as of this termination date, such remaining balance shall revert to the Released Parties.

g. In agreeing to create the Credit Usage Notice Fund, the Parties agree that the Released Parties have denied that there have been any overcharges to Texas policyholders as the result of erroneous FPRA or FARA assignments. The Parties further agree that neither this Settlement Agreement, nor the MOU, nor anything stated herein or in the MOU or in connection with the Settlement should be construed or interpreted as an admission or evidence of any wrongdoing or liability by any of the Released Parties or of any violation of state or federal law, including without limitation the Fair Credit Reporting Act.

h. Within 30 days after the last payment is made under the Credit Usage Notice Fund, the Released Parties shall provide a report to the OAG and TDI which reflects the total number of Claim Forms submitted; the total dollar amount of payments made to persons eligible to participate in the Credit Usage Notice Fund; the total number of persons who were mailed checks; and the total number and dollar amount of negotiated checks.

i. The Parties acknowledge that as of February 2003, Farmers has used the Forms attached as Exhibits F, G, H, and I for new and renewed Texas homeowners and automobile policies. The Parties further agree that Farmers can cease using these exemplar forms of notice thirty (30) days after they have submitted replacement notice

forms for Farmers Texas homeowners and automobile policies to TDI, provided that TDI does not object to the replacement forms.

5. **Payment or Credit of 100%.** With regard to the Individualized Discount Adjustment, Released Parties have committed to a payment or credit of 100% of any premium differential resulting from the adjustment process set forth in Section IV, Paragraph 3. These calculations, which require individualized calculations, have been made by Released Parties and will be reported to the OAG and the TDI, and will be subject to verification by the TDI.

6. **Unclaimed Funds.** The cash components of the Settlement Fund shall be evidenced by a check that shall be valid for not less than 120 days after issuance. Any such checks that are uncashed, unclaimed, undeliverable, or not negotiated after 120 days from issuance shall be subject to Texas Property Code § 72.001 *et seq.*

7. **Mailing of Checks.** All checks to Settlement Class Members mailed under this Settlement Agreement must be accompanied by a letter and release language in the form attached as Exhibit J.

8. **Attorneys' Fees and Investigative Costs.** No later than 30 days after the Effective Date, the Farmers Parties shall pay a total of $2 million to the State of Texas for its attorneys' fees, expenses, and costs of investigation.

9. **Estimated value.** Based upon the Parties' assumptions and projections, the estimated total value of the Settlement is $117,500,000.

10. **Accounting Treatment for Settlement Fund Payments and Credits.** All amounts paid or credited to policyholders for the Retrospective Rate Reduction, the Individualized Discount Adjustment, and the Credit Usage Notice Fund components shall be treated and accounted for by the Farmers Parties as a return of written premiums. The Farmers Parties shall also prepare such amendments as necessary to their previously reported statistical plan filings to reflect a reduction in direct written premiums for amounts paid for the above-referenced components.

## V. RELEASE

On the Effective Date, the State, for itself and for the Settlement Class Members, RELEASES, ACQUITS, and FOREVER DISCHARGES the Released Parties from all Released Claims.

## VI. FINAL JUDGMENT

At the Settlement Hearing, a Final Judgment, substantially in the form attached as Exhibit K hereto, will be submitted to the Court, and entry requested. Among other things, the Final Judgment directs that the Judicial District Court of Travis County, Texas, expressly retains jurisdiction to enforce and modify the relief granted in the Final Judgment, including injunctive relief, to the fullest extent allowed by Texas law. The Parties also specifically agree that the venue for any dispute arising under this Settlement Agreement shall be in the District Court of Travis County, Texas.

## VII. OTHER CONSIDERATIONS REGARDING SETTLEMENT CLASSES

1.      In the event that the Court were to alter or make any change in the Settlement Classes or this Settlement Agreement (including the Settlement Fund) or to decline to approve the Settlement Classes and this Settlement Agreement (including the Settlement Fund) in all respects, any of the Parties to this Settlement Agreement shall have the right to terminate the Settlement and this Settlement Agreement. In the event of such termination, no further payments or credits will be made under the Settlement Fund and all releases and dismissals executed hereunder will become null and void.

2.      Any person within the Settlement Classes as defined may request not to participate as a member of the Settlement Classes, by submitting a timely request for exclusion in accordance with the Amended Order of Preliminary Approval and the Notice of Proposed Class Settlement. To be effective, any person requesting exclusion from the Settlement Classes *must* submit a timely written request for exclusion. Such written request *must* contain all of the information described in the discussion of Exclusion Requests that is contained in the Notice of Proposed Class Settlement, and it *must* be sent to the address specified in the Notice of Proposed Class Settlement, by first class mail, postmarked no later than thirty (30) days before the date scheduled for the Settlement Hearing. Any person who submits such a timely written request and who does not revoke that request for exclusion in writing at least seven (7) days prior to the Settlement Hearing, is an Opt-Out Claimant. An Opt-Out Claimant thereby elects not to participate in any benefits or payments under the Settlement Fund or this Settlement Agreement and is deemed to have waived any and all claims to any part of the Settlement Fund.

3.      A Settlement Classes member who does not opt out may submit objections, if any to (a) certification of the Settlement Classes; (b) the terms of the Settlement Agreement, including the exhibits hereto; or (c) the proposed form of Final Judgment. In order for any such objection to be considered by the Court at the Settlement Hearing, the objection *must* (a) contain all of the information described in the discussion of Objections that is contained in the Notice of Proposed Class Settlement and (b) be sent to the addresses specified in the Notice of Proposed Class Settlement, by first class U.S. mail, postmarked no later than the date specified by the Court.

4.      All Parties shall undertake to encourage participation of the putative class members in the Settlement Classes. In the event that more than 2% of the policyholders eligible to receive benefits from the Retrospective Rate Reduction or Individualized Discount Adjustment portions of the Settlement Fund were to opt out of the Settlement Classes, any of the Parties to this Settlement Agreement shall have the right to terminate the Settlement and this Settlement Agreement.

## VIII. NO ADMISSION OF LIABILITY

In entering into this Settlement Agreement, the Parties agree that the Released Parties have denied, and continue to deny, any wrongdoing or liability with respect to the claims that have been made in the AG Lawsuit, the Cease and Desist Order, the Administrative Proceedings and the OAG CIDs, or that have been made or could have been made by or on behalf of the Exchanges' individual policyholders in any other forum arising out of or relating to the subject

matters of the AG Lawsuit, the Cease and Desist Order, the Administrative Proceedings or the OAG CIDs. The Parties further agree that neither this Settlement Agreement nor anything stated herein or in connection with the Settlement should be construed or interpreted as an admission or evidence of any wrongdoing or liability by any of the Released Parties. The Released Parties are entering into this Settlement Agreement and the Settlement in order to avoid the further expense and burden of protracted litigation.

## IX. RELATED PROCEEDINGS

1. **Dismissal With Prejudice of Administrative Proceeding, Setting Aside of Cease and Desist Order, and Related Matters.** TDI will request that the Administrative Law Judge in the Administrative Proceeding dismiss with prejudice TDI's claims in the Administrative Proceeding, substantially in the form attached hereto as Exhibit L, and the Commissioner will enter a final order, substantially in the form attached as Exhibit M hereto, that dismisses those claims with prejudice and that also provides (a) the findings of the Commissioner in the Cease and Desist Order are set aside in their entirety; (b) the Cease and Desist Order is set aside in its entirety; (c) the findings and order shall be of no further force and effect whatsoever; and (d) neither the findings nor the order may be utilized as evidence of, or be used or relied upon by any person in any proceeding as evidence of, any alleged violation of law or breach of contract by the Released Parties. The State agrees that the Application for Emergency Cease and Desist Order, dated August 13, 2002, by Karen A. L. Barratt ("Application") is of no further force and effect whatsoever, and neither the Application nor the Order may be used as evidence of, or be used or relied upon by any person in any proceeding as evidence of, any violation of law or breach of contract by the Released Parties. TDI also will set aside in its entirety and with prejudice, substantially in the form contained in the Commissioner's Order attached as Exhibit M hereto, the (1) the Report concerning Farmers Insurance Exchange and Fire Insurance Exchange dated August 14, 2002, and (2) the "Notice of Report to Commissioner; Alleged Violations by Farmers Insurance Exchange and Fire Insurance Exchanges," dated August 14, 2002. The State agrees that, upon such setting aside, the Report is of no further force and effect whatsoever; and that such Report may not be used as evidence of, or be used or relied upon by any person in any proceeding as evidence of, any violation of law or breach of contract by the Released Parties.

2. **Termination of OAG CIDs.** All OAG CIDs issued to the Released Parties (listed in Exhibit N hereto) shall be withdrawn and all associated investigations as to the Released Parties shall be terminated. The investigations associated with the time periods covered by each CID are concluded and there will be no new investigations or CIDs for these time periods. The Farmers Parties also will dismiss with prejudice their challenges that have been filed in the district courts of Travis County to certain of the OAG CIDs, substantially in the form of the example attached as Exhibit O hereto.

3. **Termination of Market Conduct Examination.** The market conduct examination of the Exchanges commenced by TDI in January 2002 pursuant to article 1.15 (now revised to Section 401.051 et. seq.) of the Texas Insurance Code, and all associated investigations, shall be terminated and no new investigation will commence concerning Released Claims. The market conduct examination report has never been finalized and shall be withdrawn in its entirety and with prejudice, in the form attached as Exhibit M hereto, and shall not be used

in evidence of or relied upon by any person in any proceeding as evidence of any violation of law or breach of contract by the Released Parties.

4. **Dismissal With Prejudice of Exchanges' Lawsuit and Counterclaim.** The Exchanges agree that they will dismiss with prejudice the claims that the Exchanges made against TDI and the Commissioner and Jose Montemayor, individually, in the Exchanges Lawsuit, substantially in the form attached as Exhibit O hereto. The Farmers Parties also will dismiss with prejudice their counterclaim in the AG Lawsuit, substantially in the form contained in the Final Judgment attached as Exhibit K hereto. The dismissal of the Farmers Parties' counterclaim in the AG Lawsuit shall have no effect on obligations set forth in the Protective Orders entered therein regarding the Parties' continuing duties regarding confidential documents or documents produced under seal or in camera.

5. **Abatement Pending Effective Date.** Upon execution of this Settlement Agreement, counsel for the Parties in the legal proceedings referenced in this Section IX, Paragraphs 1-4 above, will take all appropriate steps to stay or abate the matters that are the subject of this Settlement Agreement until either (a) the Final Judgment entered in accord with Section VI of this Settlement Agreement becomes final and no longer subject to appeal or review, or (b) the Court refuses or declines to enter the Final Judgment in accord with this Settlement Agreement, or (c) such a Final Judgment is reversed or vacated on appeal, or (d) it becomes impossible for the Effective Date to occur for any reason. If the Effective Date occurs, then the Parties agree that, within thirty (30) days after the Effective Date, they will take the appropriate steps in the cases listed in this Section IX to enter the indicated dismissals with prejudice.

6. **Management Fee.** For the Released Parties and any other company or reciprocal or inter-insurance exchange associated or affiliated with the Released Parties, and regardless of whether such entity is or is not subject to rate regulation in Texas, TDI agrees henceforward that it will not consider the management fee (profits or expenses) as a separate element in its evaluation of such company's expense structure or consider such management fee in the rate process generally, but may consider the over-all expense component of the rate as it compares the companies' expenses with other agency distribution companies doing business in Texas. This section does not preclude TDI from evaluating overall rate levels as authorized by law.

## X. OTHER PROVISIONS

1. **Cooperation.** It is the mutual intent of the Parties to consummate this Settlement Agreement promptly. The Parties therefore agree to cooperate and to exercise their best efforts to the extent necessary to effectuate and implement all of its terms and conditions as quickly as possible. The OAG, TDI, and the Commissioner further agree to comply with all reasonable requests for assistance that the Released Parties may make in order to give effect to the purposes of the Settlement, including (without limitation) providing affidavits and/or testimony in connection with any lawsuits, claims or demands that have been made or could have been made by or on behalf of the Released Parties' policyholders in any forum arising out of or relating to the subject matters of the AG Lawsuit (as amended), the Cease and Desist Order, or the Administrative Proceedings. The intent and spirit of this Settlement Agreement is to terminate all of the disputes arising out of and relating to the Released Claims, except as provided herein,

and to permit the Farmers Parties to continue to provide insurance in the Texas market. The Parties agree to take all reasonable steps and exercise best efforts to achieve that goal. As an initial step towards the restoration of a correct and constructive relationship between the Released Parties and the TDI, the TDI agrees that should it have concern in the future about any practice undertaken by the Released Parties, it will use its best efforts as authorized by statute to contact the appropriate representative of the Released Parties to discuss and hopefully resolve any such concerns. The Released Parties will use their best efforts to notify the TDI, in advance, of any material changes in their course of conduct.

2. This Settlement Agreement and the Exhibits hereto constitute the entire agreement among the Parties. All other agreements and understandings between the Parties, including the MOU, are superseded by this Settlement Agreement.

3. This Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of the Parties or their successors in interest.

4. Except as otherwise expressly provided in this Settlement Agreement, each Party shall bear its own costs, including taxable court costs.

5. The undersigned each represent that he or she is fully authorized to execute this Settlement Agreement on behalf of the Parties for which he or she signs.

6. This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective agents, representatives, successors and assigns. This Settlement Agreement can be signed in multiple counterparts.

THE STATE OF TEXAS, AND THE OFFICE OF THE ATTORNEY GENERAL

By: David Mattax
Director of Defense Litigation
Office of the Attorney General

JULIA J. RATHGEBER, COMMISSIONER
TEXAS DEPARTMENT OF INSURANCE

_____

FARMERS INSURANCE EXCHANGE

_____

FIRE INSURANCE EXCHANGE

_____

FIRE UNDERWRITERS ASSOCIATION

_____

FARMERS GROUP, INC., INDIVIDUALLY AND
D/B/A FARMERS UNDERWRITERS
ASSOCIATION

_____

TEXAS FARMERS INSURANCE COMPANY

_____

MID-CENTURY INSURANCE COMPANY OF
TEXAS

_____

MID-CENTURY INSURANCE COMPANY

_____

FARMERS TEXAS COUNTY MUTUAL
INSURANCE COMPANY

_____

TRUCK INSURANCE EXCHANGE

_____

TRUCK UNDERWRITERS ASSOCIATION

_____

# EXHIBIT 7

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, and THE TEXAS COMMISSIONER OF INSURANCE, | § § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, and TRUCK UNDERWRITERS ASSOCIATION, | § § § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS<br><br><br><br><br>261ST JUDICIAL DISTRICT |
| Defendants. | | |

## ORDER OF PRELIMINARY APPROVAL

This matter came on for hearing on October 18, 2013, at 9:00 a.m. for preliminary approval of the Second Amended Settlement Agreement and Stipulation of December 18, 2002, as amended on June 13, 2003, and as further amended on August ___, 2013 ("Second Amended Settlement Agreement") between the State of Texas, the Texas Department of Insurance, and the Texas Commissioner of Insurance, on behalf of Texas policyholders of the Defendants in the classes defined below (collectively, the "State") and Fire Underwriters Association, Farmers Group, Inc. d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire

Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (collectively, the "Farmers Parties"). The State and the Farmers Parties have moved jointly, pursuant to Texas Rule of Civil Procedure Rule 42(e) and Texas Insurance Code § 541.266, for an Order of Preliminary Approval (the "Order") (1) preliminarily approving the settlement of all claims asserted in the above-captioned cause (the "Action"), the terms of which are set forth in the Second Amended Settlement Agreement which has been filed with the Clerk of the Court, and (2) approving the proposed notice to the Classes.

The Court having read and considered the Second Amended Settlement Agreement and attached exhibits, including the proposed Notice of Proposed Class Settlement, the proposed Claim Form, the proposed form of Final Judgment, exhibits, pleadings and record in this case, the evidence and other materials presented at the hearing, and argument of counsel and applicable authorities, finds that there exists substantial and sufficient grounds for entering this Order.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:

1. The Court, for purposes of this Order, adopts all defined terms as set forth in the Settlement Agreement.

2. Pursuant to Rule 42 and Texas Insurance Code §§ 541.251-.267, this Court hereby certifies, only for purposes of effectuating the Settlement Agreement, the following Settlement Classes (the "Settlement Classes"):

> (i) All of the Exchanges' Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or

(b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed (the "Rate Class");

(ii)    All of the Exchanges' Texas homeowners insurance policyholders who according to Farmers' records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002 (the "Discount Class"); and

(iii)   All Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers who according to Farmers' records had a homeowners or automobile insurance policy in effect with Farmers from October 1, 1999, through February 28, 2003 (the "Credit Usage Notice Class").

3.      The Court hereby acknowledges and confirms the State, through the Office of the Attorney General, to fulfill the role of the Settlement Classes' Counsel. The Court finds that the Attorney General's office is authorized to bring this class action by the *parens patriae* authority granted in sections 541.251 and 541.256-57 of the Insurance Code and Rule 42 of the Texas Rules of Civil Procedure. *See Farmers Group, Inc. v. Lubin*, 222 S.W.3d 417 (Tex. 2007).

4.      This Court additionally finds and concludes that each of the requirements of Rule 42(a) & (b) and §§ 541.256 and 541.257 of the Texas Insurance Code has been met, specifically: (a) each of the Settlement Classes is so numerous that joinder of all members is impracticable; (b) there are questions of law or fact common to the Settlement Classes which predominate over any individual questions; (c) the claims or defenses brought by the State on behalf of Farmers' policyholders are typical of the claims or defenses of the Settlement Classes and the State is authorized to bring claims on behalf of the Settlement Classes; (d) in negotiating and entering into the Settlement Agreement, the State has fairly and adequately represented and protected the interests of the Settlement Classes; (e) the questions of law or fact common to the Settlement Classes predominate over any questions affecting only individual members; and (f) certifying this Action as a class action for settlement purposes is superior to other available methods for the fair and efficient adjudication of the controversy.

5.     The Court further finds that there has been no collusion between the State and the Farmers Parties with respect to negotiating the Settlement Agreement and that the State has represented, and will continue to represent, the interests of the Farmers' policyholders fairly and adequately and without a conflict of interests. Accordingly, the Court preliminarily approves: (a) the Second Amended Settlement Agreement, including the terms and the releases set forth therein, as being fair, just, reasonable, and adequate as to each of the parties thereto, and (b) the Settlement Funds described therein, including the Prospective Rate Reduction, Retrospective Rate Reduction, Individualized Discount Adjustment, and Credit Usage Notice Adjustment Fund, and the proposed additional consideration, subject to the right of any member of the Settlement Classes to exclude himself or herself from the Settlement Classes in accordance with the terms set forth in the Settlement Agreement, and to show cause, if any exists, why a Final Judgment should not be entered in accordance with the terms of the Settlement Agreement.

6.     A hearing (the "Settlement Hearing") shall be held before this Court on January 22, 2014, at 9:00 a.m. in the 53rd Judicial District Court Room: (a) to determine whether the proposed Second Amended Settlement Agreement is fair, reasonable, and adequate and should be approved, and whether the Final Judgment should be entered as to claims asserted therein, or which could have been asserted, against the Released Parties on the merits; (b) to determine whether the Settlement Classes members' right to adequate representation has been satisfied; and (c) to reserve jurisdiction to effect and enforce the Settlement Agreement.

7.     The Farmers Parties shall disseminate notice of the proposed Second Amended Settlement Agreement and Settlement Hearing to putative members of the Settlement Classes within thirty (30) days of the date of this Order. A copy of the Notice of Proposed Class Settlement (the "Notice"), together with a copy of the Claim Form, substantially in the form

attached hereto as Exhibit 1, shall be mailed by first-class U.S. mail, postage prepaid, to all members of the Settlement Classes at the address of each such person as set forth in the records of the Released Parties or as otherwise may be identified through reasonable effort. In addition, commencing within seven (7) days of the date of this Order and continuing until the date of the Settlement Hearing, the Office of the Attorney General, the Texas Department of Insurance, and the Farmers Parties shall post on their respective Internet web-sites (www.oag.state.tx.us, www.tdi.state.tx.us and www.farmers.com), as well as at www.TexasFarmersSettlement.com, the Notice and a Summary Notice of Settlement, substantially in the form attached hereto as Exhibit B ("Summary Notice").

8.      The Court approves the form of Notice, the Summary Notice, and the Claim Form, and finds that the procedures established for mailing and distributing such notices substantially in the manner and form set forth in paragraph 7 of this Order meet the requirements of Rule 42 of the Texas Rules of Civil Procedure and §§ 541.261 and 541.267(b) of the Texas Insurance Code and due process, and constitute the best notice practicable under the circumstances.

9.      To effectuate the provision of notice provided in paragraph 7 hereof, the Farmers Parties shall be responsible for the receipt of all responses from the members of the Settlement Classes and, until further order of this Court, shall preserve all entries of appearance, Claim Forms, requests for exclusion, and any and all other written communications from members of the Settlement Classes or any other person in response to the Notice. The costs of notification of the Settlement Classes as provided herein, including printing, mailing, and posting on the Internet of all required notices, shall be borne by the party charged with the responsibility for such actions in paragraph 7 of this Order.

10.    Three (3) days before the date fixed by this Court for the Settlement Hearing, the State and the Farmers Parties shall cause to be filed with the Clerk of the Court affidavits or declarations of the person or persons under whose general direction the mailing of the Notice and the distribution of the Summary Notice by posting on the web-sites identified in paragraph 7 shall have been made, showing that such mailing and publication have been made in accordance with this Order.

11.    Each member of the Settlement Classes will be bound by the proposed settlement provided for in the Settlement Agreement, and by the Final Judgment or any other determination by this Court affecting the Settlement Classes, unless such member shall mail, by first-class U.S. mail, a written request for exclusion from the Settlement Classes, post-marked no later than December 23, 2013, addressed to State v. Farmers Settlement Administrator, Rust Consulting, Inc.; P.O. Box 9348; Minneapolis, MN 55440-9348. Such request for exclusion must state (a) the name, address and telephone number of the person seeking exclusion; (b) whether such person has a homeowners or automobile insurance policy from the Farmers Parties, or both; (c) the date of inception of such policy(ies) and the most recent date of renewal for such policy(ies), if available; (d) the policy number(s), if available; and (e) that the person making the request wishes to be excluded from the Settlement Classes. Because the Settlement Agreement is intended to be a resolution of all Released Claims, any person requesting exclusion must either exclude himself or herself from the Settlement Agreement in its entirety, or submit to the Settlement Agreement in its entirety. A request for exclusion shall not be effective unless it is made in the manner and within the time set forth in this paragraph and in the Notice. If a member of the Settlement Classes requests to be excluded, that person will not receive any benefit from the Retrospective Rate Reduction, the Individualized Discount Adjustment, or the

Credit Usage Notice Adjustment Fund provided for in the Settlement Agreement, in the event the Settlement Agreement is approved by the Court, nor will such person be permitted to participate further in the Action. Any Class Member who does not request exclusion in the manner provided for herein may, but need not, enter an appearance in this Action at his or her own cost through counsel of his or her own choice. If a member of the Settlement Classes does not enter an appearance, that person's interests will be represented by the State in the Action.

12. Any member of the Settlement Classes who has not requested exclusion from the Settlement Classes may appear at the Settlement Hearing, in person or through counsel, to object and be heard in opposition to any of the matters to be heard at the Settlement Hearing, including (a) the requested approval of the Settlement Agreement as fair, adequate, and reasonable, and/or (b) the requested entry of the Final Judgment. A member of the Settlement Classes cannot request exclusion from the Settlement Classes AND object to the Settlement Agreement. For any objection to be considered by the Court, the objector must mail a valid written objection, and it must be postmarked by no later than December 23, 2013. In order to be valid, the written objection must set forth (a) a reference, at the top, to "State of Texas v. Farmers, Cause No. GV202501," (b) a statement as to whether the objector intends to appear at the Settlement Hearing, either in person or through counsel, (c) a detailed statement of the specific basis for the objection, (d) the name that is set forth on the Notice that was sent to the objector, (e) the objector's current name, if different from the name set forth on the Notice, (f) the objector's current address, (g) the objector's current telephone number and, if available, telecopier number, (h) the objector's type of policy and policy number, and (i) the objector's signature or that of his or her authorized representative. Three copies of the written objection must be sent, the first addressed to the District Clerk of Travis County, Texas, 1000 Guadalupe Street, Austin, Texas

78701, the second addressed to David C. Mattax, Director of Defense Litigation, Office of the Attorney General, P.O. Box 12548, Austin, Texas 78711-2548, and the third addressed to Marcy Hogan Greer, Fulbright & Jaworski L.L.P., 98 San Jacinto Boulevard, Suite 1100, Austin, Texas 78701. If an objection does not include all of the required information or if it is not timely mailed to the three correct addresses, then it shall be invalid and it will not be considered by the Court. Any member of the Settlement Classes who does not object in the manner provided shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy, or reasonableness of the Settlement Agreement and the proposed Final Judgment.

13.     If the Court gives final approval to the Settlement Agreement and enters a final judgment, in order to be entitled to participate in the Credit Usage Notice Adjustment Fund portion of the Settlement Agreement, a member of the Credit Usage Notice Class who has not requested exclusion from the Settlement Classes must submit a Claim Form, substantially in the form attached as Exhibit C hereto, to the Claims Administrator at the address set forth in the Notice. Such Claim Form must be completed and postmarked on or before March 24, 2014. Any member of the Credit Usage Notice Class who does not submit a completed Claim Form shall not be entitled to share in the Credit Usage Notice Adjustment Fund but nonetheless shall be bound by the terms of the Second Amended Settlement Agreement and by the Final Judgment and any other Order of this Court approving the Second Amended Settlement Agreement, including all releases therein, and shall be barred and enjoined in this or any other action from asserting any Released Claims.

14.     Members of the Rate and Discount Classes shall automatically receive their share of Settlement Funds upon final approval of the Second Amended Settlement Agreement and

entry of final judgment, unless they file a written request for exclusion from the Settlement Classes as provided in paragraph 11 herein.

15. The Court expressly retains the power to adjourn the Settlement Hearing, without any further notice other than an announcement at the Settlement Hearing of adjournment thereof, and to approve, modify, or disapprove the Second Amended Settlement Agreement without further notice to members of the Settlement Classes. The Court retains jurisdiction over this Action to consider all further applications arising out of or connected with the proposed settlement herein.

16. The administration of the Second Amended Settlement Agreement, and the decision of all disputed questions of law and fact with respect to the validity of any claim or right of any person to participate in the distribution of the Settlement Fund, shall be under the authority of the Court. The parties to this Second Amended Settlement Agreement, counsel herein in any capacity in which they may act hereunder, and any employees or agents of such law firms or the parties to the Second Amended Settlement Agreement (including, without limitation, those employees who may furnish services in connection with the proposed Settlement) shall not be liable for anything done or omitted in connection with the Second Amended Settlement Agreement and the administration thereof except for their own willful misconduct.

17. The parties to the Settlement Agreement are directed to carry out their obligations under the Second Amended Settlement Agreement.

18. In the event that the Second Amended Settlement Agreement is not approved by the Court, or the Court enters the Final Judgment and it is vacated or modified on appeal, or otherwise altered in a material way, or the Effective Date for any other reason does not occur,

and if any party to the Second Amended Settlement Agreement thereafter exercises its right to terminate the Settlement Agreement as provided therein, then the Second Amended Settlement Agreement and any actions to be taken in connection therewith shall be vacated and terminated and shall become null and void for all purposes, and all negotiations, transactions and proceedings connected with it (a) shall be without prejudice to the rights of any party hereto; (b) shall not be deemed or construed as evidence or an admission by any party of any fact, matter or thing; and (c) shall not be admissible in evidence or used for any purpose in any subsequent proceeding in the Action, or any other action or proceeding in this or any other forum, judicial, administrative, or otherwise, except proceedings to enforce the Settlement.

SIGNED_____, 2013.


_____
PRESIDING JUDGE

# EXHIBIT 8

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**

| | | |
|---|---|---|
| CHARLES O. "CHUCK" GRIGSON, | § | IN THE DISTRICT COURT |
| | § | |
| Intervenor – Plaintiff | § | |
| | § | |
| v. | § | |
| | § | |
| THE STATE OF TEXAS, THE TEXAS | § | |
| DEPARTMENT OF INSURANCE, AND | § | |
| THE TEXAS COMMISSIONER OF | § | |
| INSURANCE, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| FARMERS GROUP, INC., FARMERS | § | |
| UNDERWRITERS ASSOCIATION, | § | |
| FIRE UNDERWRITERS | § | |
| ASSOCIATION, FARMERS | § | |
| INSURANCE EXCHANGE, FIRE | § | |
| INSURANCE EXCHANGE, TEXAS | § | |
| FARMERS INSURANCE COMPANY, | § | |
| MID-CENTURY INSURANCE | § | |
| COMPANY OF TEXAS, MID- | § | |
| CENTURY INSURANCE COMPANY, | § | |
| and FARMERS TEXAS COUNTY | § | |
| MUTUAL INSURANCE COMPANY, | § | |
| Defendants. | | 261ST JUDICIAL DISTRICT |

**CHARLES O. "CHUCK" GRIGSON'S PLEA IN INTERVENTION
AND OBJECTION TO PRELIMINARY APPROVAL OF
SECOND AMENDED SETTLEMENT AGREEMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CHARLES O. "CHUCK" GRIGSON, pursuant to Rule 60, Tex.

R. Civ. P., who intervenes in this Cause for the purpose of opposing the Joint Motion for

Preliminary Approval of their 2013 Second Amended Settlement Agreement ("2013

Agreement"). This new 2013 Agreement, which supersedes all others, is not within the "range of possible approval," therefore approval should be denied:

## I.     DISCOVERY – LEVEL 2

Charles O. "Chuck" Grigson ("Grigson"), Plaintiff-Intervenor, seeks and intends to conduct Level 2 discovery under Tex. R. Civ. P. 190.3 and will abide by the Protective Order entered in this case.

## II.     STANDING – GRIGSON IS A SUBSCRIBER/POLICYHOLDER/OWNER

Grigson at all material times relevant to this case has been a policyholder of various insurance policies issued by Farmers Insurance Exchange ("Farmers Exchange"); Fire Insurance Exchange ("Fire Exchange") and/or Truck Insurance Exchange ("Truck Exchange"). He is a current subscriber and policyholder in one (or more) of the Exchanges. Zurich Insurance Group, the Parent-Owner of Farmers Group, Inc. ["FGI"], show these Exchanges to be owned by their policyholders. *See* Exhibit "A." Grigson seeks protection of his financial interest as an owner of Exchange assets, including the capital and surplus, of the Exchanges. He objects to any dilution of his policyholder capital & surplus resulting from the proposed new 2013 Agreement.

## III.     FARMERS GROUP, INC. ("FGI") IS ATTORNEY-IN-FACT ("AIF") FOR GRIGSON

The Attorney-in-Fact (AIF) for Grigson and his fellow policyholder/subscribers is Defendant FGI. FGI's relationship with Grigson and the other policyholders in the Exchanges is that of a fiduciary. *See Fogel v. FGI*, 74 Cal. Rptr.3d 61, 66 (Cal. App. 2008, pet. denied).

-2-

In their live pleadings, the State and the Commissioner describe the scope of FGI's fiduciary duties to the policyholders as one of "utmost good faith, fair dealing, honest performance and strict accountability...**for all material matters and conflicts of interest**." *Plaintiffs' Second Amended Petition* at 6, ¶ 18 (filed February 18, 2003 – verified by Sara Shipley Waitt). (*Emphasis* supplied).

## IV.  2013 AGREEMENT SUPERSEDES ALL OTHERS

On August 23, 2013, Plaintiffs and Defendants ("Settling Parties") entered into a "Second Amended Settlement Agreement and Stipulation" which is attached as Exhibit 1 to their "Joint Motion for Preliminary Approval" and referred herein as "the 2013 Agreement."

The 2013 Agreement ... "**amends and supersedes** the Settlement Agreement and Stipulation entered into on the 18th day of December, 2002, as amended on the 13th day of June 2003." (Second Amended Settlement Agreement at 1 – Introductory ¶).

The 2013 Agreement further provides

> This Settlement Agreement and the Exhibits hereto *constitute the entire agreement among the parties. All other agreements and understandings between the Parties, including the MOU, are superseded by this Agreement.*

Id at 17 ¶ X.2:: Emphasis supplied].

Because this 2013 Settlement is not the same as the one approved in 2003[1], it must undergo this Court's "rigorous analysis" before obtaining preliminary approval. *Lubin III*, 2009 WL 3682602 (2009) at 9.

## V.  THE COURT CANNOT APPROVE THE NEW SETTLEMENT WITHOUT A NEW CERTIFICATION ORDER

The Settling Parties correctly state in their jointly filed Motion, that *"Court approval is required before any action brought as a class action may be settled."* Joint Motion at 17 [*Emphasis* supplied].

They further correctly note (citing *Cortez*) that approval is "generally a multi-step process":

> Only the first step is to occur at the upcoming hearing – preliminary approval of the proposed settlement ***and conditional certification of a temporary class."***

Joint Motion at 17-18 [*Emphasis* supplied].[2]

The new Agreement notes at page 9 that payment of the previous "prospective rate reduction" component of the 2003 Settlement has been "consideration previously provided." Because past consideration is no consideration – no release can be given pursuant to this component of any settlement.

---

[1]  This 2013 Agreement differs in every material respect from the now abandoned agreement approved in 2003: Different Class Members; Different Settlement Terms; Different Relief; Different Release; Different Class Notice; Different Order.

[2]  It is a *fact* that the Joint Motion seeks approval of the 2013 Second Amended Settlement Agreement – not the abandoned 2003 Settlement Agreement. "Factual matters" relating to the 2013 agreement have not been heard, much less determined. "The doctrine of the law of the case only applies to questions of law and does not apply to questions of fact." *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986).

Consequently, the 2013 Agreement, if approved, requires a new certification of the classes meeting the new terms of the 2013 Agreement. Previous certification of the 2003 Classes did not certify anything pursuant to this 2013 Agreement.

## VI.    FATAL CONFLICTS OF INTERESTS PREVENT PRELIMINARY APPROVAL

The 2013 Agreement is not within the "range of possible approval" due to fatal conflicts of interest. The Supreme Court has recognized that the Attorney General may have conflicts so serious that adequacy of representation is called into question. Such conflicts now infect the 2013 Agreement presented here.

The conflicts of interest infecting the 2013 Agreement are three fold:

1.      The "dynamic conflict" between FGI and the Exchanges;

2.      The conflict created by one law firm, Fulbright & Jaworski representing both FGI and the Exchanges; and

3.      The State of Texas agreeing to terms directly antagonistic to the policyholders that it purports to represent.

**A.    The "dynamic conflict" between Zurich/FGI – and the Exchanges.**

Paul Hopkins, the President of FGI who signed the now abandoned 2003 Settlement Agreement, described the "conflict" best in 2005:

> Reporter's Question: **It seems that there's a conflict between the best interest of the management company and the best interest of the Exchanges there.** I just wonder, is that true, and how do you manage that?
>
> **Hopkins' Answer:** When you just look at the model, you can definitely ascertain there seems to be some **dynamic conflict**

-5-

that sits between the motivation of the Exchanges and the motivation of the management company. That really falls right back to here. **We are fiduciaries to the Exchanges.** We completely understand that **it is the golden goose that lays the eggs that we harvest.**

September 14, 2005 Paul Hopkins at Zurich's Investor Day Presentation. (Video supplied).

Last Thursday, April 24, 2014, Tom Schrader – President of the Farmers Agents' Association brought the "conflict" current:

> One has to wonder when the AIF (Attorney-In-Fact/Management Company) sent Zurich approximately 3.5 Billion in management fee profits from the Exchanges in 2013 and the Exchanges lost 1,251,000 Net PIF and $1,251,000,000 in lost premium from the loss of policies, whether the best interest/needs of the Exchanges are actually being taken into consideration by the AIF **or is the AIF more interested in their fees**?

April 24, 2014 *The Voice*; UFAA Publication p.2. (*Emphasis* supplied).

The Settling Parties now seek Court approval requiring the Exchanges – **to pay the 2013 settlement** – thereby depleting the policyholder capital and surplus in the Exchanges.

**Such an approval would benefit only FGI –not the policyholders**

It is undisputed that the Exchanges and FGI are represented by the same lawyers – Fulbright & Jaworski. **Hence, the Exchanges, owned by the policyholders, have had no separate and independent lawyers to protect their interests in negotiating the 2013 agreement.**

-6-

Lawyers' Conflicts of Interest are governed by Rule 1.06; Texas Rules of Professional Conduct, which provides:

> (a) A lawyer shall not represent opposing parties to the same litigation.
> (b) In other situations and except to the extent permitted by ¶(c) a lawyer shall not represent a person if the representation of that person:
> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interest of another client of the lawyer or the lawyer's firm; or
> (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

Here, the Settling Parties references to the 2011 *Fogel* Settlement demonstrate the attorneys' conflict:

Exchanges policyholders participated in the *Fogel* settlement by receiving payment *from FGI* – and its parent company Zurich Financial Services (now Zurich Insurance Group). In *Fogel* the interests of the Exchanges were represented by its independent counsel – Lock Lord Bissell & Liddell, LLP. FGI was represented by independent counsel – Skadden, Arps, Slate, Meagher & Flom LLP; and the now defunct Dewey LeBoeuf independently represented Zurich Financial Services.

As a result of the separate representation of Zurich/FGI on the one hand versus the policyholder-owned Exchanges on the other, Zurich/FGI paid the entire $527 million settlement **which included $294 million going to the policyholders as an increase to the Exchanges' policyholder capital and surplus**. This result was reached because the interests between the two were allegedly antagonistic.

**The 2013 Agreement here stands in stark contrast to *Fogel*.**

Here, where the Exchanges are represented by F & J – the same counsel as FGI –

the Exchanges pay everything – decreasing their capital and surplus. FGI thereby

benefits it own self-interest at the expense of the policyholders.[3]

Stated differently, when the Exchanges and FGI are represented by separate

counsel – FGI pays. When the Exchanges and FGI are represented by the same counsel

– the policyholders pay.

**B.      Conflict between State of Texas and Policyholders.**

**1.      Waiving TDI's ability to separately contest management fees.**

The State and TDI's agreement to "henceforward" not separately regulate FGI's

management fees in rate hearings, besides being unconstitutional, **benefits no one but**

**FGI at the expense of the Policyholders.** See Sec. IX. 6 at 16; 2013 Agreement.

Such an "agreement", if approved, would defeat the entire purpose of the

"Exchange" form of doing business. See Chapter 422, Tex. Ins. Code.

In the late 1800's, Reciprocal Exchanges were formed for the very purpose of

allowing individuals and companies to "exchange" promises to pay for each other's risk

losses without the huge expense encountered by the for profit stock companies. *See (*D.

Reinmuth, Ch. 8 *The Regulation of Reciprocal Insurance Exchanges*, University of

Pennsylvania (1967)[4]. Keeping expenses at a minimum was critical to the functions of an

---

[3]      In *Fogel*, **Zurich/FGI obtained a release from the Exchanges thereby documenting the antagonism between the two.** *See Hooks* **Objection; Ex. "D" at 12; 17; 43.**

[4]      Even in 1967, Reinmuth was critical that "…the attorney-in-fact will use more sophisticated methods of increasing its compensation *        *        * another method of increasing income is to transfer of shift some of the expenses which were to be borne by the attorney-in-fact to the exchange with no corresponding decrease in management fee." Reinmuth *Id* at 148.

Exchange if it were to survive.

Today, even Farmers' agency force is critical of the $3.5 billion dollars that FGI receives yearly from policyholders as an "expense" as being excessive by one billion dollars. See Exhibit B (4-24-2014) Issue of *The Voice.*

Moreover, the Office of Public Insurance Counsel ("OPIC") is currently contesting the "excessiveness" of FGI's management fees before TDI. *See* Exhibit C; *Dec. 2013 OPIC Letter* Deeia Beck contesting Farmers' Proposed Rate Hike. Should the Court approve this agreement, TDI would be voluntarily "handcuffed" to ignore this vital item as an "individual expense." FGI management fees deserve *more* TDI scrutiny – not less.

### 2. State gets $2 Million Dollars from the Policyholders.

Finally, the policyholders would also pay two million dollars ($2,000,000) to the State of Texas. These are the same policyholders Attorney General, Gregg Abbott, purports to represent.

These conflicts of interest are so fraught with antagonism to policyholders that they rise to the level of inadequate representation by the State. *See FGI v. Lubin*, 222 S.W.2d 417, 426 (Tex. 2007).

### VII CONCLUSION

This Court should not approve the 2013 Agreement. The Joint Motion to Approve should be denied. WHEREFORE, PREMISES CONSIDERED, Intervenor Grigson prays that the Court deny the Joint Motion for Preliminary Approval of Second Amended

-9-

Settlement Agreement, and for such other and further relief to which he may show himself justly entitled.

Respectfully submitted,

LAW OFFICES OF JOE K. LONGLEY

Joe K. Longley
State Bar No. 12542000
1609 Shoal Creek Blvd. #100
Austin, Texas 78701
512-477-4444 PHONE
512-477-4470 FAX

LAW OFFICE OF PHILIP K. MAXWELL
Philip K. Maxwell
State Bar No. 13254000
1609 Shoal Creek Blvd #100
Austin, Texas 78701
512-947-5434 PHONE

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was served on the following counsel of record by facsimile transmission on this the 28th day of April, 2014

David C. Mattax
Chief, Financial Litigation Division
Joshua Godbey
Office of the Attorney General of Texas
Financial Litigation Division
P. O. Box 12548
Austin, TX 78711-2548

Richard N. Carrell
Fulbright & Jaworski, LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095

M. Scott Incerto
Fulbright & Jaworski, LLP
98 San Jacinto Blvd #1100
Austin, TX 78701

Marcy Greer
Alexander Dubose Jefferson & Townsend, LLP
515 Congress Ave., Suite2350
Austin, TX 78701

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217

Rudlfo Vela
Anna Vela
1001 Coffeyville Tr.
Grand Prairie, TX 75052
jackvela@yahoo.com

Joe K. Longley

-11-

# EXHIBIT 9

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GV-02-002501

| | |
|---|---|
| STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE, Plaintiffs, | ) IN THE DISTRICT COURT ) ) ) ) ) |
| VS. | ) ) ) |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, AND FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, Defendants. | ) ) TRAVIS COUNTY, TEXAS ) ) ) ) ) ) ) ) ) ) 261ST JUDICIAL DISTRICT |

-------------------------------------------------

HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF
THE SECOND AMENDED SETTLEMENT AGREEMENT
AND STIPULATION OF CLASS NOTICE

-------------------------------------------------

On the 29th day of April, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott H. Jenkins, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

MR. MATTAX: I would suggest two things, Your Honor. One, to agree to go forward with the deal you made to me is not collusion. When you negotiate a deal and you're adverse to the parties as the Court realized back in 2003 and you make a deal, that's the deal that was done.

THE COURT: Okay.

MR. MATTAX: Now, have I -- have I hinted at the interest? Have I raised the specter of interest since then? Yes.

THE COURT: Yes. And since we --

MR. MATTAX: And the response has been --

THE COURT: And since we had a whole hearing on what you did behind the scenes, including Senator Duncan's participation in it --

MR. MATTAX: Yes.

THE COURT: -- so that your negotiations were all revealed, it was an open story, something that was fought at the time, but I thought it was right to make it an open book, that's why I'm opening the book now. Did you argue this to Farmers at all? Did you say, you know, I know a deal's a deal, but we've got this judge who may just be hard on this, and these consumers have been waiting for the money more than ten years; we think you ought to tweak and sweeten this deal

with the time value of money? Did you make that argument to Farmers?

MR. MATTAX: Without sort of -- I'm trying to understand how to reveal this, but as late as last night I mentioned interest.

THE COURT: Okay.

MR. MATTAX: And the answer was no.

THE COURT: Well, what you say between you and Farmers is not privileged --

MR. MATTAX: Right.

THE COURT: -- in this hearing.

MR. MATTAX: Correct.

THE COURT: What you say between you and the department --

MR. MATTAX: Exactly.

THE COURT: -- may be, but not between you and Farmers.

MR. MATTAX: Right. I raised the issue that in retrospect there should have been an inclusion of interest because the time had passed, and that was not accepted.

THE COURT: Okay.

MR. MATTAX: Now, did I say I'm not going to do the deal because of that? No.

THE COURT: Okay.

MR. MATTAX: Because we did the deal without that, for better or worse, and now we're here before the Court.

THE COURT: Now you can tell reason number one that you can now negotiate is that this judge doesn't like it, and this judge needs to wrap his arms around a possible settlement that the judge can contemplate approving at some point. And without any calculation for the time value of money, since Farmers has had the benefit of all that money for more than a decade and the consumers haven't, it's not within the range of something I think I could approve.

Now, you can keep putting on a record about that today if you want or in the future, but you need to know that's one of the problems I listed as I worked on this this weekend.

MR. MATTAX: Very good. Well, let me then close with the first element of the settlement agreement with the caveat that interest is up in the air, and that was with, as I said, the retrospective rate relief. The Court also put its finger on another aspect of the original settlement, the prospective rate relief. And in the prospective rate relief, that actually was basically intended to be sort of a stop-gap between the time of the settlement and the time the Legislature had

working on this for a decade. I've had a thousand cases since then and haven't.

MR. MATTAX: Right.

THE COURT: So tell me what's in there.

MR. MATTAX: Well, my recollection is that the question really came down to with respect to funding the settlement, how does that funding occur, and the thought process was that it's the exchanges that are the people that charge the rates.

THE COURT: Yes. Here's my question. I don't remember anybody challenging whether that was fair to the exchanges vis-a-vis the corporation. I don't remember that issue of the tension between the exchanges and the corporation being flushed out in that trial.

MR. MATTAX: I would -- I would agree with your recollection.

THE COURT: And now even an argument that a single law firm can't represent them because of the internal conflicts. That's really interesting, and I'm sure it is to all of us lawyers, and concerning.

MR. MATTAX: Well, let me do this, Your Honor.

THE COURT: So I don't remember any of that. And you're confirming for me now it was not dealt with in that trial?

MR. MATTAX: Let me do it this way.

THE COURT: Is that right?

MR. MATTAX: I don't recollect. And let me, if I could, defer to Norton Rose and see if they have a recollection, if that's okay, or should we do that later?

THE COURT: No, let's finish yours.

MR. MATTAX: Okay.

THE COURT: But they'll make a note, and they'll know they're going to have to explain that if it was in that trial, because I don't have enough of a recollection to be confident going forward that I can approve the settlement given this issue that I'm now discerning about the potential for unfairness to the exchanges vis-a-vis the corporation. That's something I don't remember anybody briefing for me ten plus years ago.

MR. MATTAX: Let me --

THE COURT: And I'm going to need that to be satisfied that I can ever approve this settlement or give preliminary approval, so somebody's going to have to address that.

MR. MATTAX: Very good, Your Honor.

THE COURT: Thank you.

MR. MATTAX: And I think the best answer I

Farmers ever had the contractual right to terminate the HOB policies. And what was fascinating to me in this is that Farmers -- and Justice Burgess was astounded by it too -- made the -- what I wrote was "amazing" last night -- made the amazing argument that the contract was ambiguous and therefore you couldn't have a class about that. And yet, that's the very argument they're making here, is that they want a declaration in your class settlement that they had the right to cancel the policies. Those are diametrically opposite arguments by Farmers. And so -- and I understand. These are really great lawyers for Farmers, really great lawyers. They're making -- they're fighting hard for their client. That's their job. Their job is not to do your job to protect this consumer class.

So what I want to know is why wouldn't you as class counsel argue for in this settlement let's carve out *Geter* because it's not about money, it's been certified, Justice Burgess has affirmed it, and why not let those people get that declaration -- or Justice Sondock thinks they'll lose; Farmers thinks they'll lose -- and let that be decided? Let it be decided. Why would we just obliterate that cause of action and not let them get that be decided and you as class counsel never even wanted to make the argument because

**REPORTER'S CERTIFICATE**

THE STATE OF TEXAS )

COUNTY OF TRAVIS )

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this the 12th day of May, 2014.

/s/ Chavela V. Crain
Chavela V. Crain
Texas CSR 3064, RMR, CRR
Expiration Date: 12/31/2015
Official Court Reporter
53rd District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
(512) 854-9322

# EXHIBIT 10

**TO APPELLANT GRIGSON'S RESPONSE TO
APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR
LACK OF APPELLATE JURISDICTION**

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GV-02-002501

STATE OF TEXAS, THE TEXAS ) IN THE DISTRICT COURT
DEPARTMENT OF INSURANCE, )
AND THE TEXAS )
COMMISSIONER OF )
INSURANCE, )
   Plaintiffs, )
)
VS. )
)
)
FARMERS GROUP, INC., )
FARMERS UNDERWRITERS ) TRAVIS COUNTY, TEXAS
ASSOCIATION, FIRE )
UNDERWRITERS ASSOCIATION, )
FARMERS INSURANCE )
EXCHANGE, FIRE INSURANCE )
EXCHANGE, TEXAS FARMERS )
INSURANCE COMPANY, )
MID-CENTURY INSURANCE )
COMPANY OF TEXAS, AND )
FARMERS TEXAS COUNTY )
MUTUAL INSURANCE COMPANY, )
   Defendants. ) 261ST JUDICIAL DISTRICT

-----------------------------------------------------

HEARING ON MOTIONS TO STRIKE
AND MOTION TO LIFT STAY ON DISCOVERY

-----------------------------------------------------

On the 4th day of September, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Scott H. Jenkins, Judge presiding, held in Austin, Travis County, Texas;

Proceedings reported by machine shorthand.

judgment on the settlement that went up through appeals. That has not occurred at this point. This language was brought forward and, you know --

THE COURT: What am I to make of the language farther up the page, though, that he didn't cite, Farmers parties do not agree to certification of the settlement classes for any purpose other than to effectuate this settlement agreement?

Well, I haven't approved this settlement agreement. In fact, I rejected it. So you are now in a posture where you don't agree with the class action. And in fact, you were the party who wanted the class action 12 years ago. So it seems to me we're back at square one with no settlement agreement, no certified class, because no party -- I mean, you were the party who asked for it, and now you don't agree to it, according to your own signed document, and the State really wasn't the one who asked for it to begin with. So what am I to make of all that?

MR. INCERTO: Well, I have to respectfully disagree with the Court's analysis on that. I think we do have a class action. I believe it's law in the case from the Supreme Court. I believe that this particular provision --

THE COURT: Well, then is this just

MR. INCERTO: -- if this Court denies the preliminary approval.

THE COURT: Exactly. Since I've denied it, it seems to me now there's no agreement. I've got the State who didn't want to do it -- didn't ask to do it to begin with, Farmers who wanted to do it because they wanted to effectuate a settlement, and now the Court has declined to approve the settlement. I'm just thinking that that language is significant. You don't think that it is, apparently.

MR. INCERTO: Your Honor, I don't think the Court has denied preliminary approval. There's no order denying preliminary approval of the current settlement agreement. The Court has expressed some concerns and some issues --

THE COURT: Well, actually, that's what we started off with at this hearing. I thought I was pretty clear on April 29th I'm declining to approve the second amended settlement agreement. I thought that was pretty clear, and I thought that you and I had that sort of meeting of the minds at the beginning of this hearing, but I guess if I wasn't clear, I'm hopefully clear now. So what does that mean?

MR. INCERTO: Well, Your Honor, what it means is we've got -- we've -- the parties have been

# REPORTER'S CERTIFICATE

THE STATE OF TEXAS )

COUNTY OF TRAVIS )

    I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

  I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

  WITNESS MY OFFICIAL HAND this the 10th day of September, 2014.

        /s/ Chavela V. Crain
        Chavela V. Crain
        Texas CSR 3064, RMR, CRR
        Expiration Date: 12/31/2015
        Official Court Reporter
        53rd District Court
        Travis County, Texas
        P.O. Box 1748
        Austin, Texas 78767
        (512) 854-9322

*

# EXHIBIT 11

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

## SUPPLEMENT TO THE SECOND AMENDED
## SETTLEMENT AGREEMENT AND STIPULATION

This is a Supplement, entered into on the 4th of March, 2015, ("Supplement") to the Second Amended Settlement Agreement and Stipulation ("Settlement Agreement"), which was entered into on 29th of August, 2013, by and among the State of Texas ("Texas"), the Office of the Attorney General ("OAG"), the Texas Department of Insurance ("TDI"), including the Texas Commissioner of Insurance ("Commissioner") (collectively referred to as the "State"), and defendants Fire Underwriters Association, Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (collectively referred to as the "Farmers Parties"). Any reference to "Settlement Agreement" in the Settlement Agreement or any of the Exhibits to the Settlement Agreement, including the Order of Preliminary Approval, Notice of Proposed Class Settlement, and Final Judgment, is meant to include this Supplement.

The State and the Farmers Parties (collectively referred to as the "Parties") reaffirm their obligations and commitments made in the Settlement Agreement subject to the enhancements, modifications, and conditions in this Supplement. The Parties further agree as follows:

## I. DEFINITIONS

For this Supplement, all the terms have the same meanings as set forth in the Settlement Agreement, except that the definition of Released Claims is modified to add the following sentence at the end of the definition:

> Notwithstanding the foregoing, the claim for declaratory relief only without any claim for damages, which has been certified as a class action, and as set forth in the Order of November 23, 2010, in the pending *Geter v. Farmers Group, Inc., et al.*, No. E-0167872 in the 172nd District Court of Jefferson County, Texas, is not released by this definition. All other class claims are released.

The following definition is added after the definition for "MOU":

> The "2014 MOU" is the Memorandum of Understanding executed by the Parties on December 17, 2014.

## II. RECITALS

In Section II of the Settlement Agreement, entitled "Recitals," the following is added at the end of the Recitals:

> WHEREAS, at the hearing on April 29, 2014, the Court raised certain issues to be considered.

Page 1 of 5

WHEREAS, the Parties reaffirm the Second Amended Settlement Agreement in its entirety, but have agreed to the enhancements, modifications, and conditions set forth in this Supplement.

## III. CERTIFICATION OF SETTLEMENT CLASSES

As to Section III of the Settlement Agreement on "Certification of Settlement Classes," the Parties acknowledge and agree that the District Court has certified the Settlement Classes in its Order of Preliminary Approval (June 27, 2003), that was appealed to the Third Court of Appeals and the Texas Supreme Court, which affirmed the Order of Preliminary Approval, and the case was ultimately remanded to the District Court on March 9, 2010. Accordingly, the Parties have satisfied the requirement of seeking certification of the Settlement Classes for purposes of Paragraphs 1-4 of Section III of the Settlement Agreement, although the other conditions of Paragraph 2 still apply.

Further to Section III of the Settlement Agreement, Exhibit B (Notice of Proposed Class Settlement), Exhibit C (Summary Notice of Settlement) and Exhibit E (Claim Form) have been revised and the Exhibit B and Exhibit C, attached to this Supplement, are substituted in their place.

## IV. SETTLEMENT FUND

In Section IV of the Settlement Agreement, entitled "Settlement Fund," the Parties agree to the following changes:

The following is substituted for Paragraph 8:

8. **Attorneys' Fees and Investigative Costs.** This Paragraph is no longer operative.

The following is substituted for Paragraph 9:

9. **Estimated Value.** Class members who renewed or received a new HO-A insurance policy from the Defendants after November 11, 2002 and before September 1, 2003, received a 6.8% "prospective" reduction in their premiums. The value of undistributed benefits to the eligible Rate and Discount Class Members under this Settlement is $84.38 million. In addition, eligible Credit Usage Notice Class Members can apply to receive a payment of $35.

The following is substituted for Paragraph 10:

10. **Accounting Treatment for Settlement Fund Payments and Credits.** All amounts paid or credited to policyholders for the Retrospective Rate Reduction and the Individualized Discount Adjustment components shall be treated and accounted for by the Farmers Parties as a return of written premiums. The Farmers Parties shall also prepare such amendments as necessary to their previously reported statistical plan filings to reflect a reduction in direct written

premiums for amounts paid for the above-referenced components. At the time the payment of the Retrospective Rate Reduction and Individual Discount Adjustment is made to the Settlement Class Members, Farmers Group, Inc. shall cause to be paid to the Farmers Exchanges a reimbursement of the attorney-in-fact fee related to those returned premiums, including the enhancement of return premium set out in Paragraph 11 below, in an amount to be determined by the Exchanges.

The following Paragraph is added as Paragraph 11:

11.    The Farmers Parties will provide a total of $10 million (TEN MILLION US DOLLARS AND NO/100) in additional consideration to eligible Rate and Discount Class Members. These additional funds will be distributed on a proportionate basis based on the aggregate of the amounts that the individual class member will be receiving for the rate and discount components.

## IX. RELATED PROCEEDINGS

In Section IX in the Settlement Agreement entitled "Related Proceedings," the Parties agree to the following change:

The following is substituted for Paragraph 6:

6.    **Management Fee.** This Paragraph is no longer operative.

The following is added as a new Paragraph 7:

7.    **Geter.** The Farmers Parties agree that the settlement of this case will not be used to argue that the declaratory relief claim, which was certified as a class action and as set forth in the Order of November 23, 2010, in the pending *Geter v. Farmers Group, Inc.*, No. E-0167872, in the 172nd District Court of Jefferson County, Texas, is barred by the doctrines of res judicata, collateral estoppel, or release; provided that this exception to the scope of the release and effect of the final judgment in this case is limited solely to the previously certified class claim for declaratory relief in the *Geter* case.

## X.    OTHER PROVISIONS

In Section X of the Settlement Agreement, the Parties agree to the following changes:

The following is substituted for Paragraph 1:

1.    **Cooperation.** The Parties and their undersigned counsel agree to undertake their best efforts and to cooperate with each other to effectuate the prompt consummation of the proposed settlement, including taking all steps and efforts contemplated by their written agreements, and any other reasonable steps and efforts that may become necessary by order of the Court or otherwise.

SUPPLEMENT TO THE SECOND AMENDED
SETTLEMENT AGREEMENT AND STIPULATION

The following is substituted for Paragraph 2:

2.     This Settlement Agreement, this Supplement, and the exhibits attached to both agreements constitute the entire agreement among the Parties.  All other agreements and understandings between the Parties, including the MOU and the 2014 MOU, are superseded by the Settlement Agreement and this Supplement. To the extent there is any conflict between the Settlement Agreement and this Supplement, the Supplement will control.

The following are added as Paragraphs 7-8:

7.     The Parties will present the Settlement Agreement and this Supplement to the Court for preliminary approval at the earliest practical time after execution of this Supplement.

8.     The parties agree and recognize that each of the foregoing provisions is subject to preliminary and final approval by the Travis County District Court.

This Supplement may be executed in counterparts, and a signature by facsimile or email shall have the same weight and effect as an original signature.

Once fully executed, this Supplement satisfies the requirement of Section X, Paragraph 3, of the Settlement Agreement that permits the Settlement Agreement to be amended or modified by a written instrument signed by or on behalf of the Parties or their successors in interest.

THE STATE OF TEXAS, AND THE OFFICE OF
THE ATTORNEY GENERAL
By:  Joshua Godbey
Senior Attorney for Financial Litigation
Office of the Attorney General

DAVID MATTAX, COMMISSIONER
TEXAS DEPARTMENT OF INSURANCE

SUPPLEMENT TO THE SECOND AMENDED
SETTLEMENT AGREEMENT AND STIPULATION

_____

FARMERS INSURANCE EXCHANGE, FIRE
INSURANCE EXCHANGE, TRUCK
INSURANCE EXCHANGE, TEXAS FARMERS
INSURANCE COMPANY, MID-CENTURY
INSURANCE COMPANY OF TEXAS, MID-
CENTURY INSURANCE COMPANY,
FARMERS TEXAS COUNTY MUTUAL
INSURANCE COMPANY

_____

FARMERS GROUP, INC., INDIVIDUALLY,
AND D/B/A FARMERS UNDERWRITERS
ASSOCIATION, FIRE UNDERWRITERS
ASSOCIATION, AND TRUCK
UNDERWRITERS ASSOCIATION

SUPPLEMENT TO THE SECOND AMENDED
SETTLEMENT AGREEMENT AND STIPULATION

# EXHIBIT 12

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

REPORTER'S RECORD
VOLUME 2 OF 2 VOLUMES
TRIAL COURT CAUSE NO. D-1-GV-02-002501

STATE OF TEXAS, THE TEXAS ) IN THE DISTRICT COURT
DEPARTMENT OF INSURANCE, )
AND THE TEXAS )
COMMISSIONER OF )
INSURANCE, )
      Plaintiffs, )
)
VS. )
)
)
FARMERS GROUP, INC., )
FARMERS UNDERWRITERS ) TRAVIS COUNTY, TEXAS
ASSOCIATION, FIRE )
UNDERWRITERS ASSOCIATION, )
FARMERS INSURANCE )
EXCHANGE, FIRE INSURANCE )
EXCHANGE, TEXAS FARMERS )
INSURANCE COMPANY, )
MID-CENTURY INSURANCE )
COMPANY OF TEXAS, AND )
FARMERS TEXAS COUNTY )
MUTUAL INSURANCE COMPANY, )
      Defendants. ) 261ST JUDICIAL DISTRICT

-----------------------------------------------------

HEARING ON JOINT MOTION FOR
PRELIMINARY APPROVAL OF SECOND AMENDED
SETTLEMENT AGREEMENT

-----------------------------------------------------

On the 2nd day of July, 2015, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

    Proceedings reported by machine shorthand.

THE COURT: Well, I asked questions because of the very -- for the very same reason I'm asking now, does anybody know that answer, and I think --

MR. LONGLEY: I don't know of any empirical evidence that's in this record.

**COURT'S RULING**

THE COURT: Okay. Thank you. That answers my question. You both answered my question the same way. Thank you. And that's my only question.

All right. You need to submit to my staff proposed orders. I know your proposed order will be to grant the joint motion for preliminary approval.

And I know your motion -- or your order will be to deny the joint motion for preliminary approval. It might even have more in it such as to sign an order that decertifies the class. I don't know.

But do you, as you sit here now, have in your possession the very proposed order that you wish for this Court to sign after I go back and think about whether I'm prepared to sign your proposed order? Do you have your order?

MS. GREER: We do, Your Honor.

THE COURT: Would you hand that to my court operations officer? And I assume you've already

tendered that to the opposing parties.

MS. GREER: No, we weren't presuming at this point.

THE COURT: That's okay. Please do that now.

MS. GREER: And I have provided it to the State.

THE COURT: Thank you. Do the intervenors have a proposed order to conclude this hearing?

MR. LONGLEY: No, Your Honor. We were relying upon the form of the order that was attached to their moving motion, which is obviously far different from this order.

THE COURT: Okay. That's great. Well, let's just take a moment to look at it and see what it is they're asking the Court to do at the conclusion of this hearing.

This question is directed to the moving parties. Exhibits 1, 2 and 3 to this order are identical to the forms that were already submitted in your joint motion materials, correct?

MS. GREER: Yes, Your Honor.

THE COURT: Thank you. I'm not going to go reread --

MS. GREER: Although I did note, being

completely detail oriented here, one typographical error in the notice that we might as well address now.

THE COURT: On which exhibit is this?

MS. GREER: That would be Exhibit 1, Your Honor.

THE COURT: Yes, the notice.

MS. GREER: There's a reference --

THE COURT: What page are you on?

MS. GREER: I am on Page 5 under Question No. 9. At the end of that first paragraph, it says see Question 14, and that actually should be Question 13. Since we're here I thought we could correct it.

THE COURT: Oh, I see. At the end of the first paragraph?

MS. GREER: Yes, Your Honor.

THE COURT: Question 14 is a mistake. It should be Question 13.

MS. GREER: Yes, sir.

THE COURT: Okay. Otherwise, these are identical to what you submitted before?

MS. GREER: Correct.

THE COURT: And in fact, it is identical, but it contains a mistake, and so it now needs to be corrected.

MS. GREER: Correct.

THE COURT: I get it.

MS. GREER: And, Your Honor, the State has pointed out a couple of small nits in the order itself just with website names on Page 4.

THE COURT: At the bottom?

MS. GREER: Yes, Your Honor. The Texas Attorney General has changed its website to www.texasattorneygeneral.gov.

THE COURT: All spelled out?

MS. GREER: All spelled out. And the next --

THE COURT: And then it's still dot state dot TX, et cetera?

MR. GODBEY: No, Your Honor.

THE COURT: Okay. So it's just www.texasattorneygeneral --

MS. GREER: Dot gov.

THE COURT: -- dot gov. Yes, we changed ours here in the County also, which causes no end to problems, although most of it's seamless, but not entirely.

MS. GREER: And Your Honor, there's a typo in the next website, and I apologize because it's mine. It should be TDI.state.tx.

THE COURT: I'm sorry. It should be --

MS. GREER: TDI, Texas Department of Insurance.

THE COURT: Of course, instead of just TI.

MS. GREER: Correct.

THE COURT: Got that.

MR. MINDELL: Your Honor, actually the TDI website is now www.TDI.Texas.gov.

MS. GREER: We got the Norton Rose one right.

THE COURT: Well, that's nice. That's good. All right. Anybody else find any other typos?

I mainly wanted to make sure -- because I did not take the time to reread Exhibits 1, 2 and 3, because I've already read those things. I only wanted to read with some care the proposed order that you want me to sign, and I've done that.

And so I'm prepared to tell you -- because I've spent a lot of time on this, we all have, for many, many years. I've read everything you've asked me to read, every case you've asked me to read, and thought about everything you wanted me to think about, and I really do appreciate what you said, but I'm now about to rule in a way that the intervenors are asking me not to. I'm about to grant this joint motion for preliminary approval.

And there are some blanks that will have to be filled in which will involve all of us. Certainly it will involve the moving parties and the Court. And so -- and you're going to get out the notice within 60 days of the signature on this order. And I'll be signing it with corrections no later than Monday, maybe sooner if I finish this work today, but I've got other work to do, and so we'll just see. But I'd like to get this done. So we need to figure out what date this will be set. I need to ask them that question first. Thank you, Mr. Longley.

MR. INCERTO: We have proposed dates if the Court wants to --

THE COURT: Would you hand that to the court operations officer with a copy to the -- do you have copies for the other side?

MR. INCERTO: It's a little confusing. The yellow highlighted are --

THE COURT: Well, I always like to walk back -- begin with the end in mind.

MR. INCERTO: Right.

THE COURT: Walk back to the end, just like we do on a trial scheduling order, and figure out what needs to be done in advance of that and how far in advance it needs to be accomplished.

MR. INCERTO: I think the end --

THE COURT: Do we need to discuss all these time periods on the record or may I give the court reporter a break now?

MR. LONGLEY: I want to make an objection on the record before we go off the record, Your Honor, regarding the form of the order that you're about to sign. We object to the form.

THE COURT: Then tell me what the defect is in the form of the order.

MR. LONGLEY: The defect is that, number one, we were just handed this order. It was not attached as part of the moving papers. The one that was attached to the moving papers in Paragraph 2 says this Court hereby certifies classes, and this is the first time we've seen an order that does not certify classes.

THE COURT: That's because their position, as you know, all along in this joint motion has been that the class was previously certified -- or the Court gave preliminary approval before, it's come back to the Court and that the class has never been decertified. That's -- has that been your argument?

MS. GREER: Yes, Your Honor.

MR. GODBEY: Yes, Your Honor.

THE COURT: And so what you like about

that other order is that it suggests that I have to go back and recertify the class, and that's what you'd like me to put in the order, right?

MR. LONGLEY: Either that or that you refuse to certify a class in this particular order for the reason that you're adopting their view that it's already been certified and you're applying that certification in 2003 to this new 2015 settlement.

THE COURT: No, I understand what they're doing in this order, and I thought about that very thing as I read it, just as you did, and I am going to sign the order as they've presented it.

MR. LONGLEY: And --

THE COURT: But I understand why you don't like that.

MR. LONGLEY: Well, the point -- the reason we don't like it is it's an attempt through collusion to deny these -- let me finish, please.

THE COURT: Well, I'm not going to morph into argument. I'm only going to talk about the form of the order. And I understand why you don't want me to sign the order, but I don't want to morph into argument now, which it sounds like you want to do, and I understand that, but we're not going to do that.

Is there any other defect in the form of

the order, that is, errors, bad grammar, misstatement of the record?  I don't believe that does misstate the record, and I am going to sign that.

MR. LONGLEY:  I have not had time to read the new order, and I would request respectfully that we have a red lined copy of what the differences are between the order they just handed us and the order they attached to their moving papers for this hearing, because I've seen nothing except what I've just told the Court, and I want to see what's been added, what's been subtracted, because I went through this whole hearing without having a copy of this.

THE COURT:  I understand.

MR. LONGLEY:  And I object to it as a matter of form.

THE COURT:  I understand.  But I had read it so thoroughly before, things jumped out at me just as they jumped out to you because you and I have both read this so carefully.  I understand it.  Let me ask them if they have a red lined copy.  And if they do, I will certainly ask them to give you one.  And if they don't, I will give you this afternoon to read this and compare it to the previous one and send electronically to the Court by, I would say, 3:00 or 4:00 -- I mean, you're going to need to work now side by side and compare it,

what form errors there are -- I know you have substantive disagreements; I'm not going to go backwards on that -- form errors you have on the form of the order given your comparison of the previous form and this form, and I will certainly read that, if not today then tomorrow, if not tomorrow then Saturday, because I want to get this done before I start a trial on Monday.

MR. LONGLEY: Well, I respectfully request that they provide us with a red lined because they have these documents on their computers.

THE COURT: I just mentioned I'm going to ask them that. And if not, I'll let you do the green eye shade work of looking back and forth, but let's see if they have it.

MR. LONGLEY: Okay.

THE COURT: Thank you. Do you have that?

MS. GREER: No, Your Honor, we haven't created that.

THE COURT: Okay. Never have created it. They say they haven't created it. And I know you take them at their word that they've never created that. This is simply -- this is their new and improved proposed order. And I understand that you see differences. I do, too. But that's why I wanted to take enough time so that I felt comfortable knowing

what's in this that was not in the previous order. Amazingly I do. I guess I'm still able to move that quickly. And so I'll keep reading it, though, but I wanted to let you know while you're all here that having read it, though I discerned some differences too, I'm prepared to approve it. But I want to give you the next two or three hours to go through it yourself and see if you find any other errors in it and submit that electronically simultaneously copying the other side, because I would like to get this, you know, out of the court along with all the other findings of fact and conclusions of law on other trials I've got that I'm going to be working on today and this weekend. Okay.

MS. GREER: Your Honor --

THE COURT: Anything else?

MS. GREER: Your Honor, the document that has the colored lines on it that has the dates is in the form of an Excel spreadsheet, and we can manipulate those numbers if the Court --

THE COURT: Let's talk about the final fairness hearing and work back from that, okay?

MS. GREER: Okay.

THE COURT: Because you need me for that.

MS. GREER: Correct.

THE COURT: And you only get me at certain

times.  Can we now go off the record and give the court reporter a break?  I don't want to do that if you want to keep the scheduling discussions on the record. I can go back and repeat it on the record what we've agreed to, but I thought I'd give her a break if we can be conversational for a moment about scheduling the final fairness hearing.  Is that okay or do you want to keep -- do you want to stay on the record about discussing our calendars?

MR. LONGLEY:  We can go off the record for a few minutes, Your Honor.

THE COURT:  Okay.  Great.  You should enjoy that.

All right.  Let's talk about my calendar and your calendar.

(Discussion off the record)

THE COURT:  All right.  We're back on the record, Counsel.  We've had a discussion about timing and giving everyone ample time in advance of the final fairness hearing to file objections and to file any briefing about those objections so that the Court can thoroughly consider that.  And having consulted and worked collegially about this, I think everyone's in agreement that we can give more than ample time for all of that to be accomplished if we set the final fairness

hearing for February 1st. And if no one says they disagree with that, I think I just summarized correctly what everyone has worked together to ensure that the Court is going to do, and that is to have a thorough opportunity to consider any objections to final fairness in advance of that hearing and to begin that hearing on February 1st. So that date will be put in this order, and then you will back up from that date and put briefing -- you're going to add a briefing schedule to this order, correct?

MR. INCERTO: That's correct.

THE COURT: And you're going to add, are you, a subpoena deadline to this order, or do you want to think about that?

MR. INCERTO: I think we'll add the subpoena deadline and we'll add the briefing deadline as the 14th of December.

THE COURT: All right. Well, I want to review that order. And if there's some -- and I ask you to send that to Mr. Longley and his colleagues so that you can, again, collegially discuss any deadlines to make sure that everyone's had an opportunity to think about who they want to subpoena. But then, for everyone's sake, and especially the witnesses, so we don't have the last-minute subpoenas we've had in this

preliminary fairness hearing, I would like to cook some deadlines in there. Do you have any questions about what I'm going to do?

MR. LONGLEY: No, Your Honor, I don't. What I would request is that the nits that you have requested, that they be included in whatever they send over to us so that we don't -- I haven't written all these down as we've gone through here informally. So just correct whatever it is they're going to correct and send it over to us. As to form, we have no objection with the date the Court has said that you want to have the final fairness hearing. We're not agreeing to it.

THE COURT: I understand.

MR. LONGLEY: Yeah.

THE COURT: But you have no objection to --

MR. LONGLEY: We have no objection to the setting.

THE COURT: To the setting. And you have no objection to baking into this order deadlines for subpoenas, deadlines for briefing provided those are reasonable. And we've talked about roughly six or more weeks before the final fairness hearing having the final briefs submitted. Given how far in advance we're setting this final fairness hearing, you have during our

discussions offered no objections to the idea that we would bake in some deadlines so that the Court has an ample opportunity to have us all prepared for the final fairness hearing.

MR. LONGLEY: We understand thoroughly, Your Honor, the need for dates to be in there, and as to that part of the form we have no objection.

THE COURT: Thank you for saying that. And I know you're speaking on behalf of the other intervenors, too. Thank you.

Anything else we need to say on the record about this so that I can then review this order you're going to get to me hopefully later today and I can sign it sometime today or over the weekend? The next time it'll be filed if it's not filed by 5:00 p.m. today -- the clerk's office shuts down, so they won't be filing it until Monday no matter what I'm signing, but I will get it signed no later than Monday. And you're going to be getting that to me this afternoon; is that correct?

MR. INCERTO: That is correct.

THE COURT: And Mr. Longley requested just now, could you -- when you redo this, correcting the nits, could you shoot that over to his office and his co-intervenors in a form that allows them to quickly see --

MR. INCERTO: We'll red line --

THE COURT: -- the nit corrections you've done?

MR. INCERTO: We'll red line the original order to show the corrections and the nits.

THE COURT: Thank you. I know he appreciates that. Anything else we need to say on the record?

MR. INCERTO: Nothing further, Your Honor.

MR. GODBEY: Nothing, Your Honor.

MR. LONGLEY: I think we're finished, Your Honor. Do we need to report back to you tomorrow? Is that what you were asking?

THE COURT: First I need to let the court reporter know she's through. Is there anything else we need to say on the record? No?

MR. LONGLEY: Only when you want us to report back to you with regard to what they're going to send to us so that we know the deadline that we've got to get you something, objections or something about this order.

THE COURT: Well, they're not going to give you a red line comparing this order today with the previous order.

MR. LONGLEY: I understand that.

THE COURT: They're only going to give you a little red line with the nit corrections.

MR. LONGLEY: Right.

THE COURT: So your job now is to go back now, which you're already doing, and I am too -- I've already compared it in my mind because I remember what was in the previous order, and that's why you and I both knew one of the changes in this order. You now need to go back and compare this to the previous order, and you also need to let me know by the end of the day what corrections, even before you get the nit red lines, you are finding in this order. Then if there's something about their -- so you'll need to do that this afternoon also. I suggest at 4:00 o'clock that you need -- but I would like it no later than 4:00. I'd prefer it earlier.

How long is it going to take you to go back and read the order that you already argued on the record is different from this order in some material way, especially as it references the certification of the class? You know what I'm referring to now.

MR. LONGLEY: Yes, sir, I do.

THE COURT: Anything else like that you want me to understand that you think I might not have understood -- I believe I have, but if you don't think I

have, I want to know by what time this afternoon you're going to put that in an e-mail to the Court so I can give one last thought to that. I'm not going to rethink my decision, but I am thinking about the form of the order.

MR. LONGLEY: I think I can meet that timetable so long as I get what they're going to send over to me reasonably soon.

THE COURT: Well, that's just nit corrections with dates. I need to know anything in addition to the thing that you said earlier such as, well, this changes what you're saying about the class certification. Yes, yes it does, in some respects, and I'm signing it. If there's anything else like that, I need to know by 3:00, 4:00 at the latest. I would hope by 3:00. I would hope you could go back right now and compare it and tell me anything else that you couldn't -- because I know you've read this thoroughly before.

MR. LONGLEY: I guess what I need to know is the Court is not going to entertain any alternative order to refuse with regard to what we might want to submit?

THE COURT: I'm not going to entertain any substantive differences, that's correct.

MR. LONGLEY: Such as the certification.

THE COURT: That's correct. That's exactly right.

MR. LONGLEY: We're addressing that right now.

THE COURT: Exactly, we are addressing that right now. And I understood that from the briefing you gave me in advance of this hearing that you were each trying to spin my prior comments on the record to be a "oh, we need to recertify this class" from your perspective and "no we don't" from their perspective. I understood that completely.

MR. LONGLEY: And I think I do, too, Your Honor, that this particular settlement that you're approving will not have a separate certification or refusal to certify.

THE COURT: It's going to be the order they've proposed.

MR. LONGLEY: I gotcha. And I can get back to you by 5:00 o'clock today or to e-mail Ms. Daniel.

THE COURT: No.

MR. MAXWELL: 4:00 o'clock, Joe.

THE COURT: No, by 4:00 o'clock.

MR. LONGLEY: 4:00 o'clock. Okay. Sorry.

THE COURT: Okay. Good. All right. Any other questions or statements on the record before I let the court reporter get a well-deserved break?

MR. INCERTO: Nothing further.

MR. GODBEY: Nothing further, Your Honor.

MR. LONGLEY: Nothing further.

MR. BLANKS: Nothing from the Hooks, Your Honor.

MR. WOODS: Nothing.

THE COURT: All right. Thank you all.

*(Court adjourned)*

# REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )

COUNTY OF TRAVIS      )

I, Chavela V. Crain, Official Court Reporter in and for the 53rd District Court of Travis County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered in evidence by the respective parties.

WITNESS MY OFFICIAL HAND this the 12th day of July, 2015.

/s/ Chavela V. Crain
Chavela V. Crain
Texas CSR 3064, RMR, CRR
Expiration Date:  12/31/2015
Official Court Reporter
53rd District Court
Travis County, Texas
P.O. Box 1748
Austin, Texas 78767
(512) 854-9322

# EXHIBIT 13

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

## SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION

This Second Amended Settlement Agreement and Stipulation (the "Settlement Agreement"), entered into on the 13th of June, 2003, August, 2013, amends and supersedes the Settlement Agreement and Stipulation entered into on the 18th day of December, 2002, as amended on 13th of June, 2003 ("2003 Amended Settlement Agreement"), by and among the State of Texas ("Texas"), the Office of the Attorney General ("OAG"), the Texas Department of Insurance ("TDI"), including the Texas Commissioner of Insurance ("Commissioner") (hereafter sometimes referred to collectively as the "State"), and defendants Fire Underwriters Association, Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association (hereafter sometimes referred to collectively as the "Farmers Parties"). The State and the Farmers Parties (hereafter collectively the "Parties") agree as follows:

## I. DEFINITIONS

For purposes of this Settlement Agreement, the following terms have the meanings specified below:

"Administrative Proceeding" means the Notice of Public Hearing, Docket No. 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.D, To Consider Whether Commissioner's Emergency Cease and Desist Order No. 02-0844 Should Be Affirmed and Whether Disciplinary Action Should Be Taken Against Farmers Insurance Exchange and Fire Insurance Exchange, which TDI issued on or about September 18, 2002.

"AG Lawsuit" means Cause No. GV202501, *The State of Texas and The Texas Commissioner of Insurance v. Farmers Group, Inc., Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, and Fire Insurance Exchange*, in the 261st Judicial District Court of Travis County, Texas, filed on or about August 5, 2002, and including all amendments thereto.

"Agreed Discounts" means the discounts described in Section IV, Paragraph 3(b), below.

"Associations" means defendants Fire Underwriters Association and Farmers Group, Inc. d/b/a Farmers Underwriters Association, acting as the Exchanges' attorneys in fact.

"Amended Order of Preliminary Approval" means an order substantially in the form attached as Exhibit A.

"Automobile insurance" means private passenger automobile insurance.

"Automobile Insurance Providers" means defendants Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, and Truck Insurance Exchange.

"Cease and Desist Order" means the Cease and Desist Order, No. 02-0844, which the Commissioner signed and entered against the Exchanges, on or about August 13, 2002.

"Claim Form" means the form to be used by applicants for the Credit Usage Notice ~~Adjustment~~ Fund, attached as Exhibit E hereto and addressed in Section IV, Paragraph 4(b) below.

"Commissioner" means the Texas Commissioner of Insurance.

"Court" means the 261st Judicial District Court of Travis County, Texas, in which the AG Lawsuit was filed.

"Credit Period" shall have the meaning given it in Section IV, Paragraph 2, below.

"Credit Usage Notice Fund" shall have the meaning given it in Section IV, Paragraph 4, below.

"Credit Usage Notice" means a notice of adverse action under the Fair Credit Reporting Act.

"Effective Date" means the date by which all of the following have occurred: (i) an Order of Preliminary Approval has been entered by the Court in the AG Lawsuit giving notice of a hearing on the Settlement of the Settlement Classes' claims; (ii) the Court has approved the Settlement in all respects; (iii) a Final Judgment as described below shall have been entered by the Court and not vacated, stayed, or modified in any material way, upon appeal or otherwise; and (iv) either the time to appeal or otherwise seek review of the Final Judgment has expired without any appeal having been taken or review sought, or if an appeal is taken or review sought, the expiration of five days after such an appeal or review shall have been finally determined by the highest court before which appeal or review is sought and is not subject to further judicial review.

"Exchanges" means Farmers Insurance Exchange and Fire Insurance Exchange.

"Exchanges Lawsuit" means Cause No. GN-203156, *Farmers Insurance Exchange and Fire Insurance Exchange v. Jose Montemayor, individually and in his capacity as Texas Commissioner of Insurance, and Texas Department of Insurance*, in the 353rd Judicial District Court of Travis County, Texas.

"FARA" means Farmers Auto Risk Assessment.

"FCRA" means the Fair Credit Reporting Act.

~~"Credit Usage Notice Adjustment Fund" shall have the meaning given it in Section IV, Paragraph 4, below.~~

"*Fogel* Action" means *Benjamin Fogel v. Farmers Group, Inc., et al.,* Case No. BC 300142, in the Superior Court for the State of California for the County of Los Angeles, in which a final judgment was signed on December 21, 2011.

"FPRA" means Farmers Property Risk Assessment.

"Homeowners insurance" means and includes policies written on TDI-promulgated forms described as HO-A (including TDP-1), HO-B (as defined in "Released Claims"), HO-B-CON, and HO-B-T, and all endorsements, promulgated or approved, for use with such forms.

"IDA Eligibility" shall have the meaning given it in Section IV, Paragraph 3(a), below.

"Individualized Discount Adjustment" shall have the meaning given it in Section IV, Paragraph 3, below.

"Final Judgment" means a final judgment to be rendered by the 261st Judicial District Court of Travis County, Texas, substantially in the form attached as Exhibit K hereto.

"*Mobbs* Action" means *In re Farmers Insurance Co., Inc. FCRA Litig.,* No. CIV-03-158-F, including all cases consolidated or coordinated in MDL No. 1564, before the U.S. District Court for the Western District of Oklahoma, in which a final judgment was entered on September 29, 2011.

"MOU" means the Memorandum of Understanding between and among the Parties, which was signed by authorized representatives of the Parties on November 30, 2002.

"Notice of Proposed Class Settlement" means the notice of this Settlement Agreement and of the Settlement Hearing substantially in the form of Exhibit B hereto that is to be made available to all persons in the Settlement Classes pursuant to Section III, Paragraph 7 below.

"OAG CIDs" means all Civil Investigative Demands that OAG has served on the Released Parties and that are outstanding as of the date of this Settlement Agreement. These OAG CIDs are listed in the attached Exhibit N.

"Opt-Out Claimant" means a member of the Settlement Classes who submits a timely and valid request for exclusion in accordance with the Amended Order of Preliminary Approval and the Notice of Proposed Class Settlement, and who does not revoke that request for exclusion in writing at least seven (7) days prior to the Settlement Hearing. Such requests for exclusion shall apply to all of the Released Claims which a given Opt-Out Claimant has against the Released Parties.

"Opt-Out Claims" means Released Claims that belong to Opt-Out Claimants. Opt-Out Claims are not settled by this Settlement Agreement.

"Order of Preliminary Approval" means an order substantially in the form attached as Exhibit A hereto the Order signed by the District Court on June 27, 2003, certifying the Settlement Classes and preliminarily approving the 2003 Settlement Agreement.

"Prospective Rate Reduction" shall have the meaning given it in Section IV, Paragraph 1, below.

"Released Claims" means and includes, with respect to homeowners insurance offered or sold by the Released Parties, all existing, known ~~and unknown~~ claims and Unknown Claims, demands and causes of action against the Released Parties, whether pending or threatened, suspected or unsuspected, contingent or non-contingent, for all existing, known and unknown damages and remedies that arise out of or relate to the acts and/or occurrences alleged in the AG Lawsuit, or in the Cease and Desist Order or the Administrative Proceedings, or in the OAG CIDs to the extent any such acts or occurrences took place prior to November 30, ~~2000~~2002, including but not limited to issues concerning or related to a management fee or fees, the placement of policyholders in a particular insuring entity, the age of home discount, the unfunded catastrophe load, the decision to no longer offer HO-B policies (including HO-Protector Plus (PTP), HO380 endorsement, TDP-2, TDP-3, DF-Builder's Risk, and HO-A with HO-170 endorsement (collectively referred to herein as "HO-B")), the offering of HO-A policies in place of HO-B policies, territorial discounts, credit scoring, the use of the Farmers Property Risk Assessment, or the rates that the Released Parties have charged for homeowners policies and endorsements and all notices and statements that the Released Parties have made or issued in connection with the above, including but not limited to the notices of non-renewal of the HO-B policies and notices issued pursuant to the Fair Credit Reporting Act. The State's release of claims against Texas Farmers Insurance Company related to credit scoring is expressly based on Texas Farmers Insurance Company's representation that it ~~does~~did not and has not used credit scores, insurance scores, credit reports or any other method of calculating premiums based on credit history until 2011, at which time it began using the credit model that is on file with TDI. "Released Claims" also include any claims, demands, or causes of action to the effect that the discounted rates adopted by the Exchanges from November 11, 2002, through and including August 31, 2003, are unfair, unreasonable, discriminatory, misleading or excessive. With respect to the automobile insurance offered or sold by the Released Parties, "Released Claims" includes all existing claims, demands, and causes of action related only to the disclosure or nondisclosure of consumer credit information or the disclosure or nondisclosure of the use or effect of using consumer credit information, including claims under the Fair Credit Reporting Act. "Released Claims" does not include individual claims or complaints about claims payments, handling or processing pursued by individual claimants directly or such individual claims or complaints about claims payments, handling or processing as may be pursued by TDI under Article 21.55, Texas Insurance Code, which are identified in a schedule which has been provided by TDI to the Farmers Parties. Remedies for any such scheduled claims or complaints, if pursued by the TDI, shall be limited to the payment of interest under article 21.55, section ~~6,~~6 (now § 542.060), of the Texas Insurance Code (which interest is not part of the total value of this settlement), as the result of non-compliance with that statute, and may not include fines or penalties or any other relief, except relief may include corrective action respecting procedures. "Released Claims" also does not include claims that have been asserted in Cause No. GV000271, *State of Texas v. Texas Farmers Insurance Company, et al.*, which ~~is~~was pending in the 200th Judicial District Court of Travis County, Texas, ~~and which~~ relates to betterment in the context of automobile insurance in the Texas market~~,~~, and was dismissed in 2003.

"Released Parties" means and includes Farmers Group, Inc., individually and d/b/a Farmers Underwriters Association, Fire Underwriters Association, Farmers Insurance Exchange, Fire Insurance Exchange, Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas, Mid-Century Insurance Company, Farmers Texas County Mutual Insurance Company, Truck Insurance Exchange, and Truck Underwriters Association, as well as their affiliates, officers, employees, agents, directors or governors, representatives, attorneys, predecessors, successors and assigns.

"Releasing Parties" means and includes Texas, the OAG (both on behalf of Texas and, subject to Court approval, the members of the Settlement Classes defined below), the TDI, and the Commissioner.

"Retrospective Rate Reduction" shall have the meaning given it in Section IV, Paragraph 2, below.

"Settlement" shall have the meaning given it in Section II, below.

"Settlement Classes" means and includes (1) all of the Exchanges' Texas homeowners insurance policyholders (a) whose homeowners insurance policy incepted (including renewals) from December 28, 2001, through and including December 27, 2002, or (b) who received a notice at any time after November 14, 2001, that their HO-B policy would not be renewed (the "Rate Class"); (2) all of the Exchanges' Texas homeowners insurance policyholders who according to Farmers records were eligible to receive discounts for FPRA, age of home, or territory from November 16, 2000, through and including December 10, 2002 (the "Discount Class"); and (3) all Texas homeowners or automobile insurance policyholders of the Exchanges or the Automobile Insurance Providers who according to Farmers records were provided or should have been provided a Credit Usage Notice from October 1, 1999, through February 28, 2003 (the "Credit Usage Notice Class").

"Settlement Class Members" means all members of the Settlement Classes except for Opt-Out Claimants.

"Settlement Fund" shall have the meaning given it in Section IV, below.

"Settlement Hearing" means the hearing to be held before the District Court of Travis County, Texas, to determine (a) whether this Settlement Agreement, including the Settlement Fund and the attached exhibits, should be approved as fair, adequate and reasonable; and (b) whether the Final Judgment should be entered.

"Summary Notice of Settlement" shall have the meaning given it in Section III, Paragraph 7, below.

"Unknown Claims" means any and all provisions, rights, and benefits conferred either (a) by section 1542 of the California Civil Code, or (b) by any federal law or law of any state or territory of the United States, or by any principle of common law that is similar, comparable, or equivalent to section 1542 of the California Civil Code, with respect to the Claims released pursuant to part II.B. Section 1542 of the California Civil Code reads:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR
HER MUST HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR.

## II. RECITALS

WHEREAS, on or about October 1, 1999, the FARA discount program was introduced in Texas for the Farmers Parties' automobile policyholders;

WHEREAS, on or about November 16, 2000, the FPRA discount program was introduced in Texas for the Farmers Parties' homeowners policyholders;

WHEREAS, on or about November 9, 2001, the Exchanges announced they would no longer renew Texas HO-B homeowners policies;

WHEREAS, on or about November 14, 2001, the Exchanges began issuing notices of non-renewal of HO-B policies to Texas HO-B homeowners insureds;

WHEREAS, on or about January, 2002, the TDI initiated a market conduct examination of the Farmers Parties pursuant to article 1.15 of the Texas Insurance Code;

WHEREAS, on or about December 28, 2001, Fire Insurance Exchange began offering Texas HO-A homeowners policies for former HO-B insureds;

WHEREAS, on or about March 20, 2002, Farmers Insurance Exchange began offering Texas HO-A homeowners policies for former HO-B insureds;

WHEREAS, on or about August 5, 2002, the OAG, on behalf of Texas and the TDI, brought the AG Lawsuit against the Farmers Parties;

WHEREAS, on or about August 13, 2002, the TDI brought an Application for Emergency Cease and Desist Order against the Exchanges;

WHEREAS, on or about August 13, 2002, the Commissioner entered the Cease and Desist Order against the Exchanges;

WHEREAS, on or about August 14, 2002, the TDI filed a Report to the Commissioner of Insurance concerning the Exchanges;

WHEREAS, the OAG has served the "OAG CIDs" on the Released Parties;

WHEREAS, on or about August 30, 2002, the Exchanges brought the Exchanges Lawsuit against the Commissioner and TDI, appealing from the Cease and Desist Order and also seeking a declaratory judgment that, *inter alia*, the Commissioner and TDI lack the authority to issue the

Cease and Desist Order and to institute disciplinary action as outlined in the Report to the Commissioner of Insurance filed by TDI on or about August 14, 2002;

WHEREAS, on or about September 18, 2002, the TDI commenced the Administrative Proceedings against the Exchanges;

WHEREAS, on or about September 24, 2002, the Exchanges gave notice to their Texas homeowners insureds that the Exchanges would not be offering coverage or renewing homeowners insurance policies, with effective dates of such non-renewal action falling between November 11, 2002 and November 10, 2003, and also notified their agents they would accept no new business after November 11, 2002;

WHEREAS, on November 13, 2002, TDI agreed to extend the effective date of the Cease and Desist Order for thirty days through December 10, 2002, to allow the Parties an opportunity to negotiate a settlement of these matters and the Exchanges, in turn, agreed to continue offering coverage and renewing homeowners insurance policies until December 10, 2002, with a base rate reduction of 6.8% from the rate structure used in the period immediately prior to November 2002;

WHEREAS, after considering the benefits to be gained under the Settlement Agreement, the risks associated with continuing to prosecute this complex and time-consuming litigation, the likelihood of success on the merits of the litigation, the public interest in an efficient market for homeowners and automobile insurance, the welfare of Texas' consumers, and to avoid further expense and inconvenience, the State believes this Settlement Agreement is fair, adequate, reasonable, and in the best interests of the Settlement Classes;

WHEREAS, the Farmers Parties, while denying each of the claims alleged herein and further denying wrongdoing of any kind whatsoever, and without admitting liability, have agreed to enter into the Settlement Agreement to avoid further expense, inconvenience, and the distraction of a burdensome and lengthy litigation, and in order to be completely free of any further controversy with respect to the Released Claims;

WHEREAS, the Parties have agreed that there should be a global settlement of all of the Released Claims, as herein defined, and this document sets forth the terms of the Parties' settlement agreement, which was reached after arms' length negotiations between the State and the Farmers Parties (the "Settlement");

WHEREAS, the Court has certified the Settlement Classes and preliminarily approved the 2003 Amended Settlement Agreement by order of June 27, 2003 ("Order"), which was appealed to the Third Court of Appeals and the Texas Supreme Court, which affirmed the Order, and the case was ultimately remanded to this Court on March 9, 2010;

WHEREAS, upon its remand to the Court, this case was stayed pending the resolution of certain nationwide class actions involving some of the claims made in the AG Lawsuit, including the *Fogel* and *Mobbs* Actions, in which final judgments approving settlement agreements were issued on September 29, 2011, and December 21, 2011, respectively;

WHEREAS the passage of time caused by the lengthy appeal and the settlement agreements in the *Fogel* and *Mobbs* Actions have necessitated certain limited changes to the 2003 Amended Settlement Agreement:

NOW THEREFORE IT IS AGREED by the Parties that subject to approval of the Judicial District Court of Travis County, Texas, the AG Lawsuit, the Administrative Proceeding, the Exchanges Lawsuit, and the other matters in Section IX below are conditionally settled, on the following terms and conditions:

## III. CERTIFICATION OF SETTLEMENT CLASSES

1. The Parties shall promptly and jointly submit this Settlement Agreement, including the exhibits hereto, to the Court for preliminary approval.

2. The State will seekhas sought, and the Farmers Parties agreehave agreed to, conditional certification of the Settlement Classes pursuant to this Settlement Agreement, which the Court granted in its June 27, 2003 Order. The Farmers Parties do not agree to certification of the Settlement Classes for any purpose other than to effectuate this Settlement Agreement. In the event that the Court were not to approve and certify the Settlement Classes in all respects as defined in this Settlement Agreement, (1) any stipulations and agreements made herein are null and void and (2) it is understood that the Farmers Parties would challenge the certification of a litigation class and nothing relating to this Settlement Agreement will be introduced into evidence or used in any way to impede the exercise of that right.

3. The State shall file aan amended motion for preliminary approval that requests the Court to enter anAmended Order of Preliminary Approval substantially in the form of Exhibit A hereto.

4. The Parties agree that the Court may enter an order conditionally certifying the Settlement Classes and appointing the State of Texas, through the Attorney General, as representative and counsel for the Settlement Classes.

5. If this Settlement Agreement is terminated pursuant to its terms, or if the Effective Date does not occur for any reason, the conditional certification of the Settlement Classes shall be vacated.

6. Inadditional proceedings before the Court (and before any appellate courts, if necessary), the State shallcontinue to affirmatively present their support for certification of the Settlement Classes and for final judicial approval of the Settlement Agreement.

7. Subject to the Court's prior preliminary approval of the Settlement Agreement (including the exhibits hereto), the Farmers Parties shall assume responsibility for identifying, locating, and providing a copy of the Notice of Proposed Class Settlement, substantially in the form attached as Exhibit B hereto, to as many members of the Settlement Classes as is reasonably practicable by means of a direct mailing to such Settlement Classes members' most recent address in the Farmers Parties' records. In addition, the OAG, TDI and the Farmers Parties shall disseminate a Summary Notice of Settlement, in the form attached hereto as Exhibit

C, by posting the Summary Notice of Settlement through their respective web-sites (www.farmers.com, www.oag.state.tx.us, and www.tdi.state.tx.us), as well as at www.TexasFarmersSettlement.com, beginning as soon as practicable after the Court's entry of the Order of Preliminary Approval and continuing until the date of the Settlement Hearing. The full Notice of Proposed Class Settlement also shall be made available through these web-siteswebsites over the same period of time. In order to avoid any confusion, no other documents interpreting the Settlement Agreement or the Notice of Proposed Class Settlement, or the provisions or effect of such documents, will be posted on the Parties' websites without prior Court approval.

## IV. **SETTLEMENT FUND**

In conjunction with the settlement of the Released Claims, the Released Parties agree to create a settlement fund ("Settlement Fund") with the following components:

1. **Prospective Rate Reduction.** Subject in all respects to Paragraph 1(b) below, the Exchanges agreeagreed (1) to reduce their HO-A primary contract homeowners insurance (excluding endorsements) base rates in effect as of November 10, 2002 in the overall average amount of 6.8%, based on a statewide average rate indication for all classes, effective as of November 11, 2002 (the "Prospective Rate Reduction"), (2) to refrain from any increase in those base rates that would take effect prior to midnight on August 31, 2003, provided, however, that rates can be changed to include charges for any existing endorsement or any new endorsements approved by TDI or for coverage changes requested by policyholders, and (3) for the period December 11, 2002 through August 31, 2003, to adopt the Agreed Discounts described in Section IV, Paragraph 3(b) hereof.

a. The reduction in premiums contemplated by the Prospective Rate Reduction will bewas undertaken for all Texas policyholders who renewrenewed an existing HO-A homeowners' insurance policy through the Exchanges or obtainobtained a new policy.

b. It is understood and agreed to by the Parties that adopting the Agreed Discounts as contemplated under this settlement will change each customer's rate even though the 6.8% reduction is made to the base rate;

c. If legislation or regulation is hereafter enacted that has the effect of requiring or compelling the Exchanges to implement a rate reduction or rollback, then:

(1) The Exchanges' obligation to issue or grant credits or refunds under the Prospective Rate Reduction and, if the legislation or regulation is retroactive, under the Retrospective Rate Reduction, will be reduced by the amount of the rate reduction or rollback to customers mandated by such legislation or regulation;

(2) In the event any such rate reduction or rollback is enacted or adopted, the Exchanges' rates and rate structures on the day before the effective

date of any such rate reduction or rollback shall be deemed to revert back to the rates and rate structures in effect as of November 10, 2002. Under no circumstances would such rate reduction or rollback be applied to the Exchanges' rates in effect as the result of the Prospective Rate Reduction, the Retrospective Rate Reduction, or any other term of this Settlement Agreement.

(3) This consideration was previously provided to the Class Members pursuant to the Parties' agreement.

2. **Retrospective Rate Reduction.** In addition to the Prospective Rate Reduction, for all Texas policyholders who were insured under an HO-A policy form issued by the Exchanges at any time during the period commencing on December 28, 2001 up to and including November 10, 2002 (the "Credit Period"), the Exchanges agree to fund a Retrospective Rate Reduction in the amount of 6.8% of the base premium for the HO-A policy form earned by the Exchanges during those policies' actual term ("Retrospective Rate Reduction").

a. For those Texas policyholders who were insured under an HO-A policy form issued by the Exchanges during the Credit Period but such policy is no longer in effect or is not renewed at the next renewal date after the 30th day following the Effective Date, the Retrospective Rate Reduction shall be paid by means of a refund check based on each individual HO-A policy's base rate premium earned with appropriate release language in favor of the Released Parties as an endorsement. Refund checks in payment of the Retrospective Rate Reduction will be processed and paid on the later of:

(1) Forty-five (45) days after the end of the original annual term covered by the policy in question, which schedule will apply even if the policy is terminated prior to the end of the policy period, or (2) Thirtythirty (30) days after the Effective Date.

b. For those Texas policyholders who were insured under an HO-A policy form issued by the Exchanges during the Credit Period with coverage going forward beyond the next renewal date after the 30th day following the Effective Date, the Retrospective Rate Reduction shall be applied as either a credit or a refund check, at Farmers' election. Unearned policy premiums that may be returned to the policyholder shall not include the credit. The or refund. If a credit is used, the credit shall be applied to the first premium notice for such HO-A policies renewed after the 30th day following the Effective Date.

3. **Individualized Discount Adjustment.** In addition to the Prospective Rate Reduction and Retrospective Rate Reduction described above, and with respect to Texas homeowners insurance policyholders who did not receive the Agreed Discounts for FPRA, age of home, and territory at any time during the period commencing November 16, 2000, continuing through and including December 10, 2002, the day immediately preceding the adoption of the Agreed Discounts described in Paragraph 3(b) below, the Exchanges agree to fund an "Individualized Discount Adjustment" payment.

a.      Payments to individual Texas homeowners insurance policyholders for the Individualized Discount Adjustment shall be determined in the following fashion:  The Individualized Discount Adjustment payment for each Texas policyholder equals the amount by which the premium actually charged for the Texas policyholder's policy exceeded the premium which would have been charged if the Exchanges had adopted discounts for FPRA, age of home, and territory elements at the Agreed Discounts on a revenue neutral basis, rather than the lesser discounts which were actually adopted on a revenue neutral basis (the "IDA Eligibility") as provided in Paragraph 3(b) below.  In calculating each policyholder's IDA Eligibility, if the aggregate of the three discount factors (FPRA, age of home, or territory) results in a negative value for that individual, then the Individual Discount Adjustment shall be considered a zero.

b.      The Parties' actuaries have met and agreed on discounts for FPRA and age of home, as well as territorial rate revisions, to be applied for purposes of the Individualized Discount Adjustment and also to be applied to the same factors for the period identified in Section IV, Paragraph 1 hereof (the "Agreed Discounts").  For informational purposes, schedules setting forth the Agreed Discounts for the FPRA and age of home discounts and the territorial rate revisions to be applied for purposes of the Individualized Discount Adjustment are attached as Exhibits D-1 and D-3, and schedules setting forth the Agreed Discounts for the FPRA and age of home discounts and the territorial rate revisions to be applied commencing December 11, 2002, and continuing through and including August 31, 2003, are attached as Exhibits D-2 and D-3.

c.      No Individualized Discount Adjustment benefits shall be paid or credited prior to the Effective Date.

d.      Credits and payment of the Individualized Discount Adjustment shall be made in the same manner and at the same time as the Retrospective Rate Reduction listed above.

e.      Thirty (30) days after the final payment is made or credit provided under this section dealing with the Individualized Discount Adjustment, the Released Parties shall report to the OAG and TDI the amounts so paid and credited.

4.      **Credit Usage Notice ~~Adjustment~~ Fund.**  In addition to the Prospective Rate Reduction, the Retrospective Rate Reduction, and the Individualized Discount Adjustment, the Released Parties further agree initially to provide funds in the total amount of $3.0 million, but will provide additional funds if necessary (~~hereafter the~~ "Credit Usage Notice ~~Adjustment Fund"), for the purpose of reimbursing any overcharges that may have occurred to homeowners or automobile insurance policyholders whose policies were issued by the Released Parties in Texas and who paid a premium for automobile or homeowners insurance that would have been less, but for erroneous credit information on the individual's credit history maintained at the~~

credit bureau which led to Fund"), as well as certain non-cash benefits, to compensate eligible Settlement Class Members who allege that adverse actions were taken by the Farmers Parties without providing sufficient notice as required by the Fair Credit Reporting Act, 15 U.S.C. § 1681m, resulting in credit report inaccuracies going undetected and potentially resulting in FPRA or FARA discounts lower than would have resulted from correct credit information or to assignment to a company affiliated with the Farmers Parties having a higher premium structure.

a. Eligibility for the Credit Usage Notice Adjustment Fund is limited to individualsCredit Usage Notice Class Members who were issued an automobile or homeowners insurance policy by one or more Released Parties during the time period October 1, 1999, through February 28, 2003.2003; provided however, that any eligible Settlement Class Member who mailed a timely claim form (or on whose behalf such a claim form was submitted) pursuant to the settlement agreement in the *Mobbs* Action is not eligible for any additional benefits, including cash payments, described in this component (part IV.4) of the Settlement Agreement.

b. Submission of a completed Claim Form in the form attached hereto as Exhibit E ("Claim Form"), postmarked by May 15, 2004, is a prerequisite to any individual receiving a credit report code to obtain a free copy of his or her credit report from Equifax and any payment from the Credit Usage Notice Adjustment Fund. Eligible Settlement Class Members will have until 60 days after the Settlement Hearing to mail-in the Claim Form. A timely submitted and completed Claim Form entitles the eligible Settlement Class Member to access and review at no cost his or her individual credit report as maintained by Equifax, Inc. A Claim Form will be considered complete if it provides all of the requested information except a policy number, policy effective date, agent's name, and vehicle identification number, so long as the information provided is sufficient to identify the claimant from the records of the Released Parties after a good faith effort. Each eligible Settlement Class Member will receive only one Claim Form with the Class Notice and is eligible to receive only one credit report code and one payment as provided in paragraph (d) below.

c. Any fee charged by a credit agency to a Released Parties' policyholder in order to provide credit history information in connection herewith that is not waived shall be paid from the Credit Usage Notice Adjustment Fund.c. Within 15 business days after the deadline to mail-in the Claim Form, each eligible Settlement Class Member who timely completes and submits a Claim Form will be mailed a credit report code and accompanying letter on how class members may use the credit report code to review their individual credit report for accuracy. The credit report code will expire 30 days from the date of mailing.

d. Settlement Class Members who use the credit report code and review their credit reports will be given the opportunity to certify online that they reviewed their individual credit reports for accuracy within 45 days from the date of mailing of the letter described in paragraph IV.4(c) above. The certification will read as follows: "I certify that I have reviewed my Equifax consumer credit report for errors and inaccuracies." Each eligible Settlement Class Member who so certifies will be mailed a

check in the amount of thirty-five dollars ($35.00 US) within 60 days following receipt of the Settlement Class Member's certification, assuming the Effective Date has passed.

e.      Each eligible Settlement Class Member who timely submits a Claim Form shall also receive an educational credit brochure, explaining the importance of accurate credit reports and the Settlement Class Member's right to review his or her credit report and dispute any inaccuracies or errors contained in it.

f.      The Credit Usage Notice ~~Adjustment~~ Fund shall terminate ~~on the later of June 15, 2004, or 30~~180 days after the Effective Date. To the extent that there is a remaining balance in the Credit Usage Notice ~~Adjustment~~ Fund as of this termination date, such remaining balance shall revert to the Released Parties.

~~e~~g.      In agreeing to create the Credit Usage Notice ~~Adjustment~~ Fund, the Parties agree that the Released Parties have denied that there have been any overcharges to Texas policyholders as the result of erroneous FPRA or FARA assignments. The Parties further agree that neither this Settlement Agreement, nor the MOU, nor anything stated herein or in the MOU or in connection with the Settlement should be construed or interpreted as an admission or evidence of any wrongdoing or liability by any of the Released Parties or of any violation of state or federal law, including without limitation the Fair Credit Reporting Act.

f.      ~~Payments from~~h.      Within 30 days after the last payment is made under the Credit Usage Notice ~~Adjustment Fund shall be made by means of a refund check. Refund checks in payment of the Credit Usage Notice Adjustment Fund will be processed and paid on the later of:~~

    (1)      ~~Thirty (30) days after receipt of a completed Claim Form, or~~

    (2)      ~~Thirty (30) days after the Effective Date.~~      g.      ~~On or before August 15, 2004,~~Fund, the Released Parties shall provide a report to the OAG and TDI which reflects the total number of Claim Forms submitted; the total dollar amount of payments made to persons eligible to participate in the Credit Usage Notice ~~Adjustment~~ Fund; the total number of persons who were mailed checks; and the total number and dollar amount of negotiated checks.

h.      ~~As soon as possible after January 15, 2003, but no later than~~i.      The Parties acknowledge that as of February ~~28,~~ 2003, Farmers has used the Forms attached as Exhibits F, G, H, and I for new and renewed Texas homeowners and automobile policies, ~~the Released Parties shall replace the existing Credit Usage Notice with appropriate notices in the forms attached hereto as Exhibits F, G, H and I. Each notice must be in a minimum of 12 point type clearly marked as IMPORTANT INSURANCE INFORMATION. The text will be on a separate piece of paper than any other writing and the notice will not be attached to or incorporated into any other document.~~ The Parties further agree that Farmers can cease using these exemplar forms of notice thirty (30) days after they have submitted replacement notice forms for Farmers Texas

homeowners and automobile policies to TDI, provided that TDI does not object to the replacement forms.

5. **Payment or Credit of 100%.** With regard to the Individualized Discount Adjustment ~~and the Credit Usage Notice Adjustment Fund~~, Released Parties have committed to a payment or credit of 100% of any premium differential resulting from the adjustment process set forth in Section IV, ~~Paragraphs 3 and 4. It is not feasible to calculate in advance the amount, if any, to be paid to each class member.~~Paragraph 3. These calculations, which ~~will~~ require individualized calculations, ~~will be~~have been made by Released Parties and will be reported to the ~~Office of the Attorney General~~OAG and the ~~Texas Department of Insurance~~TDI, and will be subject to verification by the ~~Texas Department of Insurance~~TDI.

6. **Unclaimed Funds.** The cash components of the Settlement Fund shall be evidenced by a check that shall be valid for not less than 120 days after issuance. Any such checks that are uncashed, unclaimed, undeliverable, or not negotiated after 120 days from issuance shall be subject to Texas Property Code § 72.001 *et seq.*

7. **Mailing of Checks.** All checks to Settlement Class Members mailed under this Settlement Agreement must be accompanied by a letter and release language in the form attached as Exhibit J.

8. **Attorneys' Fees and Investigative Costs.** No later than 30 days after the Effective Date, the Farmers Parties shall pay a total of $2 million to the State of Texas for its attorneys' fees, expenses, and costs of investigation.

9. **Estimated value.** Based upon the Parties' assumptions and projections, the estimated total value of the Settlement is $117,500,000.

10. **Accounting Treatment for Settlement Fund Payments and Credits**. All amounts paid or credited to policyholders for the Retrospective Rate Reduction, the Individualized Discount Adjustment, and the Credit Usage Notice ~~Adjustment~~ Fund components shall be treated and accounted for by the Farmers Parties as a return of written premiums. The Farmers Parties shall also prepare such amendments as necessary to their previously reported statistical plan filings to reflect a reduction in direct written premiums for amounts paid for the above -referenced components.

## V. RELEASE

On the Effective Date, the State, for itself and for the Settlement Class Members, RELEASES, ACQUITS, and FOREVER DISCHARGES the Released Parties from all Released Claims.

## VI. FINAL JUDGMENT

At the Settlement Hearing, a Final Judgment, substantially in the form attached as Exhibit K hereto, will be submitted to the Court, and entry requested. Among other things, the Final Judgment directs that the Judicial District Court of Travis County, Texas, expressly retains

jurisdiction to enforce and modify the relief granted in the Final Judgment, including injunctive relief, to the fullest extent allowed by Texas law. The Parties also specifically agree that the venue for any dispute arising under this Settlement Agreement shall be in the District Court of Travis County, Texas.

## VII. OTHER CONSIDERATIONS REGARDING SETTLEMENT CLASSES

1.     In the event that the Court were to alter or make any change in the Settlement Classes or this Settlement Agreement (including the Settlement Fund) or to decline to approve the Settlement Classes and this Settlement Agreement (including the Settlement Fund) in all respects, any of the Parties to this Settlement Agreement shall have the right to terminate the Settlement and this Settlement Agreement. In the event of such termination, no further payments or credits will be made under the Settlement Fund and all releases and dismissals executed hereunder will become null and void. In addition, the Exchanges' obligation to reduce HO-A policy form base rates under the Prospective Rate Reduction and to refrain from any increase in those rates prior to midnight on August 31, 2003 (as described in Section IV, Paragraph 1, hereof) would immediately terminate and no longer be binding on the Exchanges.

2.     Any person within the Settlement Classes as defined may request not to participate as a member of the Settlement Classes, by submitting a timely request for exclusion in accordance with the Amended Order of Preliminary Approval and the Notice of Proposed Class Settlement. To be effective, any person requesting exclusion from the Settlement Classes *must* submit a timely written request for exclusion. Such written request *must* contain all of the information described in the discussion of Exclusion Requests that is contained in the Notice of Proposed Class Settlement, and it *must* be sent to the address specified in the Notice of Proposed Class Settlement, by first class mail, postmarked no later than thirty (30) days before the date scheduled for the Settlement Hearing. Any person who submits such a timely written request and who does not revoke that request for exclusion in writing at least seven (7) days prior to the Settlement Hearing, is an Opt-Out Claimant. An Opt-Out Claimant thereby elects not to participate in any benefits or payments under the Settlement Fund or this Settlement Agreement and is deemed to have waived any and all claims to any part of the Settlement Fund.

3.     A Settlement Classes member who does not opt out may submit objections, if any to (a) certification of the Settlement Classes; (b) the terms of the Settlement Agreement, including the exhibits hereto; or (c) the proposed form of Final Judgment. In order for any such objection to be considered by the Court at the Settlement Hearing, the objection *must* (a) contain all of the information described in the discussion of Objections that is contained in the Notice of Proposed Class Settlement and (b) be sent to the addresses specified in the Notice of Proposed Class Settlement, by first class U.S. mail, postmarked no later than the date specified by the Court.

4.     All Parties shall undertake to encourage participation of the putative class members in the Settlement Classes. In the event that more than 2% of the policyholders eligible to receive benefits from the Retrospective Rate Reduction or Individualized Discount Adjustment portions of the Settlement Fund were to opt out of the Settlement Classes, any of the

Parties to this Settlement Agreement shall have the right to terminate the Settlement and this Settlement Agreement.

~~5. Any policyholder whose HO-B policy was non-renewed by Farmers Insurance Exchange and who accepted an HO-A policy from Fire Insurance Exchange between December 28, 2001 through and including March 20, 2002, upon request, will be offered an HO-A policy from Farmers Insurance Exchange, if they qualify.~~

## VIII. NO ADMISSION OF LIABILITY

In entering into this Settlement Agreement, the Parties agree that the Released Parties have denied, and continue to deny, any wrongdoing or liability with respect to the claims that have been made in the AG Lawsuit, the Cease and Desist Order, the Administrative Proceedings and the OAG CIDs, or that have been made or could have been made by or on behalf of the Exchanges' individual policyholders in any other forum arising out of or relating to the subject matters of the AG Lawsuit, the Cease and Desist Order, the Administrative Proceedings or the OAG CIDs. The Parties further agree that neither this Settlement Agreement nor anything stated herein or in connection with the Settlement should be construed or interpreted as an admission or evidence of any wrongdoing or liability by any of the Released Parties. The Released Parties are entering into this Settlement Agreement and the Settlement in order to avoid the further expense and burden of protracted litigation.

## IX. RELATED PROCEEDINGS

1. **Dismissal With Prejudice of Administrative Proceeding, Setting Aside of Cease and Desist Order, and Related Matters.** TDI will request that the Administrative Law Judge in the Administrative Proceeding dismiss with prejudice TDI's claims in the Administrative Proceeding, substantially in the form attached hereto as Exhibit L, and the Commissioner will enter a final order, substantially in the form attached as Exhibit M hereto, that dismisses those claims with prejudice and that also provides (a) the findings of the Commissioner in the Cease and Desist Order are set aside in their entirety; (b) the Cease and Desist Order is set aside in its entirety; (c) the findings and order shall be of no further force and effect whatsoever; and (d) neither the findings nor the order may be utilized as evidence of, or be used or relied upon by any person in any proceeding as evidence of, any alleged violation of law or breach of contract by the Released Parties. The State agrees that the Application for Emergency Cease and Desist Order, dated August 13, 2002, by Karen A. L. Barratt ("Application") is of no further force and effect whatsoever, and neither the Application nor the Order may be used as evidence of, or be used or relied upon by any person in any proceeding as evidence of, any violation of law or breach of contract by the Released Parties. TDI also will set aside in its entirety and with prejudice, substantially in the form contained in the Commissioner's Order attached as Exhibit M hereto, the (1) the Report concerning Farmers Insurance Exchange and Fire Insurance Exchange dated August 14, 2002, and (2) the "Notice of Report to Commissioner; Alleged Violations by Farmers Insurance Exchange and Fire Insurance Exchanges," dated August 14, 2002. The State agrees that, upon such setting aside, the Report is of no further force and effect whatsoever; and that such Report may not be used as evidence of,

or be used or relied upon by any person in any proceeding as evidence of, any violation of law or breach of contract by the Released Parties.

2. **Termination of OAG CIDs**. All OAG CIDs issued to the Released Parties (listed in Exhibit N hereto) shall be withdrawn and all associated investigations as to the Released Parties shall be terminated. The investigations associated with the time periods covered by each CID are concluded and there will be no new investigations or CIDs for these time periods. The Farmers Parties also will dismiss with prejudice their challenges that have been filed in the district courts of Travis County to certain of the OAG CIDs, substantially in the form of the example attached as Exhibit O hereto.

3. **Termination of Market Conduct Examination**. The market conduct examination of the Exchanges commenced by TDI in January 2002 pursuant to article 1.15 (now revised to Section 401.051 et. seq.) of the Texas Insurance Code, and all associated investigations, shall be terminated and no new investigation will commence concerning Released Claims. The market conduct examination report has never been finalized and shall be withdrawn in its entirety and with prejudice, in the form attached as Exhibit M hereto, and shall not be used in evidence of or relied upon by any person in any proceeding as evidence of any violation of law or breach of contract by the Released Parties.

4. **Dismissal With Prejudice of Exchanges' Lawsuit and Counterclaim**. The Exchanges agree that they will dismiss with prejudice the claims that the Exchanges made against TDI and the Commissioner and Jose Montemayor, individually, in the Exchanges Lawsuit, substantially in the form attached as Exhibit O hereto. The Farmers Parties also will dismiss with prejudice their counterclaim in the AG Lawsuit, substantially in the form contained in the Final Judgment attached as Exhibit K hereto. The dismissal of the Farmers Parties' counterclaim in the AG Lawsuit shall have no effect on obligations set forth in the Protective Orders entered therein regarding the Parties' continuing duties regarding confidential documents or documents produced under seal or in camera.

5. **Abatement Pending Effective Date**. Upon execution of this Settlement Agreement, counsel for the Parties in the legal proceedings referenced in this Section IX, Paragraphs 1-4 above, will take all appropriate steps to stay or abate those the matters that are the subject of this Settlement Agreement until either (a) the Final Judgment entered in accord with Section VI of this Settlement Agreement becomes final and no longer subject to appeal or review, or (b) the Court refuses or declines to enter the Final Judgment in accord with this Settlement Agreement, or (c) such a Final Judgment is reversed or vacated on appeal, or (d) it becomes impossible for the Effective Date to occur for any reason. If the Effective Date occurs, then the Parties agree that, within thirty (30) days after the Effective Date, they will take the appropriate steps in the cases listed in this Section IX to enter the indicated dismissals with prejudice.

6. **Management feeFee**. For the Released Parties and any other company or reciprocal or inter-insurance exchange associated or affiliated with the Released Parties, and regardless of whether such entity is or is not subject to rate regulation in Texas, TDI agrees henceforward that it will not consider the management fee (profits or expenses) as a separate

element in its evaluation of such company's expense structure or consider such management fee in the benchmark rate process generally, but may consider the over-all expense component of the rate as it compares the companies' expenses with other agency distribution companies doing business in Texas. This section does not preclude TDI from evaluating overall rate levels as authorized by law.

## X. OTHER PROVISIONS

1. **Cooperation.** It is the mutual intent of the Parties to consummate this Settlement Agreement promptly. The Parties therefore agree to cooperate and to exercise their best efforts to the extent necessary to effectuate and implement all of its terms and conditions as quickly as possible. The OAG, TDI, and the Commissioner further agree to comply with all reasonable requests for assistance that the Released Parties may make in order to give effect to the purposes of the Settlement, including (without limitation) providing affidavits and/or testimony in connection with any lawsuits, claims or demands that have been made or could have been made by or on behalf of the Released Parties' policyholders in any forum arising out of or relating to the subject matters of the AG Lawsuit (as amended), the Cease and Desist Order, or the Administrative Proceedings. The intent and spirit of this Settlement Agreement is to terminate all of the disputes arising out of and relating to the Released Claims, except as provided herein, and to permit the Farmers Parties to continue to provide insurance in the Texas market. The Parties agree to take all reasonable steps and exercise best efforts to achieve that goal. As an initial step towards the restoration of a correct and constructive relationship between the Released Parties and the TDI, the TDI agrees that should it have concern in the future about any practice undertaken by the Released Parties, it will use its best efforts as authorized by statute to contact the appropriate representative of the Released Parties to discuss and hopefully resolve any such concerns. The Released Parties will use their best efforts to notify the TDI, in advance, of any material changes in their course of conduct.

2. This Settlement Agreement and the Exhibits hereto constitute the entire agreement among the Parties. All other agreements and understandings between the Parties, including the MOU, are superseded by this Settlement Agreement.

3. This Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of the Parties or their successors in interest.

4. Except as otherwise expressly provided in this Settlement Agreement, each Party shall bear its own costs, including taxable court costs.

5. The undersigned each represent that he or she is fully authorized to execute this Settlement Agreement on behalf of the Parties for which he or she signs.

6. This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective agents, representatives, successors and assigns. This Settlement Agreement can be signed in multiple counterparts.

THE STATE OF TEXAS, AND THE OFFICE OF
THE ATTORNEY GENERAL

By: ~~Jeffrey S. Boyd~~David Mattax
Director of Defense Litigation
~~Deputy~~Office of the Attorney General

~~TEXAS DEPARTMENT OF INSURANCE~~

~~JOSE MONTEMAYOR, INDIVIDUALLY AND~~
~~AS~~JULIA J. RATHGEBER, COMMISSIONER,
TEXAS DEPARTMENT OF INSURANCE

FARMERS INSURANCE EXCHANGE

FIRE INSURANCE EXCHANGE

FIRE UNDERWRITERS ASSOCIATION

_____


FARMERS GROUP, INC., INDIVIDUALLY AND
D/B/A FARMERS UNDERWRITERS
ASSOCIATION

_____

TEXAS FARMERS INSURANCE COMPANY


_____


MID-CENTURY INSURANCE COMPANY OF
TEXAS


_____


MID-CENTURY INSURANCE COMPANY


_____


FARMERS TEXAS COUNTY MUTUAL
INSURANCE COMPANY


_____


TRUCK INSURANCE EXCHANGE


_____


TRUCK UNDERWRITERS ASSOCIATION


_____

# EXHIBIT 14

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

CAUSE NO. GV202501

| | | |
|---|---|---|
| THE STATE OF TEXAS, THE TEXAS DEPARTMENT OF INSURANCE, AND THE TEXAS COMMISSIONER OF INSURANCE, | § § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| FARMERS GROUP, INC., FARMERS UNDERWRITERS ASSOCIATION, FIRE UNDERWRITERS ASSOCIATION, FARMERS INSURANCE EXCHANGE, FIRE INSURANCE EXCHANGE, TEXAS FARMERS INSURANCE COMPANY, MID-CENTURY INSURANCE COMPANY OF TEXAS, MID-CENTURY INSURANCE COMPANY, TRUCK INSURANCE EXCHANGE, TRUCK UNDERWRITERS ASSOCIATION and FARMERS TEXAS COUNTY MUTUAL INSURANCE COMPANY, | § § § § § § § § § § § § § § § | OF TRAVIS COUNTY, TEXAS |
| Defendants. | § § | 261ST JUDICIAL DISTRICT |

**STATE OF TEXAS AND FARMERS PARTIES' JOINT MOTION FOR PRELIMINARY APPROVAL OF SECOND AMENDED SETTLEMENT AGREEMENT AND STIPULATION, SUPPLEMENT THERETO, AND CLASS NOTICE**

JOSHUA GODBEY
Assistant Attorney General
JAMES R. WENZEL
Assistant Attorney General, Consumer
Protection Division
OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
P.O. Box 12548
209 West 14th Street
Austin, Texas 78711-2548

RICHARD N. CARRELL
State Bar No. 03871000
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713-651-5151
Telecopier: 713-651-5246

M. SCOTT INCERTO
State Bar No. 10388950
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

Marcy Hogan Greer
State Bar No. 08417650
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress Ave., Suite 2350
Austin, Texas 78701
Telephone: 512-482-9300
Telecopier: 512-482-9303

**TABLE OF CONTENTS**

Page

OVERVIEW ................................................................................................................ 1

BACKGROUND FACTS ........................................................................................... 3

    A.    History of the State's Claims ...................................................... 3

    B.    Recovery for the Class Members ................................................ 7

    C.    The Court Conducts a Thorough Preliminary Hearing ............... 8

    D.    The Seven-Year Appeals Process Ultimately Vindicates the Attorney General's Authority ...................................................... 9

    E.    The Nationwide Class Action Settlements in Fogel and Mobbs ........ 10

        1.    The Fogel Action—Management Fee Claims ........................ 10

        2.    The Mobbs Action—FCRA Claims ...................................... 12

    F.    The Parties Update Their Settlement in 2013 ............................ 13

    G.    New Round of Objectors Enters Case in 2014 .......................... 13

    H.    The Parties Heed the Court's Questions .................................... 14

    I.    Mediation Results in Supplemented Settlement Agreement ............... 15

EXPLANATION OF CHANGES TO SETTLEMENT AGREEMENT AND NOTICE ........... 16

    I.    Updates in Supplement to Second Amended Settlement Agreement ........ 16

        A.    Time Value of Money Addressed by $10 Million Increase in Recovery to Class Members .............................. 17

        B.    Settlement in This Case Will Not Impact Claim in Pending Geter Action ................................................................ 17

        C.    "Management Fee" Provision Eliminated .............................. 18

        D.    Any Perceived Conflict is Addressed ................................... 18

        E.    Updated Class Notice .......................................................... 19

        F.    Other Updates in the Supplement ........................................ 20

    II.    Updates Made in 2013 Second Amended Settlement Agreement ........ 20

ARGUMENT AND AUTHORITIES ........................................................................ 22

    I.    Preliminary Approval is the First of a Two-Step Approval Process ........ 22

    II.    The Proposed Settlement is Well Within the "Range of Possible Approval" ........................................................................ 23

        A.    The Terms of the Second Amended Settlement Agreement and the Supplement Track the Favorable Terms of the 2003 Settlement Agreement and Also Add Favorable Terms ......................... 25

B.    The Bloyed Factors That Will Be Considered at the Ultimate Fairness Hearing Counsel in Favor of Preliminary Approval ................. 26

    1.    There is no evidence of collusion ............................................... 27

    2.    The complex issues presented would undoubtedly result in protracted litigation if not settled ................................................ 27

    3.    The facts and legal theories were sufficiently developed to permit a proper analysis of the settlement terms ......................... 28

    4.    There is a significant chance that the State will be unable to establish liability or damages ...................................................... 29

    5.    The Settlement Agreement actually exceeds the anticipated recovery, considering the highly uncertain nature of liability and the damages sought ...................................................... 29

    6.    The opinions of experienced counsel confirm the fairness of the settlement to the class members ........................................ 30

III.    The Court Should Approve the Class Notice ........................................................ 31

CONCLUSION AND PRAYER ..................................................................................... 32

## OVERVIEW

On September 4, 2014, twelve years after the filing of this lawsuit, the Court asked the parties and intervenors to "avoid any unnecessary costs, motions, hearings and procedural machinations and let's get to fairness quickly." Ex. 3, Sept. 4, 2014 Hearing, Tr. 78:4-11. With their supplemented settlement agreement (Exhibits 1 and 2) and this joint motion, that is exactly what the State of Texas and Farmers seek to accomplish.

The Court, the parties, and even intervenors' counsel have been here before. In 2003, after an extensive hearing lasting four days, this Court preliminarily approved the parties' landmark settlement in this case, one of the largest of its kind in Texas history, and certified three subclasses for settlement purposes with the Attorney General representing these classes. Then came a series of appeals that lasted almost a decade, which were ultimately resolved against the intervenors and in favor of this Court's original ruling. In the interim, nationwide class actions in California (*Fogel*) and Oklahoma (*Mobbs*) raised and settled claims that entirely disposed of a number of intervenors' objections to the parties' 2003 Settlement Agreement. Following the resolution of *Fogel* and *Mobbs*, in 2013, the State and Farmers updated their 2003 Settlement Agreement and jointly moved for preliminary approval of the Second Amended Settlement Agreement.[1] That update in 2013 was not a renegotiation of any terms but simply reflected the parties' voluntary implementation of all the prospective relief terms agreed to in 2003 and, where the passage of time had made the proposed claims process for the Credit Usage

---

[1] The executed Supplement to the Second Amended Settlement Agreement is provided as Exhibit 1, adding provisions to and substituting provisions in the Second Amended Settlement Agreement, which is attached as Exhibit 2. The exhibits to the Second Amended Settlement Agreement that were changed to conform to the Supplement are also attached to Exhibit 1 as Exhibits B (Proposed Class Notice), C (Proposed Summary Notice), and E (Claim Form). These exhibits are substantively the same as Exhibits B, C, and E to the Second Amended Settlement Agreement, but have been rewritten in "plain English" to provide greater clarity.

Class unworkable, the parties' adoption of a recovery mechanism similar to the one approved by the Oklahoma federal court in *Mobbs*.

The Court heard the previous joint motion for preliminary approval on April 29, 2014. Several intervenors also filed objections and appeared at that hearing. No objections were raised or concerns expressed regarding the changes made to the Second Amended Settlement Agreement. The Court, however, identified three potential concerns regarding (1) the impact of the passage of time on the settlement amount; (2) the effect of the settlement agreement on the *Geter* case pending in another Texas court; and (3) the alleged tension between the Farmers defendants. As a result, the Court declined at that time to preliminarily approve the Second Amended Settlement Agreement and advised the parties to address those issues at the next preliminary approval hearing. The Court also advised the parties and intervenors about the benefit of mediation, which the State and Farmers took to heart, and all of the intervenors were invited to participate. Indeed, the mediation resulted in an executed Supplement to the Second Amended Settlement Agreement (Exhibit 1) that addresses each of the issues raised by the Court at the April 2014 hearing. Additionally, other valuable concessions and enhancements have been incorporated into the Supplement, including an agreement by Farmers to provide additional consideration to the Settlement Class members and to remove the provision previously dealing with the Texas Department of Insurance's examination of the management fee, an agreement by the Attorney General to forgo its $2 million in fees so those funds could be used to enhance the benefits to the class, and an updated class notice that conforms to the newer, "plain English" format.

Since 2003, the State and Farmers have been ready to reach a final settlement in this case and compensate the Texas policyholders that make up the Settlement Classes. More than a

decade of appeals and other proceedings have delayed that resolution. But the parties, with guidance from the Court, have nonetheless worked to update their settlement to ensure that it remains fair and beneficial to Texas policyholders. Because the Second Amended Settlement Agreement and its Supplement are well within the range of possible approval, the State and Farmers respectfully request that this Court grant preliminary approval of the Second Amended Settlement Agreement and the Supplement and grant approval of class notice to Texas policyholders.

## BACKGROUND FACTS

This Motion brings forward the Joint Motion for Preliminary Approval of the Second Amended Settlement Agreement that the parties previously filed on August 23, 2013, and is meant to be comprehensive, covering the relevant background and information that the Court needs to grant preliminary approval. As a result, it supersedes the 2013 joint motion.

### A. History of the State's Claims

Some context is necessary to fully understand the circumstances that gave rise to the controversy and settlement in this case. As a result of a vast increase in claims for mold and water damage in the late 1990s, rates for homeowners insurance across the State of Texas began to rise. Farmers and other Texas insurers were offering homeowners policies under the HO-B policy form that, at the time, was asserted by policyholders to provide coverage for mold and water damage claims.[2] As the number of these claims under HO-B policies rose sharply, so did HO-B rates.

---

[2] The primary distinction between the HO-A and HO-B policies was the perception that the HO-B policy covered mold damage and the HO-A policy did not provide that coverage. In late 2006, the Texas Supreme Court concluded that the HO-B policy did not provide mold coverage. *See Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006).

Because no insurer in Texas may offer a homeowners policy that has not been approved by the Texas Department of Insurance ("TDI"), in November 2001, the homeowners insurance industry asked for TDI's approval to offer a new HO-A homeowners policy. Responding to the growing crisis, TDI approved the new HO-A policy form that excluded coverage for most mold and water damage claims. Farmers, like virtually all Texas insurers, ceased offering HO-B policies and instead began offering its policyholders HO-A policies as the HO-B policies came up for renewal.

In October 2001, the Office of Attorney General initiated a series of Civil Investigative Demands ("CIDs") directed to various Farmers entities on a variety of insurance practices and alleged conduct in Texas. In addition to the numerous CIDs, TDI also conducted a Market Conduct Examination beginning in January 2002, inquiring into many of the practices that later formed the basis of the State's suit against Farmers. In connection with these information requests, the Farmers entities collectively produced to the State approximately 10,000 pages of documents—many of which were proprietary and confidential—and engaged in a dialogue with TDI about its concerns. TDI representatives were also allowed to go to Farmers' regional office to review documents and conduct computer searches.

On August 5, 2002, the State of Texas and the Commissioner of Insurance filed this suit against Farmers Insurance Exchange, Fire Insurance Exchange, and Farmers Group, Inc., as well as related entities, complaining of Farmers' homeowners' insurance practices in Texas and seeking permanent injunctive relief and monetary "restoration" of alleged overpayments made by insureds, as well as civil penalties and attorneys' fees.

Within a week of filing the lawsuit, TDI's staff prepared and presented to the Commissioner an application for emergency cease and desist order, requesting the Commissioner

to order Farmers Insurance Exchange and Fire Insurance Exchange to change their rate practices. The Exchanges were given no prior notice and were not provided an opportunity to participate in the *ex parte* process leading to the issuance of the cease and desist order on the same day. The cease and desist order restricted the Exchanges' rate practices—specifically requiring them to cease and desist from increasing their rates and seeking to regulate the components of their new rates—and threatened the Exchanges with civil penalties of $25,000 "for each act of violation" of the order. The order compelled the Exchanges to alter their policy practices by imposing significant conditions on all new or renewal policies that were to take effect in 90 days. Farmers sought review of the order both through the administrative process and in the courts.

The principal challenge to Farmers homeowners' practices was based on policyholder complaints that the new HO-A forms provided less coverage—excluding mold and limiting coverage for water damage—and charged excessive rates. Although, as noted above, the policy forms were regulated and approved by TDI, the rates that the Exchanges charged were statutorily exempt from TDI regulation at the time. *See* TEX. INS. CODE ANN. art. 19.12(a) (repealed).

While Farmers vigorously defended its actions and was confident of its legal position, it risked losing its franchise in the struggle. Farmers was left with three difficult choices: (i) withdraw from the Texas market; (ii) comply with, but continue to challenge, the cease and desist order; or (iii) settle its differences with the State.

The Exchanges had already lost $1.3 billion in the Texas homeowners lines in the approximate two-year period prior to this time. As the litigation and other tensions mounted, Farmers made the reluctant decision on September 25, 2002, to announce its withdrawal from the Texas homeowners' insurance market. Although settlement communications continued throughout this time period, no resolution was apparent.

By early October 2002, the situation had become critical for Farmers. Several onerous requirements under the cease and desist order were about to go into effect on November 6, 2002, and would have significantly compromised Farmers' ability to write homeowners' insurance without also jeopardizing its ability to meet obligations to other insureds. Acting at the request of their constituents, two state senators attempted to bring the parties back to the negotiating table. These discussions sparked renewed settlement efforts between the parties, and Farmers and the State continued to engage in numerous, lengthy face-to-face settlement discussions in an effort to reach a compromise. The parties continued their negotiations almost daily over the course of the next few weeks and, through that process, exchanged more documents and information. Over the Thanksgiving holiday, on November 30, 2002, they executed a Memorandum of Understanding ("MOU").

Based upon that MOU, the parties began to prepare a formal settlement agreement, meeting on an almost daily basis to iron out the remaining details of the settlement. Several weeks later, the original Settlement Agreement and Stipulation was executed. It provided that the settlement would be effectuated through a class action so that (i) court approval would be obtained to confirm the fairness of the agreement, (ii) the insureds would have both notice and an opportunity either to object or to "vote" by opting out of the class, and (iii) Farmers would have greater certainty and a "global resolution" of the pending matters. This change did not alter the nature of the claims or the State's representation of all Farmers policyholders statewide; it altered only the procedural vehicle through which the global peace would be implemented. The agreement also contained a bilateral "blow-up" provision allowing either the State or Farmers to terminate the settlement if more than 2% of the insureds decided to opt out, meaning that if the

settlement were rejected by a sufficient number of policyholders, the State also had the option to terminate.

## B. Recovery for the Class Members

The Settlement Agreement provided for three settlement classes, each of which would receive a different form of compensation, although Farmers insureds could be members of more than one class. The first class of Farmers' insureds received a 6.8% premium abatement both prospectively and retrospectively. Ex. 2 § IV(1) & (2). The Attorney General believed that Farmers' rates were approximately 12% too high and explained that Farmers would not have paid more, and "given the vagaries of litigation," he believed the settlement was fair and adequate. Ex. 4, Ltr. of David C. Mattax to Joe K. Longley, Mar. 12, 2003 ("Mattax Letter").

The members of the second class received full restitution for any discrepancies in their premiums as a result of certain challenged discounts. Ex. 2 § IV(3). This recovery was designed to resolve TDI's challenge to the manner in which Farmers had instituted a series of discounts of premiums for such things as age of home and location of home.

The third class, the Credit Usage Class, consisted of insureds who were alleged to have failed to receive adequate notice that their credit reports might have adversely affected their insurance premiums in violation of the Fair Credit Reporting Act ("FCRA"). Under the settlement, a Credit Usage Fund was established, and these class members could receive full restitution on a claims-made basis, but had to prove that their credit reports contained erroneous information. *Id.* § IV(4). A prerequisite to any recovery from the fund was the policyholder's ability to retrieve a copy of his or her contemporaneous credit report, and with the passage of so much time while the settlement has been stayed, this provision had to be changed. The third-party credit agencies have indicated it is no longer possible to provide individual credit reports

going back so far in time, and so this provision was amended, and remains so, in the Second Amended Settlement Agreement and Supplement to match the recovery provided in the *Mobbs* case, discussed below.

### C.     The Court Conducts a Thorough Preliminary Hearing

With their hard-fought settlement in hand, the State and Farmers requested the Court to certify settlement classes and preliminarily approve the Settlement Agreement.  But, before preliminary approval, eleven law firms representing five policyholders—Jan Lubin, Gilberto Villanueva, Michael Paladino, and Gerald and Lesly Hooks—intervened and submitted objections to the settlement agreement.  Their principal objections to the Settlement Agreement involved:  (i) suggestions of collusion; (ii) the authority of the Attorney General to bring and settle the claims; (iii) the management fee component of the homeowners rates; (iv) the policyholders' claims under FCRA; and (v) Farmers' withdrawal from the HO-B line of policies in favor of offering the newly approved HO-A form of homeowners coverage.  The Court continued the hearing for four months, allowing the intervenors to conduct discovery on their objections.  Thousands of pages of documents—representing all contemporaneous communications between the State and Farmers relating to this litigation—were exchanged.  The intervenors were also afforded the opportunity to take depositions and other forms of discovery relating to the settlement.  As a result, they were allowed to discover, in advance of the initial hearing, precisely what transpired in the settlement negotiations.

From May 19 to 22, 2003, the Court conducted an unprecedented four-day evidentiary hearing on preliminary approval and class certification.  Prior to the hearing, hundreds of pages of briefing were provided to the Court regarding the propriety of preliminarily approving the settlement and certifying the settlement classes.  At the hearing, the parties and intervenors

examined numerous witnesses and proffered thousands of pages of exhibits. Professor Samuel Issacharoff, a leading national class action expert, testified that the hearing was "the most elaborate preliminary approval hearing I've ever been a part of." The Court actively participated in the hearing by questioning witnesses, and the intervenors were allowed full participation in the proceeding.

At the conclusion of the 2003 hearing, the Court certified the settlement classes (with some changes to class definitions based upon testimony at the hearing) and preliminarily approved the Settlement Agreement, overruling each of the myriad objections raised by the intervenors. Indeed, the Court found that there was "not . . . a scintilla of evidence of collusion." Ex. 5, 5 RR 48. In several pages of transcript, the Court also provided its reasons for determining that the Attorney General of Texas was not only an appropriate and adequate, but a vigorous and able, advocate for the interests of the Farmers' policyholders. *Id.*, 5 RR 45-58. The intervenors appealed the certification order, obtaining a stay of class notice and further settlement proceedings and commencing an appellate process that would last seven years. The Court also imposed a stay of discovery at the outset of those appeals.

### D. The Seven-Year Appeals Process Ultimately Vindicates the Attorney General's Authority

On appeal, the Austin Court of Appeals overturned the certification order. The State and Farmers successfully sought review by the Texas Supreme Court, which unanimously upheld the Attorney General's authority to represent the Texas policyholders in this class action under the Insurance Code. *Farmers Grp., Inc. v. Lubin*, 222 S.W.3d 417, 424-28 (Tex. 2007).[3] The Supreme Court also explained, "While the opinions of class members are certainly relevant in

---

[3] Justice Hecht concurred in part and dissented in part from the majority's analysis, but agreed that the Attorney General was statutorily authorized to bring and settle the claims.

analyzing the settlement, their comments are generally solicited by notice and an opportunity to be heard, not by turning over management of the class action to them." *Id.* at 426.

The case was remanded to the court of appeals to address the remaining challenges to the certification order. The court of appeals upheld the settlement classes against every other challenge to certification and eventually remanded to this Court. *See generally Lubin v. Farmers Grp., Inc.*, No. 03-03-00374-CV, 2009 WL 3682602 (Tex. App.—Austin Nov. 6, 2009, no pet.).

**E.**      **The Nationwide Class Action Settlements in *Fogel* and *Mobbs***

While the *Lubin* case was on appeal through the Texas appellate system, nationwide class actions progressed in California and Oklahoma. In particular, these class actions included the same management fee and FCRA-related objections raised by the intervenors with regard to the 2003 Settlement Agreement. As discussed below, not only have the California and Oklahoma actions been settled and dismissed with prejudice, so too have the claims and objections of nearly all of the previous intervenors.

**1.**      **The *Fogel* Action—Management Fee Claims**

A nationwide class action challenging the management fee charged by Farmers Group, Inc. ("FGI")[4] to Farmers Insurance Exchange, Fire Insurance Exchange, and Truck Insurance Exchange ("Exchanges") was filed in the Superior Court for the State of California for the County of Los Angeles, styled *Benjamin Fogel v. Farmers Group, Inc., et al.*, Case No. BC 300142 ("*Fogel* Action"). The Exchanges are reciprocals, sometimes referred to as inter-insurance exchanges, created under California law. They are not corporations but, rather, a different type of business entity through which individuals, partnerships, and corporations pool

---

[4] Farmers Group, Inc. does business as Farmers Underwriters Association, and Fire Underwriters Association and Truck Underwriters Association are its subsidiaries. These entities will be referred to collectively as "FGI."

premiums to indemnify each other from loss. Pursuant to California law, the Exchanges are managed by an attorney-in-fact, in this case FGI, in exchange for a percentage of premiums, referred to as the management fee. *See* CAL. INS. CODE § 1305.

The *Fogel* Action, filed in August 2003 after preliminary approval of the 2003 Settlement Agreement in this case, asserted that FGI's management fee was excessive and brought claims for breach of fiduciary duty, violation of California's Unfair Competition Law, fraud, and deceit against FGI. The same claims asserted in the *Fogel* Action were also pursued by Intervenor Jan Lubin, and adopted by Intervenors Villanueva and Paladino, in intervening and objecting to the 2003 Settlement Agreement in this case. The overlap between the *Fogel* Action and this case does not end there. Intervenor Lubin's counsel and now counsel for current Intervenor Charles Grigson, Joe Longley and Philip Maxwell, were also class counsel in *Fogel*.

After a vigorous contest in both the trial and appellate courts and following multiple mediations over the course of a year, the parties in *Fogel* reached a substantial settlement where FGI paid the entire amount of the settlement, around $50 million of which was attributable to Texas policyholders' claims. On December 21, 2011, the *Fogel* court signed the final judgment approving the settlement agreement on behalf of a nationwide class. Class counsel in *Fogel* and now Intervenor Grigson's counsel, Longley and Maxwell, not only approved the *Fogel* settlement as "fair, just, reasonable, and adequate" but also claimed attorneys' fees in *Fogel* for their work in this Texas case based on the overlapping nature of the two cases. Exs. 6, 7, Declarations of J. Longley and P. Maxwell. And their current client, Grigson participated and received compensation in *Fogel*.

Recognizing that same overlap between the nationwide *Fogel* class claims and the claims in this case, Farmers agreed in the *Fogel* settlement that it would not assert the defenses of

release, accord and satisfaction, estoppel, collateral estoppel (issue preclusion), res judicata (claim preclusion), or any similar defense that is based on the *Fogel* settlement agreement or final judgment to preclude any recovery under the Settlement Agreement in this case. As a result, the *Fogel* class members in Texas may participate in, and do not need to opt out of, the benefits provided by the Second Amended Settlement Agreement and Supplement even if they were members of the class certified in *Fogel*.

### 2. The *Mobbs* Action—FCRA Claims

Another nationwide class was certified in *In re: Farmers Insurance Co., Inc. FCRA Litigation*, Case No. CIV-03-158-F, including all cases consolidated and coordinated in MDL No. 1564, before the United States District Court for the Western District of Oklahoma ("*Mobbs* Action"). The claims in that case revolved around allegations that the Farmers defendants violated FCRA by not providing sufficient adverse action notices as required under the federal statute, and the class sought statutory damages as a result. On September 29, 2011, the *Mobbs* court entered a final judgment approving a settlement agreement reached by the parties. The claims settled and released on a nationwide basis in *Mobbs* paralleled the FCRA claims and objections raised by some of the previous intervenors as to the proposed 2003 Settlement Agreement in this case.

Except as to the class members who timely filed a completed claim form in *Mobbs*, the Farmers Parties have agreed that they will not assert the defenses of release, accord and satisfaction, estoppel, collateral estoppel (issue preclusion), *res judicata* (claim preclusion), or any similar defense that is based on the *Mobbs* settlement agreement or final judgment to preclude any recovery under the Settlement Agreement in this case. Those class members who

filed a proof of claim may still receive the other (non-FCRA) benefits provided under the Second Amended Settlement Agreement and Supplement if they are otherwise eligible to receive them.

**F.     The Parties Update Their Settlement in 2013**

After the resolution of the *Fogel* and *Mobbs* Actions, the Farmers Parties reached settlements with some of the remaining intervenors, including Jan Lubin, represented by Longley and Maxwell.  The parties then turned their attention back to the 2003 Settlement Agreement, updating it to bring it current to 2013 (as explained below).  The agreement's terms otherwise remained the same.  On August 23, 2013, the State and Farmers jointly moved for preliminary approval of and publicly filed their Second Amended Settlement Agreement.

At the time the parties jointly moved for preliminary approval in 2013, the only intervention that remained in this case was of Intervenors Gerald and Lesly Hooks, who are also members of a class in a separate matter, *Sandra Geter v. Farmers Group, Inc., et al.*, No. E-0167872, in the 172nd Judicial District Court of Jefferson County, Texas ("*Geter* Action"). Although the Hooks filed their intervention just days before the 2003 preliminary approval hearing, their counsel was present and given the opportunity to argue and question witnesses at that hearing.  *See* Ex. 8, 2 RR 126-27; Ex. 9, 3 RR 114-120.  And, like the objections of other previous intervenors, their objections were overruled by this Court in 2003.  As discussed below, the parties' Supplement to the Second Amended Settlement Agreement resolves the Hooks' stated objection related to the *Geter* Action.

**G.     New Round of Objectors Enters Case in 2014**

Nine months passed between the August 2013 public filing of the Second Amended Settlement Agreement and the scheduled preliminary approval hearing date of April 29, 2014. Not until the eve of the hearing, April 28, did Charles Grigson file his intervention.  Just two

weeks earlier, Michael Woods, proceeding pro se, had also filed a notice of intervention.[5] Their interventions alleged that a conflict existed between the State and the policyholders it represents; that a conflict existed between the Exchanges and FGI; that Farmers' shared counsel of twelve years was conflicted and should withdraw or be disqualified; and that the Court should "decertify" and "start over." Based on these objections, Grigson also moved to lift the stay on discovery that the Court put in place in 2003. No intervenor claimed that the settlement consideration was unfair or inadequate or outside the range of possible approval, and no intervenor objected to any of the 2013 updates that the parties made in the Second Amended Settlement Agreement. As this Court has noted, the objections that intervenors did assert were either overruled by the Court in 2003 or raised by Grigson's own counsel, Longley, in 2003 and pursued no further in the intervening decade. *See* Ex. 10, Apr. 29, 2014 Hearing, Tr. 104; Ex. 3, Sept. 4, 2014 Hearing, Tr. 43-46.

## H.    The Parties Heed the Court's Questions

On April 29, 2014, the Court heard the parties' 2013 joint motion for preliminary approval. At the hearing, the Court informed the parties that it was "unprepared to approve" the Second Amended Settlement Agreement at that time and instead raised several issues for the parties to address at a future hearing:

- The time value of money in the settlement, given the passage of time;

- The settlement's impact on the pending *Geter* Action, which has been certified as a class and seeks declaratory relief only; and

- The alleged conflict between the Farmers Exchanges and Farmers Group, Inc.

[5] The Velas also filed a notice in intervention around this time but they later moved for a non-suit on the grounds that they lacked standing and the desire to intervene. The Velas' intervention had sought to bring their individual foundation and other claims that were not properly a part of this case.

*See* Ex. 10, Apr. 29, 2014 Hearing, Tr. 12:11-14, 25, 54-57, 75-77. Although not prepared to grant preliminary approval, the Court advised the parties and intervenors that it had already examined all of the class certification standards and granted certification in 2003; it did not want to "redo" that. *Id.* at 104. The Court also encouraged the parties and intervenors to consider mediation. *Id.* at 76-77.

I.      **Mediation Results in Supplemented Settlement Agreement**

Once again, at the September 4, 2014, hearing on intervenors' motion to lift the discovery stay and Farmers' motions to strike the interventions, the Court urged the parties and intervenors to consider mediation to resolve the outstanding issues. Ex. 3, Sept. 4, 2014 Hearing, Tr. 73, 75-78. The State thereafter initiated discussions with Farmers and intervenors about mediation. *See* Ex. 11, Sept. 25, 2014 Ltr. from D. Mattax to Hon. Scott Jenkins. Although counsel for Intervenor Grigson had initially asked to participate in settlement discussions, Grigson then filed a Motion to Disqualify Counsel on September 19, 2014,[6] and thereafter refused to participate in mediation. All other intervenors, together with the State and Farmers, agreed to participate in mediation, which was conducted before former Judge Patrick Keel on December 1, 2014. As the State informed the Court at the hearing on December 4, the mediation was fruitful and led to an agreement in principle between the parties. A supplemented agreement was drafted, and on March 4, 2015, these parties executed the Supplement to the Second Amended Settlement Agreement (Exhibit 1). As discussed below, the Supplement addresses the issues raised by this Court at the April 29, 2014 hearing. The parties are now ready to proceed with preliminary approval and to issue notice to the class, and set a final fairness hearing.

---

[6] The Motion to Disqualify was denied after a hearing on December 4, 2014.

**EXPLANATION OF CHANGES TO SETTLEMENT AGREEMENT AND NOTICE**

Since 2003, the parties' settlement has undergone two updates. The first occurred in 2013 after the resolution of the *Fogel* Action in California, the *Mobbs* Action in Oklahoma, and the previous intervenors' objections in this case. Those updates produced the Second Amended Settlement Agreement (Exhibit 2) and were spelled out in detail in the 2013 motion for preliminary approval; they have never been challenged. The second set of updates arose out of mediation and are contained in the Supplement to the Second Amended Settlement Agreement (Exhibit 1). Like the Second Amended Settlement Agreement, the Supplement does not re-trade the deal; it maintains much of the substance of the Second Amended Settlement Agreement and thus the 2003 Settlement Agreement,[7] while responding to the issues raised by the Court at the April 29, 2014 hearing. Because the changes in the Supplement address the issues raised by the Court, these changes are described first, in Part I below. Thereafter, the uncontested changes that were included in the Second Amended Settlement Agreement, which the parties previously briefed, are highlighted for the sake of completeness in Part II.

## I. Updates in Supplement to Second Amended Settlement Agreement

In the most recent round of updates, the parties have agreed to enhance significantly the benefits to the Settlement Classes, notwithstanding: (1) the lack of any legal obligation either under the Settlement Agreement or under Texas law; (2) delays caused mostly by intervenors' failed appeals; and (3) the overall value of the legal claims in light of settlement carve-outs (i.e., *Fogel*, *Mobbs*, and now *Geter*) and a changed legal landscape. As the Supplement reflects, the prospective rate abatement has previously been provided to the Rate Class, and the value of

---

[7] In fact, the parties have been operating since 2003 in compliance with many of the terms of the original 2003 Settlement Agreement, including the prospective relief to the Rate Class, the revised FCRA notices, and injunctive relief. *See, e.g.*, Proposed Class Notice (Ex. 1-B).

undistributed benefits to the eligible Rate and Discount Class Members under the Settlement (not including the already provided rate abatement) is $84.38 million. Ex. 1 § IV(9). In addition, eligible Credit Usage Notice Class Members can apply to receive a payment of $35. *Id.*

## A. Time Value of Money Addressed by $10 Million Increase in Recovery to Class Members

To address the Court's question regarding whether the settlement should be adjusted given the passage of time, the parties negotiated an increase of $10 million in the payment to class members as a result of the delay in effectuating the settlement from intervenors' years of appeals.[8] That consideration will be distributed on a proportionate basis to each Settlement Class Member who will be receiving the Retrospective Rate Reduction component or the Individualized Discount Adjustment component and will be based on the aggregate amount of the two components received by the member. Ex. 1 § IV(11). This amount is not interest *per se*; it is instead a figure that, considering all of the circumstances, the parties believe will fairly compensate class members in light of the time that has passed in this case.

## B. Settlement in This Case Will Not Impact Claim in Pending *Geter* Action

At the hearing on April 29, 2014, the Court correctly noted that the *Geter* Action "is not about money" but is rather seeking declaratory relief only, without any claim of damages. Ex. 10, Apr. 29, 2014 Hearing, Tr. 55. The Court also expressed its view that the *Geter* Action should be carved out of the parties' settlement. *Id.* Considering the Court's statements, as well

---

[8] While Farmers does not agree that any interest or amount for the time value of money should legally or fairly be assessed against it, Farmers has agreed to the additional consideration in the spirit of settling this case and finally compensating policyholders. Ex. 1 § IV(11). This increase of $10 million includes an additional $8 million contributed by Farmers and $2 million that Farmers originally agreed to pay to the State in attorneys' fees, but which the State has agreed to forgo for the benefit of the class. Although not an issue raised by the Court previously, the parties' Supplement changes the State's attorneys' fee to $0 in order to enhance the recovery of the policyholders. Ex. 1 § IV(8). Thus, unlike private class actions, where a large portion of the recovery is often paid to class counsel, in this case, **all** of the settlement consideration is being paid directly to the class.

as the input received at mediation from counsel for the Hooks, who are class members in *Geter*, the State and Farmers have agreed to exclude the declaratory-relief claim in the *Geter* Action from the release of claims in the Second Amended Settlement Agreement in this case, as agreed to in the Supplement. Ex. 1 § I. The Supplement also adds a new provision, precluding the Farmers Parties from using the settlement here to argue that the *Geter* declaratory relief claim is barred by the doctrines of res judicata, collateral estoppel, or release. *Id.* § IX(7). The parties have also revised the Class Notice to reflect this update. Ex. 1-B at 6. Because this update fully carves out the *Geter* declaratory relief claim that has been certified as a class action (but no other claim) from the settlement's release of claims, it fully addresses the Court's previous concern regarding the *Geter* Action.

## C. "Management Fee" Provision Eliminated

The parties have agreed to remove the "Management Fee" provision that had appeared in Section IX(6) of the Second Amended Settlement Agreement, Ex. 1 § IX(6), because current laws regarding how rates are reviewed, which were not in effect at the time of the original settlement, make this provision moot. This change eliminates the concerns raised by the Office of Public Insurance Counsel or OPIC.

## D. Any Perceived Conflict is Addressed

Any perceived conflict created by the funding of the settlement is addressed in the Supplement. Farmers Group, Inc. will provide reimbursement to the Farmers Exchanges for the attorney-in-fact fee related to those returned premiums paid to the Settlement Classes, including the $10 million enhancement discussed above, in an amount to be determined by the Exchanges according to their existing practices. Ex. 1 § IV(10).

Also, as the State explained to the Court at the December 4, 2014 hearing, the settlement in this case will only effectuate a release in which the Plaintiffs (and the classes) release the Farmers Defendants. Ex. 12, Dec. 4, 2014 Hearing, Tr. 64-65. Consistent with the parties' original agreement in 2003, the Second Amended Settlement Agreement and Supplement do not include any release between or among the Farmers Defendants.

Furthermore, the terms and conditions of the Supplement and Second Amended Settlement Agreement have been approved by the Audit Committee of the Boards of Governors of each of the Exchanges,[9] who have been advised by counsel separate from their litigation counsel in this case. Ex. 13, D. Hohl Affidavit & Farmers Exchanges Audit Committee: Certified Copy of Resolutions.

E.     Updated Class Notice

Because the proposed class notice that the Court approved in 2003 needed more substantial revisions to help communicate the reasons for the decade-long delay and what has happened as a result to the class members, the parties updated the proposed notice in 2013. The parties also updated the notice to inform the class members about the multiple other class actions affecting their rights and to advise them of their options so that they can make informed decisions. In the most recent updates, the parties have revised the notice to reflect the updates made in the Supplement to the Second Amended Settlement Agreement and to again make the class notice as clear and understandable as possible for the class members, taking into account

[9] Each Exchange is governed by a Board of Governors that is independent from FGI. Exs. 14-16 at 3 § III.2, Rules and Regulations of Farmers Exchanges. The Audit Committee of the Board of Governors is a joint committee created by resolution of the three Boards of Governors of the Exchanges and is composed only of Governors from the Exchanges' Boards of Governors—meaning that none of its members is affiliated with FGI or an attorney-in-fact either. Ex. 17 ¶¶ 3-4, Affidavit of R. Myhan. The Audit Committee is specifically authorized to approve the settlement terms and conditions. *Id.* ¶ 5. Approval from the Audit Committee confirms that the settlement reached has been considered and found to be in the best interests of the Exchanges.

the complexities of an already complicated settlement whose implementation has been delayed and impacted by other competing class actions. In addition, the proposed notice (both the "long-form" version to be mailed to the Class Members and the summary notice) has been simplified and translated into a "plain language" format that is recommended by the Federal Judicial Center. The proposed class notice and summary notice are attached to Exhibit 1, as Exhibits B and C.

### F. Other Updates in the Supplement

The parties also agreed to the following additional updates in the Supplement. Additional recitals have been added to Section II of the Second Amended Settlement Agreement. Exhibit 1 § II. In addition to the changes discussed above, Paragraph 10 of Section IV has been updated, deleting the reference to the "Credit Usage Notice Fund" component, to conform with the recently clarified accounting requirements of FCRA. *Id.* § IV(10). Paragraph 1 of Section X has been simplified in response to party and intervenor input given at the mediation. *Id.* § X(1). Paragraphs 2, 7, and 8 have also been revised in or added to Section X. *Id.* §§ X(2), (7), (8). The parties have also clarified and acknowledged that: the Court has approved and certified the Settlement Classes as affirmed by the Texas appellate courts and as carried forward without change in the Second Amended Settlement Agreement; the parties have satisfied the requirement of seeking certification, as set forth in Paragraph 2 of Section III of the Second Amended Settlement Agreement; and therefore the parties agree that the stipulations and agreements made in that Agreement have not terminated and remain in effect. *Id.* § III.

### II. Updates Made in 2013 Second Amended Settlement Agreement

The parties previously identified for the Court the limited ways in which the 2013 Second Amended Settlement Agreement differed from the 2003 Settlement Agreement that the Court

preliminarily approved in 2003. None of those updates has been challenged by intervenors. For purposes of completeness, the parties summarize the relevant aspects of the 2013 updates below and adopt and incorporate by reference the State of Texas and Farmers Parties' Joint Motion for Preliminary Approval of Second Amended Settlement Agreement and Stipulation and Class Notice, filed with the Court on August 23, 2013.

- **FCRA Claims Process Update and Carve-Outs:** Given the passage of time, the Credit Usage Fund provision could no longer require individual credit reports because those reports were no longer available. The provision was therefore amended to match the recovery provided in the *Mobbs* Action. The Settlement Agreement also carves out *Mobbs* class members (and similarly, *Fogel* class members) from the Settlement's release, unless they previously filed a proof of claim in *Mobbs*.[10]

- **Updating of Terms:** Some terms in the Settlement Agreement were brought current because the events had already passed or circumstances had changed, such as those surrounding the prospective relief and the retrospective rate relief.

- **FCRA Adverse Action Notices:** Based on major developments in Texas statutory law and U.S. Supreme Court precedent, the parties agreed that Farmers could cease using the previously negotiated forms for the FCRA adverse action notices once they have submitted replacement forms to TDI and allowed for TDI objections.

- **Injunctive Relief:** Because Farmers has abided by the injunctive relief relating to the State's antitrust claims since the 2003 Settlement Agreement was executed, the parties agreed that Farmers no longer needed to operate under a consent order but will continue to comply with applicable antitrust laws.

Because the Supplement addresses and alleviates each of the concerns raised by the Court at the April 29, 2014, hearing and because the Second Amended Settlement Agreement, as supplemented, continues to maintain the full substantive recovery (and more) to Texas policyholders that was negotiated and preliminarily approved in 2003, the State and Farmers

---

[10] Those class members who filed a proof of claim in *Mobbs* may still receive the other benefits provided under the Settlement Agreement if they are otherwise eligible to receive them.

respectfully request that the Court grant preliminary approval of the Second Amended Settlement Agreement and the Supplement so that notice can be provided to the class members.

## ARGUMENT AND AUTHORITIES

### I. Preliminary Approval is the First of a Two-Step Approval Process

Court approval is required before any action brought as a class action may be settled. TEX. INS. CODE ANN. art. 21.21, § 18(g); TEX. R. CIV. P. 42(e). Courts generally look with favor on the voluntary resolution of litigation through settlement, particularly so in the context of a class action: "[C]lass action damage suits should be settled whenever possible, as soon as possible." *In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117, 1157 (S.D. Tex. 1982); *see also In re Chicken Antitrust Litig.*, 669 F.2d 228, 238 (5th Cir. 1982) (noting that public policy strongly favors pretrial settlement of class actions).

Approving a class action settlement as to a putative class is generally a multi-step process. MOORE'S FEDERAL PRACTICE: MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.632 (2004) ("MANUAL FOR COMPLEX LITIGATION").[11] Only the first step is to occur at the upcoming hearing—preliminary approval of the proposed settlement. *McAllen Med. Ctr., Inc. v. Cortez*, 66 S.W.3d 227, 234 (Tex. 2001); *O'Reilly v. Brodie*, 975 S.W.2d 57, 59 & n.1 (Tex. App.—San Antonio 1998, pet. denied).

Upon preliminary approval, the court directs that notice be given to class members before proceeding with the second step of the process—a formal "fairness hearing" at which class members can be heard regarding the settlement and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented. *See* MANUAL FOR

---

[11] Although commercially published as part of the MOORE'S FEDERAL PRACTICE papers, the MANUAL FOR COMPLEX LITIGATION is actually a manual prepared by the Federal Judicial Center, which compiles the experiences and counsel of federal judges having expertise in complex case management issues.

COMPLEX LITIGATION § 21.632.[12] This notice will provide the class members an opportunity to be heard at the final "fairness hearing" or to opt out of the classes. Those putative class members who choose to opt out of the proposed settlement after preliminary approval will neither be bound nor affected by the settlement that is later approved.

The fairness hearing is the final step in the approval process where the Court will determine whether the settlement should be approved as fair, adequate, and reasonable, and whether it should be certified for the class. *E.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997); *Gen. Motors Corp. v. Bloyed*, 916 S.W.2d 949, 954-55 (Tex. 1996).

## II.     The Proposed Settlement is Well Within the "Range of Possible Approval"

The issue currently before the Court is limited to the first step in the approval process.[13] The preliminary approval stage constitutes an "initial evaluation" of the fairness of the proposed settlement, which can be made by the Court on the basis of written submissions and informal presentation from the settling parties. MANUAL FOR COMPLEX LITIGATION § 21.632, 321 and n. 976 (citing *In re Amino Acid Lysine Antitrust Litig.*, MDL No. 1083, 1996 U.S. Dist. LEXIS 5308, *11 (N.D. Ill. Apr. 22, 1996)) (the first step of the process is the preliminary ascertainment of whether the settlement appears to fall within the "range of possible approval").

---

[12] Professors Newburg and Conte suggest that the Court's preliminary approval at this stage is not required in order to send the notice, but certainly desirable to avoid a costly notification. *See* 4 ALBA CONTE AND HERBERT NEWBERG, NEWBERG ON CLASS ACTIONS ("NEWBERG ON CLASS ACTIONS") § 11.25 (4th ed. 2002) ("Because notice to the class, with its attendant expenses, and a hearing will be futile gestures if the court feels that some of the settlement terms are unacceptable at the outset, the parties are well advised to seek informally a preliminary court response in a pretrial conference that the proposed settlement is within the range of possible judicial approval.").

[13] As noted by this Court, affirmed by the appellate courts, and acknowledged and agreed to by the parties, this Court has already certified the Settlement Classes defined in the Second Amended Settlement Agreement, so the Court need not revisit that issue, allowing it to focus on preliminary approval. *See* *Lubin*, 2009 WL 3682602 (affirming this Court's original certification order and finding that the requirements for class certification had been met).

The nature of the decision at the preliminary step of the settlement approval process is limited:

> At this preliminary stage, the Court need only determine whether the settlement is "within the range of possible approval." *Gautreaux v. Pierce*, 690 F.2d 616, 621 n.3 (7th Cir. 1982). Preliminary approval does not require the district court to answer the ultimate question of whether a proposed settlement is "fair, reasonable, and adequate." *Armstrong v. Bd. of Sch. Dirs. Of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980). Rather, that determination is made only at the final approval stage, after notice of the settlement has been provided to the class members and they have had an opportunity to voice their views of the settlement or to exclude themselves from the settlement.

*City of Greenville v. Syngenta Crop Prot., Inc.,* No. 3:10-cv-188-JPG-PMF, 2012 U.S. Dist. LEXIS 74305, *11-12 (S.D. Ill. May 30, 2012) (citing MANUAL FOR COMPLEX LITIGATION § 21.632); *see also Bloyed*, 916 S.W.2d at 954 (quoting 2 NEWBERG ON CLASS ACTIONS § 11.27 at 11-50 (3d ed. 1992), for the proposition that "'[t]he actual class ruling is deferred in [settlement class actions] until after the hearing on the settlement approval, following notice to the class . . . .'"). "In other words, the preliminary certification of a settlement class action simply means that the class action may proceed, and the certification does not address the fairness or adequacy of a proposed settlement." *Lubin*, 2009 WL 3682602, at *10.

The standard for approval—"[w]ithin the range of possible approval"—"is simply a determination that there is, in effect, 'probable cause' to submit the proposal to members of the class and to hold a full-scale hearing on its fairness, at which all interested parties will have an opportunity to be heard and after which a formal finding on the fairness of the proposal will be made." *In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983); *see also Peters v. Blockbuster, Inc.*, 65 S.W.3d 295, 305 (Tex. App.—Beaumont 2001, no pet.) (upholding trial court's preliminary finding that certification requirements had been met and finding that approval of the settlement agreement was not reviewable until after the fairness

hearing). The Court held that this standard was met in 2003, and the changes made in the Second Amended Settlement Agreement provide no reason for coming to a different conclusion now.

A. **The Terms of the Second Amended Settlement Agreement and the Supplement Track the Favorable Terms of the 2003 Settlement Agreement and Also Add Favorable Terms**

The Second Amended Settlement Agreement and the Supplement easily fall within "the range of possible approval." The updated agreement maintains the same significant concessions negotiated in 2003, including: (1) a significant rate reduction for homeowners insured by the Exchanges in Texas going forward—a rate reduction the Exchanges actually implemented in 2003; (2) a similarly significant, retrospective rate reduction for homeowners' policyholders; (3) a fund for individualized discount adjustments; and (4) a fund to compensate any insureds whose credit reports contained adverse, but erroneous, credit information, without which the insureds would have paid lower premiums. *See generally* Ex. 2 § IV; Ex. 1 § IV.

On top of those favorable terms, the recently executed Supplement includes additional terms that will again significantly benefit class members: (1) the addition of $10 million by the Farmers Defendants in consideration (which includes the elimination of the State's $2 million in attorneys' fees and costs) to be proportionately distributed to class members; (2) a carve out of the declaratory relief claim in the *Geter* Action from the settlement's release of claims so that eligible class members in *Geter* and in this case may pursue the defined relief in both cases; and (3) the provision that FGI shall pay to the Exchanges a reimbursement of attorney-in-fact fees related to returned premiums in an amount to be determined by the Exchanges.

The core terms of this settlement, including the certified Settlement Classes, have already been vetted and approved in a detailed evidentiary hearing and the Court's thorough, well-

reasoned ruling that has stood the test of the appellate process. Both this Court and the Austin Court of Appeals found persuasive the fact that the Attorney General believed the settlement was fair and adequate after a thorough and vigorously contested fight. *See Lubin*, 2009 WL 3682602, at *7 n.9; *see also* Ex. 4, Mattax Letter. The Supplement does not alter any of the settlement's core terms; it instead seeks to address issues raised by this Court and to add to the favorable terms of the original settlement. By executing the Second Amended Settlement Agreement and the Supplement, the Attorney General and TDI continue to stand behind this settlement as being in the best interests of the policyholders.

**B.      The *Bloyed* Factors That Will Be Considered at the Ultimate Fairness Hearing Counsel in Favor of Preliminary Approval**

In *General Motors Corp. v. Bloyed*, the Texas Supreme Court outlined six considerations, known as the *Ball* factors, that are considered by a court in evaluating the fairness of a proposed settlement: (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and amount of discovery; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of damages; and (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members. 916 S.W.2d at 955 (citing *Ball v. Farm & Home Sav. Ass'n*, 747 S.W.2d 420, 423-24 (Tex. App.—Fort Worth 1988, writ denied)). The *Ball/Bloyed* factors remain the gold standard for settlement fairness review in Texas today. *See, e.g.*, *Hall v. Pedernales Elec. Coop., Inc.*, 278 S.W.3d 536, 548-549 (Tex. App.—Austin 2009, no pet.) (citing *Bloyed*, 916 S.W.2d at 955) ("The Texas Supreme Court has provided six factors that a trial court must take into account when determining whether a proposed class settlement is fair, adequate, and reasonable."); *Johnson v. Scott*, 113 S.W.3d 366, 371 (Tex. App.—Beaumont 2003, pet. dism'd) (same); *see also Rocker v. Centex Corp.*, 377

S.W.3d 907, 913 (Tex. App.—Dallas 2012, judgm't vacated pursuant to settlement by *Rocker v. Centex Corp.*, No. 12-0797, 2012 Tex. LEXIS 1015 (Tex. Nov. 30, 2012)) (same).

As discussed above, the standard for this hearing's determination is whether the Second Amended Settlement Agreement and Supplement are "within the range of possible approval." MANUAL FOR COMPLEX LITIGATION § 21.632, 321 and n. 976; *City of Greenville*, 2012 U.S. Dist. LEXIS 74305 at *11—12.. Accordingly, the *Ball/Bloyed* factors are not applicable at this time. *Bloyed*, 916 S.W.2d at 954. However, whether viewed through the lens of preliminary approval or the ultimate fairness inquiry, the Settlement Agreement and Supplement are fair and adequate.

### 1.    There is no evidence of collusion

The settlement was the product of serious, arm's-length negotiations between the State and Farmers over an extended period of time after a great deal of discovery and conducted by competent counsel. The Court has previously found that there was "not . . . a scintilla of evidence of collusion." Ex. 5, 5 RR 48. Not only that but the Supplement was a product of mediation before an impartial third party, former Judge Patrick Keel, at the suggestion of this Court. All intervenors (except Grigson, who refused to attend) accepted the parties' open invitation to participate in the mediation, and all who attended expressed satisfaction with the additional recovery and accommodations in the Supplement.

### 2.    The complex issues presented would undoubtedly result in protracted litigation if not settled

The decade-long appellate process to determine issues relating to this settlement agreement—itself the product of years of investigation and legal battles on multiple fronts—is the best evidence of the complexity and uncertainty of litigating this complex of related cases to conclusion. The vast and hotly contested discovery disputes related to the settlement agreement

are only a taste of what would follow if the merits were to be litigated. Not only is this litigation unavoidably complex and inevitably protracted, but the practical stakes are enormous, with over one million policyholders affected by the litigation.

By settling the litigation, the parties will conserve substantial time and expense if the cases were to go forward, and the class members will receive relief much sooner than would be possible with further drawn-out litigation. In fact, if this Settlement were not approved and litigation were to continue, the policyholders may—and in Farmers' view would—recover nothing.

### 3. The facts and legal theories were sufficiently developed to permit a proper analysis of the settlement terms

As the Court heard and considered in preliminarily approving the 2003 Settlement Agreement, Farmers has produced thousands of pages of documents both formally and informally to the State in connection with the CIDs, the Market Conduct Examination, and other discovery requests. These documents included a number of highly confidential materials from which the State could evaluate the strength of its case against Farmers. Further, the State interviewed Farmers' representatives both for further information in connection with the Market Conduct Examination and in connection with the Settlement Agreement. The State had ample information from which to make informed decisions about the strength of its claims.[14] The Intervenors, including Intervenor Grigson's current counsel, were also afforded substantial opportunity for discovery during the 2003 preliminary approval process. Even now, with the unusual benefit of twelve years of time to reflect on it, the State and the Attorney General have

---

[14] The Court should consider the entire context of the parties' controversy, especially when considering that the State began its investigation—with the attendant powers to compel discovery—in late 2001. *Compare Bloyed*, 916 S.W.2d 949 (case had been pending for nine months and trial court agreed that sufficient discovery and case development had occurred to evaluate settlement).

reaffirmed the deal they made in 2003, believing it to be fully informed and in the best interests of the policyholders.

4. **There is a significant chance that the State will be unable to establish liability or damages**

As explained above, the settlement terms are generous; they should be considered even more so when the Court weighs into the fairness equation the fact that it is highly questionable whether either liability or damages could be established. First, there are serious questions as to a number of critical issues, including: (i) whether the State has the authority to examine, regulate, and/or enjoin the rate practices enumerated in the cease and desist Order and in the administrative proceedings; (ii) whether Farmers made any misrepresentations to its insureds; (iii) whether any policyholders relied to their detriment upon any alleged misrepresentations; (iv) whether any action of Farmers was a producing cause of damages to any policyholder; (v) whether any policyholders could prove damages (or at least damages in any significant amount) as a result of an unlawful practice as opposed to universal changes in the marketplace; and (vi) whether any cause of action for unfair discrimination lies under the facts alleged.

5. **The Settlement Agreement actually exceeds the anticipated recovery, considering the highly uncertain nature of liability and the damages sought**

In its review of the fairness of the proposed settlement, the Court has already considered (i) the risks of establishing liability and damages, and (ii) the range of reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation. *In Re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 317 (3d Cir. 1998). The purpose of this inquiry is to balance the likelihood of success on the merits and the potential damage award if the case were taken to trial against the benefits of an immediate settlement. *Id.* at 319.

Here, Farmers believes that the issues of liability would likely have been disposed of as a matter of law because the practices underlying the claims were not unlawful and that the magnitude of the Settlement Agreement is attributable not to the legal or factual merit of the claims, but rather to a confluence of myriad political, media, and litigation pressures that threatened Farmers' ability to remain in the Texas homeowners' marketplace. The State agrees that the benefits to the class members of the settlement exceeds the risks of continued litigation.

**6.      The opinions of experienced counsel confirm the fairness of the settlement to the class members**

Both representatives and counsel for the State and Farmers support the Second Amended Settlement Agreement and Supplement as a fair and appropriate way to resolve what will otherwise become protracted litigation. There does not appear to be any dispute that counsel for both sides are experienced with complex litigation and in a position to evaluate the objective fairness of the proposal. Further, counsel for the State prepared a detailed and comprehensive evaluation of the strengths and weaknesses of the claims and issues, explaining why the State supported the Settlement Agreement from the outset. *See generally* Ex. 4, Mattax Letter.

In sum, the Second Amended Settlement Agreement and Supplement that this Court is asked to preliminarily approve are the result of the parties' serious and arms' length discussions, and they continue to represent a number of hard-fought compromises that are designed to benefit Farmers' insureds in Texas. As the Court can see from the terms of the parties' agreement, the settlement falls easily within the range of possible approval as is necessary for notice to be provided to Farmers' insureds and for this litigation to proceed—at last—to a fairness hearing to grant final approval and implement the settlement.

## III.    The Court Should Approve the Class Notice

The proposed order requires class notice to be disseminated via direct mail to the class members' most recent addresses in Farmers' records.  In addition, the State and Farmers will disseminate a Summary Notice of Settlement in the form attached as Exhibit C to Exhibit 1, by posting it on their respective websites—www.farmers.com, www.oag.state.tx.us, www.tdi.state.tx.us, and www.TexasFarmersSettlement.com—beginning as soon as practicable after the Court's entry of the Order of Preliminary Approval and continuing through the date of the fairness hearing.  The Summary Notice will also be made available on the respective websites, and the Settlement Agreement itself will be posted on TDI's website.  *See, e.g.*, *Peters*, 65 S.W.3d at 308 (finding notice to be sufficient where it directed class members to website with full copy of the settlement agreement and informed them of their right to opt out and the consequences of not doing so).  And, as part of the latest round of negotiations, both the Class Notice and Summary Notice have been converted into a more modern, "plain language" format and wording to make the terms of the Settlement more understandable to the Settlement Class members.

The form of notice is reasonably calculated to apprise members of the Settlement Classes of the terms and conditions of the Settlement Agreement, the background of the litigation and the nature of these proceedings, the nature of the claims asserted and the proposed release, the identity of class counsel, and the rights and responsibilities of class members.  The notice need only be the best notice practicable under the circumstances.  *Peters*, 65 S.W.3d at 308 ("[T]he notice must 'contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.'" (quoting *In re Nissan Motor Corp. Antitrust Litig.*, 552

F.2d 1088, 1105 (5th Cir. 1977)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 355 n.22 (1978) (speaks favorably of the use of second-class mail to provide notice to class members). It also affords sufficient time for the class members to prepare to appear at the final approval hearing and present any objections to the Settlement Agreement they may have. Finally, the notice fulfills the requirement of neutrality in class notices. *See* 3 NEWBERG ON CLASS ACTIONS § 8.39. It summarizes the pertinent information in an informative and coherent manner and makes clear that the settlement does not constitute an admission of liability by Farmers. It further provides instruction about how to opt out of the class or raise objections at the fairness hearing. Accordingly, the notice complies with the standards of fairness, completeness, and neutrality required of a combined settlement-certification class notice disseminated under the authority of the Court. *Id.* §§ 8.21 & 8.39.

## CONCLUSION AND PRAYER

For these reasons, the State of Texas and the Farmers Parties jointly request that the Court:

(1)     grant preliminary approval of the Second Amended Settlement Agreement and Supplement for the purpose of providing notice to the Settlement Classes of the terms of the Second Amended Settlement Agreement and Supplement and the date of the fairness hearing before the Court when a final determination of the adequacy and fairness of the Second Amended Settlement Agreement and Supplement will be made;

(2)     approve the notice to be sent to the class members; and

(3)     grant such other and further relief to which the State and Farmers are entitled.

Dated: March 6, 2015.

Respectfully submitted,

**OFFICE OF THE ATTORNEY GENERAL
OF TEXAS**

_____

JOSHUA GODBEY
Assistant Attorney General
State Bar No. 24049996
JAMES R. WENZEL
Assistant Attorney General, Consumer
Protection Division
State Bar No. 21179370
P.O. Box 12548
209 West 14th Street
Austin, Texas 78711-2548

56120560

NORTON ROSE FULBRIGHT US LLP

_[signature]_
_____

RICHARD N. CARRELL
State Bar No. 03871000
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: 713-651-5151
Telecopier: 713-651-5246

M. SCOTT INCERTO
State Bar No. 10388950
98 San Jacinto Blvd., Suite 1100
Austin, Texas 78701
Telephone: 512-474-5201
Telecopier: 512-536-4598

ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP

Marcy Hogan Greer
State Bar No. 08417650
515 Congress Ave., Suite 2350
Austin, Texas 78701
Telephone: 512-482-9300
Telecopier: 512-482-9303

**Attorneys for Defendants Fire Underwriters
Association, Farmers Group, Inc., Farmers
Underwriters Association, Farmers Insurance
Exchange, Fire Insurance Exchange, Texas
Farmers Insurance Company, Mid-Century
Insurance Company of Texas, Mid-Century
Insurance Company, Farmers Texas County
Mutual Insurance Company, Truck
Insurance Exchange, and Truck Underwriters
Association**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served on the following counsel of record on this the 6th day of March, 2015, via certified mail, return receipt requested, and via e-mail:

Joseph C. Blanks
P.O. Box 999
Doucette, TX 75942
blanxlex@gmail.com

Joe K. Longley
Philip K. Maxwell
1609 Shoal Creek Blvd. # 100
Austin, TX 78701

Michael J. Woods
8620 N. New Braunfels, Ste. 522
San Antonio, TX 78217

_____*/s/ M. Scott Incerto*_____
M. Scott Incerto

56120560

# EXHIBIT 15

**TO APPELLANT GRIGSON'S RESPONSE TO APPELLEES' JOINT MOTION TO DISMISS APPEAL FOR LACK OF APPELLATE JURISDICTION**

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-03-00374-CV

---

### Jan Lubin, Gilberto Villanueva, and Michael Paladino, Appellants

### v.

### Farmers Group, Inc.; Farmer Underwriters Association; Fire Underwriters Association;

### Farmers Insurance Exchange; Fire Insurance Exchange; Texas Farmers Insurance Company, Mid-Century Insurance Company of Texas; Mid-Century Insurance

### Company; et al, Appellees

---

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

## NO. GV202501, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

---

## O R D E R

**PER CURIAM**

Appellants seek an emergency stay of the sending of notices to the class preliminarily certified below by the district court until this Court rules in this interlocutory appeal. Because the district court's preliminary certification of a settlement-only class will cause immediate, significant and potentially irreparable effects in this case and to prevent interference or impairment with this Court's jurisdiction or the effectiveness of any appellate relief we may subsequently grant, the Order of Preliminary Approval, signed by the district court on June 27, 2003, is hereby stayed in all respects until further order of this Court.

It is ordered on this the 7th day of July, 2003.

Before Justices B. A. Smith, Yeakel and Puryear